UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE,<br>　　　　*Plaintiff,*<br>　　　　*v.*<br>QUINNIPIAC UNIVERSITY, TERRI JOHNSON,<br>AND SEANN KALAGHER,<br>　　　　*Defendants.* | Civil No. 3:17cv364 (JBA)<br><br><br>March 31, 2017 |

**RULING DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff John Doe filed this action against Defendants Quinnipiac University ("QU" or the "University"), Terri Johnson and Seann Kalagher on March 2, 2017 alleging violations of Title IX against QU on the basis of erroneous outcome (Count One), selective enforcement (Count Two) and deliberate indifference (Count Three), as well as breach of contract (Count Four) and breach of the covenant of good faith and fair dealing (Count Five). Additionally, he brings a claim of tortious interference with contract against Defendants Johnson and Kalagher (Count Six). Simultaneously, Plaintiff filed a Motion [Doc. # 2] for Temporary Restraining Order and for Preliminary Injunction ("Mot. for TRO/PI") "restraining Quinnipiac from holding a Hearing in a pending disciplinary proceeding against Plaintiff until such time as it can properly investigate the underlying claims and prepare an unbiased and adequate report for the Hearing Committee." (Pl.'s Mot. for TRO/PI at 1.) The Court denied [Doc. # 22] Plaintiff's Motion for TRO as moot on consent with QU's agreement to postpone the hearing scheduled for the next day, March 3, 2017 so the parties could brief and be heard on Plaintiffs' Motion for a Preliminary Injunction. Argument on the Motion for Preliminary Injunction was held March 8, 2017. For the following reasons, Plaintiff's Motion is denied and the Hearing may proceed forthwith.

## I. Background

### A. Complaints Against Plaintiff: The Investigation and Plaintiff's Response

Plaintiff is currently a student at QU involved in a Title IX disciplinary investigation (the "Investigation") which was initiated in June 2016 when a female student at the University, Jane Roe, filed a formal complaint against him alleging Intimate Partner Violence, Assault, Breach of Peace, Disturbing the Peace and Property Damage. (Compl. ¶¶ 1, 3.) According to Plaintiff, Roe brought this complaint against him one hour after he broke up with her following an 18-month on-and-off relationship and after Jane Roe "among others things, begged John Doe to see her; went to John Doe's home unannounced; went in to his home searching for John Doe; refused to leave when John Doe asked her to do so, thus forcing John Doe to leave his home; and fell asleep in John Doe's bed waiting for him to get home. Jane Roe continually texted John Doe and wrote that if he did not see her, he left her 'no option.'" (*Id.* ¶ 1.) One hour before she filed a complaint, Plaintiff alleges that she threatened, "I will make sure you can never go near me again." (*Id.*)

As required by QU's Title IX Policy Against Gender-based Discrimination and Sexual Misconduct, the Deputy Title IX Coordinator, Seann Kalagher appointed three impartial investigators (the "Investigators") from different areas of the University to conduct the Investigation. (*See* Ex. A (Title IX Policy) to Def.'s Objection to Pl.'s Mot. for TRO/PI ("Def.'s Opp'n") at 15). During the Investigation, the Investigators interviewed a multitude of witnesses, including Plaintiff. (*See* Ex. B (Letter from Terri Johnson dated February 24, 2017) to Def.'s Opp'n). After Jane Roe 2, Jane Roe's sorority sister and a former girlfriend of Plaintiff, was interviewed, QU chose to undertake an investigation into her allegations as well and filed a formal complaint on Jane Roe 2's behalf. (Compl. ¶ 2). Plaintiff "told QU investigators that Jane Roe and Jane Roe 2

were both hurt that he had broken up with each of them and both had stalked and harassed him during their relationships." (*Id.*)

In October 2016, the Investigators issued a 250-page investigative report (the "Report" or the "Investigation Report"), which they gave to Plaintiff at a meeting, marking the first time Plaintiff had seen the evidence against him. (*Id.* ¶ 3.) The Report found that there was "sufficient information to conclude there may have been violations of the Title IX policy and student code of conduct" including all of the charges alleged by Jane Roe (Intimate Partner Violence, Assault, Breach of Peace, Disturbing the Peace and Property Damage).[1] (Ex. 1 (Investigation Report) [Doc. # 11] to Compl. at 4.) The Investigators recommended that Plaintiff be suspended for a year if he accepted their findings.[2] (Compl. ¶ 3.) Plaintiff alleges that in reading the Investigation Report

