## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE, | ) | Civil Action |
| | ) | |
| Plaintiff, | ) | Case No. 3:17-cv-00364-JBA |
| | ) | |
| v. | ) | |
| | ) | |
| QUINNIPIAC UNIVERSITY, TERRI | ) | |
| JOHNSON, SEANN KALAGHER, | ) | |
| AND VINCENT CONTRUCCI | ) | |
| | ) | |
| Defendants. | ) | May 1, 2018 |

### SECOND AMENDED COMPLAINT

Plaintiff John Doe, a disabled male Hispanic formerly enrolled as a student at Defendant

Quinnipiac University ("QU" or "Defendant"), alleges as follows:

### INTRODUCTION

1.      This action seeks damages and injunctive relief based on the Defendants'

gender-based motivation and bias in investigating charges against, and imposing discipline on,

the Plaintiff.  John Doe was the subject of a disciplinary investigation (the "Investigation") at

QU that was initiated in June 2016.  The Investigation involved, among other things, charges

of intimate partner violence and assault. The complaining party, Jane Roe, brought a formal

complaint against John Doe one hour after he broke up with her following an 18-month, on-

and-off relationship. QU initiated a second complaint against John Doe based on information

provided by another former girlfriend, Jane Roe 2.  QU's investigation of both complaints was

deeply flawed and John Doe was denied the most rudimentary elements of fairness promised to

him by QU in its Policies and required by Title IX of the Education Amendments of 1972, 20

U.S.C. §1681, *et seq*. ("Title IX").  Over John Doe's objection, on April 21, 2017, a panel of

QU employees conducted a hearing and found John Doe responsible for the charges brought

against him, and a panel of QU employees denied John Doe's appeal.  John Doe has sustained substantial damages as a result of the Defendants' actions with respect to their handling and disposition of the charges asserted against him.

## THE PARTIES

2.      Plaintiff John Doe was a male student at Quinnipiac University from the fall of 2014 until his graduation in May of 2017.  John Doe was a business major and performed well academically at QU.

3.      Defendant Quinnipiac University is a private university of higher education located in Hamden, Connecticut. Quinnipiac University is the beneficiary of federal funds within the meaning of Title IX.

4.      Defendant Terri Johnson is, and at all times relevant to this Amended Complaint has been, employed by QU as its Associate Vice President of Operations and Title IX Coordinator.

5.      Defendant Seann Kalagher is, and at all times relevant to this Amended Complaint has been, employed by QU as its Associate Dean of Student Affairs and Deputy Title IX Coordinator for Students.

6.      Defendant Vincent Contrucci is, and at all times relevant to this Amended Complaint has been, employed by QU as its Director, Office of Community Service.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Plaintiff's claims arise out of QU's violation of a federal statute, Title IX, and Defendants' breach of contractual and other obligations to the Plaintiff.

8.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

9.      Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§2201 and 2202.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) in that the Plaintiff's claims arose in this District.

## GENERAL ALLEGATIONS

### General Requirements of Title IX

11.     Title IX is a comprehensive federal law that prohibits any federally-funded education program or activity, such as QU, from discriminating on the basis of sex. Title IX protects students from all forms of sex discrimination, including sexual harassment and gender discrimination.

12.     In 1975, the Department of Health, Education and Welfare, the predecessor to the United States Department of Education ("DOE"), adopted regulations interpreting Title IX. These regulations (the "Regulations") are codified at 34 C.F.R. Part 106. The DOE's Office for Civil Rights ("OCR") enforces Title IX.

13.     34 C.F.R. § 106.31(b) provides that an educational institution:

> shall not on the basis of sex, (1) treat one person differently from another in determining whether any such person satisfies any requirement or condition for the provision of such aid, benefit or service; (2) provide different aid, benefits or  service  or provide aid, benefits or service in a different manner; (3) deny any person any such aid, benefits or service; (4) subject any person to separate or different rules of behavior, sanctions, or other treatment.

3

14.     The OCR publishes updates and guidance to schools to assist in interpreting and complying with Title IX, including through its Title IX Resource Guides, its "Dear Colleague" letter, and its Question and Answers on Title IX, including on Sexual Harassment and Sexual Violence ("OCR Publications").  The OCR Publications require adherence to the following procedures to achieve compliance with Title IX:

a.     Upon receipt of a Title IX complaint, a school is required to take immediate and appropriate steps to investigate. OCR makes clear in its Dear Colleague letter of April 4, 2011 that in responding to these obligations, schools must conduct impartial and equitable investigations, and must take prompt and effective action to end any harassment, prevent its reoccurrence, and remedy its effect.

b.     A school's grievance procedures must include adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence.  The rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights. Procedures that ensure the Title IX rights of the complainant, while at the same time according any federally guaranteed due process to both parties involved, will lead to sound and supportable decisions.

c.     The Title IX coordinator is responsible for ensuring that Title IX complaints are processed appropriately, including coordinating the school's efforts to accept and appropriately respond to all complaints of sex discrimination.  The Title IX coordinator is generally in the best position to evaluate confidentiality requests in the context of providing a safe, nondiscriminatory environment.

d.     Title IX requires schools to respond promptly to a complaint and recommends 60 days within which to investigate, hold a hearing and decide which actions the school will take to remedy the situation, including imposing sanctions against the accused.

e.     Even if there is no complaint, when a school knows or should know of possible sexual misconduct, harassment, or gender discrimination, it is required to take immediate and appropriate steps to investigate that conduct or otherwise determine what occurred.  A school's failure to investigate and take prompt and effective corrective actions in such cases violates Title IX.  A school "should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

f.     Title IX requires a school to protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation, and these steps should be taken promptly once it has notice of an allegation.  If a school delays responding to allegations of sexual violence or responds

4

inappropriately, the school's own inaction may subject the student to a hostile environment.

g.      A school violates a student's rights under Title IX regarding student-on-student sexual violence when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program, i.e. creates a hostile environment; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.  This is the standard for seeking injunctive relief.

h.      A school's grievance procedures must include adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence.

### QU'S Contractual Obligations Under its Publications

15.      QU sets forth its policies regarding fairness, compliance with federal and state laws, student conduct complaints and its processes for student conduct, sexual misconduct and disability complaints in many publications, including its *Student Handbook* ("Handbook"), *Title IX Policy Against Gender-based Discrimination and Sexual Misconduct* ("Title IX Policy") and its *Guidelines and Procedures for Students with Disabilities* ("ADA Policy").  The Title IX Policy, the Handbook, and other related written documents (the "QU Publications") set forth QU's policy to comply with Title IX, and its grievance procedures for student conduct and sexual misconduct, including but not limited to the following:

a.      Quinnipiac University is committed to complying with Title IX and providing an educational, working and living environment free from gender or sex discrimination and sexual misconduct. Members of the university community, guests and visitors have a right to be free from sexual harassment, violence and gender-based discrimination and harassment.

b.      This policy will help to create an atmosphere in which allegations of discrimination or harassment are dealt with in a timely, private, fair and effective manner. These procedures are designed to provide a supportive process for individuals who report discrimination and to ensure a fair process for individuals who are accused of discriminatory conduct.

c.      A responsible employee is expected to report any incidents of sexual

violence, harassment or discrimination involving a student promptly to the University Title IX coordinator or deputy coordinator. Prompt reporting of such incidents makes investigation of the incident more effective and enhances the ability of the University to take action on a complaint.

       d.      Upon receiving a report, the University will respond promptly, equitably and thoroughly. In addition, the University will take steps to prevent the recurrence of the misconduct and correct its effects, if appropriate.

       e.      When a student, faculty or staff member, or other participant in the University's programs and activities feels that she or he has been subjected to discrimination on the basis of sex in any University program or activity, including without limitation being subjected to sexual harassment and sexual assault, she or he may contact the Title IX coordinator or utilize the Title IX grievance procedures to bring concerns forward for the purpose of obtaining a prompt and equitable resolution.

       f.      Title IX requires the University to investigate all incidents about which the University knows or has reason to know to protect the health and safety of the University community and the University will investigate issues raised anonymously or by third parties. Similarly, the University will undertake an investigation where appropriate even in cases where the alleged victim and/or complainant choose not to cooperate or participate.

       g.      The University Title IX coordinator has the authority to investigate allegations of discrimination prohibited by Title IX even absent the filing of a formal grievance, or after its subsequent withdrawal. The University has an obligation to the entire Quinnipiac community to take appropriate steps to prevent community members from being subjected to discrimination and sexual misconduct. As a result, there may be circumstances that will require the University Title IX coordinator to proceed with investigating a formal or informal grievance even if a complainant specifically requests that the matter not be pursued.

       h.      After reviewing the complaint, the deputy coordinator will. . . meet the complainant to inquire about and finalize complaint; and conduct an immediate initial investigation to determine if there is cause to proceed with further investigation.

       i.      Reported issues will be investigated and may be resolved through the appropriate grievance procedures and investigation and procedures will be conducted with due regard for the privacy of those involved. Only people who have a need to know about the issue will be informed, and materials and information prepared or acquired under Title IX procedures will be shared only as necessary with investigators, witnesses and other relevant parties.

       j.      A student who has been charged with a violation of the Student Code of Conduct is granted fundamental fairness in the form of the following rights as part of this process: Privacy—The right to have all records, files and proceedings kept

appropriately private. This policy will help to create an atmosphere in which allegations of discrimination or harassment are dealt with in a timely, private, fair and effective manner.

k.      Participants in an investigation have the right to: privacy, and the assurance that information regarding the complaint will be shared only with those necessary; the right to challenge information and documents prior to the hearing; an investigation and appropriate resolution of all credible complaints of sexual misconduct, gender-based discrimination and/or harassment made in good faith to the University; be treated with respect by University staff throughout the process; a hearing outcome based on information presented during the hearing which the committee finds credible, relevant and convincing; identify witnesses and other parties, and to request the deputy coordinator contact those individuals as part of the investigation; have a committee of mixed genders, to know the members of the committee ahead of time, and to address concerns of bias and/or conflict of interest in regard to committee members; review all documents and reports produced by the investigation, subject to limitations provided by law, as well as the names of all witnesses who may be called to provide statements to the committee, at least 24 hours prior to the hearing; be present and participate in the committee hearing; and be informed of the outcome and sanction of any committee hearing within 24 hours of a decision being rendered, and to receive that decision in writing.

l.      During the formal investigation, the deputy coordinator, or a trained lead investigator identified by the deputy coordinator will identify and select a trained investigator to assist with the formal investigation and complete the investigation in a timely manner, without unnecessary deviation from the intended timeline.

m.      A conduct officer will find a student responsible for a conduct code violation if the violation is shown by a preponderance of the information presented; that is, based on information that the conduct officer finds credible and convincing, it is more likely than not that the student is responsible for violating the Student Code of Conduct.

n.      Students who are witnesses to an incident or are involved in the same student conduct matter cannot serve as advisors.

o.      Completion of the investigation and grievance procedures should be complete within 60 days of the receipt of the complaint, oftentimes sooner. Should this process last longer than 60 days, the deputy coordinator will communicate the reasons and expected timeline to all parties.

p.      The Title IX Grievance Committee shall be composed of University staff members who are trained annually on Title IX issues, investigations and hearing practices.

q.      Retaliation against any person in the University community for alleging a violation of Title IX or for cooperating in any investigation, proceeding or hearing

relating to an alleged violation of Title IX is strictly prohibited and may result in disciplinary action, including additional interim or permanent measures. Any concerns regarding retaliation should be addressed immediately with the University Title IX coordinator or Deputy Coordinator.

16.     QU's Title IX Policy defines "Intimate Partner Relationship Violence" as "a pattern of behavior in an intimate relationship that is used to establish power and control over another person through fear and intimidation. A pattern of behavior is typically determined based on the repeated use of words and/or actions and inactions in order to demean, intimidate and/or control another person. This behavior can be verbal, emotional and/or physical. Examples include, but are not limited to: striking another person (slapping, punching, etc.), property damage, reckless behavior, name calling and insults, public humiliation, harassment directed toward friends and acquaintances, and verbal and/or physical threats."

17.     QU's Title IX Policy defines "stalking" as involving "any behaviors or activities occurring on more than one occasion that collectively instill fear and/or threaten a person's safety, or mental health and include, but are not limited to nonconsensual communications (i.e., face-to- face, telephone, email, social media), threatening or obscene gestures, surveillance or showing up outside the targeted individual's classroom, residence or workplace."

18.     QU's Title IX Policy defines "sexual harassment," in relevant part, as "unwelcome gender-based verbal or physical conduct that is the creation of a hostile environment, or retaliation, and includes but is not limited to . . . failure to accept the termination of a consensual relationship with repeated and persistent requests and behavior."

19.     The ADA Policy and certain of other of the QU Publications set forth QU's policy to comply with the Americans with Disabilities Act ("ADA") and its grievance procedures for discrimination based on disability, including but not limited to the following:

8

a.      "[QU] is committed to providing equal educational opportunities and full participation for students with disabilities."

b.      "No qualified student will be excluded from participation in any University program or be subject to any form of discrimination."

c.      "[QU] recognizes its obligation to comply with the Americans with Disabilities Act . . . [and that c]onsistent with its responsibilities, [QU] provides reasonable accommodations to promote equal educational opportunity."

d.      "The University provides reasonable accommodations to students with disabilities in order to reduce or eliminate any disadvantages that may exist because of disability."

e.      "Quinnipiac University through its dedicated offices has the responsibility to:

1. ensure that University courses, programs, services, activities, and facilities, when viewed in their entirety, are offered in the most integrated and appropriate setting.

