## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ | : |
| JOHN DOE | : |
| | : |
| Plaintiff, | : Civil Action No.: 3:17-CV-00364-JBA |
| | : |
| | : |
| V. | : |
| | : |
| QUINNIPIAC UNIVERSITY, TERRI | : |
| JOHNSON, SEANN KALAGHER, | : |
| AND VINCENT CONTRUCCI | : |
| | : |
| Defendants | : November 14, 2018 |
| _____ | : |

### MEMORANDUM IN SUPPORT OF DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. Rule 56 (c), the defendants, Quinnipiac University ("QU"), Terri Johnson, Seann Kalagher and Vincent Contrucci (hereinafter "defendants") hereby move for summary judgment on the grounds that there is no genuine issue of material fact that the plaintiff, John Doe, cannot succeed on his claims as a matter of law. Accordingly, the defendants are entitled to judgment as a matter of law.

### I.    STATEMENT OF FACTS

The plaintiff, John Doe commenced this action by way of a complaint filed on March 2, 2017. Most recently, the plaintiff filed a Second Amended Complaint on July 18, 2018, to which the defendants filed an Amended Answer and Affirmative Defenses on August 3, 2018. In his Complaint the plaintiff alleges the following facts.

The plaintiff was the subject of a Title IX disciplinary investigation at QU that involved charges of intimate partner violence, assault, breach of peace, disturbing the peace and property

damage, arising from relationships with his former girlfriends, Jane Roe and Jane Roe 2.  On April 21, 2017, a Title IX Grievance Hearing Committee found John Doe responsible for the charges brought against him.  An appeal officer and appeal panel, denied John Doe's appeal.  (Compl. ¶ 1).

The defendants, QU, Terri Johnson, Seann Kalagher and Vincent Contrucci, now files the instant Motion for Summary Judgment on the ground that the plaintiff cannot succeed on any of his twelve causes of action.  As will be explained in more detail, there is no genuine issue of material fact that the defendants are entitled to judgment as a matter of law.

## II.   LEGAL ARGUMENT

## A.   STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  To overcome a motion for summary judgment, a plaintiff must offer specific support for her claims, not simply conclusory allegations. Bickerstaff v. Vassar College, 196 F.3d 435, 451 (2d Cir. 1999); Martin v. Town of Westport, 329 F.Supp.2d 318, 325 (D.Conn. 2004).  To avoid summary judgment, Plaintiffs "may not rest upon mere allegations or denials... [instead they] must set forth specific facts showing that there is a genuine issue for trial... [and provide] sufficient evidence supporting the claimed factual dispute."  (Internal quotation marks omitted).  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505 (1986).  Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive

2

determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548 (1986).

## B. COUNT ONE – "ERRONEOUS OUTCOME" UNDER TITLE IX (QU)

Title IX prohibits discrimination on the basis of sex in any educational program or activity that directly or indirectly receives Federal financial assistance.  20 U.S.C. § 1681(a). The plaintiff contends that QU violated Title IX because gender bias against male respondents in sexual assault cases resulted in an "erroneous outcome" because he was found responsible in his case and also because Jane Roe was not found responsible in her case.  (Compl. ¶¶ 180, 183).

A successful "erroneous outcome" claim is one where the plaintiff was innocent and that gender bias was a motivating factor in the incorrect determination made by the university.  See Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994).  A plaintiff making an erroneous outcome claim must offer evidence to show "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding."  Id.  For example, a plaintiff may demonstrate that he was innocent and did not engage in the conduct complained of. See Marshall v. Ohio University, No. 2:15-CV-775, 2015 WL 7254213 at *6 (S.D. Ohio, November 17, 2015) (the plaintiff does not even allege that he was innocent of a policy violation or that he did not send the offending texts).  A plaintiff may also demonstrate that he is a "victim of mistaken identity and/or that there was sufficient incongruity in the witness descriptions of the alleged perpetrator and in the details of the offense itself to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding."  (Internal quotation marks omitted.) Faparusi v. Case Western Reserve University, No. 1:16-CV-1586, 2016 WL 8794464 at *4 (N.D. Ohio, November 30, 2016).

Once the plaintiff has established doubt, the plaintiff must next show "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." Yusuf v. Vassar College, supra, 35 F.3d 715.  Such evidence may include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  Id.  It is important to note that "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."  Sahm v. Miami University, 110 F. Supp. 3d 774, 778 (S.D. Ohio, May 20, 2015).  In addition, "one case by an individual who was subjectively dissatisfied with the result [of a disciplinary proceeding] does not constitute a pattern of decision making . . . ." (Internal quotation marks omitted.)  Mallory v. Ohio University, 76 Fed. Appx. 634, 640 (6th Cir. 2003).

The evidence in this case fails to create any triable issue of fact with respect to gender bias, as the plaintiff's claims are based on sheer speculation, not "competent evidence" or "specific facts."  (Citations omitted.)  Bleiler v. College of Holy Cross, No. 11-11541, 2013 WL 4714340 at *5 (D. Mass. 2013).  The plaintiff has adduced no direct evidence of gender bias on the part of the investigators, Hearing Committee, appeal officer, appeal panel, or any QU official for that matter.  To the contrary, the plaintiff testified that no Quinnipiac officials or representatives made any comments or statements that they were going to find him responsible because he was male.  (Exhibit D, Pl's Depo Tran., p. 231: 3-5).  The plaintiff also testified that no QU officials or representatives made comments or statements that they were biased against him when Jane Roe was found not responsible because he was male.  (Id.).

Also, the plaintiff testified that the Hearing was biased against him and inadequate because "it didn't seem very important on what I had to say.  It was kind of more based off what was written in the investigation report."  (Exhibit D, Pl's Depo Tran., p. 226: 2-6).  He further testified that if the Hearing Committee reviewed and considered his Response and the investigators report that would encompass everything that he wanted them to consider.  (Exhibit D, Pl's Depo Tran., p. 226: 19-24).  It is clear that the Hearing Committee was provided the investigation report and Response prior to the Hearing.  (Exhibit F, SK Depo Tran., p. 288: 8-12).  In addition, the plaintiff testified that the appeal was biased and unfair because "they kind of already had their minds made up already" because of the investigation and subsequent report.  (Exhibit D, Pl's Depo Tran., p. 228: 2-6; p. 229: 5-9).

The plaintiff also has not introduced any indirect evidence of systemic gender bias.  To the contrary, QU's policies concerning sexual assault are gender neutral (Exhibit A), and the evidence shows that roughly 51% of male students accused of sexual assault or sexual misconduct were **not** found to be responsible in QU Title IX disciplinary proceedings.  (Exhibit N); See Bleiler, supra, 2013 WL 4714340 at *8 (holding fact that one-third of male students are found not responsible precludes finding of gender bias).  In addition, despite the allegations in the Complaint, a student named J.P. complained that he was discriminated against during the student conduct process based on his ethnicity, not gender.  The OCR found that QU engaged in no bias, the OCR looked through past cases and found no pattern of bias, and also found that Mr. Kalagher did not make any racially insensitive statements.  (Compl. ¶¶ 23-24; Exhibit F, SK Depo Tran., p. 26: 20-25; p. 27: 1-25; p. 28: 1-13).  In addition, despite the allegations in the Complaint that another student name S.R. was treated more favorably during the general student conduct process, S.R. was only male and received the same sanction as the plaintiff.  The

plaintiff also testified that he did not believe that S.R. was treated more favorably during the student disciplinary process.  (Exhibit D, Pl's Depo Tran., p. 125: 21-25; Exhibit M, SR's Conduct File, p. 33).  As such, the plaintiff has adduced no evidence of any QU official being pressured by the supposed "nationwide trend favoring female students" because of the "OCR's enforcement of the 2011 Dear Colleague letter."  (Compl. ¶¶ 27-30).  Accordingly, QU is entitled to summary judgment as to the plaintiff's erroneous outcome claim.

C. **COUNT TWO – SELECTIVE ENFORCEMENT UNDER TITLE IX (QU)**

The plaintiff contends that QU violated Title IX because the defendants treated Jane Roe and Jane Roe 2 more favorably than the plaintiff during the investigation, hearing and appeal based on gender.  (Compl. ¶ 188).  In addition, the plaintiff contends that the defendants treated Jane Roe more favorably in regards to his complaints that she violated the no contact order ("NCO") and the decision not to charge her in response to his formal complaint based on gender. (Compl. ¶ 189).

"A selective enforcement claim is one where a plaintiff alleges that, regardless of his guilt or innocence, the decision to initiate proceedings or the penalty imposed was affected by the student's gender. . . .  This type of claim is centered on the familiar concept of disparate treatment accompanying traditional discrimination cases.  Plaintiffs must establish that he or she (1) is a member of a protected class, (2) suffered an adverse action, (3) was treated less favorably than other similarly situated students, outside the protected class, under nearly identical circumstances."  (Citations omitted.)  Pacheco v. St. Mary's University, No. 15-CV-1131, 2017 WL 2670758 at *18 (W.D. Texas, June 20, 2017).

Specifically, a male plaintiff must demonstrate that "a female was in circumstances sufficiently similar to his own and was treated more favorably by the University."  Mallory v.

Ohio University, 76 Fed.Appx. 634, 641 (6th Cir. September 11, 2003). "The male plaintiff must show that the University's actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings." (Internal quotation marks omitted.) Xiaolu Peter Yu v. Vassar College, 97 F.Supp.3d 448, 480 (S.D.N.Y. March 31, 2015). "Stated differently, a plaintiff demonstrates selective enforcement through the identification of a comparator of the opposite sex who was treated more favorably by the educational institution when facing similar disciplinary charges." (Internal quotation marks omitted.) Stenzel v. Peterson, No. 17-580, 2017 WL 4081897 at *4 (D. Minn. September 13, 2017). "To consider a student similarly situated, the individuals with whom a plaintiff seeks to be compared *must have engaged in the same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it." (Emphasis in original; internal quotation marks omitted.) Saravanan v. Drexel University, No. 17-3409, 2017 WL 5659821, *6 (E.D. Penn., November 24, 2017).