> he learned that QU did not follow Title IX's and QU's own policies and procedures in conducting the Investigation and in fact acted in direct contradiction of its own procedures, [treating] the two women complainants more favorably than John Doe because he is male, thereby discriminating against him based on sex in violation of Title IX. For example, the interviews were one-sided and included hearsay. The investigators completely ignored the evidence of stalking, harassment and assault by . . . Jane Roe and Jane Roe 2 against John Doe and never investigated or questioned the complainants about that evidence, ignored allegations that Jane Roe violated the confidentiality surrounding the investigation and the No Contact Order that issued against her, and provided benefits for Jane Roe and Jane Roe 2 but not for John Doe.

(*Id.* ¶ 4.)

Plaintiff had the opportunity to submit a response to challenge any information and documents, which he did (the "Response"), providing significantly more details and additional

---

[1] With regard to Jane Roe 2, the Report finds that Plaintiff may have breached all of the same provisions as with Jane Roe except it does not include assault.

[2] This is not disputed, although it does not appear to be included in the Report itself.

evidence supporting his version of events and identifying what he saw as the problems with the Investigation to date. (*Id.* ¶ 5.) At his request, QU accommodated Plaintiff's ADHD condition by providing him additional time to submit this Response. (Ex. B to Def.'s Opp'n at 2.) Although acknowledging Plaintiff's allegations of stalking and harassment against Roe and Roe 2, no one re-interviewed either woman regarding Plaintiff's claims about their behavior or investigated his side of the story.[3]

### B.  The Title IX Grievance Hearing[4]

The Title IX Grievance Committee (the "Committee") consists of three University staff members trained annually on Title IX issues. (Amended Ex. A ("Ex. A") [Doc. # 25] (QU Title IX Policy Against Gender-based Discrimination and Sexual Misconduct) to Def.'s Opp'n at 16.)

According to QU's Policy:

> The deputy Title IX coordinator for student affairs will convene the Title IX Grievance Committee (committee) to conduct a hearing once charges have been assigned following an investigation, and the accused student has not accepted responsibility or has not accepted the investigator's proposed sanction. The committee is responsible for determining whether it is more likely than not that the

---

[3] Under its Title IX Policy, QU will undertake an investigation on a student's behalf when appropriate. (Ex. A to Def.'s Opp'n at 15.) At no time did the investigators find it appropriate to file a formal complaint on Plaintiff's behalf against Jane Roe or Jane Roe 2. (*Id.*) The Investigators, however, found reasonable grounds to proceed with a Title IX Grievance Hearing (the "Hearing") against Plaintiff. (*Id.*) Plaintiff, in the week before Oral Argument on his Preliminary Injunction Motion, formally filed complaints against Jane Roe and Jane Roe 2. Investigations of those complaints will follow a separate schedule.

[4] At Plaintiff's request, the Hearing was not scheduled during his first semester final exams and was instead scheduled for the beginning of the second semester. (Ex. B to Def.'s Opp'n at 2.) Plaintiff then asked that it be rescheduled to avoid the beginning of classes, and QU complied, moving the hearing to February 8, 2017. (*Id.*) Finally the Hearing was once more postponed at Plaintiff's request due to a conflict with his class schedule and re-scheduled for March 3, 2017. (*Id.*) When his request for another postponement was denied, he commenced this action.

accused individual violated the Student Code of Conduct. If the accused student is found responsible, the committee shall assign appropriate sanctions in accordance with this policy and the Student Code of Conduct process. The goal of the hearing is to provide a resolution through an equitable process, respecting the rights of all participants.