2. provide information regarding policies and procedures to students with disabilities and assure its availability in accessible formats upon request.

3. evaluate students on their abilities, not their disabilities.

4. provide reasonable and appropriate accommodations, academic adjustments, and/or auxiliary aids for students with disabilities upon a timely request by students.

5. maintain appropriate confidentiality of records and communication concerning students with disabilities except where disclosure is required by law or authorized by the student.

More specifically, personnel in these dedicated offices have the responsibility to:

1. assist students with disabilities who self-identify and meet University criteria for eligibility to receive reasonable and appropriate accommodations, academic adjustments, and/or auxiliary aids determined on a case-by-case basis.

2. assure appropriate confidentiality of all information pertaining to a student's disability.

3.  assure that the students receive appropriate reasonable accommodations based on documentation of the disability.

4.  interact with the faculty, when appropriate.

5.  inform students with disabilities of University policies and procedures for filing a formal grievance."

f.      "Under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973, individuals with disabilities are guaranteed certain protections and rights of equal access to programs and services."

g.      "[QU] has a responsibility to maintain confidentiality of the evaluation and may not release any part of the documentation without the student's informed and written consent."

QU's ADA Policy sets forth the specific conditions covered by it, including ADHD and psychological disabilities, and rules and guidelines for requesting and receiving accommodations for disabilities.

## FACTUAL ALLEGATIONS

### The Context of Collegiate Investigations for Sexual Misconduct

20.     On April 4, 2011, the OCR issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague" letter. The Dear Colleague Letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX and its implementing regulations and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

21.     In the wake of the "Dear Colleague" letter, the OCR commenced numerous investigations against colleges and universities, with the underlying threat that those not in compliance might lose federal funding.

22.     QU first implemented its Title IX Discrimination and Harassment Policy in Fall 2012 following the 2011 OCR Dear Colleague letter.

23. In December 2012, QU was under investigation by OCR based on a complaint by a Latino male student at QU who had been barred from his dorm room after allegedly assaulting his girlfriend. It was reported in the media that Defendant Kalagher had oversight of QU's Title IX compliance and that when "the student's mother asked Defendant Kalagher, what evidence they had to prove her son violated the student code of conduct, Defendant Kalagher replied that '... he did not need any evidence to make a decision because this is how your people act.'"

24. In 2012, it was reported in the media that the same Hispanic student made a separate complaint to the OCR alleging that QU discriminated against him based on gender because the RA did not properly respond to his complaint that his male roommate had choked him. The OCR declined to investigate because the student did not file a formal complaint and could not produce evidence.

25. Also in 2012, a federal appeals court upheld a district court ruling that QU had discriminated against women in violation of Title IX in its athletic department. This drew much attention as a number of organizations joined the litigation as amici curiae: the Department of Justice Civil Rights Division and the National Women's Law Center (joined on the brief by dozens of other women's organizations) supported the plaintiffs; the Eagle Forum Education and Legal Defense Fund supported QU. As a result of that litigation, QU was monitored for its compliance with Title IX and required to submit yearly reports until June 2016.

26. In 2014, Connecticut passed Public Act 14-11, entitled "An Act Concerning Sexual Assault, Stalking and Intimate Partner Violence," which affords certain protections to victims of sexual assault on college and required Connecticut public and private colleges to report to the government the most recent policies in place for sexual assault, stalking and

intimate partner violence.  Effective October 2016, the law was amended to require colleges in Connecticut to use a high standard of affirmative consent in determining whether victims consented to sexual assault.

27.     On information and belief, due to the renewed emphasis on victims' rights and the loss of federal funding if a school is not in compliance with Title IX, there has been a nationwide trend favoring female student complainants over male student respondents accused of sexual misconduct because the OCR's enforcement of the 2011 Dear Colleague letter has become gender-skewed against men, or has become widely understood by schools as such.

28.     On information and belief, QU was influenced by the pressure or coercion of the OCR's enforcement to protect females and to skew procedures against males to demonstrate to the OCR that it would find accused men responsible for sexual misconduct and impose severe sanctions.

29.     QU has a financial incentive to refrain from challenging the legality of the OCR's enforcement.

30.     On information and belief, due to the local and national attention Title IX received, the Defendants were fully aware of the OCR oversight and sought to protect female complainants of sexual misconduct and harassment, particularly stalking and intimate partner violence by skewing procedures against males.

31.     On information and belief, since 2012, the number of complaints by female QU students for sexual misconduct/harassment against males has increased significantly, while the number of complaints by male QU students for sexual misconduct/harassment against females has not similarly increased.

32.     On information and belief, since 2012, QU has treated female *complainants* of sexual misconduct/sexual harassment more favorably than male complainants due to pressure from the OCR to protect females and to skew procedures against men and to demonstrate to the OCR that more QU female students are reporting sexual misconduct/sexual harassment and that QU would find accused men responsible for sexual misconduct and impose serious sanctions.

33.     On information and belief, since 2012, QU has treated female *respondents* of sexual misconduct/sexual harassment complaints more favorably than male respondents due to pressure from the OCR to protect females and skew procedures against men and to demonstrate to the OCR that more QU female students are reporting sexual misconduct/sexual harassment and that QU would find accused men responsible for sexual misconduct and impose serious sanctions.

34.     On information and belief, since 2012, male accused QU students invariably are found responsible in sexual misconduct/sexual harassment claims made by female QU students, regardless of the weight of the evidence, while female accused are not.

35.     On information and belief, since 2012, in sexual misconduct/sexual harassment proceedings, QU has shifted the burden of proof to male respondents, unlike female respondents, requiring them to prove they are not responsible for the charged offenses, while QU requires male complainants, unlike female complainants, to prove female respondents are responsible, thus imposing a higher burden of proof on male students than on female students.

36.     On information and belief, QU's Title IX investigators, Deputy Coordinator, Coordinator, and Hearing and Appeal Panel members were not properly trained.

37. On information and belief, since 2012, in intimate partner violence claims at QU, male accused students invariably are found responsible in complaints made by female students, regardless of the weight of the evidence, while female accused are not.

38. On information and belief, since 2012, in assault claims at QU, male accused students are invariably found responsible in complaints by female students, regardless of the weight of the evidence, while female accused are not.

39. On information and belief, since 2012, at QU, in sexual misconduct/sexual harassment claims, in he-said/she-said scenarios in which the complained-of incident has no witnesses other than the male and female, male accused students invariably are found responsible in complaints by female students, regardless of the weight of the evidence, while female accused are not.

40. On information and belief, since 2012, no female student has been expelled or suspended from QU for claims of sexual misconduct/sexual harassment against a male, while numerous male students have been expelled and suspended for sexual misconduct/sexual harassment against females.

41. In 2015, John Doe was assaulted by another male student and punched in the face. That student was arrested and charged by the police. The student was found responsible, but only given a warning and remained on campus. The student later assaulted John Doe again. Upon information and belief, Defendant Kalagher and Megan Buda were involved in the student conduct investigation for these assaults and again imposed very lenient sanctions against the male who had assaulted John Doe; sanctions included banning that student from campus for 6 months, but little if anything was done to enforce the sanction.

42. Against this backdrop, QU conducted its investigation of the claims against John

Doe.

## The Student Relationships

43.     The charges against John Doe in QU's underlying investigation arise from two relationships in which John Doe was involved as a student at QU: one with Jane Roe 2 from about May 2014 and continuing through about January 2015, and another with Jane Roe beginning in January 2015 and continuing through June 2016.   Both relationships were emotionally intense and, with each relationship, the parties experienced on and off periods of emotional closeness and distance.   John Doe and either Jane Roe or Jane Roe 2, in their periods of emotional distance would get angry at each other and arguments would ensue as these young adults worked out their emotional needs and continued development. Both Jane Roe and Jane Roe 2 were upset that John Doe ended his relationships with them.

44.     Jane Roe 2 was John Doe's girlfriend through the very early days of January 2015. Although they were in the same sorority system, Jane Roe 2 and Jane Roe did not know each other before John Doe dated Jane Roe.   John Doe broke up with Jane Roe 2 and started dating Jane Roe in early January 2015.   Jane Roe 2 was hurt and jealous of John Doe's relationship with Jane Roe.   Among other things, Jane Roe 2 sent John Doe texts when he was dating Jane Roe trying to get back together with Plaintiff, said hurtful things about Jane Roe, and continued to text him months after their relationship ended after he asked her to stop.

45.     Jane Roe 2 graduated in May 2015 and since that time has resided in Boston.

46.     One of the times John Doe broke up with Jane Roe during their on-and-off relationship was on December 5, 2015.   Jane Roe's first contact with Jane Roe 2 occurred when Jane Roe Facebooked Jane Roe 2 on December 6, 2015 (almost a year after Jane Roe 2 and John Doe had broken up) because Jane Roe was jealous of nude photos she had seen on John

Doe's computer that she thought were of Jane Roe 2.  Jane Roe also wrote in a Facebook message to Jane Roe 2 that John Doe put his arm across her throat when she tried to enter his apartment that morning.  Jane Roe 2's little sister in the sorority reported to her RA that Jane Roe had told her about this alleged incident.  The RA reported the incident to QU.  Defendant Kalagher emailed Jane Roe asking about the incident the RA reported and told Jane Roe she could make a confidential report. On December 7, 2016, at 5:23 p.m., Jane Roe emailed back the following: "Hi Seann, Thank you for your concern, but I am very fine. I appreciate you reaching out to me.  Have a wonderful week!  Sincerely, Jane Roe."  This is the only claim of assault by Jane Roe against John Doe and serves as the basis for the charge of assault and intimate partner violence brought by QU against John Doe in this investigation.

47.     During their relationship, Jane Roe often would refuse to leave John Doe's property when asked and she would show up at his home unannounced and unwelcome.  While John Doe was breaking up with Jane Roe in June 2016, she was very unhappy and hurt that he had done so.  Among other things, during that time, Jane Roe; (a) continually texted him and wrote that if he did not see her, he left her "no option"; (b) called him; (c) went to his home in Hamden unannounced; (d) refused to leave his car or home in Hamden when asked to do so; and (e) followed him to his home in Stamford against his wishes.  When he finally made it clear to her that he was breaking their relationship off, she returned a gift card he had given to her for her brother and left it ripped up with his sweatshirt that he had lent her, which was cut up, on his porch at his home in Hamden. Her allegations against John Doe came only after he broke off their relationship for the final time and repeatedly told her that he would get a restraining order if she did not stop contacting him and following him to his apartment in Hamden or to his home in Stamford.  On June 28, 2016, within the hour of John Doe's final communication

16

making it clear that he was ending the relationship, Jane Roe filed a complaint at QU accusing John Doe of verbal and physical abuse. Jane Roe was afraid of legal action and preemptively and vindictively filed this complaint against John Doe.

48.     John Doe was not aware that Jane Roe had filed a complaint. Concerned for his safety, John Doe consulted with his parents, who scheduled an appointment with their lawyer. On July 11, 2016, John Doe's attorney wrote a letter to Jane Roe requesting that she stop contacting John Doe.  Jane Roe received the letter approximately one month before John Doe was aware that she had filed a complaint against him.

### The Flawed Investigation

49.     The QU investigators, Defendant Vincent Contrucci and Audrey Heins, first interviewed Jane Roe at length. Then, rather than interviewing John Doe to get his side of the events and to be better prepared to investigate objectively, the investigators over a two-month period interviewed 14 witnesses, whose names were provided by the complainants. Jane Roe brought Jane Roe 2 into the investigation as a witness. Jane Roe spoke to Jane Roe 2 about this investigation before Jane Roe 2 was interviewed. They had every reason to work together because they were both angry that John Doe had broken up with each of them. The witnesses the investigators interviewed (as requested by Jane Roe and Jane Roe 2) for the most part are their close friends or sisters from their tight-knit sorority who heard about their relationships with John Doe through gossip and details that were provided either by Jane Roe or Jane Roe 2 and of which they had little or no personal knowledge.  In addition, Jane Roe spoke with most of the witnesses before they spoke with the investigators (as did Jane Roe 2 once she was involved).  Not surprisingly, the two complainants' and their witnesses' stories were consistent, even though few of the witnesses had any personal knowledge of events and had only heard

about events through gossip or from Jane Roe or Jane Roe 2.  Also, not surprisingly, Jane Roe and Jane Roe 2 and their witnesses, although they didn't recall specific facts, used strangely consistent language to describe what happened -- language that eerily mirrored the specific terminology of Intimate Partner Violence ("IPV") from the Handbook, such as *controlling, abusive, manipulative, intimidating, unhealthy relationship, pattern*, etc. There was also a coordinated attempt between the two complainants and their hand-picked witnesses to express the same concerns regarding their fears about what may happen when John Doe found out about the complaint.

50.     It is evident from the investigative report that the investigators asked leading questions, suggesting the answers to the witnesses that would support a charge of IPV against John Doe.

51.     The investigators addressed the complainants' and some witnesses' claims of fear about possible retaliation from John Doe and made every effort to protect them.

52.     Upon information and belief, Jane Roe 2 did not file a complaint; rather, QU investigators administratively brought a complaint on behalf of Jane Roe 2 after they had interviewed her.