Here, there is no evidence of a comparator of the opposite sex who was treated more favorably by QU when facing similar disciplinary charges. See generally, Yusuf, supra, 35 F.3d at 716; Doe v. Columbia University, 101 F.Supp.3d 356, 374-75 (S.D.N.Y 2015). Instead, the plaintiff relies on Jane Roe and Jane Roe 2 as the comparators, claiming without basis that they are "similarly situated." To the contrary, it is clear that the plaintiff was found responsible on all charges after an investigation, hearing and appeal. (Compl. ¶ 1). It is also clear that the investigators did not pursue the plaintiff's allegations against Jane Roe and Jane Roe 2 as a complaint because the investigators questioned the plaintiff, Jane Roe and Jane Roe 2 and the investigators could not corroborate John Doe's allegations. The investigators made the determination that there was nothing that needed to be investigated, reinvestigated or new

charges brought.  (Exhibit E, VC Depo Tran., Vol. II, p. 531: 7-25; p. 534: 1-15; Exhibit F, SK

Depo Tran., p. 301: 20-25; p. 304: 8-21).  Also, QU informed John Doe that he could not bring a

complaint against Jane Roe 2 because she was no longer a student.  (Compl. ¶ 130).  Therefore,

Jane Roe and Jane Roe 2 were not facing similar disciplinary charges and, therefore, were not

similarly situated.

        In addition, Jane Roe was not similarly situated to the plaintiff in regards to the alleged

violations of the NCO.  The plaintiff does not even allege that he was a comparator, i.e. found

responsible for violating the NCO, when Jane Roe was found not responsible.  Nevertheless, the

alleged violations of the NCO were investigated by public safety and it was determined by other

staff members that there were no violations by Jane Roe.  (Compl. ¶¶ 81, 160-162, 164, 167-

168).  Also, any alleged violations of the NCO are decided as a general student conduct matter.

(Exhibit F, SK Depo Tran., p. 246: 8-13).  As such, they should not be considered under this

Title IX cause of action.  Additionally, Jane Roe was not similarly situated to the plaintiff when

the investigators decided not to charge her after the plaintiff made a formal complaint against

her.  Jane Roe was investigated and found not responsible for sexual harassment, intimate partner

violence and stalking.  (Compl. ¶ 144; Exhibit K, KK Depo Tran., p. 189: 14-19 and 21-24).

        Even if there was evidence of a comparator of the opposite sex who was treated more

favorably by QU when facing similar disciplinary charges, the evidence in this case fails to

create any triable issue of fact with respect to gender bias, as there is no evidence that QU was

motivated by the male plaintiff's gender.  Xiaolu Peter Yu, supra, 97 F.Supp.3d 448 at 480.  To

the contrary, the plaintiff testified that no Quinnipiac officials or representatives made any

comments or statements that they were going to find him responsible or not charge Jane Roe

because he was male.  (Exhibit D, Pl's Depo Tran., p. 231: 3-5).  The plaintiff further testified

that Jane Roe was treated more favorably than him during the investigation because one side of the investigation was done before he had a chance to speak and Jane Roe had more time to prepare everything.  (Exhibit D, Pl's Depo Tran., p. 215: 21-25; p. 216: 1-8).  However, it is typical for the investigators to interview a Complainant, witnesses and then the Respondent. (See Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11, p. 1; See also Exhibit E, VC Depo Tran., Vol. II, p. 359: 24-25; p. 360: 1).  Also, the plaintiff testified that he was given extra-time when he requested it.  (Exhibit D, Pl's Depo Tran., p. 215: 21-25; p. 217: 4-12).  Therefore, it was the respective conduct of the plaintiff, Jane Roe and Jane Roe 2, not their gender that resulted in different treatment. Accordingly, QU is entitled to summary judgment as to the plaintiff's selective enforcement claim.

### D. <u>COUNT THREE – TITLE IX – DELIBERATE INDIFFERENCE (QU)</u>

The plaintiff also contends that QU violated Title IX because QU had actual knowledge of the harassment sustained by the plaintiff and its response and/or lack thereof was deliberately indifferent to the outcome as a result of gender bias, which limited his ability to participate in and benefit from QU's educational program.  (Compl. ¶¶ 193-197).

A recipient of federal funding can be liable under Title IX if its deliberate indifference subjects its students to harassment.  Davis v. Moore County Board of Education, 526 U.S. 629, 644, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).  "[F]unding recipients are properly held liable in damages only when they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  Id. at 650.

"[Deliberate indifference claims are typically brought in cases where a school has ignored a victim's complaint of sexual harassment or assault." <u>Doe v. Brown Univ</u>., No. 15-144 S, 2016 WL 715794, at *10 (D.R.I. February 22, 2016); <u>see also</u> <u>Marshall v. Ohio University</u>, No. 2:15-CV-775, 2015 WL 1179955, at *8 (S.D. Ohio Mar. 13, 2015).  In the present case, the plaintiff's claims of sexual harassment or assault were not ignored.  To the contrary, the investigators did not pursue the plaintiff's allegations against Jane Roe and Jane Roe 2 as a complaint because the investigators questioned the plaintiff, Jane Roe and Jane Roe 2 and the investigators could not corroborate John Doe's allegations.  The investigators made the determination that there was nothing that needed to be investigated, reinvestigated or new charges brought.  (<u>Exhibit E</u>, VC Depo Tran., Vol. II, p. 531: 7-25; p. 534: 1-15; <u>Exhibit F</u>, SK Depo Tran., p. 301: 20-25; p. 304: 8-21).  Also, QU informed John Doe that he could not bring a complaint against Jane Roe 2 because she was no longer a student.  (Compl. ¶ 130).  In addition, the alleged violations of the NCO were investigated by public safety and it was determined by other staff members that there were no violations by Jane Roe.  (Compl. ¶¶ 81, 160-162, 164, 167-168).  Also, any alleged violations of the NCO are decided as a general student conduct matter.  (<u>Exhibit F</u>, SK Depo Tran., p. 246: 8-13).  As such, they should not be considered under this Title IX cause of action. Additionally, Ms. Johnson assessed John Doe's complaints set forth in the February 1, 2017 letter, the Title IX policy and process, consulted with Mr. Kalagher and QU legal counsel and decided not to open an independent investigation into his complaints.  (Compl. ¶ 78; TJ Depo Tran., p. 197: 17-23).  Also, Jane Roe was investigated by QU and found not responsible for sexual harassment, intimate partner violence and stalking.  (Compl. ¶ 144; <u>Exhibit K</u>, KK Depo Tran., p. 189: 14-19 and 21-24).

Moreover, the traditional deliberate indifference standard, "demands that a funding recipient be shown to have actual knowledge of the harassment." Santiago v. Puerto Rico, 655 F.3d 61, 73 (1st Cir. 2011). Failing "to comply with [Title IX] regulations" in the handling of conduct proceedings, as the plaintiff alleges in this case, "does not establish the requisite actual notice and deliberate indifference." Gebser v. Lago Vista Independent School District, 524 U.S. 274, 291-92, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998); see also Doe v. University of the South, 687 F. Supp. 2d 744, at 758 (E.D. Tenn. October 13, 2009) (dismissing deliberate indifference claim where "misconduct" at issue was university's alleged failure to comply with Title IX regulations); Karasek v. Regents of the University of California, No. 15-cv-03717, 2015 WL 8527338 at *13 (N.D. Cal. December 11, 2015) (noting that the Department of Education's Dear Colleague Letter "does not define what amounts to deliberate indifference.").

In the present case, QU did not ignore the plaintiff's complaint of sexual harassment or assault, it simply did not find in his favor. In addition, there is no evidence that any QU administrator had "actual knowledge" that the plaintiff was being discriminated against in connection with his disciplinary case, his alleged violations of the NCO, or Jane Roe's disciplinary case because he was male.

In addition, "[f]or a court to find that harassment denied a student access to educational resources and opportunities, the harassment must have [had] a concrete negative effect on the victim's education, which may include dropping grades, becoming homebound or hospitalized due to harassment, physical violence, or physical exclusion from a school resource." Carabello v. New York City Department of Education, 928 F.Supp.2d 627, 643 (E.D.N.Y. March 6, 2013).

In the present case, the alleged harassment did not deny the plaintiff access to educational resources or opportunities. To the contrary, the plaintiff graduated from QU. (Exhibit D, Pl's

Depo Tran. p. 38: 2-3; p. 43: 15-16).  He was able to walk at the earlier graduation ceremony for

the School of Arts and Sciences.  (Compl. ¶ 152).  He was able to participate in an undergraduate

internship from July 10, 2017 through July 21, 2017.  (Compl. ¶ 158; <u>Exhibit I</u>, TJ Depo Tran.,

p. 303: 20-25; p. 311: 5-12).  The plaintiff never asked the Title IX Coordinator for permission to

be on campus to use the library to study, find job resources or meet with teachers.  (<u>Exhibit L</u>, ¶

7).  The plaintiff also testified that he was not an honors student.  During the fall semester, he

received a grade of D in a class.  But he had received the grade of C and C+ during previous

semesters at QU.  (Compl. ¶ 65; <u>Exhibit D</u>, Pl's Depo Tran., QU Transcript, attached as <u>Exhibit</u>

<u>D</u>).  Therefore, the alleged harassment did not deny the plaintiff access to educational resources

or opportunities.  Accordingly, QU is entitled to summary judgment as to the plaintiff's

deliberate indifference claim.

### E.  <u>COUNT FOUR – BREACH OF CONTRACT (QU)</u>

The plaintiff has made claims for breach of express contract and breach of implied

contract.  The plaintiff alleges that QU failed to follow the provisions and policies set

forth in its official publications, including its Handbook, its Title IX policy and its ADA

policy.  (Compl. ¶¶ 200-201).  Whether viewed individually or in the aggregate, these

claims amount to nothing more than an educational malpractice challenge of the

university's decision to find the plaintiff responsible under its Title IX policy after

conducting a Title IX investigation, Title IX Grievance Committee Hearing, and appeal

process.  In addition, the plaintiff is asserting an educational malpractice claim on its

decision not to find Jane Roe responsible under its Title IX policy following a Title IX

investigation, as well as a finding that Jane Roe did not violate a NCO or breach any

confidentiality regarding the investigation.  These claims are precluded by Connecticut

12

law.

In <u>Gupta</u>, the Connecticut Supreme Court expressly rejected tort and contract claims challenging an academic institution's overall educational policies, curriculum, and program. <u>Gupta v. New Britain General Hospital</u>, 239 Conn. 574, at 592-593, 687 A.2d 111 (1996). "Because [ ] tort principles are difficult, if not impossible, to apply in the academic environment, courts have almost universally held that claims of 'educational malpractice' are not cognizable." (Internal quotation marks omitted). <u>Id</u>. at 592. Based on the same "jurisprudential considerations that shed doubt on the viability of the tort of educational malpractice..., contract claims challenging the overall quality of educational programs have generally been rejected" as well. (Citations omitted; internal quotation marks omitted.) <u>Id</u>. at 592-93. Recognizing both the deference afforded to academic decision-makers and the difficulty of applying tort and contract principles to the academic context, the <u>Gupta</u> court recognized only two situations where courts may entertain a cause of action for institutional breach of a contract for educational services. "The first would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field. The second would arise if the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." (Citations omitted.) <u>Id</u>. The plaintiff has failed to assert a claim that falls into either <u>Gupta</u> exception.