(*Id.*)

It appears that the Committee relies primarily on the Investigation Report in making its determination. (*See id.* ("the hearing script ensures . . . the investigator will present the results and findings of the investigation.").) However, Plaintiff is given an opportunity to challenge information and documents prior to the Hearing, which he did in the form of his voluminous Response–including screenshots of text messages, print outs of emails and other concrete evidence that may tend to undermine the hearsay contained in the Investigation Report. (Ex. A to Def.'s Opp'n at 14.) The parties agree Plaintiff's Response will also be provided to the Committee, although this procedure is not made clear in the text of QU's Policy. Although the Committee might ask questions of Plaintiff if they so choose, beyond Plaintiff's Response, Plaintiff is not guaranteed any opportunity to speak.[5] (*Id.* at 17-18.) The Committee deliberates privately after "conclusion of the investigation presentation and questioning" to decide, by majority, whether the accused student is responsible for the charged conduct code violations, after which there is a sanctions phase if any such violations are found. (*Id.* at 18.) Like the first phase, any sanctions imposed must be by a majority of the Committee, again after private deliberation. (*Id.*)

---

[5] Pursuant to QU's hearing script, Plaintiff, as the accused student, is provided an opportunity to plead "responsible," "not responsible," or decline to make a plea, for each conduct code charge. (*Id.* at 18.) At the sanctions phase the Committee will accept a verbal or written impact statement from Plaintiff. (*Id.*) These are the only two instances where Plaintiff will speak at the Hearing itself except to respond to any questions from the Committee.

### C.      Plaintiff Challenges the Fairness of the Investigation

At some point after submitting his Response Plaintiff requested that Associate Vice President of Operations and Title IX Coordinator, Defendant Terri Johnson, who manages QU's compliance with Title IX, review the Investigation that was performed by the Investigators and postpone the Hearing until such underlying review was completed, as he claimed the Investigation was untimely, biased and in violation of the ADA. (Compl. ¶ 6.) The Title IX Coordinator reviewed Plaintiff's contentions, as well as the Investigation performed by the Investigators and found that the Investigation was timely, adequate, and fair. (Compl. ¶ 6; Ex. B to Def.'s Opp'n). Ms. Johnson indicated that there would not be another investigation performed as Plaintiff had requested and that the Hearing "will remain as scheduled and take place on March 3, 2017."[6] (Compl. ¶ 6.)

Plaintiff's primary concern with the Investigation is that by not investigating his side of the events in question, he has been denied the opportunity to adequately defend himself against the most serious charge, intimate partner violence. QU's policy divides this charge of sexual misconduct into two specific categories–"relationship violence" and "stalking." (Ex. A to Def.'s Opp'n at 11.) "Relationship violence" is defined as "a pattern of behavior in an intimate

---

[6] According to Defendants, on February 27, Plaintiff requested the Hearing scheduled for March 3, 2017 be postponed. (Def.'s Opp'n at 3.) Before every hearing, the Deputy Title IX Coordinator assigns three members of the University staff trained in Title IX issues to the Title IX Grievance Committee to conduct the hearing. (Ex. A to *Id.* at 16). Plaintiff complained that there was a conflict of interest because one of the assigned members reported to the Deputy Title IX Coordinator, Assistant Dean Seann Kalagher. That same day, Plaintiff was re-assured that there was no conflict because the assigned Grievance Committee member had no prior involvement with the plaintiff and also Seann Kalagher did not have any involvement in the decision-making process at the hearing. (*See* Ex. C (Email dated February 27, 2017) to *Id.*) On February 28, 2017, the plaintiff was informed that his request to postpone the Hearing was denied and that it would proceed as scheduled on March 3, 2017. (*See* Ex. D (Letter dated February 28, 2017) to *Id.*)

relationship that is used to establish power and control over another person through fear and intimidation." (*Id.*) Plaintiff argues evidence of Roe and Roe 2's behavior demonstrating lack of such fear and intimidation constitutes his primary defense. He alleges that despite four months of investigation including interviewing many witnesses regarding Jane Roe's and Jane Roe 2's complaints, "[a]t no point since the Investigation began has anyone from QU even spoken to Jane Roe or Jane Roe 2 about – much less investigated – John Doe's side of the events and allegations concerning their stalking and harassment." (*Id.* ¶ 7.)[7]

Plaintiff has just over two months before his classes end and he should graduate. (*Id.* ¶ 10.) Since the Investigation began in 2016, QU addressed any safety concerns by issuing a mutual No Contact Order ("NCO") between John Doe and Jane Roe and one particular witness. John Doe has abided by that order. (*Id.*) Jane Roe and John Doe have co-existed at QU since their breakup in June 2016 with no problems other than John Doe's complaints that Jane Roe breached the confidentiality of the process and the NCO. Jane Roe 2 resides in Boston. (*Id.*)

The day prior to the scheduled Hearing, on March 2, 2017, the plaintiff filed his Motion for Temporary Restraining Order asking this Court to require QU to "postpone the Hearing and conduct an independent and unbiased investigation that complies with Title IX and QU's Publications." (Pl.'s Mot. for TRO at 36.)