53.     Only after interviewing 13 people suggested by Jane Roe and Jane Roe 2 did the investigators inform John Doe of the existence of the claims made against him and the investigation of those claims. They ultimately interviewed him two months later, on August 23, 2016.

54.     When John Doe was interviewed on August 23, 2016, he was asked questions about details of events spanning a two-year period with no preparation. The allegations were very difficult to hear and John Doe did his best to remember dates and times. He answered the

investigators' questions as best as he could recall. Among other things, he told the investigators that Jane Roe 2 and Jane Roe engaged in the same type of behavior that they had complained he engaged in; that Jane Roe 2 had harassed and stalked him after he broke up with her in January 2015; and that Jane Roe had harassed, stalked and assaulted him during their relationship. He provided text messages to support his claims.

55.     John Doe also informed the investigators that Jane Roe's friend had been contacting him indirectly through his friends and harassing him about the ongoing investigation in breach of the confidentiality surrounding the investigation and a No Contact Order ("NCO") issued to Jane Roe on August 19, 2016.  The investigators told John Doe and his father that there was nothing they could do about the complainants' friends' actions.  The investigator omitted John Doe's claims of this harassment from his investigation report and addenda.

56.     During interviews with his son, John Doe's father gave the investigators relevant information about the relationships he personally had observed and learned about from John Doe.  For example, John Doe's father explained that late one night in June 2016, he had received a call from John Doe, who had been trying to end his relationship with Jane Roe.  His father could hear Jane Roe in the background refusing to leave John Doe's apartment.  His father told John Doe to leave his apartment if Jane Roe refused to do so; John Doe went home to Stamford right after that call.

57.     John Doe's mother also attempted to provide information via email to the investigators.

58.     At the end of October 2016, the investigators made an appointment with John Doe. John Doe was shocked when they gave him a copy of their investigation report ("Report") and their recommendations.  The Report was over 250 pages long with attachments.  (See

Exhibit 1 attached and made part of the Amended Complaint, filed at 3:17cv364, Docket No. 11 and incorporated herein by reference.) In the Report, the investigators found "sufficient information to conclude that there may have been violations of the Title IX Policy and student code of conduct." "The investigators believe that" John Doe may be found responsible for five charges (Intimate Partner Violence ("IPV"), Assault, Breach of Peace, Disturbing the Peace and Property Damage) and recommended that he be suspended for a year if he accepted their findings.

59.     The investigators gave John Doe three days to digest the lengthy report and let them know if he accepted responsibility.  Not only was the timing extremely problematic due to John Doe's academic schedule, but John Doe has disabilities that affected his ability to process this Report in the time given.

60.     In 2014, John Doe enrolled in QU's ADA (Americans with Disabilities Act) center and received accommodations for his disabilities.  The medical records provided to QU show that John Doe was diagnosed with ADHD in second grade and set forth John Doe's diagnosis including, "inattention, distractibility, difficulty with sustained concentration, cognitive impulsivity, and motor restlessness."  John Doe was later diagnosed as having "a significant problem with underlying anxiety."  John Doe has been under the care of a therapist for years and has taken medication for both the ADHD and anxiety.  Because of his challenges with ADHD and anxiety, John Doe is very sensitive, has difficulty staying focused and paying attention to detail, and gets frustrated, particularly under pressure.

61.     In response to the investigators' demand to get back to them within three days, and despite his preference to keep his disabilities confidential, John Doe met with investigators and informed them of his disabilities and their effect on his ability to respond to the investigation

under their timetable.

62.     The investigators continued to push for a short response time and a hearing date that would fall at the time of final exams.  This was extremely stressful for John Doe, who then met with Matthew Cooper, QU Director, Office of Student Accessibility, and spoke with his therapist to seek assistance in getting an extension.  Mr. Cooper determined that John Doe should be afforded an accommodation based on his disabilities and allowed to "postpone his decision in terms of the charges that he faces until Friday, November 11th by 4:00 PM."  On Wednesday afternoon, November 9, 2016, John Doe asked the investigators for time over the weekend of November 12, 2016 to respond due to the length of the report and his academic schedule. QU denied his request.

63.     On November 11, 2016, John Doe informed the investigators that he accepted responsibility for property damage for breaking a glass door, but did not accept responsibility for the other four charges.  John Doe sought additional time to respond to the content of the investigation report, based on its length, the amount of information, the numerous internal inconsistencies in the complainants' and witnesses' interviews, missing information and evidence, and the number of contradicting statements, all in combination with his disabilities. Mr. Cooper assisted and, based on his review of John Doe's medical documentation and the spring schedule, recommended that John Doe be given until the week of January 16, 2017 to process his response. In an email dated November 17, 2016, Mr. Cooper advised John Doe and Defendant Kalagher, who was supervising the investigation, that "[o]n Monday January 23 the spring semester begins.  Taking into consideration your history of receiving academic accommodations, I do not think it reasonable to begin classes while at the same time processing your response to Mr. Kalagher."

64.     Upon information and belief, the second investigator, Ms. Heins, was no longer involved in the formal investigation and was not replaced, in violation of QU's Title IX Policy, Handbook and publications.

65.     John Doe spent the winter break reviewing and digesting the Report and attempting to find and gather evidence to support his response. This was particularly difficult as the evidence boiled down to Jane Roe 2's and Jane Roe's words against his.  During that time, John Doe again was approached by another friend of Jane Roe, who was with Jane Roe at a restaurant, and who swore at John Doe and harassed him.  John Doe did not report this at that time to investigators based on their lack of response to his earlier complaint regarding Jane Roe's violation of the NCO.  The investigation took a toll on John Doe's grades.  In fact, John Doe received a D in a class in the fall, which was the first D he had received at QU, where he has earned a 3.23 GPA overall. John Doe spent a great deal of time, effort and energy on his response because the charges were not true, the investigation was one-sided, and he had one semester left to graduate and wanted to end this extremely stressful time.

66.     On Friday, January 13, 2017, the week *before* John Doe's response was due, he received an email from Defendant Kalagher that set a hearing date for January 23, the Monday classes began-- and the exact day that Mr. Cooper said would be very problematic for John Doe. This caused John Doe extreme anxiety not only due to the timing, but because the investigators had not seen his response and clearly John Doe's response was to be of no avail.

67.     On January 18, 2017, Defendant Kalagher was informed that John Doe believed, based on the evidence in his response, that the investigators would decide that charges against John Doe were not warranted and, at the very least, additional investigation was warranted. Defendant Kalagher was informed that John Doe wanted the investigators and any hearing panel

22

to have knowledge of his disabilities to provide context to the investigation, but requested that such information be kept confidential and not be provided to the complainants based on their history of abusing the parameters of the investigation and making confidential information public.  John Doe requested that QU stop Jane Roe's friends' actions and enforce Jane Roe's NCO and re-establish the confidentiality surrounding the investigation.  Defendant Kalagher advised that he could do nothing and the only way QU could act would be if John Doe filed a claim of harassment or retaliation.

68.    On January 20, 2017, John Doe submitted a 20-page response, with new evidence attached, ("Response") consisting mainly of numerous texts and voicemails. (See Exhibit 2 attached and made part of the Amended Complaint, see 3:17cv364, Docket No. 12 and incorporated herein by reference.)  The Response marshaled the evidence in the Report to show that, based on Jane Roe's and Jane Roe 2's own statements and the evidence in the Report, it was evident that neither was afraid of John Doe  or intimidated by him that there was no controlling relationship with either (as required for IPV); that each was an equal participant in an on-and-off relationship with John Doe; that John Doe did not assault Jane Roe; and that based on Jane Roe 2's and Jane Roe's statements alone (corroborated by texts), each had sexually harassed, harassed and stalked John Doe. He also pointed out numerous internal inconsistencies in both complainants' statements and inconsistencies between theirs and their witnesses' statements in the Report that cast great doubt on their credibility.  John Doe also stated that he felt the investigation was biased against him as a male and set forth the grounds for requesting that the investigators and Defendant Kalagher read his response and seriously consider it.

69.    On January 24, 2017, after one business day following QU's receipt of John

Doe's lengthy Response, John Doe received an email from Defendant Kalagher advising that the investigator reviewed John Doe's Response and decided "not to amend any of the alleged violations that was included in the investigation report you received."  Defendant Kalagher scheduled a hearing for February 7, 2017.  In addition, he informed John Doe that any information John Doe wanted to be shared with investigators needed to be shared with the complainants, including John Doe's privileged and HIPPA-protected medical information.  He then informed John Doe that he had forwarded John Doe's Response to the complainants and the Hearing Panel without the confidential information included and that if John Doe wanted the Hearing Panel to review the confidential information, he would need to give it to the complainants.

70.    On Friday, January 27, 2017, Defendant Kalagher sent a revised investigation report ("Revised Report") containing additional information regarding subsequent interviews and communications between the investigators and Jane Roe and Jane Roe 2 dating back to November and December 2016.  That information showed that a witness in the investigation who was recommended by Jane Roe acted as Jane Roe's advisor in her subsequent interview with the investigators; that the investigators had lost their notes of those interviews with Jane Roe and Jane Roe 2; that the investigators permitted Jane Roe and Jane Roe 2 to recreate what they said during the those interviews; and that the investigators had included Jane Roe's and Jane Roe 2's responses to the  investigative Report in the investigative addenda in the Revised Report, imbuing their responses with the cloak of credibility, but had not included John Doe's Response in their addenda to the Revised Report.

**The Request for Review of the Flawed Investigation**

71.     On February 1, 2017, Plaintiff informed the Title IX Coordinator (Defendant Johnson), the person responsible for managing Title IX investigations at QU, that the investigation had been extremely problematic and unfair, and that QU was in violation of, among other things, Title IX, the QU Student Handbook, and QU's promises to its students and their parents.  (See Exhibit 3 attached and made part of the Amended Complaint, see 3:17cv364, Docket No. 1 and incorporated herein by reference.)   In particular, the letter identified the following deficiencies:

       a.     The investigation had taken well over the recommended 60 days in violation of Title IX and QU's Handbook.

       b.     QU failed to investigate possible sexual misconduct and harassment that it knew about in violation of Title IX and QU's Policies.

       c.     QU's failure to act on Jane Roe's breach of her NCO and both Jane Roe's and Jane Roe 2's breach of confidentiality regarding the investigation was in violation of Title IX, FERPA and QU's Policies.

       d.     QU Violated Title IX and its own policies on the rights of the Accused.

       e.     QU's investigation was inadequate in violation of T-IX and QU's own policies.

       f.     QU's investigation was biased in violation of T-IX and QU's own policies.

72.     The letter then identified ways in which QU discriminated by gender bias, including the following:

       a.     The investigators interviewed the two complainants and 13 witnesses before interviewing John Doe.

       b.     John Doe was not interviewed until approximately two months after the complaint had been filed and 13 biased witnesses interviewed.

       c.     John Doe introduced additional evidence which refuted the complainants' versions.  Yet the investigators did not re-interview Jane Roe, Jane Roe

2 or any witnesses regarding any new information or evidence introduced by John Doe to check credibility and discover whether they would agree or disagree with the new facts, all of which would have affected the outcome of the report and the charges. The investigators simply decided to believe the female complainants without doing a proper investigation and to charge John Doe based on the flawed investigation.

      d.     Objective investigators would have brought administrative charges and started investigations into sexual misconduct against Jane Roe or Jane Roe 2. John Doe raised these issues expressly and provided evidence to support his claims of their sexual misconduct in his interviews and his response. Yet, neither Jane Roe nor Jane Roe 2 had been investigated for any of those.

      e.     The investigators and Defendant Kalagher chose to ignore John Doe's complaints regarding Jane Roe's breach of the NCO and confidentiality surrounding the investigation as described above.

      f.     The investigators bent over backwards and were solicitous toward the complainants in addressing their alleged fear of John Doe's reaction to the complaint. For example, investigators agreed to notify the complainants and witnesses when John Doe was notified of the charges, informed them of the NCO and other avenues they had if they felt threatened and asked if they were afraid of John Doe but never asked John Doe if he was afraid of them.

      g.     The investigators permitted the complainants and their main witness to review the notes of their interviews and make clarifications and edits before being included in the reports. John Doe was not given the same opportunity.

      h.     The investigators interviewed Jane Roe's mother after requesting her permission to do so and told Jane Roe they would "speak to anyone whom [Jane Roe] requests." Inconsistently, the investigators did not interview John Doe's parents, nor did they include the information his parents emailed or said at his interviews in the report. John Doe's parents would both be able to provide information similar to Jane Roe's mother about John Doe's and Jane Roe's relationship and are direct witnesses to some of the alleged incidents. Even after John Doe raised this omission in his response to Defendant Kalagher and the investigators, his parents have not been interviewed.

73.     The manner in which QU handled this investigation, including conducting an inadequate and biased investigation, failing to address Jane Roe's breaches of confidentiality and NCO, and failing to investigate conduct that it knows or has reason to know constitutes sexual harassment, harassment, IPV and stalking, limited John Doe's ability to participate in and benefit from its educational programs and as such is in violation of Title IX.