In Connecticut, "<u>Gupta</u> stands for the principle that the courts will generally not interfere when claims, whether brought in contract or tort, are made against an academic institution regarding the nature and content of its educational programs or the criteria

which the institution applies in determining whether a student meets its academic

requirements."  Hope Academy v. Friel, Superior Court, judicial district of Ansonia-

Milford, Docket No. CV-030081183-S (July 22, 2004, *Lager*, J.) (refusing to "second-guess

the professional judgment of [school] educators and staff and analyze the educational

appropriateness and effectiveness of [the school's] curriculum).  Under the second, "narrow"

Gupta exception, a plaintiff must show that the "educational institution failed to provide

specifically promised educational services."  (Emphasis in original; internal quotation

marks omitted.)  Id.  "General or vague promises do not suffice."  Id.

Characterizing the second Gupta exception as an "exacting standard," the

Connecticut Appellate Court has made clear that, "to limit judicial intrusion into educational

decision making, the student must... allege nonperformance of a special promise, a promise

outside the purview of normal educational expectations."  Faigel v. Fairfield University, 75

Conn. App. 37, 38, 815 A.2d 140 (2003).  Affirming the trial court's entry of summary

judgment, the Faigel Court held that indefinite promissory statements alleged by the plaintiff

"did not satisfy the criteria for an action for breach of contract in an educational context that

were set out in Gupta." Id., at 41-42.

Following Gupta, Connecticut courts have rejected negligence and tort claims in the

educational context even where such claims have been characterized as something other than

educational malpractice.  See, e.g., Jacobs v. The Ethel Walker School, Superior Court,

judicial district of New Britain, Docket No. CV-02-0515279, *5-6 (September 30, 2003,

*Robinson*, J.) ("plaintiff does not have to use the words 'educational malpractice' in order for

a cause of action to sound in the tort of educational malpractice.") citing Vogel v.

Maimonides Academy of Western Conn., Inc., 58 Conn. App. 624, 631, 754 A.2d 824

14

(2000).  In Jacobs, the court held that claims by a former private school student of unfair

disciplinary proceedings and expulsion (including breach of contract claims) were, in fact,

claims for educational malpractice.  As in Jacobs, the plaintiff's contract and tort claims in

the present case are actually claims of educational malpractice.  Indeed, the crux of the

plaintiff's Complaint is an attack on QU's discretion to determine its own policies, and the

conditions and circumstances under which it will provide educational services.  Since the

plaintiff's claims sound in contract and tort, the only real issue here is the plaintiff's

challenge of the university's decision to find the plaintiff responsible under its Title IX

policy and impose sanctions.  Even if the defendant is not entitled to summary judgment on

all claims because the plaintiff's claims sound in educational malpractice, the defendant is

entitled to summary judgment on the plaintiff's breach of contract claim.  Assuming the

Court analyzes the contract claims under the second Gupta exception, those

claims must fail.

### 1. The Process Was Fundamentally Fair.

The plaintiff has not alleged facts nor can the plaintiff prove that the fundamental

processes were unfair.  Gupta v. New Britain General Hospital, supra, 239 Conn. 593;

Disciplinary proceedings are "conducted with basic fairness" if the student has notice of the

allegation against him and an opportunity to be heard., i.e. to present his version of events

and offer supporting evidence.  Cloud v. Trustees of Boston University, 720 F.2d 721, 725

(1st Cir. 1983); Kiani v. Trustees of Boston University, No.-cv-11838, 2005 WL 6489754, at

*8; Schaer v. Brandeis University, 432 Mass. 474, 481, 735 N.E.2d 373 (2000); Morris v.

Brandeis University, 60 Mass. App. Ct. 1119, 804 N.E.2d 961, *2 (2004).

15

The plaintiff was afforded processes that easily meets this test.  The plaintiff had notice of the allegations against him.  On August 22, 2016, the investigators notified the plaintiff via email that they were investigating a Title IX complaint and requested to meet with him to review the process, ask him questions and answer his questions.  He was also informed that he could bring another person with him to the meeting that was not involved in the investigation.  Also attached to the meeting request was a NCO, which requested that he not contact Jane Roe, Jane Roe 2 and another student, A.S.  (See Title IX Investigation Report, Exhibit No. 1, T-IX Doc C).  The investigators interviewed John Doe on August 23, 2016 with an attorney present as his adviser.  (See Title IX Investigation Report, Exhibit No. 1, p. 1).  Also, the defendant had the opportunity to be heard.  The plaintiff submitted a 20-page response ("Response") to the investigation report.  (Compl. ¶ 68, see Exhibit 2 attached and made part of the Amended Complaint, see 3: 17cv364, Docket No. 12.)  The plaintiff attended the Hearing and he plead not responsible to the charges and read his impact statement.  (Compl. ¶¶ 102, 112). The plaintiff also filed an appeal.  (Compl. ¶¶ 118, 119).

The processes the plaintiff was afforded easily meets the test of "fundamental" or "basic" fairness.[1]  The plaintiff's claims that the processes were unfair as applied are addressed below.

### 2.  The Decision was Not Arbitrary, Capricious or in Bad Faith.

---

[1] Compare Doe v. Brandeis Univ., No. 15-115557, 2016 WL 1274533, at *32-37 (D. Mass. Mar. 31, 2016), in which the court at the initial pleading stage, determined that the plaintiff had stated a plausible violation of "basic fairness" on alleged facts vastly different from this case.  The accused student in that case allegedly received no notice of the allegations against him, was not permitted to consult with counsel, was not permitted to confront or cross-examine his accuser or other witnesses directly or indirectly, was not able to view witness statements or other evidence, was denied the opportunity to submit the facts and evidence after learning the charges against him; in addition, his case was decided by a special examiner, who did not provide the accused with a copy of the report until the entire proceeding concluded.

16

The plaintiff has not alleged facts nor can the plaintiff prove that the decision resulted from arbitrary, capricious or bad faith conduct by the university. Gupta v. New Britain General Hospital, supra, 239 Conn. 594. In "exercising its professional judgment, an educational institution does not have license to act arbitrarily, capricious, or in bad faith. Such a substantial departure from academic norms may implicate substantive due process, see Regents of University of Michigan v. Ewing, 474 U.S. 214, 106 S. CT. 507 at 513, 88 L.Ed.2d 523 (1985); or may constitute the breach of an educational contract by a private institution." Gupta v. New Britain General Hospital, supra 239 Conn. 595, citing Doherty v. Southern College of Optometry, 862 F.2d 570, 577 (6th Cir. 1988), cert denied, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989) (implicit in contract is promise not to act capriciously or arbitrarily"; Paulsen v. Golden Gate University, 25 Cal.3d 803, 808-809, 602 P.2d 778 (1979) (159 Cal. Rptr. 858) (applying arbitrary and capricious standard to private school).

In the present case, the plaintiff bears a heavy burden in proving that his finding of responsibility and sanctions, resulted from arbitrary, capricious, or bad faith conduct on the part of QU. To prevail, he must show that QU's decision had no "discernable rational basis." Gupta v. New Britain General Hospital, supra, 239 Conn. 596, citing Holert v. University of Chicago, 751 F.Supp. 1294, 1301 (N.D.Ill.1990). To rebut the university's motion for summary judgment, the plaintiff is required to provide an evidentiary foundation to demonstrate the existence of material facts in this regard. Id., citing Doty v. Mucci, 238 Conn. 800, 805-806, 679 A.2d 945 (1996).

In the present case, the Board had a rational basis that was supported by reasonable grounds. Prior to the Hearing, the Committee was provided the investigation report and the

plaintiff's Response for review.  (<u>Exhibit F</u>, SK Depo Tran., p. 288: 8-12).  The Hearing was

held for approximately seven hours.  (Compl. ¶ 101; <u>Exhibit F</u>, SK Depo Tran., p. 321: 14-17;

<u>Exhibit H</u>, MB Depo Tran., p. 213: 14-25; p. 214: 1-3).  The Hearing Committee took a break to

decide responsibility and it used the preponderance of the evidence standard.  (Compl. ¶ 110;

<u>Exhibit H</u>, MB Depo Tran., p. 184: 9-10).  After the Hearing Committee reconvened, it read the

definitions for each of the charged conduct violations and found John Doe responsible for each

charge against Jane Roe and Jane Roe 2.  (Compl. ¶ 111.).  Mr. Kalagher then read John Doe's

prior charge of assault to the Committee and provided the range of sanctions available for the

findings of responsibility for the charges with which John Doe had been found responsible.

(Compl. ¶ 114).  See <u>Cloud v. Trustees of Boston University</u>, supra, 720 F.2d at 724 (Where

there are any "reasonable grounds" to support the finding of a university disciplinary board,

it "will not be subject to successful challenge in the courts."), <u>quoting</u> <u>Coveney v. President</u>

<u>and Trustees of Holy Cross College</u>, 388 Mass. 16, 19, 445 N.E.2d at 139 (1983); <u>Shaer v.</u>

<u>Brandeis University</u>, 432 Mass. 474, 479 n.9, 735 N.E.2d 373 (2000) (rejecting student's

contract claim where "[t]here was ample evidence which, if believed, could have supported

the board's decision").

**3.  The University Followed its Policies and Procedures.**

Assuming the Court analyzes the contract claims under the second <u>Gupta</u> exception,

those claims must fail.  It is well settled that, "[t]o form a valid and binding contract in

Connecticut, there must be a mutual understanding of the terms that are definite and certain

between the parties ... To constitute an offer and acceptance sufficient to create an

enforceable contract, each must be found to have been based on an identical understanding

by the parties ... If the minds of the parties have not truly met, no enforceable contract exists

... [A]n agreement must be definite and certain as to its terms and requirements ... So long as

any essential matters are left open for further consideration, the contract is not complete ... A

contract requires a clear and definite promise.  (Citations omitted; internal quotation marks

omitted.)  Geary v. Wentworth Laboratories, Inc., 60 Conn.App. 622, 627-28, 760 A.2d 969

(2000); Augeri v. C.F. Wooding Co., 173 Conn. 426, 430, 378 A.2d 538 (1977) ("a contract

must be definite and certain as to its terms and requirements").  "A contractual promise

cannot be created by plucking phrases out of context, there must be a meeting of the minds

between the parties."  (Internal quotation marks omitted).  Reynolds v. Chrysler First

Commercial Corp., 40 Conn.App. 725, 730, 673 A.2d 573, cert. denied, 237 Conn. 913

(1996).