---

[7] Plaintiff also alleges that QU has repeatedly denied John Doe's requests to keep confidential certain highly sensitive and personal information regarding his psychological issues and disabilities, as well as HIPPA-protected medical information. (*Id.* ¶ 7.) He requested it be given only to the Hearing Committee as it provides some context for the events in the investigation, but QU insists that information must also be provided to the complainants, one of whom has been harassing him in public through her friends. (*Id.*)

## II. Discussion

### A. Legal Standard

A party who seeks a TRO must make the same showing that is required for a preliminary injunction. *Proctor & Gamble Co. v. Cheesborough-Pond's, Inc.*, 747 F.2d 114, 118 (2d Cir. 1984). "[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990). Generally, a party seeking a preliminary injunction must show (1) "a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor"; and (4) that the "public interest would not be disserved" by the issuance of an injunction. *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (alterations and internal quotation marks omitted).

### B. No Preliminary Injunction is Warranted Because Plaintiff Does not Demonstrate Irreparable Harm

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948, at 431 (1973)). The Second Circuit has defined irreparable harm "as certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("Irreparable harm is an injury that is not remote

or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation.") (internal quotation marks and citations omitted).

A plaintiff must connect future harm to the absence of an injunction (i.e., show that he or she will be irreparably harmed if the Court does not grant the requested preliminary injunction). *See e.g.*, *Salinger*, 607 F.3d at 79–80; *Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07CV1562(ERK)(RML), 2008 WL 207843, at *6 (E.D.N.Y. Jan. 24, 2008), *order aff'd and remanded sub nom. Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 282 F. App'x 885 (2d Cir. 2008) ("the injunction must prevent or remedy the harm."). The Second Circuit has held that a party seeking a preliminary injunction must establish more than a mere "possibility" of irreparable harm. Rather, it must show that irreparable harm is "likely" to occur. *See JSG Trading Corp.*, 917 F.2d at 79.

Plaintiff essentially identifies two different harms he contends are irreparable absent issuance of an injunction: emotional distress and violation of his constitutional right not to be discriminated against based on his gender.[8] Defendant argues that until the Hearing is completed

---

[8] Plaintiff makes two additional arguments that merit little discussion. First, he asserts that his grades have suffered as a result of the significant time he already spent over winter break preparing his Response and will continue to suffer should he be required to spend more time preparing for the Hearing itself. Plaintiff then concludes with his personal view that this will affect his future educational and employment opportunities. Second, he claims that he would not have suffered the continued harassment by Jane Roe's friends had the investigation been conducted fairly and his first complaints about the harassment and violations of the NCO been addressed. To the extent that these arguments implicate harm that Plaintiff has already suffered in the past, any injunction regarding the Hearing would not remedy or prevent that harm and therefore they have no bearing on the Court's limited determination. Additionally, any link between an allegedly unfair Hearing, as opposed to the Hearing under any circumstances, and future harm to his grades is entirely speculative. Furthermore, insofar as Plaintiff claims the loss of educational or employment opportunities, his failure to present any evidence of an actual lost opportunity precludes finding irreparable harm on that basis.

there can be no irreparable harm, since no discipline has yet been imposed. Plaintiff acknowledges he found no cases where a court granted a preliminary injunction or temporary restraining order enjoining a disciplinary hearing, but argues such action is required here because the irreparable harm focuses not on potential discipline, but on having to go through the purportedly unfair Hearing, whether Plaintiff is found responsible or not.

### i.   Plaintiff's Claimed Future Extreme Emotional Injury is Speculative

Plaintiff principally focuses on his argument that he will be irreparably emotionally harmed if the Hearing goes forward because the Investigation favored the female complainants over him "by refusing to . . . investigate [his] defense that includes allegations of stalking and harassment against the female complainants," or to investigate his initial complaints about Jane Roe's breaches of confidentiality and the No Contact Order. (Pl.'s Mot. for TRO at 10.)