26

74.     The Defendants' decision to charge Plaintiff and initiate a Hearing was based on his gender.

75.     Upon information and belief, had John Doe been a woman and had Jane Roe and Jane Roe 2 been male, QU would not have favored the male complainants like it favored the female complainants here, and there is little doubt that John Doe would not have been charged with and preliminarily found responsible for these charges of sexual misconduct or assault and that a hearing would not have been scheduled. For example, if the genders had been reversed, QU would have done at least the following:

> a.     interviewed the female accused right after the male complainant, rather than interviewing 13 other witnesses for the male complainant before speaking with the female accused;

> b.     investigated the male complainants for the behavior of stalking, sexual harassment and assault based on the male's statements in the interviews alone;

> c.     investigated the male complainants for the behavior of stalking, sexual harassment and assault based on the additional evidence provided by the female respondents in their Response;

> d.     brought administrative charges against both complainants;

> e.     followed up on the female respondents' reports of breach of confidentiality and violations of the NCO by the male complainant;

> f.     interviewed the female respondent's material witnesses;

> g.     included the female respondents' cease and desist letter in the Report as evidence;

> h.     not allowed a friend of the male complainant who was a witness in the investigation to serve as the male complainant's advisor in an interview with the investigators;

> i.     included the female respondent's Response in the addendum to the investigation report;

> j.     considered the female student's Response and additional evidence and conducted a further investigation against the male complainants and found sufficient

27

evidence to warrant a hearing against the male complainants; and

      k.     made a determination that there was insufficient evidence to warrant a hearing against the female respondent.

76.     In his February 1, 2017 letter, John Doe requested that QU's Title IX Coordinator (Defendant Johnson) immediately open an investigation into the manner in which the investigation had been handled to determine whether any charges should be brought against John Doe for IPV or assault.

77.     John Doe also requested that, at the least, the following actions must be taken:

      a.     QU needed to investigate further before scheduling a Hearing to cure the defects mentioned above,

      b.     the current investigators and Defendant Kalagher should be removed from any further involvement in this case due to bias,

      c.     an objective investigator should conduct an independent investigation, and

      d.     administrative charges should be brought against Jane Roe for the same charges brought against John Doe and for violation of the NCO and against both Jane Roe and Jane Roe 2 for sexual harassment, harassment and stalking.

78.     On February 6, 2017, QU continued the Hearing until February 24, 2017.

79.     The Hearing was rescheduled by QU until March 3 due to a scheduling conflict.

80.     On February 17, 2017, John Doe notified Defendants Kalagher and Johnson of two additional incidents in which he was harassed by two different friends of Jane Roe, in violation of the NCO and QU's and Title IX's policies against harassment and retaliation. Defendant Kalagher assured Plaintiff that QU's Public Safety Department would investigate the incident he reported and that that he would contact Jane Roe "to reiterate the expectations of the no  contact order, share John Doe's concerns and let her know that the university will be following up on the matter."  John Doe requested that Defendant Kalagher let him know when

the above steps have been taken as it would provide some comfort to John Doe and allow him to go about his daily activities without fear of being harassed." John Doe, however, was never informed that Jane Roe had been contacted, unlike in the 2016 investigation of Jane Roe's complaint, in which the investigators informed Jane Roe when they contacted John Doe upon her request.

81.     On February 22, 2017, QU Public Safety Officer Karoline Keith interviewed John Doe regarding these last two claims of violation of the NCO, but advised that Defendant Kalagher would handle the issues about violations regarding the confidentiality of the investigation and any previous incidents of claims of violation of the NCO.

82.     On February 24, 2017, Defendant Kalagher gave Plaintiff the following information:

      a.     that in the Hearing, there would be three people on the Committee,

      b.     if John Doe had a conflict with any of the three Committee members, he should inform Defendant Kalagher,

      c.     That the only materials provided to the Committee will be the Revised Report and John Doe's Response minus the confidential materials,

      d.     If John Doe wants the confidential documents given to the Committee he needs to let him know before the Hearing, but Defendant Kalagher would have to give the documents to the complainants that Defendant Kalagher would be present,

      e.     that the one of the investigators would present a summary of the investigation,

      f.     the Committee could ask the investigator questions,

      g.     the Committee could question the parties if they chose to,

      h.     only the witnesses interviewed by the investigators would be available if the Panel wanted to question them,

      i.     none of the parties are permitted to ask questions of anyone,

      j.     no opening or closing statements are permitted,

      k.     an impact statement is permitted after a finding of responsibility, and

l.        that he will wait to hear from Mr. Cooper regarding any accommodations for John Doe.

83.      On February 27, 2017, Plaintiff informed Defendant Kalagher that he was waiting to hear back from Defendant Johnson about his concerns and his position that a Hearing was not warranted under these circumstances.  John Doe asked that both Defendant Kalagher and Megan Buda (one of the Committee members and Committee Chair), be recused from the Hearing (if conducted).  John Doe cited a conflict with Defendant Kalagher as set forth in his Response, and noted that Ms. Buda was involved in prior investigation concerning the student who assaulted John Doe, and that she reported to Defendant Kalagher.  John Doe requested again that the confidential documents be given to the Committee but not the parties and that his claims of Jane Roe's violations of the NCO and confidentiality should be brought to the Committee's attention as they go to her credibility and motive.

84.      On February 27, 2017, the Title IX Coordinator (Defendant Johnson) responded that she reviewed Plaintiff's contentions and the underlying investigation and determined that the investigation was not biased or unfair and that "the university will not be opening an investigation into the manner in which this Title IX investigation has been handled nor will there be another investigation performed as you request."  (See Exhibit 4 attached and made part of the Amended Complaint, see 3:17cv364, Docket No. 1 and incorporated herein by reference.)  She also concluded regarding Plaintiff's claims that "the university failed to take certain steps in regard to either its investigation or in regard to matters with the complainants," it was her "conclusion that the Deputy Title IX Coordinator has appropriately addressed the various issues you raised in regard to both your client and the complainants." There was no explanation of why no one had addressed in any manner Plaintiff's allegations of harassment or retaliation or violation of the NCO in the fall or his allegations of stalking and sexual

harassment by Jane Roe 2 and Jane Roe and assault by Jane Roe.

85.     On February 27, 2017, John Doe responded to Defendant Johnson by noting the following:

    a.     At no point since the investigation commenced has anyone from Quinnipiac even spoken to Jane Roe or Jane Roe 2 about -- much less investigated -- John Doe's allegations concerning their stalking and harassment. The investigators spent 4 months and interviewed many witnesses regarding Jane Roe's and Jane Roe 2's complaints. There are two sides to this story. This lack of investigation and equal consideration of John Doe's side is completely unfair and inequitable and has yet to be explained by Quinnipiac. . . .

    b.     Because John Doe's complaints against Jane Roe and Jane Roe 2 arise out of the same set of facts and same transactions as the complaints against John Doe and support John Doe's defense, they should be heard by the same Hearing Panel at the same time. . . .

    c.      If the only way to get John Doe's side before the Hearing panel so that he can have a fair hearing is for John Doe to file formal complaints against Jane Roe and Jane Roe 2 so his allegations will be investigated, please consider this email and John Doe's response and exhibits he provided to the investigation report as a formal complaint against Jane Roe and Jane Roe 2."

    d.     QU was requested to "immediately investigate John Doe's complaints against Jane Roe and Jane Roe 2 and schedule the Hearing for a time when all each of the complaints -- by Jane Roe, by Jane Roe 2, and by John Doe -- can be heard together."

    e.     QU was requested to advise immediately if it would not accept this as a formal complaint by John Doe against Jane Roe 2 and Jane Roe and that as the complainant, he remains willing to engage in an informal process to work out a solution for all parties.

86.     On February 27, 2017, Defendant Johnson emailed and denied John Doe's requests for recusal based on conflicts reasoning that Ms. Buda was not involved in the prior investigation or decision-making in that case and Defendant Kalagher had not been unfair or biased against John Doe, and that Defendant Kalagher was not involved in the decision-making in the Hearing.

87.     On February 28, 2017, Defendant Johnson replied to the email sent February 27. In her response, she advised that John Doe's complaints about Jane Roe's violations of the NCO and breach of confidentiality issues were being addressed by Public Safety Officer Karoline Keith;  that QU also accepted the email of February 27, 2017 as a formal complaint, that the Hearing would proceed in compliance with QU's Title IX policy and that the Hearing would still be going forward on March 3, 2017.

88.     In preparation for the Hearing, on March 1, 2017, John Doe met again with Mr. Cooper to discuss the stressful process and to obtain his recommendations for accommodations after his review of the John Doe's therapist's letter.

89.     On March 2, 2017, John Doe filed this action and a motion for a TRO and preliminary injunction. The QU Hearing was stayed pending a hearing and ruling on the motion for preliminary injunction.

90.     On March 31, 2017, the Court denied John Doe's motion for preliminary injunction.

**Hearing Preparation**

91.     On April 5, 2017, Defendant Kalagher informed John Doe that the Hearing was scheduled for Friday, April 21, 2017 at 10:00 am.

92.     On April 6, 2017, John Doe through counsel inquired whether QU was amenable to discussing a way to resolve the disciplinary process without a Hearing to avoid serious emotional distress to him and, if that was possible, John Doe requested an answer as soon as possible because he would need significant time to prepare for a Hearing.

93.     On April 11, 2017, QU informed John Doe that it was not amenable to resolving the disciplinary process without hearing and that the Hearing would proceed as scheduled.

94.     On April 8, 2017, John Doe renewed his request that Defendant Kalagher and Ms. Buda be recused from the Hearing due to bias, informing Defendant Johnson that he recalled Ms. Buda being involved in two previous student conduct investigations.

95.     On April 8, 2017, to have time to adequately prepare for the Hearing, John Doe also asked Defendant Kalagher, among other things:

       a.     whether QU received Mr. Cooper's recommendations for accommodations for the hearing and, if so, what they were and what was the next step;

       b.     whether there would be a person trained in understanding mental health issues and learning differences/disabilities on the Hearing Committee to assist the Committee in understanding both John Doe's conduct under investigation and how his disabilities could affect his credibility;

       c.     whether John Doe's psychiatrist could testify as a witness to assist the Hearing Committee in understanding John Doe's disabilities and mental health issues;

       d.     that QU only provide the confidential information to the Hearing Committee and not the complainants.

96.     Having heard no response and becoming increasingly distressed and anxious as he tried to prepare, on April 18, 2017, John Doe emailed again stating he had received no answers.

97.     On April 19, 2017, two days before the Hearing, Defendant Johnson denied John Doe's request for recusal for the same reasons as before:  that Defendant Kalagher was not the decision-maker and Ms. Buda had never been involved in a student conduct matter with John Doe. John Doe replied informing Defendant Johnson that his father had spoken directly to Ms. Buda (a) at least twice concerning the student assault case and John Doe on or about September 25, 2015 and February 6, 2016 and (b) concerning the incident on the shuttle bus, and sent email correspondence that included Ms. Buda showing her involvement in the prior investigation. On

33

April 20, 2017, the day before the Hearing, Defendant Johnson denied John Doe's request for recusal.

98. On April 19, 2017, two days before the Hearing, Defendant Kalagher informed John Doe that

      a.    he had received the recommendations from Mr. Cooper and passed on the recommendations to the Chair of the Hearing Committee.

      b.    QU denied John Doe's request for a person trained in understanding disabilities and mental health issues serving on the Committee, and that the Committee was well aware of John Doe's accommodations and it would only consider his mental health issues if any sanctions were imposed.

      c.    QU denied John Doe's request that his psychiatrist testify as a witness.

      d.    QU denied John Doe's request to provide the confidential information only to the Committee.

99. Defendant Kalagher also informed John Doe that the following accommodations would be provided at the hearing:

      a.    To aid in his processing the information, all questions pertaining to a specific event and date should be kept together, without going back and forth between dates and events.

      b.    To avoid "shutting down," allow John Doe time (several minutes) to process questions and regroup," with assistance if necessary, in order to recall the context of the question at hand.

      c.    Because of his difficulty sustaining attention and focus and the ease with which he tires out cognitively, John Doe should be given frequent breaks in the questioning (every 15-20 minutes), during which time he may "clear his head" and confer with his advisor.

100. Despite the stress and anxiety he felt concerning the provision of his confidential information to the complainants, because he felt it was important for the Committee to review, John Doe requested that Defendant Kalagher share the confidential information with the Committee knowing it would be shared with the complainants.

**The Flawed Hearing**

101.    The Hearing was held on April 21, 2017 at 10:00 a.m. and concluded sometime after 5:30 p.m. that evening.  The three-member committee, including Committee Chairperson Megan Buda, and Defendants Kalagher and Contrucci were present during the Hearing, as well as John Doe and Jane Roe.102. John Doe was required to arrive at 9:20 a.m. and to remain in a conference room with his advisor unless he was in the Hearing room.

102.    In the morning in the Hearing Conference room, John Doe plead not responsible to each of the charges for Jane Roe and Jane Roe 2. Jane Roe participated by video conference from a separate conference room in the building.

103.    Defendant Contrucci summarized the investigative report, reading from a lengthy document that was not provided to John Doe until later that day, and which had not been provided to John Doe prior to the Hearing in violation of QU's Title IX Policy, Handbook and publications.  He summarized Jane Roe and Jane Roe 2 and their witnesses' interviews, reflected in 10.5 single-spaced pages, and John Doe's and his witnesses' interviews in under 4 pages. Defendant Contrucci summarized John Doe's lengthy Response in one line: "On January 19, [John Doe] sent additional materials in response to the Investigation Findings via email where he declined responsibility for all charges aside from 8C for breaking the door in Hill."