A breach must be material, and not inconsequential.  "A material breach has been

defined as one that would justify the other party to suspend his own performance of the

contract.  The breach must be material, that is, it must be so important that it vitiates or

destroys the entire purpose for entering into the contract.  Contract law has always

distinguished between 'material' and 'immaterial' breaches.  If a breach is immaterial, the

existing rights of the parties do not change.  The contract remains enforceable although the

breach may occasion liability for damages, if any can be proved.  A material breach, on the

other hand, does affect the substantive rights of the parties.  A substantive or material

breach is one which touches the fundamental purpose of the contract and defeats the object

of the parties in making the contract."  A. Prete & Son Construction v. Madison, Superior

Court, judicial district of New Haven, Docket No. CV-91-03103073 (October 4, 1994,

*Healey*, S.T.R.)

"In an action for breach of contract, the general rule is that the award of damages is

designed to place the injured party, so far as can be done by money, in the same position that he would have been in had the contract been performed." Flater v. Grace, 291 Conn. 410, 426 fn. 11, 969 A.2d 157 (2009). "A technical breach of the terms of a contract may be excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is immaterial." Borelli v. H & H Contracting, Inc., 100 Conn.App. 680, 693, n. 6, 919 A.2d 500 (2007), citing 15 Williston, Contracts (4 Ed. 2000) § 44.52, p. 218.

A party who has materially breached a contract cannot prevail on a claim of breach by the other party. The plaintiff's non-compliance with QU's official publications, including its Title IX policy and Student Handbook constituted a material breach of any alleged contract he claims existed between him and QU. It is not disputed that the plaintiff was found responsible for violating QU's Title IX policy. (Compl. ¶ 110; Exhibit H, MB Depo Tran., p. 184: 9-10). Because of his own material breach, QU was excused from further performance of any alleged contract. Accordingly, the plaintiff's contract claims must fail.

The plaintiff's breach of contract claims also fail because none of the QU publications cited by the plaintiff set forth a contractual promise by QU. The provisions are purely informational. As set forth in the Student Handbook, which incorporates the QU Title IX policy, "The Quinnipiac University Student Handbook is intended to serve as a source of information on the many services, activities and policies of Quinnipiac …. This handbook is provided to students and applicants for their general guidance only. It does not constitute a contract, either express or implied, and is subject to change at the University's discretion." See Hope Academy v. Friel, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-03-0081183, at *5 (July 22, 2004, *Lager*, J.). Thus,

the plaintiff cannot prove any breach of the Student Handbook or Title IX provisions.

Additionally, in determining whether a party has followed its stated policies under Connecticut law, the Court applies a standard of "reasonable expectation." See Travelers Casualty and Surety Co. of America, 312 Conn. 714, 740 (2014) ("Ordinarily, if an ambiguity arises that cannot be resolved by examining the parties' intentions . . . the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract."). The standard of "reasonable expectations" should apply in regards university policies as well.

The plaintiff alleges a multitude of violations of QU policies, none of which has merit.

**a. QU Did Not Fail to Complete its Investigation Within 60 Days.**

The plaintiff alleges that QU publications constituted a contract and that QU breached its agreement by failing to complete its investigation within 60 days. The plaintiff relies on the following language from the Title IX policy:

> "Completion of the investigation and grievance procedures should be complete within 60 days of the receipt of the complaint, oftentimes sooner. Should this process last longer than 60 days, the deputy coordinator will communicate the reasons and expected timeline to all parties."

(Compl. ¶ 202; Ex A.).

The Title IX policy does not make any *clear and definite promise.* It merely states that an investigation "should" be completed within 60 days and if it is not, the deputy reporter "will" communicate the reasons and expected timeline. See Culbert v. Young, 834 F.2d 624, 628 (7th Cir. 1987) ("[t]he word 'should' unlike the words 'shall,' 'will,' or 'must' is permissive rather than mandatory"). There is no promise that the university will complete the investigation within 60 days, as the plaintiff alleges.

Even if the Title IX policy could be construed as a contractual promise, the plaintiff cannot present evidence of a material breach.  First, the policy does not prohibit QU from taking longer than 60 days to complete an investigation.  It merely describes what will occur, if it does so.  Second, the plaintiff cannot prove any material breach by QU because QU addressed the issue on appeal and the Hearing Committee determined that "although the investigation took more than 60 days, it would not have materially impacted the outcome, findings and sanctions."  (Compl. ¶ 127).  Accordingly, the plaintiff cannot prove a material breach of the Title IX policy.

      **b.  QU Did Not Fail to Investigate the Complaining Parties' Potential Violations of QU Publications, including, but not limited to, Potential Sexual Misconduct, Harassment, and Stalking Engaged in by Each of the Complaining Parties.**

The plaintiff alleges that QU publications constituted a contract and that QU breached its agreement by failing to investigate the complaining parties' potential violations of QU publications, including, but not limited to, potential sexual misconduct, harassment, and stalking engaged in by each of the complaining parties.  The plaintiff fails to allege facts reflecting a policy provision that has been allegedly breached in this regard.  As such, the policies do not make any *clear and definite promise*.

Even if the Title IX policy could be construed as a contractual promise, the plaintiff cannot present evidence of a material breach.  It is clear that the investigators did not pursue the plaintiff's allegations against Jane Roe and Jane Roe 2 as a complaint because the investigators questioned the plaintiff, Jane Roe and Jane Roe 2 and the investigators could not corroborate John Doe's allegations.  The investigators made the determination that there was nothing that needed to be investigated, reinvestigated or new charges brought.  (Exhibit E, VC Depo Tran., Vol. II, p. 531: 7-25; p. 534: 1-15; Exhibit F, SK Depo Tran., p. 301: 20-25; p. 304:

8-21).  Also, QU informed John Doe that he could not bring a complaint against Jane Roe 2 because she was no longer a student.  (Compl. ¶ 130).  In addition, Jane Roe was investigated and found not responsible for sexual harassment, intimate partner violence and stalking.  (Compl. ¶ 144; <u>Exhibit K</u>, KK Depo Tran., p. 189: 14-19 and 21-24).  Accordingly, the plaintiff cannot prove a material breach of the Title IX policy.

### c.  QU Did Not Fail to Take-Action Either in Response to Jane Roe's Breach of Her No Contact Order, Or in Response to Both of the Complainant Parties' Breach of Confidentiality Regarding the Investigation.

The plaintiff alleges that QU publications constituted a contract and that QU breached its agreement by failing to take-action either in response to Jane Roe's breach of her no contact order, or, in response to both of the Complainant parties' breach of confidentiality regarding the investigation. The plaintiff fails to allege facts reflecting a policy provision that has been allegedly breached in this regard.  In fact, there is no separate QU policy that specifically addresses no contact orders and also QU does not recognize a breach of confidentiality.  The investigators can ask students to be respectful of others privacy and respectful of the process and they ask students not to speak about the investigation openly, but students are not barred from speaking about investigations.  (<u>Exhibit E</u>, VC Depo Tran., Vol. I, p. 231: 8-11; p. 232: 11-17; p. 534: 16-19; See also <u>Exhibit F</u>, SK Depo Tran., p. 318: 14-19). As such, it cannot possibly by addressed by QU policies and, therefore, the policies do not make any *clear and definite promise* as they do not exist.

### d.  QU Did Not Fail to Investigate the Charges Against John Doe in a Fair, Impartial, and Equitable Manner.

The plaintiff alleges that QU publications constituted a contract and that QU breached its agreement by failing to investigate the charges against the plaintiff in a fair, impartial, and equitable manner.  The plaintiff fails to allege facts reflecting a policy

provision that has been allegedly breached in this regard.  As such, the policies do not make

any *clear and definite promise*.  Even if the Quinnipiac policies could be construed as a

contractual promise, the plaintiff cannot present evidence of a material breach, as QU

followed the QU policies.  See Doe v. The Trustees of the University of Pennsylvania, 270

F.Supp.3d 799, 813 (E.D.Penn. September 13, 2017) (concluding that the promise of a

"thorough and fair investigation" did not impose any additional requirements other than

those specifically set forth in the student disciplinary procedures).  Accordingly, the plaintiff

cannot prove a material breach of any QU policies.

### e.  QU Did Not Conduct an Inadequate or Incomplete Investigation of the Charges Against John Doe.

The plaintiff alleges that QU publications constituted a contract and that QU

breached its agreement by conducting an inadequate and incomplete investigation of the

charges against the plaintiff.  The plaintiff fails to allege facts reflecting a policy provision

that has been allegedly breached in this regard.  The language from the

Title IX policy states:

"Student Rights – Rights of the Accused Student

- The right to an investigation and appropriate resolution of all credible complaints of sexual misconduct, gender-based discrimination and/or harassment made in good faith to the university;
- The right to be treated with respect by University staff throughout the process;
- The right to identify witnesses or other parties, and to request the deputy coordinator contact those individuals as part of the investigation;
- The right to have a committee of mixed genders, to know the members of the committee ahead of time, and to address concerns of bias and/or conflict of interest in regard to committee members;
- The right to review all documents and reports produced by the investigation subject to limitations provided by law, as well as the names of all witnesses who may be called to provide statements to the committee, at least 24 hours prior to the hearing;
- The right to challenge information and documents prior to the hearing;
- The right to be present and participate in the committee hearing;

24

- The right to be informed of the outcome and sanction of any committee hearing within 24 hours of a decision being rendered, and to receive that decision in writing;
- The right to a hearing outcome based on information presented to during the hearing which the committee finds credible, relevant and convincing;
- The right to privacy, and the assurance that information regarding the complaint will be shared only with those necessary."

(Compl. ¶ 202); (Ex. A).

Even if the Title IX policy could be construed as a contractual promise, the plaintiff cannot present evidence of a material breach.  The plaintiff cannot prove any breach by QU because the plaintiff's credible complaints were investigated and reached an appropriate resolution.  It is clear that the plaintiff was found responsible on all charges after an investigation, hearing and appeal.  (Compl. ¶ 1).  It is also clear that the investigators did not pursue complaints against Jane Roe and Jane Roe 1, as the investigators made the determination that there was nothing that needed to be investigated, reinvestigated or new charges brought.  (Exhibit E, VC Depo Tran., Vol. II, p. 531: 7-25; p. 534: 1-15; Exhibit F, SK Depo Tran., p. 301: 20-25; p. 304: 8-21).  The alleged violations of the NCO were investigated by public safety and it was determined by other staff members that there were no violations by Jane Roe.  (Compl. ¶¶ 81, 160-162, 164, 167-168).  Additionally, Jane Roe was investigated and found not responsible for sexual harassment, intimate partner violence and stalking.  (Compl. ¶ 144; Exhibit K, KK Depo Tran., p. 189: 14-19 and 21-24).