Plaintiff proffers a letter dated February 6, 2017 from his psychiatrist, Dr. Jerome H. Liebowitz, M.D., who has treated him for his anxiety and Attention-Deficit/Hyperactivity Disorder (ADHD) on and off since 2004 as evidence of the irreparable harm Plaintiff will suffer if subjected to this allegedly biased and unfair Hearing. The letter states in part:

> It is my professional opinion that the current investigation process has been detrimental to [Plaintiff's] emotional health and well-being, causing extreme stress and anxiety, in large part because he feels it has been very biased and he is not being given a fair hearing. It is my opinion that the investigation itself has been traumatic for [Plaintiff]–and a hearing under these circumstances could set off a downward spiral of anxiety and depression of a magnitude he has never had to deal with.

(Ex. 5 (Letter from Dr. Liebowitz) [Doc. # 13] to Compl. at 2.) Plaintiff, presuming such injury, claims that "[n]o one can know the long-term effect of this [downward spiral], but it can never be undone." (Pl.'s Mot. for TRO at 11.)

Dr. Liebowitz's opinion about the degree and nature of emotional harm to his patient if required to participate in the Hearing following the trauma of the Investigation is speculative. His opinion that "a hearing under these circumstances *could* set off a downward spiral . . ." does not use the probative formulation of an opinion based on a reasonable degree of medical certainty that Plaintiff will suffer this harm from the Hearing occurring "under these circumstances." (Ex. 5 to Compl. at 2 (emphasis added).) Dr. Liebowitz goes on to state that if the Hearing proceeds, certain accommodations should be provided Plaintiff. (*Id.* at 2.) He does not distinguish Plaintiff's circumstances from the inherent trauma of an investigation for a patient with Plaintiff's history and the emotional stress of a hearing on such serious charges, focusing instead on the detriment to Plaintiff caused "in large part" by Plaintiff's feelings of a biased process and an unfair Hearing. Nor does Dr. Liebowitz offer any opinion that a Hearing following the additional investigation Plaintiff seeks would be materially different if the same potential for suspension loomed.

The Court is unpersuaded that Plaintiff has demonstrated that the injunction he seeks will remedy or relieve the injury he claims if the Hearing is held under the current circumstances.

### ii.    *Plaintiff has not Demonstrated Presumptive Irreparable Harm*

Plaintiff asserts that he will experience continued gender discrimination if the Hearing proceeds under the current circumstances, that Title IX confers upon him the constitutional right to be free from gender discrimination, and that possible violation of this right presumptively shows

irreparable harm.[9]  He relies on *Able v. United States*, 847 F. Supp. 1038, 1043 (E.D.N.Y. 1994),[10] which in turn relies on Second Circuit cases relating to violation of prisoners' rights and articulating the principle that irreparable harm may be presumed from circumstances showing risk of impairment to constitutional rights. *See Mitchell v. Cuomo* 748 F.2d 804 (2d Cir. 1984); *Covino v. Patrissi*, 967 F.2d 73 (2d Cir. 1992). *Mitchell* held that "[g]iven the evidence of increasing overcrowding in the state system and its potentially dangerous consequences, which constitute the alleged threat to plaintiffs' eighth amendment rights . . . no further showing of irreparable injury is necessary." 748 F.2d at 806. Similarly, in *Covino*, the court, citing *Mitchell*, found that "given the fundamental right involved, namely, the right to be free from unreasonable searches . . . [the

---

[9] Plaintiff contends that because the University receives federal funding, Title IX places it in the same shoes as a public actor and therefore the nature of Plaintiff's right is constitutional despite being statutorily derived. The Ninth Circuit has found that violation of a civil rights statute gives rise to a presumption of irreparable injury for purposes of a preliminary injunction. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001). Defendants do not address whether a Title IX violation can constitute a constitutional violation by QU and the Court need not reach this issue because Plaintiff has not presented sufficient facts at this stage to demonstrate violation of his statutory rights.