104.    Defendant Contrucci ended his summary by defending himself in his role as the investigator against some of the concerns that John Doe had raised in his January Response about the problems with the investigation, including, among other things,

    a.    That the investigation was not biased and investigators made their determination without any regard to the sex of the individual;

    a.    That the Cease and Desist letter was not included in the report because it was not provided to the investigators for inclusion, and specifically that the investigators had asked John Doe for it who said he would email it but then did not supply the letter;

      c.      That, contrary to what John Doe wrote in his Response, the investigators at no time told him that background information about Jane Roe's claims of past sexual assault was irrelevant;

      d.      With respect to John Doe's concern that the investigators did not interview his parents but did interview Jane Roe's, that the investigators discussed interviewing his parents but did not believe they would be able to provide any additional information about events that were investigated; they were not requested to interview his parents and, had it been requested, John Doe's parents would have been interviewed; and

      e.      That contrary to John Doe's claims that the investigators had not addressed his claims that they had failed to address his concerns he raised in September 2016 in his interview that Jane Roe's friends were harassing him based on her violation of confidentiality and the NCO, the investigators had addressed it with Jane Roe and stressed confidentiality and discretion but "this, unfortunately, was not included in the notes from our conversation."

105.    This was the first time that anyone at QU had responded substantively to any of the concerns John Doe raised in January 2017, and Defendant Contrucci provided a copy of his summary to the Hearing Committee and to John Doe.  John Doe was not provided an opportunity to respond to this at the Hearing, much of which damaged his credibility before the Hearing Committee and which he would have been able to refute had he been given the opportunity.

106.    There was a lengthy break during which the Committee appeared to be reviewing the documents provided by the investigator.  Defendant Contrucci stopped by to ask whether John Doe had any questions and said that the Committee should have no questions of Defendant Contrucci since they rely primarily on the Revised Report.

107.    In the afternoon, when John Doe was brought back in to the Hearing and Jane Roe participated by video conference, the Committee reported it had no questions of Defendant Contrucci. The Committee briefly interviewed John Doe asking a half a dozen or fewer

questions regarding specific unrelated details, which were complicated and compound questions and which John Doe had difficulty putting into context, particularly when considering the length of the time period, volume of materials, and his disabilities.

108.    The Committee briefly interviewed Jane Roe, while John Doe participated via video conference (over which he had difficulty hearing Jane Roe's answers), and asked her approximately four questions. When asked about her response to the text messages John Doe had provided in his Response and if she felt any were missing, Jane Roe advised that she had not reviewed them.  Jane Roe was crying and emotional. Among other things, she said she was overwhelmed because the investigator had postponed the Hearing so many times and it was extremely stressful and she just wanted to answer the Committee's questions and not do anything else.

109.    No witnesses were interviewed by the Committee and, upon information and belief, none had been called to be on standby if the Committee wanted to interview them.

110.    The Committee took a break to decide responsibility.

111.    At about 3:36 p.m., the Committee reconvened, read the definition for each of the charged conduct violations and found John Doe responsible for each charge against each complainant.

112.    John Doe requested a short break to gather himself before reading his impact statement.  Minutes later, John Doe read his impact statement to the Committee.  After that, Jane Roe gave her impact statement.  Although it was difficult for John Doe to hear over the video conferencing equipment, Jane Roe was very emotional and was sobbing and, upon information and belief, among other things, told the Committee that she was mostly upset because of how long the investigation had taken and how it had been poorly handled by

Defendant Kalagher. Over the video conference, the Committee appeared to be visibly moved by Jane Roe's emotion.

113.    When Defendant Contrucci retrieved John Doe to escort him to the Hearing room, Defendant Contrucci was tearing up and appeared to be visibly shaken by Jane Roe's emotional interview.

114.    In the Hearing room, Defendant Kalagher read John Doe's prior charge of student conduct to the Committee and provided the range of sanctions available for the findings of responsibility for the charges with which John Doe had been found responsible.

115.    After a break to determine the sanctions, the Committee announced that the NCO would remain in effect; that John Doe would be given a deferred suspension through graduation for which any violation of policy committed during that time would result in immediate suspension; that John Doe was suspended from University-owned property without prior permission, except that he could attend classes; that John Doe was prohibited from attending University- sponsored events, including senior week, which restriction may be reviewed by the Title IX Coordinator after the 2017-2018 academic year; and that John Doe must adhere to the recommendations of the Title IX coordinator reading commencement, including his participation in the School of Business Graduation.

116.    On April 24, 2017, at 4:51 p.m., Defendant Kalagher emailed the decision letter, well beyond the 24-hour period required by the Title IX Policy, which made clear the investigation had relied on the "investigative report along with the appendixes [to] show a preponderance of the information supporting [John Doe's] responsibility for these violations."

117.     The Hearing Committee, its findings and the Hearing were biased against John Doe based on his gender in violation of Title IX and QU's Handbook, Title IX Policy and publications for, among others, the following reasons:

a.      Upon information and belief, the Hearing Committee Chair, Megan Buda, and Defendants Kalagher and Contrucci, who were both present at the Hearing were biased against John Doe due to at least in part his gender including based on past interactions and stereotypical and chauvinistic views of the sexes;

b.      Upon information and belief, the Hearing Committee members were biased against John Doe at least in part due to his gender, including based on stereotypical and chauvinistic views of the sexes;

c.      The Hearing Committee members were not properly trained in Title IX matters;

d.      Upon information and belief, there was no person trained in understanding disabilities and emotional issues, including anxiety, depression and ADHD, to assist the Committee in understanding how these diagnoses and symptoms could explain the underlying conduct at issue and affect credibility determinations based on John Doe's behavior in the interviews and Hearing;

e.      The Hearing did not include John Doe's complaint against Jane Roe for her conduct during the same time period in Jane Roe 1 and Jane Roe's 2 complaints;

f.      The Hearing Committee relied on the biased and inadequate investigative Revised Report to make its findings;

g.      The Hearing Committee called no witnesses and did not interview Jane Roe 2, but relied on the investigative Revised Report that made no findings of disputed facts, undisputed facts or credibility for its conclusory finding that Jane Roe  and Jane Roe 2 were credible as corroborated by numerous witness statements, most of whom had no personal knowledge of the specific incidents under investigation.

h.      John Doe was never given a meaningful opportunity to present his defense to the Hearing Committee and had he, he would not have been found responsible;

i.      Defendant Contrucci's summary of the investigation to the Hearing Committee was unfair and biased against John Doe, including his failure to summarize in any detail John Doe's Response;

j.      Defendant Contrucci raised certain information for the first time in the

39

Hearing that were untrue and damaged John Doe's credibility;

     k.     John Doe was not allowed to rebut damaging information from Defendant Contrucci that he had heard and seen for the first time at the Hearing;

     l.     Defendant Contrucci was tearing up and acting in favor of Jane Roe in the Hearing due to her emotional presentation;

     m.     The Committee used the wrong definition of IPV when finding John Doe responsible;  and

     n.     Based on the evidence in this investigation and before the Committee, there was insufficient evidence to prove by a preponderance that John Doe responsible and the Committee placed the burden on John Doe to prove that he had not violated any QU policy.

**The Flawed Appeal**

118.    On May 2, 2017, John Doe inquired about timing of appeal because he was delaying seeking post-graduation employment with the findings on his record and because the sanctions would interfere with his full participation in an internship he had been offered that began in June 2017. Defendant Kalagher advised that after receipt of John Doe's appeal on May 9, 2017, the complainants would have several business days to respond; after the materials are received, the appeals officer will have up to a business week to decide whether those materials require further review by the appeal panel; an appeal panel may  take up to a business week or more to decide, in total approximately 13 business days to complete the appeal process; and that once the appeal officer is decided the officer would be in touch with more specific information on a timetable.  Based on that information, John Doe was expecting a decision on his appeal sometime around May 30, 2017, which would be in advance of the beginning of his internship.

119.    On May 9, 2017, John Doe timely filed his appeal, requesting that Defendant Johnson be recused from reviewing it as a threshold matter since she was biased and had a conflict.

120.    Per QU Policy, John Doe appealed the findings of responsibility on two limited grounds: (1) Additional, and/or new relevant information not available at the time of the Committee hearing, and (2) An error in the process or an abridgment of rights, as outlined by the Title IX Policy on Gender-Based Discrimination and Sexual Misconduct, which materially impacted the outcome of the hearing.

121.    As the basis for the "new relevant information" ground for his appeal, John Doe provided an August 23, 2016 email establishing that he had sent the Cease and Desist Letter to Defendant Contrucci. This responded to Defendant Contrucci's first-time assertion to the Committee at the Hearing that the Cease and Desist Letter "was not included in the report because it was not provided to the Investigators for inclusion. In our initial meeting with Centofanti we had requested it and he indicated he would email the letter, but he did not supply it."

122.    As the basis for the second ground in his appeal, "an error in the process or an abridgment of rights, as outlined by the Title IX Policy on Gender-Based Discrimination and Sexual Misconduct, which materially impacted the outcome of the hearing," John Doe asserted numerous grounds, including the problems with the investigation he previously had identified to Defendants Johnson, Kalagher and Contrucci, and the following grounds:

      a.    The investigation had taken well over the recommended 60 days in violation of Title IX and QU's Handbook.

      b.    QU failed to investigate possible sexual misconduct and harassment that it knew about in violation of Title IX and QU's Policies.

41

    c.     QU's failed to act on Jane Roe's breach of her NCO and both Jane Roe's and Jane Roe 2's breach of confidentiality regarding the investigation, in violation of Title IX, FERPA and QU's Policies;

    d.     The Hearing Committee did not include John Doe's complaint against Jane Roe for her conduct during the same time period in Jane Roe 1 and Jane Roe's 2 complaints;

    e.     The Hearing Committee relied on the biased and inadequate investigative report to make its findings;

    f.     Had the Investigators investigated John Doe's claims about the complainants in support of his defense and presented them to the Hearing Committee, there would not have been a preponderance of evidence to find him responsible, which is the required standard;

    g.     John Doe was never given a meaningful opportunity to present his defense to the Hearing Committee and had he, he would not have been found responsible;

    h.     Defendant Contrucci's summary of the investigation to the Hearing Committee was unfair and biased against John Doe, including his failure to summarize in any detail John Doe's Response;

    i.     Defendant Contrucci raised certain information for the first time in the Hearing that were untrue and damaged John Doe's credibility and John Doe forth the information and evidence that supported his allegations that these were untrue;

    j.     Defendant Contrucci was tearing up and acting in favor of Jane Roe in the Hearing due to her emotional presentation;

    k.     The Committee used the wrong definition of IPV when finding John Doe responsible.

    l.     Based on the evidence in this investigation and before the Committee, there was insufficient evidence to prove by a preponderance that John Doe responsible.

123.    On May 15, 2017, Defendant Contrucci filed a response to the appeal.  In that response, among other things, Defendant Contrucci admitted that he had not been accurate when he told the Hearing Committee that John Doe had not sent the Cease and Desist Letter to him, and explained that he had received the email John Doe had sent to him on August 23, 2016, but "during the course of creating the report it was unfortunately overlooked."  Defendant Contrucci

concluded there was no effect on John Doe because John Doe had included the Cease and Desist Letter in his Response, which had been provided to the Committee, ignoring the negative effect his statement to the Hearing Committee had on John Doe's credibility.

124.    In his response, Defendant Contrucci defended his summary of the investigation Revised Report to the Committee explaining that investigators are not required to present on response documents.  He also rebutted John Doe's claim that the investigators had failed to investigate his allegations in his Response by explaining that John Doe's Response to the investigation and the contents of the Report was included in the Report, which the Committee had received in advance of the hearing.

125.    Both Jane Roe and Jane Roe 2 chose not to file a response to the appeal.

126.    On May 26, 2017, Defendant Johnson reviewed the request for an appeal and designated Vice President and Dean of Students Monique Drucker as the appeal officer to review the appeal.

127.    On June 23, 2017, Defendant Johnson sent Drucker's Appeal Decision Letter to John Doe, affirming the Hearing Panel's April 24, 2017 Decision. The appeal panel found no ground for appeal based on new evidence, adopting Defendant Contrucci's reasoning that there was no effect on John Doe because John Doe had included the Cease and Desist Letter in his Response, which had been provided to the Committee. The appeal panel identified only one sufficient ground for appeal based on error in the process, which was that the investigation took more than 60 days.  Accordingly, the appeal panel remanded the matter back to the Hearing Committee for review and consideration. On June 15, 2017, the Hearing Committee determined that "although the investigation took longer than the recommended 60 days, it would not have materially impacted the outcome, including the findings and sanctions."

**The 2017 Flawed Formal Investigation**

128.    As set forth above in Paragraph **84(d)**, above, on February 27, 2017, John Doe made a formal complaint against Jane Roe and Jane Roe 2.

129.    QU denied John Doe's request that both Jane Roe and Jane Roe 2's 2016 complaints and investigation and his 2017 countercomplaint against them, which contained his defense, be heard by the same Hearing Committee at the same time.

130.    QU informed John Doe that QU could not bring a complaint against Jane Roe 2 because she no longer was a QU student, effectively denying John Doe the opportunity to present his defense of QU's administrative complaint on Jane Roe 2's behalf against him.

131.    On April 8, 2017, having heard nothing from QU about his complaint, John Doe emailed Defendants Kalagher and Johnson inquiring about the status of his formal complaint against Jane Roe.