Also, the investigators listened to John Doe's father, even though he was an adviser and did not have a speaking role.  If his father had provided information that the investigators believed was relevant, then it would have been included in the report.  (Exhibit E, VC Depo Tran., Vol. II, p. 415: 1-6).  The plaintiff's mother provided information to the investigators about the nature of the plaintiff and Jane Roe's relationship and it was included within the report

25

because the investigators found it relevant.  (Exhibit E, VC Depo Tran., Vol. II, p. 416: 24-25; p. 417: 9-12).

It is not disputed that the Title IX Grievance Committee was mixed gender, as it included Ms. Megan Buda, Ms. Courtney McKenna and Mr. Stefano Fasulo.  (Exhibit H, MB Depo Tran., p. 214: 2-5).  The plaintiff raised his concerns of bias regarding Ms. Buda and Mr. Kalagher prior to the Hearing.  (Compl. ¶ 76, 77.)  Mr. Kalagher reviewed the plaintiff's concerns and found that there was no rational conflict with Ms. Buda.  Ms. Buda sent the plaintiff an assessment email that every student in the conduct process received and she answered the telephone when his parents called once or twice.  Ms. Buda was not a student conduct officer in either of the plaintiff's prior student conduct cases.  (Exhibit F, SK Depo Tran., p. 324: 21-25; p. 325: 1-8; Exhibit H, MB Depo Tran. p. 174: 10-22).  In addition, Mr. Kalagher found he did not have any conflicts.  Regardless, Mr. Kalagher had no involvement with the finding of responsibility or what sanction was imposed by the Hearing Committee.  (Exhibit F, SK Depo Tran., p. 345: 22-24; p. 239: 21-23).

It is clear that in October 2016, the plaintiff received documents and reports produced by the investigation, which consisted of a 250-page report with attachments.  (See Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11; Compl. ¶ 58).  The plaintiff has the opportunity to challenge information and documents prior to the Hearing, as he submitted a Response to the investigation report on January 20, 2017.  (Compl. ¶ 68, see Exhibit 2 attached and made part of the Amended Complaint, see 3: 17cv364, Docket No. 12.)

It is clear that the Hearing took place on Friday, April 21, 2017.  John Doe was in attendance with his attorney as his adviser.  (Compl. ¶ 101; Exhibit F, SK Depo Tran., p. 321:

14-17; <u>Exhibit H</u>, MB Depo Tran., p. 213: 14-25; p. 214: 1-3).  On Monday, April 24, 2017, Mr. Kalagher emailed the outcome letter to the plaintiff, which relied on the investigation report for its findings.  (Compl. ¶ 116).

The plaintiff does not allege nor can he prove that the any QU administrator or official shared information with individuals when it was not necessary or that they were not respectful to the plaintiff.  Accordingly, the plaintiff cannot prove a material breach of the Title IX policy.

### f.  QU Did Not Conduct a Biased Investigation of the Charges Against John Doe.

Please see section (e)., as set forth above.

### g.  QU Did Not Fail to Comply with Title IX.

The plaintiff alleges that Quinnipiac publications constituted a contract and that QU breached its agreement by failing to comply with Title IX.  The plaintiff fails to allege facts reflecting a policy provision that has been allegedly breached in this regard.  We presume the plaintiff is relying on the following language from the Title IX policy:

> "Quinnipiac University is committed to complying with Title IX and providing an educational, working and living environment free from gender or sex discrimination and sexual misconduct.  Members of the university community, guests and visitors have a right to be free from sexual harassment, violence and gender-based discrimination and harassment."

The Title IX policy is purely informational.  It does not make any *clear and definite promise*.  There is no promise that the university will comply with Title IX, provide an educational, working and living environment free form gender or gender or sex discrimination and sexual misconduct or that members of the university community will be free from sexual harassment, violence and gender-based discrimination and harassment, as the plaintiff alleges.  Additionally, as set forth in Counts One, Two and Three, QU did not fail to comply with Title IX.

27

**h. QU Did Not Fail to Provide an Environment Free From Gender-Based Discrimination and Harassment and its Promise to Address Gender-Based Misconduct.**

Please see section (b)., as set forth above.

**i. QU Did Not Fail to Respond Quickly, Equitably and Thoroughly to the Complaints by Taking More Than 8 months to Get to This Stage of the Process, Which is Well Over the Recommended 60 Days to Resolve Complaints.**

The plaintiff alleges that QU publications constituted a contract and that QU breached its agreement by failing to respond quickly, equitably and thoroughly to the complaints by taking more than 8 months to get to this stage of the process, which is well over the recommended 60 days to resolve complaints.  The plaintiff fails to allege facts reflecting a policy provision that has been allegedly breached in this regard.  The Title IX policy states:

> "As discussed below, faculty, administration, athletic, human resources, public safety and student affairs staff are considered responsible employees under Title IX and are required to immediately report any incidents of sexual violence they observe.  Upon receiving a report, the University will respond promptly, equitably and thoroughly.  In addition, the University will take steps to prevent the recurrence of the misconduct and correct its effects, if appropriate."

(Compl. ¶ 202); (Ex. A, p. 3).

The Title IX policy does not make any *clear and definite promise*.  It merely states that upon receiving a report from a responsible employee, the University will respond promptly, equitably and thoroughly.  Despite the plaintiff's allegations, this provision of the policy is separate from the provision setting forth the university's goal to resolve complaints in 60 days.

Even if the Title IX policy could be construed as a contractual promise, the plaintiff cannot present evidence of a material breach.  First, the policy does not define a prompt,

equitable and thorough response.  Also, the policy does not prohibit QU from taking longer

than 60 days to complete an investigation.  It merely describes what will occur, if it does so.

Second, the plaintiff cannot prove any material breach by QU because QU addressed the

issue on appeal and the Hearing Committee determined that "although the investigation took

more than 60 days, it would not have materially impacted the outcome, findings and sanctions."

(Compl. ¶ 127).  Accordingly, the plaintiff cannot prove a breach of the Title IX policy.

   **j.  QU Did Not Fail to Investigate and Address Plaintiff's Complaints About
        Breach of Confidentiality of the Investigation and Violations of the NCO,
        Harassment and Retaliation by Jane Roe's Friends First to the Investigator
        and then to Defendant Kalagher.**

Please see section (c)., as set forth above.

   **k.  QU Did Not Fail to Afford Plaintiff His Right to an Investigation and
        Appropriate Resolution of all credible Complaints of Sexual Misconduct,
        Gender-Based Discrimination and/or Harassment.**

Please see section (e)., as set forth above.

   **l.  QU Did Not Fail to Show By a Preponderance of the Evidence That Plaintiff
        Was Responsible For His Charges.**

The plaintiff alleges that QU publications constituted a contract and that QU

breached its agreement by failing to show by a preponderance of the evidence that plaintiff

was responsible for his charges.  The plaintiff fails to allege facts reflecting a policy

provision that has been allegedly breached in this regard.  The Student Handbook states:

> "A conduct officer will find a student responsible for a conduct code violation
> if the violation is shown by a preponderance of the information presented; that
> is, based on information that the conduct officer finds credible and convincing,
> it is more likely than not that the student is responsible for violating the Student
> Code of Conduct."

(Compl. ¶ 15(m)); (Exhibit B, p. 68).

As set forth above, the Student Handbook contains a disclaimer and is not an enforceable contract.  Even if the Student Handbook could be construed as a contractual promise, the plaintiff cannot present evidence of a material breach because QU investigators and the Hearing Committee did find that the plaintiff was responsible by a preponderance of the evidence for his charges.  (Compl. ¶ 58; Exhibit E, VC Depo Tran., Vol. II, p. 453: 4-7; Compl. ¶ 110; Exhibit H, MB Depo Tran., p. 184: 9-10).  Accordingly, the plaintiff cannot prove a material breach of the Title IX policy.

### m.  QU Did Not Fail to Allow Plaintiff a Meaningful Opportunity to Challenge Information Prior to a Hearing Before He Had a Chance to Respond to Preliminary Findings of Responsibility.

Please see section (e)., as set forth above.

### n.  QU Did Not Permit Jane Roe to Have an Adviser for her Final Interview That Was a Witness and Interviewed in the Same Student Conduct Matter.

The plaintiff alleges that QU publications permitted Jane Roe to have an adviser for her final interview that was a witness and interviewed in the same student conduct matter. The plaintiff fails to allege facts reflecting a policy provision that has been allegedly breached in this regard.  The Title IX policy states under the section titled "Title IX Grievance Committee":

> "Advisers serve as a moral and emotional support for students during committee hearings, and can assist with meeting preparation.  Advisers are not permitted to advocate for a student or speak on their behalf during a committee hearing.  Students who are witnesses to the incident or are otherwise involved in the matter before the committee cannot serve as advisers."

(Compl. ¶ 15(m)); (Ex. A., p. 16).

As set forth above, the Student Handbook contains a disclaimer and, therefore, the Title IX policy is not an enforceable contract.  Even if the Title IX policy could be construed as a contractual promise, the plaintiff cannot present evidence of a material breach.

Specifically, a student named T.C. was a witness and adviser during the investigations.  The

provision, however, does not permit witnesses to also be advisers during the Title IX

Grievance Committee Hearing.  (Ex. A., p. 16).  Here, T.C. was not Jane Roe's adviser

during the Hearing.  Mr. Kalagher requested that T.C. attend the Hearing, so that he was on

standby, if the Hearing Committee wanted to interview him.  (Compl. ¶ 109; Exhibit F, SK Depo

Tran., p. 310: 15-22).  Accordingly, the plaintiff cannot prove a material breach of the Title

IX policy.

> **o.  QU Did Not Fail to Interview Plaintiff's Parents or Include Their Remarks About the Investigation in the Body of the Report or Revised Report.**

Please see section (e)., as set forth above.

> **p.  QU Did Not Fail to Treat Plaintiff in the Same Manner and Provide the Same Benefits as They Did the Female Complainants Because He Was Male.**

The plaintiff alleges that QU publications constituted a contract and that QU

breached its agreement by failing to treat the plaintiff in the same manner and provide the

same benefits as they did the female the complainants because he was male.  The plaintiff

fails to allege facts reflecting a policy provision that has been allegedly breached in this

regard.  Even if the Student Handbook could be construed as a contractual promise, the

plaintiff cannot present evidence of a material breach because QU found that the plaintiff

was responsible by a preponderance of the evidence for his charges.  (Compl. ¶ 58; Exhibit E,

 VC Depo Tran., Vol. II, p. 453: 4-7; Compl. ¶ 110; Exhibit H, MB Depo Tran., p. 184: 9-

10).  The investigators also found that Jane Roe was not responsible by a preponderance of the

evidence for her charges.  (Compl. ¶ 144; Exhibit K, KK Depo Tran., p. 189: 14-19 and 21-

24).  Accordingly, the plaintiff cannot prove a material breach of the Student Handbook.