[10] In *Able* the plaintiffs sought an order enjoining the defendants United States and Secretary of Defense from enforcing an Act already in effect, which the plaintiffs argued violated their constitutional rights to equal protection and free speech. *Id.* at 1041. The Act in question, as interpreted by the Secretary, treated "any statement of homosexual orientation wherever and whenever made in the past and to whatever person, even a statement to this court, as proof of an intent to engage in homosexual acts" despite having an "avowed policy . . . that not 'homosexual orientation' but only homosexual 'conduct' is a 'bar' to service." *Id.* at 1040-41. The district court therefore found that preliminarily enjoining the defendants' further enforcement of the Act protected the plaintiffs' continued right to exercise their right to speak, i.e. to declare themselves to be homosexuals, in order to proceed with their case.

plaintiff] has sufficiently demonstrated for preliminary injunction purposes that he may suffer irreparable harm arising from a possible deprivation of his constitutional rights." 967 F.2d at 77.[11]

In a different context the Supreme Court recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," but did so based on a determination that it was "clear . . . that First Amendment interests were either threatened or in fact being impaired at the time relief was sought." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). However, more than a mere allegation of constitutional violation is required for irreparable harm to be presumed. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) ("[T]his court has construed *Elrod* to require movants to do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong of the preliminary injunction frame-work"). Thus, "the constitutional deprivation [must be]

---

[11] In *Jolly v. Coughlin,* the court, relying on *Mitchell* and *Covino*, stated "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm." 76 F.3d 468, 482 (2d Cir. 1996) (emphasis in original). Both *Mitchell* and *Covino* based their findings of irreparable harm on the applicant's demonstration of imminent threatened constitutional violation under the circumstances absent an injunction. *See Mitchell*, 748 F.2d at 806 ("Given the evidence of…"); *Covino*, 967 F.2d at 77 (The plaintiff "sufficiently demonstrated…"). In *Mitchell* it was undisputed that the Department of Correctional Service's plan to shut down the facility in which the plaintiffs were housed would result in their being transferred into already overcrowded prisons (filled to 116% of permanent capacity) in the face of evidence regarding the dangerous risks associated with overcrowding, namely potential increases in riots, death and injury. 748 F.2d at 805. In *Covino*, the plaintiff challenged as unconstitutional a policy permitting routine and random visual body-cavity searches, which he refused to undergo on two occasions and each time was administratively sanctioned and placed in "lock up" for several days. 967 F.2d at 76.

convincingly shown and that violation [must] carr[y] noncompensable damages."[12] *Donohue v. Paterson*, 715 F. Supp. 2d 306, 315 (N.D.N.Y. 2010); *see also Smith v. Fredrico*, No. 12-CV-04408 ADS ETB, 2013 WL 122954, at *6 (E.D.N.Y. Jan. 8, 2013).

Conversely, there is no presumption of irreparable harm where the plaintiff has not offered sufficient evidence for a court to conclude that there is a "clear," *Elrod*, 427 U.S. at 373, or "convincing" *Donohue*, 715 F. Supp. 2d at 315, threat of an "actual and imminent" constitutional violation, *Tom Doherty Assocs., Inc.*, 60 F.3d at 37. Here, Plaintiff's basic contention is that the Hearing itself, under the current circumstances, will cause him irreparable harm because QU (specifically the Committee, the decision making body at the Hearing) will discriminate against him on the basis of his sex in violation of Title IX because the Investigation Report was gender biased and unfair. However, his negative prediction is speculation and the record to date lacks any convincing evidence that the Hearing or its unknown outcome will likely violate his civil rights.

Plaintiff's argument that he will suffer either actual or presumed irreparable harm boils down to his complaints that the Investigation itself was biased and that the Report was so infused with that bias that it will inevitably prejudice the Hearing.[13] However, with respect to the Investigation, the Investigators included Plaintiff's allegations and versions of the events from his

---

[12] Defendant does not argue that Plaintiff's alleged civil rights violation may be adequately compensated by monetary award.