132.    On April 18, 2017, having not heard back, John Doe again emailed Defendants Kalagher and Johnson inquiring about the status of his formal complaint against Jane Roe.

133.    On April 19, 2017, Defendant Kalagher responded, "In regards to the formal complaint against [Jane Roe], the Title IX grievance process is underway.  [Jane Roe] was notified of this complaint by Terri Johnson. The University will need to schedule a meeting with [John Doe] to investigate this matter further."

134.    John Doe responded that he is and has been available to be interviewed regarding his formal complaints.

135.    On April 20, 2017, the day before the Hearing, almost 2 months after making his formal complaint, QU investigator Karoline Keith emailed John Doe, including the second

QU investigator Lila Carney to schedule a time to interview John Doe regarding his formal complaint of Jane Roe ("2017 Complaint").

136.     John Doe responded on Monday, April 24, 2017, explaining on April 20 he had been preparing for his Hearing and had not returned their email and asked to be interviewed on a Friday as that was the best day for him in light of his class schedule, particularly now in the last two weeks of classes.  Keith replied she could not meet on Friday of that week and offered May 3 or 4, 2017.  John Doe again explained that the middle of the week was very difficult for him and asked for Friday.  Keith replied that no Fridays worked for the investigators.  Despite difficulty juggling his academic commitments, John Doe agreed to meet on Wednesday, May 3, 2017.

137.     Keith informed John Doe that in preparation for the interview, Defendant Johnson had provided "relative to [John Doe's] complaint of Intimate Partner Violence, Stalking and Harassment against [Jane Roe], . . . John Doe's "'Response to the Investigation Report' and attachments relative to that response," which documents "would be at the center of our meeting with [John Doe]."

138.     John Doe requested that Keith consider the email dated February 28, 2017 and John Doe's response and exhibits he provided to the 2016 investigation report as his formal complaint.

139.      On May 3, 2017, John Doe met with investigators Keith and Carney for his interview as complainant.  The investigators were aware of John Doe's disabilities and psychological issues and that he was relying on the documents he had provided for details.  John Doe suggested witnesses, including his parents.

140.    On May 10, 2017, Keith called John Doe's mother and scheduled an interview for May 11 and 12, 2017.

141.    On May 12, 2017, Keith interviewed John Doe's mother and then John Doe's father over the phone.  Keith told John Doe's father that Defendant Johnson had told Keith she needed to have the investigation completed by the middle of the next week.

142.    On May 12, 2017, John Doe's mother emailed Keith after their interviews to thank her for speaking with them and reiterated her request that Keith interview John Doe's aunt who had important information about the events under investigation. She also requested that she and her husband be able to review the notes before including them in her report.  Keith responded that she did not interview John Doe's aunt because John Doe had not requested that and that while it was not her practice to review notes with witnesses, she would review the request with Defendant Johnson.  John Doe's parents heard nothing back from Keith and did not review the notes.

143.    On May 12, 2017, shortly after finishing her interviews with John Doe's parents, Keith and Carney emailed John Doe informing him they had concluded their investigation of his 2017 complaint and wanted to schedule a time to meet to discuss it.

144.    On May 19, 2017, the investigators met with John Doe to review their findings. The investigators reviewed the report ("2017 Report"), which concluded that the investigators did not find Jane Roe responsible for any of the violations of University Title IX Policy or Student Code of Conduct Policy.

145.    The 2017 Report was inadequate and biased against John Doe based on his gender, for numerous reasons, including the following:

    a.    John Doe had made clear that his complaint was his Response (including

46

exhibits) to the first investigation report, yet Keith reviewed the entire investigator's 2016 Report, with addenda and the documents associated with the Hearing, including the summary by Defendant Contrucci in which he damaged John Doe's credibility with untruths;

b.      Keith and Carney did not conduct an independent investigation, but reviewed and relied on Defendant Contrucci's first Investigation Report, which was biased;

c.      Keith and Carney did not review John Doe's appeal in which he pointed out the untruths and problems with this process, leaving them with a biased and incomplete understanding of the totality of the circumstances in this investigation;

d.      In the 2017 Report, Keith and Carney did not review, digest or analyze any of the information in John Doe's Response and exhibits (his complaint) and they made inaccurate findings of fact that would not have been made if they reviewed the exhibits and conducted a thorough investigation;

e.      Keith and Carney interviewed five witnesses for John Doe and no witnesses for Jane Roe;

f.      Keith and Carney did not consider or address the violations specifically raised by John Doe nor all violations that the allegations would support. For example, Keith failed to consider a violation that John Doe specifically raised and is obvious on its face: Sexual Harassment (failure to accept the termination of a consensual relationship with repeated and persistent requests and behaviors) as defined by QU's Title IX Policy.

g.      Unlike in Jane Roe's 2016 complaint and investigation in which the investigators, and then the Hearing Committee, found John Doe responsible based on Jane Roe and Jane Roe 2's  subjective statements  that they were afraid and intimidated by John Doe despite evidence that each was not intimidated or afraid as set forth in John Doe's Response,  the investigators in the 2017 Report found that Jane Roe was not responsible because John Doe only  said he was "stressed" when Jane Roe showed up, but never mentioned he was in fear or felt threatened in any way, despite evidence to the contrary in the 2017 Report and in John Doe's Response including that John Doe said he "felt very unsafe and  . . .hid" on the second floor when Jane Roe showed up, that he was 'stressed and it was very anxiety-provoking" when Jane Roe repeatedly called and texted him, and that he "felt super stressed and unsafe" when Jane Roe would come to his apartment unannounced or uninvited  and when Jane Roe entered his home uninvited and forced him to leave to drive home to Stamford, John Doe reported, " I was beside myself.  I didn't feel safe in my own home."

h.      Keith disregarded John Doe' claims of fear, unlike the 2016 investigation, in which the investigators bent over backwards and were solicitous with the complainants in addressing their concerns about their alleged fear of John Doe's

reaction to the complaint, which was based on archaic and stereotypical and chauvinistic views of gender roles.

146.     Moreover, the timing of this investigation was unfair in the following ways:

    a.     It was delayed and then hurried.  This complaint was made on February 27, 2017 and John Doe was not interviewed until May 3, 2017, unlike Jane Roe's process where Jane Roe was interviewed within days of her complaint.

    b.     Jane Roe was contacted the day following John Doe's interview, unlike Jane Doe's process in which many witnesses were interviewed before John Doe was interviewed months later.

    c.     The entire investigation from the first interview through the completion of the report lasted 9 days (from May 3 through May 12, 2017), unlike Jane Roe's investigation involving the same facts, which lasted approximately four months.

    d.     The investigation from the time of the complaint through completion of the investigative report, took longer than 60 days with no communication from QU explaining to either the complainant or respondent the reason for the delay, all in violation of Title IX and the QU Title IX Policy and Handbook and publications.

    e.     Keith refused to interview a suggested witness for John Roe because she did not have time to interview that witness and John Doe had not suggested it, unlike in Jane Roe's 2106 investigation in which the investigator went to great pains to interview any of her witnesses including witnesses she did not suggest.

    f.     Almost immediately after finishing her interview with John Doe's mother and then father, Keith informed John Doe she had completed the investigation, rather than digesting the information.

    g.     Unlike in Jane Roe's 2016 investigation where the complaints and witnesses were permitted to review the investigator's notes before they were placed in the final report, John Doe's mother and father were not permitted to review Keith's notes of their interviews.

    h.     Keith's use of the adjective "obstinate" to describe John Doe's mother is not the language of a neutral factfinder.

147.     On information and belief, had John Doe been female and Jane Roe been male, Keith and Carney would have investigated more thoroughly and found in favor of a female complainant at this stage and reached the conclusion that a male respondent may be responsible

for these charges sufficient to hold a hearing, as was done in Jane Roe's 2016 complaint and investigation.

148.    John Doe raised several problems with the report and were informed that there was no recourse, including no response or avenue for appeal, but that John Doe should email Defendant Johnson if he had questions.

149.    On May 26, 2017, John Doe emailed Defendant Johnson and identified problems with the 2017 investigation, bringing up many of the concerns and asking if there was any recourse available.

150.    On June 6, 2017, Defendant Johnson replied in a short email: "The investigators reviewed and considered all materials which [John Doe] submitted, and interviewed all witnesses which he put forth, and then made determinations based on the totality of the information. Yes, it is accurate, per our policy, that there is no further process if the investigators conclude that student conduct code charges are not warranted,"

**The Sanctions**

151.    QU maintains John Doe's disciplinary record, including the findings of responsibility for each charge against each complainant, for seven years, during which time future employers or educational programs would be made aware of them if John Doe waived his privacy rights, which many require of applicants, which upon information and belief would have greatly reduced his chances of acceptance.

152.    On April 27, 2017, Defendant Johnson informed John Doe that he would not be permitted to walk at the graduation ceremony for the School of Business, but instead could walk at the earlier graduation for the school of College of Arts and Sciences, and that his family would not be permitted to attend any social receptions which include a parent open house and

49

a reception following the commencement ceremony. Defendant Johnson advised that these restrictions were "designed to prohibit physical proximity between [John Doe] and [Jane Roe]."

153.     John Doe requested reconsideration due to the fact that he was receiving a degree from the School of Business; that this was  large public event; that John Doe would abide by any restriction to ensure that he would not be in close physical proximity to Jane Roe; that they have abided by a NCO for the entire academic year at QU with no issues from John Doe; that not walking at the School of Business graduation would be a hardship in that he had worked very hard to overcome many challenges in his life and succeed academically, including his learning differences; that he had connected with professors at QU that have been very supportive and he believes will continue to help him with future employment and/or school; and that if he does not attend this ceremony, aside from his extreme disappointment in not being allowed to share this momentous occasion with his professors and classmates, those connections will be weakened and will affect his future. He requested that if physical proximity is the reason, please let him know so that he could understand this.

154.    On May 1, 2017, Defendant Johnson offered no explanation, merely writing, "the decision stands."  On May 8, 2017, John Doe again asked for an explanation so he could understand and again Defendant Johnson offered no explanation merely writing, "the decision stands."

156.    John Doe sent numerous emails to Defendants Kalagher and Johnson to obtain permission in advance to be on campus over the last weeks of classes and through graduation.

157.    On May 1, 2017, John Doe emailed Defendants Kalagher and Johnson asking if he needed approval to accept a QU Professor's offer of a summer internship.  On May 4, 2017, John Doe again asked about the internship as he needed to provide an answer and was informed

that Defendant Johnson was deciding.  On May 10, 2017, John Doe again asked about whether he needed approval to accept the internship.

158.    On May 11, 2017, Defendant Johnson emailed approval for two weeks from July 10 through July 21 in the School of Business with the stipulation that he not be in any other building on campus reasoning that the internship was extended while John Doe was completing his degree and "is directly related to his academic learning and education" and she considered John Doe's "participation in this internship as completing his academic learning rather than participating in an extracurricular activity."  John Doe immediately emailed back and informed Defendant Johnson that there were other dates in June and July and asked that he be permitted to attend the other weeks. Defendant Johnson denied John Doe's request, asserting her rationale that she had approved the first request to extend John Doe's learning experience, and informed him that it would be neither fair nor rationale to approve his request for more time. John Doe let Defendant Johnson know that he was attempting to obtain more information and that he would have more limited dates for the internship and asked if that would be approved since these weeks would fit under the same rationale for approving the other two weeks.  John Doe said that if Jane Roe was in proximity he would abide by any restrictions as he had done since August 2016 and asked her to reconsider and if not asked for an explanation so he could understand so he could make plans with respect to this internship and future employment.  Two days later, John Doe sent information he had received about the needs of the Professor for the internship and requested and additional ten days in addition to the dates previously approved. Three days later, John Doe asked again about the extra ten days as they began the following week and the Professor was waiting to hear back from him. Defendant Johnson denied his request with no explanation.  Because John Doe was needed more during the ten other days, he

asked Defendant Johnson if he could switch the ten days for the two weeks previously approved. Defendant Johnson denied that request.

### Jane Roe's NCO Violation of September 2016

159.     On April 8, 2017, Defendant Johnson advised John Doe that Keith would follow up on John Doe's complaint about a possible violation of the NCO and breach of confidentiality harassment/retaliation by Jane Roe through a friend that John Doe had disclosed to investigators before October 22, 2016 to ascertain the identity of that friend to address John Doe's concerns. John Doe never heard back about that investigation.

### Jane Roe's NCO Violation of February 17, 2017

160.     On March 3, 2017, Keith finished her investigation of the February 17, 2017 complaints of two additional incidents in which John Doe was harassed by two different friends of Jane Roe and sent her report to student affairs.

161.     On March 21, 2017, Defendant Johnson emailed John Doe and advised that the complaints were reviewed by Cindy Porter, who found that the information did not support charges being brought against Jane Doe.  Defendant Johnson would not provide a copy of the Public Safety Report and required John Doe to travel to campus to review it in person.

162.     On March 27, 2017, John Doe reviewed the report in the presence of Defendant Johnson and Keith.  Despite the fact that there was an audio recording of one of Jane Roe's friend that was in direct contradiction of what that friend and Jane Roe had told Keith which raised credibility issues for each of them, Keith determined that there was no violation of the NCO and closed the case.