> **q.  QU Did Not Fail to Comply with the ADA.**

The plaintiff alleges that QU publications constituted a contract and that QU breached its agreement by failing to comply with the Americans with Disabilities Act ("ADA").  The plaintiff fails to allege facts reflecting a specific policy provision that has been allegedly breached in this regard.  In addition, if the plaintiff believes that QU violated the ADA, then he could have exhausted his administrative remedies and alleged a separate cause of action in his Complaint, but he failed to do so.  See Maxwell v. New York University, 407 Fed.Appx. 524, 527-528 (2d Cir. 2010).  The QU Guidelines and Procedures for Student with Disabilities states:

> "Quinnipiac University recognizes its obligations to comply with the Americans with Disabilities Act of 1990, hereinafter referred to as ADA, and Section 504 of the Rehabilitation Act of 1973, hereafter referred to act Section 504."

> "Under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973, individuals with disabilities are guaranteed certain protections and rights of equal access to programs and services."

(Compl. ¶ 15(m)); (Ex. C, p. 5).

The QU Guidelines and Procedures for Student with Disabilities does not make any *clear and definite promise*.  It merely recognizes its obligations to comply with the ADA and what protections and rights are afforded therein.  In addition, the guidelines provide for policies and procedures for filing a formal grievance, which the plaintiff failed to follow. (Ex. C, p. 7).  Even if the QU Guidelines and Procedures for Student with Disabilities could be construed as a contractual promise, the plaintiff cannot present evidence of a material breach because QU complied with its policy.  See sections (r). and (s). below.  Accordingly, the plaintiff cannot prove a material breach of the QU Guidelines and Procedures for Student with Disabilities.

**r. QU Did Not Fail to Provide Reasonable Accommodations in the Entire Student Conduct Process, Including With Respect to the Timing of John Doe's Response to the Investigative Report, and to His Request to Have a Person Trained in Understanding Disabilities and Emotional Distress Issues, Including Anxiety, Depression and ADHD, to Assist the Investigators, and Committee in Understanding How These Diagnoses and Symptoms Could Explain the Underlying Conduct At Issue and Affect Credibility Determinations Based on John Doe's Behavior in the Interviews and Hearing.**

The plaintiff alleges that Quinnipiac publications constituted a contract and that Quinnipiac University breached its agreement by failing to provide reasonable accommodations in the entire student conduct process, including with respect to the timing of John Doe's response to the investigative report, and to his request to have a person trained in understanding disabilities and emotional distress issues, including anxiety, depression and ADHD, to assist the investigators, and Committee in Understanding How These Diagnoses and Symptoms Could explain the underlying conduct at issue and affect credibility determinations based on John Doe's behavior in the interviews and Hearing.  The plaintiff fails to allege facts reflecting a specific policy provision that has been allegedly breached in this regard.  The QU Guidelines and Procedures for Student with Disabilities states:

> "The University provides reasonable accommodations to students with disabilities in order to reduce or eliminate any disadvantages that may exist because of disability."

> "Quinnipiac University through its dedicated offices has the responsibility to:

> 4. provide reasonable accommodations and appropriate accommodations, academic adjustments, and/or auxiliary aids for students with disabilities upon a timely request by students.

(Compl. ¶ 15(m)); (Ex. C, p. 5).

The QU Guidelines and Procedures for Student with Disabilities does not make any *clear and definite promise*. It merely states that the university provides reasonable accommodations to students with disabilities. It does not promise that reasonable accommodations would consider the timing of his response to the investigative report or promise that a person trained in disabilities would attend the interviews or hearing. In addition, the guidelines provide for policies and procedures for filing a formal grievance, which the plaintiff failed to follow in order to exhaust his administrative remedies. See Maxwell, 407 Fed.Appx. 524 at *2-*3; (Ex. C, p. 7). Even if the QU Guidelines and Procedures for Student with Disabilities could be construed as a contractual promise, the plaintiff cannot present evidence of a material breach. The plaintiff testified that he requested additional time to review the investigation report and submit his response and the extra-time was provided to him. (Exhibit D, Pl's Depo Tran., p. 215: 21-25; p. 217: 4-12).

Also, the QU Office of Student Accessibility reviewed the plaintiff's requests and approved reasonable accommodations. [2] In addition, the Title IX policy allows the Respondent to have an adviser attend the Hearing with him. (Ex. A, p. 24). Rather than have his psychiatrist attend the Hearing as his adviser, the plaintiff chose to have his attorney attend as his adviser instead. (Exhibit H, MB Depo Tran., p. 213: 14-25; p. 214: 1-3). Accordingly, the plaintiff cannot prove a material breach of the QU Guidelines and Procedures for Student with Disabilities.

---

[2] On April 19, 2017, Mr. Kalagher informed John Doe that the following accommodations would be provided at the Hearing: (a) To aid in his processing the information, all questions pertaining to a specific event and date should be kept together, without going back and forth between dates and events; (b) To avoid "shutting down," allow John Doe time (several minutes) to process questions and regroup," with assistance if necessary, in order to recall the context of the question at hand; (c) Because of his difficulty sustaining attention and focus and the ease with which he tires out cognitively, John Doe should be given frequent breaks in the questioning (every 15-20 minutes), during which time he may "clear his head" and confer with his advisor. (Compl. ¶ 98).

**s.   QU Did Not Fail to Maintain Confidentiality of John Doe's Information Pertaining to His Disabilities as He Requested.**

The plaintiff alleges that QU publications constituted a contract and that QU breached its agreement by failing maintain confidentiality John Doe's information pertaining to his disabilities as he requested.  The plaintiff fails to allege facts reflecting a specific policy provision that has been allegedly breached in this regard.  As set forth above, if the plaintiff believed that QU violated the ADA, then he could have exhausted his administrative remedies and alleged a separate cause of action in his Complaint, but he failed to do so.  The QU Guidelines and Procedures for Student with Disabilities states:

> "Quinnipiac University through its dedicated offices has the responsibility to:
>
> 4.    Maintain appropriate confidentiality of records and communication concerning students with disabilities except where disclosure is required by law or authorized by the student."
>
> "More specifically, personnel in these dedicated offices have the responsibility to:
>
> 3.    Assure appropriate confidentiality of all information pertaining to a student's disability."

(Compl. ¶ 19); (Ex. C, p. 7).

The QU Guidelines and Procedures for Student with Disabilities does not make any *clear and definite promise*.  It merely recognizes that university offices are responsible for maintain appropriate confidentiality, except where required by law or authorized by the student.  Even if the QU Guidelines and Procedures for Student with Disabilities could be construed as a contractual promise, the plaintiff cannot present evidence of a material breach.  Mr. Kalagher shared the plaintiff's documented disabilities with the Hearing Committee and the Complainants, after the plaintiff requested it.  (Compl. ¶ 100).  Accordingly, the

35

plaintiff cannot prove a material breach of the QU Guidelines and Procedures for Student with Disabilities.

> **t.  QU Did Not Deny John Doe Equal Educational Opportunities and Full Participation in the Student Conduct Process or Discriminate Against Him Based on His Disabilities.**

Please see section (a)., as set forth above.

> **u.  QU Did Provide a Title IX Grievance Committee Composed of University Staff Members Who are Trained Annually in Title IX Matters.**

The plaintiff alleges that QU publications constituted a contract and that QU breached its agreement by failing to have Title IX Grievance Committee composed of University staff members who are trained annually in Title IX matters.  The plaintiff fails to allege facts reflecting a specific policy provision that has been allegedly breached in this regard.  Nevertheless, the plaintiff cannot present evidence of a material breach.  Since 2012, Mr. Kalagher conducted and arranged trainings for all Title IX investigators and hearing board members throughout the year.  (Exhibit F, SK Depo Tran., p. 80: 14-20).  Accordingly, the plaintiff cannot prove a material breach of the QU publications.

> **v.  The Plaintiff Fails to State a Valid Implied Contract Claim.**

The plaintiff alleges that the provisions and policies set forth in QU publications formed an express contract, or, alternatively, a contract implied in law or in fact between the plaintiff and QU.  (Compl. ¶ 201).

Pursuant to Gupta, such a claim must be supported by evidence of a "specific contractual promise."  Faigel, supra, 75 Conn. App. at 43 (affirming summary judgment on contract claim where alleged promise was "too imprecise to qualify for consideration as a 'specific contractual promise.')  As set forth above, the QU publications do not qualify as a specific contractual promise.  Also, the plaintiff has not alleged nor can he prove any actions, words, or conduct by

QU that could be construed as making a specific contractual promise to form the basis of an implied contract.  Even if an implied contract could be deemed to exist, as set forth above, the plaintiff cannot produce sufficient evidence to demonstrate a material breach.  Accordingly, QU is entitled to summary judgment as to the plaintiff's breach of contract claims.

### F.  COUNT FIVE – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING – QU

The plaintiff alleges in Count Five that the QU Title IX policy, Student Handbook and the ADA policy, each contained an implied covenant of good faith and fair dealing and that Quinnipiac's conduct callously, willfully and deliberately disregarded the plaintiff's rights under the QU publications.  (Compl. ¶¶ 206, 207).

The two principles that govern the plaintiff's claim are undisputed.  "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will require the right of the other to receive the benefits of the agreement." Gupta v. New Britain General Hospital, supra, 239 Conn. at 598, citing Habetz v. Condon, 224 Conn. 231, 238, 618 A.2d 501 (1992).  "Bad faith means more than mere negligence; it involves a dishonest purpose."  Habetz v. Condon, supra, 224 Conn. at 237.

As set forth in Count Four, the plaintiff's contract claim is an impermissible education-based claim pursuant to the holding in Gupta.  Gupta v. New Britain Hosptial, supra, 239 Conn. at 574.  In addition, even if an exception under Gupta applies, the plaintiff has not alleged facts nor can he prove that the QU publications created a contract.  Even if a contract was created, the plaintiff has not alleged facts nor can the plaintiff prove that the decision resulted from arbitrary, capricious or bad faith conduct by QU.  Id., 594.  As such, the plaintiff cannot prove that QU acted with bad faith or a dishonest purpose.  Accordingly,

QU is entitled to summary judgment as to the plaintiff's breach of the covenant of good faith and fair dealing claim.