[13] With respect to the Investigation's bias, he asserts the following: the University was obligated under Title IX to investigate Roe and Roe 2 based upon evidence uncovered during the Investigation indicating sexual misconduct but did not; the Investigators did not re-interview Roe or Roe 2 regarding new  information and evidence Plaintiff brought up in his interview; the Investigators did not interview his parents despite interviewing Roe's mother; and the Investigators allowed both Roe and Roe 2 to review their statements before being included in the Report but not Plaintiff. (Ex. 2 to Compl. at 20-21.)

interview in their Report. (*See* Ex. 1 to Compl at 53-63.) Additionally, they interviewed witnesses identified by Plaintiff (Steven Aastrachan and Matthew Condon) and those interviews were included in the Report. The Investigators also attempted to contact the students (Eric Ross and Andie Ferreira) who lived above Plaintiff and who he claims to be his friends (Ex. 2 to Compl. at 8)) but they were not cooperative. (Investigation Report at 65.) Ross indicated that he would be willing to speak with Investigators if they followed up with him via e-mail, but then never responded when the Investigators did so. (*Id.*) Additionally, the Investigators attempted to contact Ferreira who was roomed with Ross but no replies were received to either e-mail or phone requests. (*Id.*) The Court is unpersuaded that Plaintiff's critique of the Investigation demonstrates it was so flawed and biased that the Hearing itself or its outcome, though drawing from the evidence recited in the Report, will likely be discriminatory in violation of Plaintiff's Title IX rights.

In terms of the role of the Committee and the Hearing, Plaintiff has not challenged the procedures governing the Hearing, the composition of the Committee, or the training of its members, as a basis for his claim that his Title IX rights are likely to be violated. At this point, there is no basis to infer a likelihood that the Committee will treat Plaintiff less favorably than "if gender roles were reversed and [Roe and Roe 2] were male." (Ex. 2 (Plaintiff's Response) to Compl. at 20.)

Significantly, the Committee is independent from the Investigators who conducted the Investigation and submitted the Report. The Committee is charged with the task of "determining whether it is more likely than not that the accused individual violated the Student Code of Conduct" (Ex. A to Def.'s Opp'n at 16) based upon their consideration of the Investigation Report, Plaintiff's Response, and any additional information obtained through questioning individuals at the Hearing. Importantly, the Policy provides that Plaintiff, as the accused student, has "[t]he right to a hearing outcome based on information presented during the hearing which the [C]ommittee

finds credible, relevant and convincing." (*Id.* at 14.) Thus, it is apparent that the Committee both has the authority to question the Investigation Report and is expected to weigh and assess the credibility of the evidence it contains.

The Committee will also consider Plaintiff's Response to the Investigation Report, containing 21 pages of his analysis and critique of the Investigation, as well as the attached exhibits which include audio files, photos, call records and copies of text messages relevant to his claims. (*See* Ex. A to Compl.) While Plaintiff notes that his Response submission is not incorporated into the Investigation Report and thus lacks equivalent standing, this does not effectively deny him the opportunity to present his defense, contrary to his contention. In fact, the Investigation Report includes the summary of Plaintiff's interview where he raises his defenses and describes his versions of the events at issue even though they were not separately investigated and corroborated in the way the Roe and Roe 2 allegations were. More importantly, Plaintiff has made no allegation nor offered any evidence that the Committee will likely give his Response less consideration than it would the Response of an accused female student and therefore the fact that his Response may not be on equal footing with the Report does not appear to bear on the question of whether Plaintiff will suffer discrimination on the basis of his sex at the Hearing.

Plaintiff's core complaints about the conduct of the Investigation may take on a greater significance in a fully developed record, after the Hearing outcome is known, such that a trier of fact could determine the existence of Investigator gender bias or Investigation flaws violative of Title IX.   Here, however, the Investigation Report itself, the interim actions reflected in the correspondence between the parties, and Plaintiff's Response, provide an insufficient basis for concluding that the Hearing process or outcome will likely violate Plaintiff's Title IX rights, requiring it to be enjoined and further postponed.

The Court concludes that Plaintiff has failed to present clear or convincing evidence that the Hearing he seeks to enjoin presents an actual and imminent threat of violating his civil rights by discriminating against him based upon his sex. Because there is insufficient evidence at this point to find that Plaintiff's civil rights are in imminent jeopardy should the Hearing proceed under the current circumstances, the Court concludes Plaintiff has failed to establish irreparable harm and thus is not entitled to preliminary injunctive relief.

### III. Conclusion

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction is DENIED and the Hearing may proceed forthwith.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 31st day of March 2017.

17