163.    This investigation was unfair and biased based on John Doe's gender in violation of Title IX, and QU's Title IX Policy and Handbook and publications.  Upon information and belief, had the complainant been a female, Keith would have found a violation of the NCO.

164.    The Hearing Committee was given copies of the Public Safety Report and informed that there was not finding of a violation by Jane Roe.

165.    On April 2, 2017, John Doe apprised Keith and Defendant Johnson that Jane Roe had come to a restaurant right after he had with a group of her friends to avoid any claim to the contrary by Jane Roe or allegation of retaliation of that he was violating the NCO.

### Jane Roe's NCO Violation of April 7, 2017

166.    On April 7, 2017, John Doe reported to Keith and Defendant Johnson he was at a restaurant with friends and Jane Roe was there with friends and was pointing at him to her friends.  Later that night, when the restaurant was closing, John Doe was outside and Jane Roe walked by and said, "I fucking hate you," which he believed was a violation of the NCO.

167.    On April 12, 2017, Keith met with John Doe to interview him about his complaint.

168.    On June 1, 2017, Defendant Johnson emailed John Doe and informed him that on May 4, 2017, Keith had concluded her investigation into the April 7, 2017 complaint of violation of the NCO against Jane Roe and the case was reviewed by Mark DeVilbiss, Director of Residential Life, who found that the information did not support conduct charges being brought against Jane Roe.

169.    On June 28, 2017, John Doe met with Keith and Defendant Johnson to review the report.  Jane Roe in her interview admitted she was at the restaurant with friends but denied seeing John Doe or saying anything to him. The report sets forth that Jane Roe said when she

left she was talking on the phone to friends and was intoxicated but was aware and that she did not believe that she said she "fucking hates him" when she was on the phone, but could not recall her conversation. Jane Roe checked her phone to show Keith the times of her call but said that her phone log only went back to April 8.  Jane Roe offered that if she was given the chance and she felt safe and was permitted to say whatever she wanted, her first choice of words would be much harsher than what John Doe claimed she said.  Keith interviewed John Doe's friends who corroborated his whereabouts.  Keith failed to interview any of Jane Roe's friends or check any social media or phone logs to corroborate Jane Roe's story.  Keith closed the case.

170.    This investigation was unfair and biased based on John Doe's gender in violation of Title IX, and QU's Title IX Policy and Handbook and publications.  Upon information and belief, had the complainant been a female, Keith would have found a violation of the NCO.

## **CLAIMS FOR RELIEF**

## **COUNT ONE – TITLE IX (ERRONEOUS OUTCOME) (QU)**

171.    John Doe realleges and incorporates herein by this reference paragraphs 1 through 170, above, as if fully set forth herein.

172.    John Doe sustained harassment because of his sex that was so severe, pervasive, and/or objectively offensive that it deprived him of access to educational opportunities.

173.    Defendants conducted an inadequate, biased and unfair Investigation, which resulted in the incorrect determination that Plaintiff was sufficiently responsible for the charges to warrant a Hearing.

174.    Defendants conducted an inadequate, biased and unfair Hearing, which resulted in the incorrect determination that Plaintiff was responsible for the charges against him.

175.    The Hearing was not the result of a bona fide, good faith investigation, but instead resulted from and relied primarily on the investigator's biased and inadequate report.

176.    Defendants conducted an inadequate, biased and unfair Appeal, which resulted in the incorrect determination that Plaintiff was responsible for the charges made against him.

177.    The Appeal was not the result of a bona fide, good faith review of the record, but instead resulted from and relied primarily on the investigator's biased and inadequate report and the biased Hearing Committee and Hearing.

178.    Defendants conducted inadequate, biased and unfair investigations into John Doe's complaints against Jane Roe's violations of the NCO, which resulted in the incorrect determinations that Jane Roe was not responsible for the charges made against her.

179.    Defendants conducted inadequate, biased and unfair investigation into John Doe's 2017 complaints against Jane Roe's and Jane Roe 2's sexual misconduct and harassment, which resulted in the incorrect determinations that Jane Roe was not responsible for the charges made against her.

180.    In their actions with respect to the Investigation, the Hearing, the Appeal, and the investigations John Doe's complaints against into Jane Roe's violations of the NCO and John Doe's 2017 complaints against Jane Roe's and Jane Roe 2's sexual misconduct and harassment, the Defendants were motivated by bias with respect to sex.

181.    The Defendants' decision to charge Plaintiff and initiate a Hearing, finding of Responsibility at the Hearing on all charges, and the affirmation of the Hearing Committee's findings on Appeal was based on his gender.

182.     The Defendants' decision to find Jane Roe not responsible for charges of violations of the NCO and of sexual misconduct and harassment and IPV sufficient to hold a Hearing was based on her gender.

183.     Had John Doe been a woman and had Jane Roe and Jane Roe 2 been male, QU would not have favored the male complainants like it favored the female complainants here, and there is little doubt that John Doe would not have been charged with and preliminarily found responsible for these charges of sexual misconduct or assault; that a hearing would not have been scheduled; that John Doe would not have been found Responsible on all charges; that John Doe's Appeal would not have been denied; and that Jane Roe would have been found preliminarily responsible in the 2017 investigation and responsible for violations of the NCO order.

184.     Plaintiff, based solely on his gender, suffered an erroneous outcome of the Investigation, which substantially limited his ability to participate in and benefit from Qu's educational program.  This unlawful discrimination by QU in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects

**COUNT TWO -- TITLE IX (SELECTIVE ENFORCEMENT) (QU)**

185.     Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 184, above, as if fully set forth herein.

186.     John Doe sustained harassment because of his sex that was so severe, pervasive, and/or objectively offensive that it deprived him of access to educational opportunities.

56

187.     Defendants treated Jane Roe and Jane Roe 2 more favorably than Plaintiff, who was similarly situated, in its disciplinary investigation, its Hearing and its Appeal.  In their actions, the Defendants were motivated by bias with respect to sex.  Defendants' decision to charge Plaintiff and initiate a Hearing, finding of Responsibility at the Hearing on all charges, and the affirmation of the Hearing Committee's findings on Appeal was based on his gender.

188.     Defendants treated Jane Roe more favorably than Plaintiff, who was similarly situated, in its 2017 disciplinary investigation of John Doe's 2017 formal complaint.  In their actions, the Defendants were motivated by bias with respect to sex.  Defendants' decision to find that Jane Roe was not sufficiently responsible to charge her and initiate a Hearing was based on her gender.

189.     Defendants treated Jane Roe more favorably than Plaintiff, who was similarly situated, in its investigation of John Doe's complaints about Jane Roe's violations of the NCO. In their actions, the Defendants were motivated by bias with respect to sex.  Defendants' decision to find that Jane Roe was not sufficiently responsible to charge her and initiate a Hearing was based on her gender.

190.     Had John Doe been a woman and had Jane Roe and Jane Roe 2  been male, QU would not have favored the male complainants like it favored the female complainants here, and there is little doubt that John Doe would not have been charged with and preliminarily found responsible for these charges of sexual misconduct or assault; that a hearing would not have been scheduled; that John Doe would not have been found Responsible on all charges; that John Doe's Appeal would not have been denied; and that Jane Roe would have been found preliminarily responsible in the 2017 investigation and responsible for violations of the NCO order.

191.    Plaintiff, based solely on his gender, suffered selective enforcement of the disciplinary process which has limited his ability to participate in and benefit from QU's educational program.  QU's unlawful discrimination violated Title IX and caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

## COUNT THREE -- TITLE IX (DELIBERATE INDIFFERENCE) (QU)

192.    Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 191, above, as if fully set forth herein.

193.    John Doe sustained harassment because of his sex that was so severe, pervasive, and/or objectively offensive that it deprived him of access to educational opportunities.

194.    The harassment of John Doe occurred in a context that was subject to QU's control and where QU could have taken remedial action.

195.    QU had actual knowledge of the harassment sustained by John Doe.

196.    QU's response to the harassment sustained by John Doe and/or its lack of response was deliberately indifferent, insofar as the response or lack thereof was clearly unreasonable in light of the known circumstances.

197.    Plaintiff, based solely on his gender, suffered deliberate indifference with respect to enforcement of the disciplinary process which has limited his ability to participate in and benefit from QU's educational program.  QU's unlawful discrimination violated Title IX and  caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish; severe emotional distress; injury to reputation; past and future economic

loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

## COUNT FOUR - BREACH OF CONTRACT (QU)

198.    Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 197, above, as if fully set forth herein.

199.    John Doe applied to and enrolled as a student in QU and, with the assistance of his parents, paid all required tuition, fees, and expenses.

200.    John Doe's application to and enrollment as a student in QU was done in reliance on QU's representations, and with the reasonable expectation, that QU would implement and enforce the provisions and policies set forth in its official publications, including its Handbook, its Title IX Policy and its ADA Policy, as well as all supporting and explanatory documents produced, published, and/or disseminated by QU.

201.    An express contract or, alternatively, a contract implied in law or in fact was formed between John Doe and QU.

202.    QU breached its contract with John Doe in in numerous ways, including but not limited to one or more of the following ways:

    a.    QU failed to complete its investigation within 60 days.

    b.    QU failed to investigate the complaining parties' potential violations of QU Publications, including, but not limited to, potential sexual misconduct, harassment, and stalking engaged in by each of the complaining parties.

    c.    QU failed to take action either in response to Jane Roe's breach of her NCO, or in response to both of the complaining parties' breach of confidentiality regarding the investigation.

    d.    QU failed to investigate the charges against John Doe in a fair, impartial, and equitable manner.

e.      QU conducted an inadequate and incomplete investigation of the charges against John Doe.

f.      QU conducted a biased investigation of the charges against John Doe.

g.      QU failed to comply with Title IX, as set forth above;

h.      QU failed to provide an environment free from gender-based discrimination and harassment and its promise to address gender -based misconduct;

i.      QU failed to respond quickly, equitably and thoroughly to the complaints by taking more than 8 months to get to this stage of the process, which is well over the recommended 60 days to fully resolve complaints;

j.      QU failed to investigate and address plaintiff's complaints about breach of confidentiality of the investigation and violations of the NCO, harassment and retaliation by Jane Roe's friends first to the investigator and then to Defendant Kalagher;

k.      QU failed to afford plaintiff his right to an investigation and appropriate resolution of all credible complaints of sexual misconduct, gender-based discrimination and/or harassment made in good faith to the University when it failed to investigate complaints of sexual misconduct of sexual harassment, stalking, and IPV by Jane Roe and Jane Roe 2 when they had reasons to know at various stages by virtue of (a) Jane Roe and Jane Roe 2 statements in their interviews with the investigators, (b) plaintiff's statements and evidence produced in his interviews with the investigators,  (c) plaintiff's Response that marshaled the evidence from the Report and provided additional evidence in support of those claims, and (d) complaint to the Title IX coordinator regarding the biased and inadequate investigation.

l.      QU failed to show by a preponderance of the evidence that plaintiff was responsible for his charges;

m.      QU failed to allow plaintiff a meaningful opportunity to challenge information prior to a hearing when they scheduled a Hearing before he had a chance to respond to preliminary findings of responsibility;

n.      QU permitted Jane Roe to have an advisor for her final interview that was a witness and interviewed in the same student conduct matter;

o.      QU failed to interview plaintiff's parents or include their remarks about the investigation in the body of the Report or Revised Report;

p.      QU failed to treat plaintiff in the same manner and provide the same benefits as they did the female complainants because he was male;

q.      QU failed to comply with the ADA;

60

r.      QU failed to provide reasonable accommodations in the entire student conduct process, including with respect to the timing of John Doe's response to the Investigative Report, and to his request to have a person trained in understanding disabilities and emotional issues, including anxiety, depression and ADHD, to assist the investigators and Committee in understanding how these diagnoses and symptoms could explain the underlying conduct at issue and affect credibility determinations based on John Doe's behavior in the interviews and Hearing;

s.      QU failed to maintain confidentiality of John Doe's information pertaining to his disabilities as he had requested;

t.      QU denied John Doe equal educational opportunities and full participation in the student conduct process and discriminated against him based on his disabilities

203.    John Doe has performed all conditions required of him under the terms of the QU Publications.

204.    As a result of QU's breach of the QU Publications including but not limited to as set forth above, John Doe has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of academic achievement, loss of employment opportunities, and loss of reputation.

## COUNT FIVE - BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (QU)

205.    Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 204, above, as if fully set forth herein.

206.    The QU Publications, including the Title IX Policy, the Handbook and the ADA Policy, each contained an implied covenant of good faith and fair dealing pursuant to which QU was obligated to deal with John Doe in a fair, reasonable, and equitable matter to ensure that John Doe received all benefits to which he was entitled under the QU Publications.

207.    By engaging in the foregoing conduct, QU callously, willfully, and deliberately disregarded John Doe's rights under the QU Publications.

61

208.   QU's unreasonable and intentional conduct in failing to comply with its contractual obligations was in reckless, wanton, deliberate, malicious and callous disregard of John Doe's rights, and constitutes a breach of the implied covenant of good faith and dealing present in the contracts.

209.   As a result of QU's breach of the implied covenant of good faith and fair dealing, John Doe has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of academic achievement, loss of employment opportunities, and loss of reputation.

## COUNT SIX - TORTIOUS INTERFERENCE WITH CONTRACT (DEFENDANT JOHNSON)

210.   Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 209, above, as if fully set forth herein.