## G. COUNTS SIX, SEVEN, EIGHT – TORTIOUS INTERFERENCE WITH CONTRACT – (DEFENDANT JOHNSON, KALAGHER, CONTRUCCI)

The plaintiff alleges in Counts Six, Seven and Eight that the individual defendants, Terri Johnson, Seann Kalagher and Vincent Contrucci tortiously interfered with his contract with QU. Specifically, the plaintiff alleges that he had a contract with QU, the defendants had knowledge of such contractual relationship and they were responsible for ensuring that the plaintiff received "fair, impartial and equitable treatment with respect to the investigation and disposition of the charges brought against him." The plaintiff further alleges the defendants by their actions and omissions, intentionally and maliciously interfered or attempted to interfere, with the plaintiff's contractual relationship with QU. As a result, the plaintiff sustained damages. (Compl. ¶ 211-215). The plaintiff's claims fail on multiple grounds.

"A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." Collum v. Chapin, 40 Conn. App. 449, 452 (1996).

As set forth in Count Four, the plaintiff has not alleged facts nor can he prove the existence of a contractual or beneficial relationship and, therefore, there can be no tortious interference with a contractual relationship in this case. See Longley v. Suffield Academy, Superior Court, judicial district of Hartford, Docket No. CV-01-0809999-S, *3 (March 17, 2004, Beach, J.), citing Anderson v. Post-Newsweek Stations, Inc., No. 2:90-cv-00583, 1992 WL 92399 (D. Conn. February 3, 1992). As such, the first element of a claim for tortious

interference with contractual relations must fail.  In the event the plaintiff can satisfy this element, the plaintiff has not alleged nor can he prove that the defendants' conduct was tortious. "[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious.  This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation … or that the defendant acted maliciously.  The burden is on the plaintiff 'to plead and prove at least some improper motive or improper means on the part of the defendants."  (Citations omitted; internal quotation marks omitted).  See Solomon v. Aberman, 196 Conn. 359, 365, 493 A.2d 193 (1985).

In the present case, the plaintiff testified that Terri Johnson, Seann Kalagher, and Vincent Contrucci intentionally interfered with his contractual relationship with QU by not allowing him to access things on campus that he would have enjoyed to.  (Exhibit D, Pl's Depo Tran., p. 237: 2-11).  The plaintiff's sanction as a result of the Hearing, however, was suspension from University owned property without prior permission, except that he could attend classes. (Compl. ¶ 115).  The plaintiff never asked for permission to be on campus to use the library to study, find job resources or meet with teachers.  (Exhibit L, ¶ 7).  It is clear that the individual defendants imposed the sanction in their duties as Title IX Coordinator, Deputy Title IX Coordinator and Title IX Investigator, respectively, which does not amount to improper motive or means and, therefore, cannot allege or prove tortious conduct.

 Additionally, the defendants were employees and agents of QU in their employment positions and because all of the conduct alleged by the plaintiff occurred within the employment relationship, then they are deemed agents of the employer and the tort thus does not apply.  See Longley v. Suffield Academy, supra, Docket No. CV-01-0809999-S, citing Selby v. Pelletier, 1 Conn. App. 320, 327, 472 A.2d 1285 (1984); Murray v. Bridgeport Hospital, 40 Conn.Sup. 56,

60-61, 480 A.2d 610 (January 26, 1984, *Cioffi*, J.).  Even if the plaintiff attempts to rely on the exception that applies if the agent "did not act legitimately within the scope of duty but used the corporate power improperly for personal gain," the exception would not apply here.  Id. at *4. The plaintiff does not allege nor can he prove that the defendants acted outside their scope of duty or improperly used corporate power for personal gain.  Accordingly, the defendants are entitled to summary judgment as to the plaintiff's tortious interference with contract claims.

## H.  COUNT NINE – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – ALL DEFENDANTS

The plaintiff alleges in Count Nine that the defendants' actions in connection with his disciplinary case caused him negligent infliction of emotional distress.  (Compl.  ¶¶ 228-232).

The plaintiff has not alleged facts nor can the plaintiff prove that the defendants caused him negligent infliction of emotional distress.  As set forth in Count Four, under Connecticut law, the plaintiff's tort claim for negligent infliction of emotional distress is foreclosed under Gupta v. New Britain General Hospital, supra, 239 Conn. at 595.  The Gupta exceptions, which permit claims against educational institutions that "act arbitrarily, capriciously, or in bad faith," necessarily exclude negligence theories of liability.  See, e.g. Id. at 598.  ("Bad faith means more than negligence; it involves a dishonest purpose).  In addition, Gupta holds that a school's academic decision deserves deference from the courts.  Bass ex rel. Bass v. Miss Porter's School, 738 F.Supp.2d 307 (D. Conn. 2010); Craine v. Trinity College, 259 Conn. 625, 663-64, 791 A.2d 518 (2002).

In the event the plaintiff's negligence claim is not barred under Gupta, it is axiomatic that negligence is an element of any claim for negligent infliction of emotional distress and, therefore, the claim is barred where the defendants owed no duty of care to the plaintiff.  See Witt v. Yale-New Haven Hospital, 51 Conn.Supp. 155, 977 A.2d 779 (September 30, 2008,

*Bellis*, J.), citing RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 384, 650 A.2d 153

(1994).  As set forth below, the defendants owed no duty to the plaintiff.  As such, their claims

for negligent infliction of emotional distress all fail as a result.  Accordingly, the defendants'

motion for summary judgment should be granted as to the plaintiff's negligent infliction of

emotional distress claims.

**I.  COUNT TEN – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS - ALL DEFENDANTS**

In order to establish a claim for intentional infliction of emotional distress, the plaintiff

must demonstrate: (1) the actor intended to inflict emotional distress; or that he knew or should

have known that the emotional distress was a likely result of his conduct; (2) that the conduct

was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's

distress; and (4) that the distress suffered by the plaintiff was severe.  See Kelly v. Yale

University, No. 3:01-cv-1591, 2003 WL 1563424 (D.Conn. March 26, 2003); see also Miner v.

Town of Cheshire, 126 F.Supp.2d 184, at 194 (D.Conn. September 29, 2000).  "Liability for

intentional infliction of emotional distress requires conduct that is so extreme and outrageous

that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable

in a civilized society, and is of a nature that is especially calculated to cause, and does cause,

mental distress of a very serious kind."  Id., 194.

As an initial matter, the plaintiff's claim fails because the plaintiff has not alleged facts

nor can he prove outrageous conduct or suggest any intent to inflict emotional distress on the

plaintiff.  Also, as set forth in Count Four, the plaintiff's tort claims are foreclosed under Gupta.

In the event that such claims are not foreclosed under Gupta, under Connecticut law, the

defendants' alleged conduct in connection with the handling of the plaintiff's disciplinary

proceedings was not "extreme and outrageous," "beyond all possible bounds of decency" and

"utterly intolerable in a civilized community" as a matter of law.  See <u>Kelly v. Yale University,</u> supra, 2003 WL 1563424 (granting summary judgment where student's allegations of intentional infliction rested on her dissatisfaction with university response to her complaints regarding an incident of alleged sexual assault by another student, violated Title IX); <u>Doe v. Trustees of Boston College</u>, No. 15-CV-10790, 2016 WL 5799297, at *25 (D. Mass. October 4, 2016) (granting summary judgment where student's allegations of intentional infliction rested on plaintiff's dissatisfaction with for disciplinary action taken against John Doe for a sexual assault); <u>Doe v. Emerson College</u>, No. 14-14752, 2015 WL 9455576 at *10 (D.Mass. December 23, 2015) (granting judgment on the pleadings where student's allegations of intentional infliction rested on his dissatisfaction with university policies and procedures and the results of the university's sexual assault investigations).

The evidence in this case fails to create any triable issue of fact with respect to conduct by any of the defendants that amounts to intentional conduct that was extreme and outrageous. To the contrary, the plaintiff testified that Vincent Contrucci, Terri Johnson, and Seann Kalagher intended to intentionally inflict emotional distress upon him because he was "treated poorly" and "wasn't listened to" by the defendants, despite the fact that Vincent Contrucci met with the plaintiff and Attorney Katz, the plaintiff and his father, the plaintiff and Attorney Duffy, and he also had phone calls with the plaintiff and his advisers.  (<u>Exhibit D</u>, Pl's Depo Tran., p. 237: 12-25 and 19-24; p. 238: 3-9 and 10-25).  The plaintiff further testified that Vincent Contrucci harassed him by not listening to what he had to say and stating that he did not receive certain information from the plaintiff when he did.  However, any information that the plaintiff felt was missing was provided in his Response.  (<u>Exhibit D</u>, Pl's Depo Tran., p. 234: 9-25).  The plaintiff further testified that Terri Johnson harassed him by not allowing him to

participate in the activities with his professor and enforcing the findings against him by the Title

IX Hearing Committee, even though that is her job as Title IX Coordinator.  (Exhibit D, Pl's

Depo Tran., p. 235: 4-19).  In addition, the plaintiff testified that Seann Kalagher harassed him

because he had predetermined opinions about him based off previous encounters with him, even

though Seann Kalagher was not the hearing officer in the student conduct case when he assaulted

another student and was sanctioned.  (Exhibit D, Pl's Depo Tran., p. 119: 14-20; p. 120: 20-24;

p. 125: 21-25; Exhibit F, SK Depo Tran., p. 250: 5-7; Exhibit M, S.R.'s Conduct File, p. 33).

None of the conduct referred to by the plaintiff amounts to intentional conduct that was extreme

and outrageous.

In addition, there is no evidence that the plaintiff suffered mental distress of a very

serious kind.  The plaintiff testified that he experienced stress and anxiety and was prescribed

Xanax by a psychiatrist.  (Exhibit D, Pl's Depo Tran., p. 88: 21 -25; 89: 1-2 and 8-10).  In

actuality, the plaintiff testified that he was prescribed Xanax by his psychiatrist for anxiety in

2013, prior to the incidents alleged in his Complaint.  (Exhibit D, Pl's Depo Tran., p. 90: 19-25;

p. 91: 1-6).  Accordingly, the defendants are entitled to summary judgment on the plaintiff's

intentional infliction of emotional distress claims.

## J.   COUNT ELEVEN – NEGLIGENCE – ALL DEFENDANTS

In Count Eleven of the Complaint, the plaintiff alleges that the "Defendants assumed a

duty to conform to the provisions and policies set forth in QU's official publications, including

its Handbook, its Title IX Policy, and its ADA Policy as well as all supporting and explanatory

documents produced, published or disseminated by QU."  (Compl. ¶ 241).  As a result of the

failure to comply with QU's official publications, the plaintiff further alleges that QU failed to

adequately train its Title IX investigators, Deputy Coordinator, Coordinator, and Hearing and

Appeal Panel members and also imposed lenient sanctions against the male student who
assaulted the plaintiff.  (Compl. ¶ 247).