211.   At all times relevant to this Complaint, John Doe had contractual relationships with QU.

212.   At all times relevant to this Complaint, Defendant Johnson had knowledge of John Doe's contractual relationship with QU.

213.   At all times relevant to this Complaint, Defendant Johnson was responsible for ensuring that John Doe received fair, impartial, and equitable treatment with respect to the investigation and disposition of the charges brought against him.

214.   Defendant Johnson, by her actions and omissions as described above, intentionally and maliciously interfered, or attempted to interfere, with John Doe's contractual relationship with QU.

215.   As a result of Defendant Johnson's actions as described above, John Doe has

sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of academic achievement, loss of employment opportunities, and loss of reputation.

## COUNT SEVEN - TORTIOUS INTERFERENCE WITH CONTRACT
### (DEFENDANT KALAGHER)

216.   Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 215, above, as if fully set forth herein.

217.   At all times relevant to this Complaint, John Doe had contractual relationships with QU.

218.   At all times relevant to this Complaint, Defendant Kalagher had knowledge of John Doe's contractual relationship with QU.

219.   At all times relevant to this Complaint, Defendant Kalagher was responsible for ensuring that John Doe received fair, impartial, and equitable treatment with respect to the investigation and disposition of the charges brought against him.

220.   Defendant Kalagher, by his actions and omissions as described above, intentionally and maliciously interfered, or attempted to interfere, with John Doe's contractual relationship with QU.

221.   As a result of Defendant Kalagher's actions as described above, John Doe has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of academic achievement, loss of employment opportunities, and loss of reputation.

## COUNT EIGHT - TORTIOUS INTERFERENCE WITH CONTRACT
### (DEFENDANT CONTRUCCI)

222.   Plaintiff realleges and incorporates herein by this reference paragraphs 1 through

221, above, as if fully set forth herein.

223.    At all times relevant to this Complaint, John Doe had contractual relationships with QU.

224.    At all times relevant to this Complaint, Defendant Contrucci had knowledge of John Doe's contractual relationship with QU.

225.    At all times relevant to this Complaint, Defendant Contrucci was responsible for ensuring that John Doe received fair, impartial, and equitable treatment with respect to the investigation and disposition of the charges brought against him.

226.    Defendant Contrucci, by his actions and omissions as described above, intentionally and maliciously interfered, or attempted to interfere, with John Doe's contractual relationship with QU.

227.    As a result of Defendant Contrucci's actions as described above, John Doe has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of academic achievement, loss of employment opportunities, and loss of reputation.

## COUNT NINE - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (ALL DEFENDANTS)

228.    Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 227, above, as if fully set forth herein.

229.    The Defendants' conduct, as described above, created an unreasonable risk of causing Plaintiff mental anguish and emotional distress.

230.    Plaintiff's mental anguish and emotional distress was foreseeable.

231.    Plaintiff's mental anguish and emotional distress was severe enough that it might result in illness or bodily harm.

232.    The Defendants' conduct in fact caused Plaintiff severe and substantial mental anguish and emotional distress.

## COUNT TEN – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (ALL DEFENDANTS)

233.    Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 232, above, as if fully set forth herein.

234.    The Defendants knew or should have known that emotional distress was the likely result of their conduct, as described above.

235.    The Defendants' conduct was extreme and outrageous.

236.    The Defendants' conduct in fact caused Plaintiff severe and substantial mental anguish and emotional distress.

## COUNT ELEVEN – NEGLIGENCE
### (ALL DEFENDANTS)

237.    Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 236, above, as if fully set forth herein.

238.    Defendant QU and the individual Defendants assumed direct responsibility for Plaintiff's protection from discrimination on the basis of sex and of his disability by, among other things, promulgating Title IX and ADA policies and procedures and holding QU out as a university that would protect students from gender discrimination and accommodate students with disabilities.

239.    Defendant QU and the individual Defendants assumed direct responsibility for Plaintiff's protection from discrimination on the basis of sex and on the basis of his disability due to duties imposed by statute, including but not limited to Title IX, the ADA, Section 504 of the Rehabilitation Act of 1973, and Conn. Gen. Stat. § 10a-55m.

240.    Defendant QU assumed the duty to follow these statutes and to enforce QU's policies and procedures equitably and fairly, and in a way that comported with reasonable expectations of due process.

241.    Defendants assumed a duty to conform to the provisions and policies set forth in QU's official publications, including its Handbook, its Title IX Policy, and its ADA Policy as well as all supporting and explanatory documents produced, published, and/or disseminated by QU.

242.    The individual Defendants were QU employees and agents charged with providing protections of fair process to Plaintiff and supervising those responsible for providing fair process to Plaintiff or protecting him from discrimination.

243.    Among other things, QU's Title IX Policy Handbook held out QU as, among other things, promising "procedures … designed … to ensure a fair process for individuals who are accused of discriminatory conduct."

244.    QU's ADA Policy held out QU as ensuring, among other things, that "[n]o qualified student will be excluded from participation in any University program or be subject to any form of discrimination based on disability."  QU also pledged to "provide[] reasonable accommodations to students with disabilities in order to reduce or eliminate any disadvantages that may exist because of the disability."

245.    Defendants individually and collectively breached their duty to protect Plaintiff from discrimination on the basis of gender and disability in numerous ways, including but not limited to the following:

       a.    Defendants failed to investigate the complaining parties' potential violations of QU Publications, including, but not limited to, potential sexual misconduct, harassment, and stalking engaged in by each of the complaining parties.

b.      Defendants failed to take action either in response to Jane Roe's breach of her NCO or breach of confidentiality regarding the investigation.

c.      Defendants failed to investigate the charges against John Doe in a fair, impartial, and equitable manner.

d.      Defendants conducted an inadequate and incomplete investigation of the charges against John Doe.

e.      Defendants conducted a biased investigation of the charges against John Doe.

f.      Defendants failed to comply with Title IX, as set forth above.

g.      Defendants failed to provide an environment free from gender-based discrimination and harassment and failed to address gender-based misconduct directed at Plaintiff.

h.      Defendants failed to investigate and address Plaintiff's complaints about breach of confidentiality of the investigation and violations of the NCO, harassment, and retaliation by Jane Roe's friends, complaints made first to the investigator and then to Defendant Kalagher.

i.      Defendants failed to afford Plaintiff his right to an investigation and appropriate resolution of all credible complaints of sexual misconduct, gender-based discrimination and/or harassment made in good faith to the University when it failed to investigate complaints of sexual harassment, stalking, and IPV by Jane Roe and Jane Roe 2, when they knew or should have known to do so at various stages by virtue of (a) Jane Roe and Jane Roe 2 statements in their interviews with the investigators, (b) Plaintiff's statements and evidence produced in his interviews with the investigators, (c) Plaintiff's Response that marshaled the evidence from the Report and provided additional evidence in support of those claims, and (d) Plaintiff's complaint to the Title IX coordinator regarding Defendants' biased and inadequate investigation.

j.      Defendants failed to show by a preponderance of the evidence that Plaintiff was responsible for his charges but nevertheless found him responsible.

k.      Defendants failed to allow Plaintiff a meaningful opportunity to challenge information prior to a hearing when they scheduled a hearing before he had a chance to respond to preliminary findings of responsibility.

l.      Defendants permitted Jane Roe to have an advisor for her final interview who was a witness and who was interviewed in the same student conduct matter.

m.      Defendants failed to interview Plaintiff's parents or include their remarks about the investigation in the body of the Report or Revised Report.

n.      Defendants failed to treat Plaintiff in the same manner and provide the same benefits as they did the female complainants because he was male.

o.      Defendants failed to comply with the ADA or Section 504 of the Rehabilitation Act of 1973.

p.      Defendants failed to provide reasonable accommodations throughout the entire student conduct process, including with respect to the timing of John Doe's response to the Investigative Report, and to his request to have a person trained in understanding disabilities and emotional issues, including anxiety, depression and ADHD, to assist the Committee in understanding how these diagnoses and symptoms could explain the underlying conduct at issue and how they affected Defendants' erroneous credibility determinations based on John Doe's behavior in the interviews and Hearing.

q.      Defendants failed to maintain confidentiality of John Doe's information pertaining to his disabilities as he had requested.

r.      Defendants denied John Doe equal educational opportunities and full participation in the student conduct process and discriminated against him based on his disabilities.

246.    Defendants also failed to adequately train QU's Title IX investigators, Deputy Coordinator, Coordinator, and Hearing and Appeal Panel members.  As a result, since 2012, in assault claims at QU, male accused students, including Plaintiff, were and are invariably found responsible in complaints by female students, regardless of the weight of the evidence, while female accused are not.

247.    When, in 2015, John Doe was assaulted by a male student and punched in the face, Defendant Kalagher and QU's Committee Chair Megan Buda were involved in the student conduct investigation for these assaults.  They negligently imposed very lenient sanctions

against the male who had assaulted John Doe.  Then QU did little if anything to enforce the sanction, exposing John Doe to further abuse and trauma, including a subsequent assault by the male student.

248.   Individual Defendants Terri Johnson, Seann Kalagher, and Vincent Contrucci were either directly responsible for negligently breaching their duty to protect Plaintiff from discrimination on the basis of gender and disability, or they exercised direct supervisory control over those who did.  They were either direct agents of Plaintiff's discrimination, or they knew or should have known of his discrimination and did nothing about it.  Where employees or agents of QU under Defendant Johnson's, Defendant Kalagher's, or Defendant Contrucci's supervisory control negligently failed to protect Plaintiff from discrimination, the individual Defendants knew or should have known that Plaintiff was, in fact, experiencing discrimination by the acts enumerated in Paragraph 245 above, among others.

249.   Harm suffered by Plaintiff was a reasonably foreseeable consequence of Defendants' breaches of duty, as set forth above.

250.   As a result of Defendants breaches of their duties, John Doe has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of academic achievement, loss of employment opportunities, and loss of reputation.

### COUNT TWELVE– RECKLESS AND WANTON MISCONDUCT
### (ALL DEFENDANTS)

251.   Plaintiff realleges and incorporates herein by this reference paragraphs 1 through 250**,** above, as if fully set forth herein.

252.   Defendants, individually and collectively, owed Plaintiff a reasonable duty of care to safeguard him from discrimination on the basis of his gender and of disability.

Defendants assumed a duty to enforce QU's policies and procedures equitably and fairly and to abide by QU's statutory obligations under Title IX, the ADA, Section 504 of the Rehabilitation Act of 1973, and Conn. Gen. Stat. § 10a-55m.  Defendants had a duty to uphold their obligations in a way that comported with reasonable expectations of due process and in a way that conformed with the provisions and policies set forth in QU's official publications, including its Handbook, its Title IX Policy and its ADA Policy, as well as with all supporting and explanatory documents produced, published, and/or disseminated by QU.

253.    Defendants, individually and collectively, intentionally breached their duty of care to protect Plaintiff from discrimination on the basis of his gender and on the basis of his disability, in particular but not limited to the actions alleged in Paragraph 245 above.

254.    In their actions discriminating against Plaintiff on the basis of his gender and on the basis of his disability, and in unfairly denying him fair process, Defendants individually and collectively indicated a reckless disregard for Plaintiff's just rights and/or safety.  Defendants individually and collectively were deliberately indifferent to the consequences that their actions had upon Plaintiff.

255.    Defendants' negligence evinced a reckless indifference to the consequences on Plaintiff's health and reputation.

256.    The harm caused to Plaintiff was a reasonably foreseeable consequence of Defendants' wanton and reckless breach of their duties.

257.    As a result of Defendants' breach of duties as described above, John Doe has sustained substantial monetary losses and other significant damages, including severe mental distress and anguish, loss of academic achievement, loss of employment opportunities, and loss of reputation.

70

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

A.      Enter an order declaring that Quinnipiac University has engaged in discrimination on the basis of sex in violation of Title IX and the regulations promulgated thereunder;

B.      Issue a permanent injunction directing Quinnipiac University to remove any findings of responsibility from his Quinnipiac University student disciplinary record regarding Jane Roe's and Jane Roe 2's complaints and restraining Quinnipiac University from discriminating against its students on the basis of sex in violation of Title IX and the regulations promulgated thereunder;

C.      Maintain jurisdiction over this action to monitor Quinnipiac University's compliance with the Court's orders;

D.      Award plaintiff compensatory damages, punitive damages, and other monetary relief as permitted by law;

E.      Award plaintiff reasonable attorneys' fees and expenses pursuant to 42 U.S.C. §1988; and

F.    Order such other and further relief as the Court deems appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES TRIABLE BY A JURY.**

PLAINTIFF
JOHN DOE

By:  ___/s/ *Felice M. Duffy*____
      Felice M. Duffy
      Duffy Law, LLC
      770 Chapel Street, Suite 4F
      New Haven, CT 06510
      (203)946-2000 phone
      (203)907-1383 fax
      felice@duffylawct.com
      Federal Bar No.:  ct21379

            And

      Douglas J. Varga (ct 18885)
      Lucas & Varga LLC
      2425 Post Road, Suite 200
      Southport, CT 06890
      Tel:  (203) 227-8400
      Fax:  (203) 227-8402
      Email: dvarga@lucasvargalaw.com

      His Attorneys

## <u>CERTIFICATION</u>

I hereby certify that on May 1, 2018, a copy of the foregoing Second Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

By:  ___/s/ *Felice M. Duffy*_____
      Felice M. Duffy (ct21379)