The plaintiff further alleges that defendants breached their duty to protect the plaintiff
from discrimination on the basis of gender and disability in numerous ways, all of which include
the failure to comply with Title IX and QU's Title IX policy and the failure to comply with the
ADA or Section 504 of the Rehabilitation Act of 1973.  (Compl. ¶¶ 246-247).  The plaintiff's
claims fail on multiple grounds.

### 1.  The Plaintiff Has No Negligence Claim Under Connecticut Law.

Under Connecticut law, the plaintiff's negligence claim is foreclosed under Gupta.
Gupta v. New Britain General Hospital, supra, 239 Conn. 59539 Conn. at 595.  The Gupta
exceptions, which permit claims against educational institutions that "act arbitrarily,
capriciously, or in bad faith," necessarily exclude negligence theories of liability.
See, e.g. Id. at 598.  ("Bad faith means more than negligence; it involves a dishonest purpose).
In addition, Gupta holds that a school's academic decision deserves deference from the courts.
Bass ex rel. Bass v. Miss Porter's School, supra, 738 F.Supp.2d 307 (2010); Craine v. Trinity
College, supra, 259 Conn. 663-64 (2002).

Under Connecticut law, it is also well settled that the relationship between a student
and a private university is essentially contractual in nature.  See Johnson v. Schmitz,
119 F.Supp.2d 90, 93 (D.Conn. 2000).  In cases such as this one, in which a student
alleges that he was wrongfully disciplined for violating a university's code of conduct,
are evaluated as claims for breach of contract.  See Okafor v. Yale University, Superior Court,
judicial district of New Haven, Docket No. CV-98-0410320 (June 25, 2004, *Corradino*, J.)

WL 1615941 (2004).  Recognizing this to be the case, the plaintiff has asserted a variety of

contract claims against the defendants in Counts IV-VIII of the Complaint.

The plaintiff has not alleged facts nor can the plaintiff prove that the individual

defendants owed the plaintiff a duty of care and, therefore, the negligence claim must fail.  In

circumstances where a contract governs the performance of a duty, the plaintiff has no cause of

action in tort absent an independent duty imposed by law.  Gazo v. City of Stamford, 255 Conn.

245, 263, 765 A.2d 505 (2001).  No such independent duty exists under Connecticut law.

Courts in this jurisdiction, as well as other jurisdictions have rejected purported

negligence claims in relation to a university's administration of student discipline.  See Xiaolu

Peter Yu v. Vassar Coll., supra, 97 F. Supp. 3d 484.; Weitz v. State of New York, 182 Misc.2d

320, 696 N.Y.S.D.2d 656 (N.Y. Ct. Cl. 1999) (applying rule that no cause of action exists for

negligent prosecution or investigation extends to administrative disciplinary charges brought

against a college or university student); Doe v. Emerson Coll., supra, 2015 WL 9455575 at *8

(dismissing negligence claim against university and its administrators based on plaintiffs'

dissatisfaction with a Title IX investigation because "Massachusetts does not … impose a

common-law or statutory duty on administrators to enforce university policies"); Salus v.

Nevada ex rel. Bd. of Regents of Nevada System of Higher Education, No. 2:10-CV-01734,

2011 WL 4828821, at *5 (D. Nev. October 10, 2011).

Also, Title IX does not establish a duty of care that would support a claim of

negligence.  Title IX creates a private right of action only for the discrimination on the

basis of gender, not for the violation of any procedural requirements or other failure to

exercise "reasonable care" in the administration of student discipline.  See Gebser v.

Lago Vista Independent School Dist., supra, 524 U.S. 292 (no private right of action for Title

IX's administrative requirements).  As a result, Title IX provides no foundation for a claim of

negligence.  See Doe v. University of the South, No. 4:09-CV-62, 2011 WL 1258104, at *14

(E.D. Tenn. March 31, 2011) ("If the court were to create a state negligence per se claim, it

would effectively eviscerate the Gebser rule."); Doe v. Brown University, 166 F.Supp.3d 177,

2016 WL 715794, at *4 (D.R.I. February 22, 2016).  Cf. Doe v. Bradshaw, No. 11-11593, 2013

WL 5236110, at *10 (D. Mass. September 16, 2013).

      In addition, the plaintiff cannot seek a claim in negligence based on the defendants'

failure to comply with the ADA or Section 504 of the Rehabilitation Act of 1973.  The "plaintiff

may not avoid the procedural scheme of his state and federal statutory remedies by asserting a

common law claim for negligence."  Cayo v. Stop & Shop Supermarket, Co., No. 3:12-cv-638, at

*2 (D. Conn. November 15, 2012), citing White v. Martin, 23 F.Supp.2d 203, 207 (D.Conn.

October 13, 1998).

      Moreover, students such as the plaintiff who are dissatisfied with the outcome of a

student disciplinary proceeding have no cognizable claim that a university or its administrators

should be held liable because they "negligently" failed to conduct the proceedings with

"reasonable care."  Allowing such claims would nullify Connecticut law, which provides that

courts will defer to the university's handling of student conduct issues unless the university

breaches its contractual obligation to the student by failing substantially to follow its own

procedures, denying the student a process that is fundamentally fair, or reaching a decision that is

arbitrary and capricious.  See Demoulas v. Quinnipiac University, Superior Court, judicial

district of New Haven, Docket No. CV-15-5006283-S (March 5, 2015, Fischer, J.), citing Gupta

v. New Britain General Hospital, supra, 239 Conn. 574.  Allowing such "negligence" claims

to proceed would also open the proverbial floodgates to litigation over student disciplinary proceedings.  Accordingly, the defendants' motion for summary judgment should be granted as to the plaintiff's negligence claims.

> **2.  Even if the Plaintiff Could Have a Negligence Claim Against Quinnipiac University There is No Basis for Any Such Claim Against the Individual Defendants.**

The plaintiff alleges that the individual defendants were either directly responsible for negligently breaching their duty to protect the plaintiff from discrimination based on gender and disability or they exercised direct supervisory control over those who did.  (Compl. ¶ 245).  For the reasons set forth above, the plaintiff has not alleged nor can he prove that the individual defendants owed the plaintiff a duty of care and, therefore, the negligence claims must fail.

In addition, assuming *arguendo* that the plaintiff's negligence claim is not foreclosed under Gupta and a duty of care could arise under these circumstances, it is well established that "an officer of a corporation does not incur personal liability for its torts merely because of his official position.  Where, however, an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby."  See Joseph General Contracting, Inc. v. Couto, 317 Conn. 565, 119 A.3d 570 (2015); Sribner v. Obrien, Inc., 169 Conn. 389, 404, 363 A.2d 160 (1975); see also Ventres v.Goodspeed Airport, LLC, 275 Conn. 105, 141-142, 881 A.2d 937 (2005).  In the present case, the plaintiff has not alleged nor can he prove that the individual defendants committed or participated in the commission of a tort and, therefore, are liable for the acts of QU and its employees.  Accordingly, the defendants' motion for summary judgment should be granted as to the plaintiff's negligence claims.

**K.** **COUNT TWELVE – RECKLESS AND WANTON MISCONDUCT – ALL DEFENDANTS**

The plaintiff in Count Twelve alleges that the Defendants owed him a duty of reasonable care for the same reasons alleged in Count Eleven.  (Compl.  ¶¶ 252, 253).  The plaintiff further alleges that the defendants' actions indicated a reckless disregard for the plaintiff's just right and/or safety and the defendants were deliberately indifferent to the to the consequences their actions had upon plaintiff.  (Compl.  ¶ 254).

As set forth in Count Four, under Connecticut law, the plaintiff's tort claim for reckless and wanton misconduct is foreclosed under Gupta.  Gupta v. New Britain General Hospital, supra, 239 Conn. 595.  Also, for the reasons set forth in Count Eleven, the plaintiff has not alleged nor can he prove that the defendants owed the plaintiff a duty of care and, therefore, the plaintiff's negligence claims must fail.  Since a "[a] count based on reckless and wanton misconduct must, like an action in negligence, allege some duty running from the defendant to the plaintiff," this claim must fail as well.  See Vitale v. Kowal, 101 Conn. App. 691, 699, 923 A.2d 778 (2007), citing Sheiman v. Lafayette Bank & Trust Co., 4 Conn. App. 39, 46, 492 A.2d 219 (1985).

In addition, assuming *arguendo* that the plaintiff could prove a duty of care could arise under these circumstances, "[i]n order to establish that the conduct of a defendant, who was under such duty, was deliberate, wanton and reckless, 'the plaintiff must prove … the existence of a state of consciousness with reference to the consequence of one's acts…. [Such conduct] is more than negligence, more than gross negligence….  [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or take reasonable precautions to avoid injury to them….  It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of

48

action…. [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (internal quotation marks omitted.)  See Vitale v. Kowal, supra, 101 Conn. App. 691, 699, 923 A.2d 778, citing Elliott v. Waterbury, 245 Conn. 385, 415, 715 A.2d 27 (1998).

In the present case, the plaintiff has not alleged nor can he prove that the defendants conduct was deliberate, wanton or reckless.  To the contrary, the plaintiff testified that the defendants were reckless in their conduct by how they went about their investigation.  (Exhibit D, Pl's Depo Tran., p. 240: 20-25; p. 241: 1-2).  The manner in which the investigation was conducted is not highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."  Accordingly, the defendants' motion for summary judgment should be granted as to the plaintiff's reckless and wanton misconduct claims.

THE DEFENDANTS,
QUINNIPIAC UNIVERSITY, TERRI
JOHNSON, SEANN KALAGHER and
VINCENT CONTRUCCI

/s/ **Lynn McCormick ct28745**

Matthew G. Conway
Fed. Bar. No. ct09612
Lynn McCormick
Federal Bar. No.: ct28745
Jessica Lynn Vizvary
Federal Bar. No. ct30291
Conway Stoughton LLC
641 Farmington Avenue
Hartford, CT 06105
Phone: (860) 523-8000
Fax: (860) 523-8002
E-Mail: mconway@conwaystoughton.com

**<u>CERTIFICATION</u>**

I hereby certify that on November 14, 2018, a copy of the foregoing Memorandum of Law in Support of Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ **<u>Lynn McCormick ct28745</u>**

Matthew G. Conway
Fed. Bar. No. ct09612
Lynn McCormick
Federal Bar. No.: ct28745
Jessica Lynn Vizvary
Federal Bar. No. ct30291
Conway Stoughton LLC
641 Farmington Avenue
Hartford, CT 06105
Phone: (860) 523-8000
Fax: (860) 523-8002
E-Mail: mconway@conwaystoughton.com