## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE, | ) | Civil Action |
| | ) | |
| Plaintiff, | ) | Case No. 3:17-cv-00364-JBA |
| | ) | |
| v. | ) | |
| | ) | |
| QUINNIPIAC UNIVERSITY, TERRI | ) | **ORAL ARGUMENT REQUESTED** |
| JOHNSON, SEANN KALAGHER, | ) | |
| AND VINCENT CONTRUCCI, | ) | |
| | ) | |
| Defendants. | ) | January 22, 2019 |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rules 7(a) and 56(a)2, Plaintiff John Doe ("Plaintiff" or "Doe") submits this memorandum in opposition to the Motion for Summary Judgment filed by Defendants, Quinnipiac University ("QU"), Terri Johnson ("TJ") Seann Kalagher ("SK"), and Vincent Contrucci ("VC").[1] (Dckt. 81). For the reasons set forth below, the Motion for Summary Judgment should be denied in its entirety.

## I.        INTRODUCTION

The Defendants have moved for summary judgment on various grounds, claiming a lack of evidence to support any of Doe's claims for relief. As discussed below, however, the evidence of record fully supports Doe's claims of discriminatory treatment under Title IX ("T9"). Doe relies on, among other things, a statement and actions of a key decision-maker showing that gender bias influenced her decision. He also relies on specific examples of more favorable treatment of similarly-situated female students in QU disciplinary proceedings involving the same QU administrative personnel and decision-makers, even after QU was advised in detail numerous times

---

[1] Defendants will be referred to by their initials, Quinnipiac University ("QU"), Terri Johnson, ("TJ") Seann Kalagher, ("SK") and Vincent Contrucci, ("VC") as well as the other individuals in this case. See Ex 128 (Legend).

of Doe's concerns about its gender bias, flawed processes and the extreme emotional toll its unreasonable actions were taking on him. The record leaves no doubt that questions of material fact exist as to all of Doe's claims, which should be decided by the jury.

## II. STANDARD FOR ENTRY OF SUMMARY JUDGMENT

A motion for summary judgment may be granted only if the court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995).

Many of the claims asserted in this case (including T9, breach of contract, bad faith, intentional infliction of emotional distress, and recklessness) implicate the Defendants' motives and intent.  Issues of motive and intent – requiring as they do assessments of credibility and demeanor – are generally ill-suited for summary judgment and should be left to a jury for resolution.  See, e.g., Poller v. Columbia Broad. Sys., 368 U.S. 464, 473 (1962) ("Summary judgment procedures should be used sparingly ... where the issues of motive and intent play leading roles."); ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 150 (2d Cir. 2007) ("[I]ntent is always a subjective matter of inference and thus rarely amenable to summary judgment.").

## III. ARGUMENT

Defendants move for summary judgment on all 12 counts of Plaintiff's Second Amended

Complaint (Doc. 71). Viewing Plaintiff's claims in light of the substantial factual record below; considering the disputed issues of fact on the most fundamental aspects of the claims and defenses in this case; and given the mandate to draw all reasonable inferences in the Plaintiff's favor, summary judgment should be denied on all counts.

### A.  Defendants' Spoliation of Evidence Precludes Entry of Summary Judgment

As a threshold matter, Defendants' motion for summary judgment should be denied in its entirety based on spoliation of evidence: SK shredded all the notes taken during the hearing in INV1[2] and KK destroyed her notes pertaining to INV2. Local Rule 56(a)2 Statement ("SOF") ¶¶259, 260. The intentional destruction of material evidence has no rational justification and, as intended, has impeded Plaintiff's ability to prove his case. See Doe v. Norwalk Community College, 248 F.R.D. 372, 375, 381 (D. Conn. 2007) (setting out spoliation elements holding plaintiff is entitled to adverse inference jury instruction).

The Hearing and INV2 are at the core of all Doe's claims against the Defendants.  SK[3] shredded the notes of the Board, explaining that "people aren't around me when I did it," Ex. 3 pp.199, 10-11, despite that he was an attorney, knew of the pending lawsuit and litigation hold, and always maintained all records for the T9 proceedings as required by T9.  SOF ¶259. KK was a former state trooper with extensive trial experience who knew of the pending lawsuit and litigation hold and that all records of T9 proceedings were sent to SK for preservation.[4] SOF ¶260.

---

[2] INV1 refers to the first investigation QU conducted in the summer of 2016 based on complaints by Roe and Roe2 against Doe.  INV2 refers to the second investigation QU conducted in spring 2017 based on Doe's formal complaint against Roe.

[3] SK was QU's Fed. R. Civ. Pro. 30(b)(6) designee and testified as QU's institutional representative. SOF ¶4.

[4] LC preserved her notes in INV2 and VC preserved his in INV1. See Exs. 106, 107.

Yet, KK "destroyed" her notes. Ex.7 p.183, 14. Notes from the Hearing and INV2 could have included inculpatory evidence of Defendants' intent and conduct regarding T9 and breach of any duty or contract. Accordingly, the intentional destruction of this relevant and potentially inculpatory evidence supports an adverse inference against Defendants sufficient to create a material issue of fact on all Defendants' identified grounds for summary judgment. Doe's claims should survive on this basis alone. See, e.g., Kronisch v. U.S., 150 F.3d 112, 129 (2d Cir. 1998) (precluding summary judgment on circumstantial evidence and possibility that jury would draw adverse inference due to spoliation); Byrnie v. Town of Cromwell, Bd. Of Ed. 243 F.3d 93 (2d Cir. 2001), superseded in part and on other grounds by Fed. R. Civ. P. 37(e) (same).

### B.   The Three Title IX Counts Survive Summary Judgment

Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, et seq. ("T9") provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ..." Id. at § 1681(a). A student discriminated against on this basis may enforce T9 through an implied private right of action "for monetary damages, as well as injunctive relief." Yusuf v. Vassar College, 35 F.3d 709, 714 (2d Cir. 1994); see also Cannon v. University of Chicago, 441 U.S. 677, 688–89 (1979). "Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" Doe v. Columbia Univ., 831 F.3d 46, 53 (2d Cir. 2016) (citing Yusuf, 35 F.3d at 715).

To show a violation of T9, a plaintiff must demonstrate "that the defendant discriminated

against him or her because of sex; that the discrimination was intentional; and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions.'" Doe v. Brown Univ., 166 F. Supp.3d 177, 185 (D. R.I. 2016).

Doe asserts three claims for relief as a result of QU's violation of T9: (1) Erroneous Outcome (Count One); (2) Selective Enforcement (Count Two); and (3) Deliberate Indifference (Count Three).

## 1. Counts One and Two – Erroneous Outcome and Selective Enforcement

Doe suffered an erroneous outcome when QU, motivated at least in part by the fact that Doe was male, engaged in flawed proceedings that led to the wrong outcome of his disciplinary charges. Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994) (plaintiff must allege (1) "a procedurally or otherwise flawed proceeding"; (2) "that has led to an adverse and erroneous outcome"; and (3) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."). "The predominant question is whether the college's actions were motivated by gender bias or if the disciplinary procedures establish a pattern of decision-making that applies a chauvinistic view of the sexes to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." Neal v. Colorado State University–Pueblo, 2017 WL 633045, *9-10 (D. Colo. 2017).

A party may recover on a selective enforcement claim when "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Yusuf, 35 F.3d at 715. To establish that the decision-making was predicated on gender bias, the plaintiff must "demonstrate that a female was in circumstances

5

sufficiently similar to his own and was treated more favorably by the university." Mallory v. Ohio University, 76 Fed. Appx. 634, 641 (6th Cir. 2003).

Defendant QU argues on both erroneous outcome and selective enforcement theories that there is no triable issue concerning gender discrimination. Defendant's Memorandum in Support of Motion for Summary Judgment Dckt. No. 81-1 ("Def. Brief"), at 4. Under either theory, "Title IX . . . is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" Doe v. Columbia Univ., 831 F.3d 46, 53 (2d. Cir. 2016) (quoting Yusuf, 35 F.3d at 715). Evidence sufficient to show discriminatory intent, includes "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Yusuf, 35 F.3d at 715.

Not only does the record here as set forth below include statements and actions of a key decision-maker (Carney) showing that gender bias motivated her decisions, it also includes overwhelming evidence that the defendants treated Doe differently than Roe throughout the entire process. Additionally, statistics derived from data provided by the Defendants show men were treated less favorably than women for T9 violations at QU, and that QU treated females more favorably due to pressure from OCR and from the State of Connecticut to err on the side of females in T9 cases.

QU's claim that there is no statement by any investigator showing gender bias, Def. Brief at 4, relies solely on Doe's deposition testimony. The record shows, however, that LC initiated and conducted INV2 with preconceived notions about gender roles and used a biased lens which influenced the outcome of INV2. When asked how she would have approached the matter if the

6

genders of the parties were reversed and every other detail was identical, she stated that "nothing is ever, you know, the same situation" and that she is "very well aware that simply switching their genders . . . would change so many other factors . . .  There would be other things happening around them that would be different if he were the woman and she were the man, . . .  I just can't imagine everything … would have played out exactly the same if he were the woman and she were the man."  Ex. 12, pp.164, 12-15, 18-20; 165, 9-11.

LC's statement that she may have treated the case differently and that the outcome might have been different if the genders were reversed pertains specifically to one of proceedings in which Doe claims QU discriminated against him and is strong evidence of QU's bias against Doe because he was male.  See, e.g., Doe v. Marymount University, 297 F.Supp.3d 573, 585-86 (E.D. Va. 2018) (adjudicator made statements that indicated gender bias in another investigation); Doe v. University of Chicago, 2017 WL 4163960, at *5 (N.D. Ill. 2017) (evidence of gender bias sufficient where administrator refused to provide a direct answer to a similar question),  Gentry v. Mountain Home School District, 2018 WL 2145011 at *8 (W.D. Ark. 2018) (vice principal made statements showing bias and mocked plaintiff's sexual orientation); Saravanan v. Drexel University, 2017 WL 5659821, at *5 (E.D. Pa. 2017) (factual scenario replete with examples of statements showing gender bias).

Further, through her biased lens, LC credited Roe's claims that she felt unsafe, yet disbelieved Doe's claims that he felt unsafe.  SOF ¶210. When asked why she disbelieved Doe, LC cited his having "chose[n] to come back to [Roe's] apartment" as the reason.  Ex. 12, p.161, 23. Yet, LC listened to voicemail recordings provided by Doe, in which Roe pleaded with him not to leave her and reviewed evidence that showed that Roe intended to go back to Doe's apartment

after he allegedly choked her. Ex. 12, p.115, 7-10; Ex. 86, p. 22. Moreover, Roe repeatedly went back to Doe's apartment, refused to leave his car and his home, and followed him to his parents' home in Stamford to escape her, after he told her not follow him.  SOF ¶25; Ex. 130, ¶19. Despite all this, LC stated she believed Roe when she said she was afraid.  SOF ¶210.  Had LC applied her own logic reasonably and without gender bias, she would have equally disregarded or equally regarded the fear expressed by both Doe and Roe. In fact, in finding Roe not responsible, LC  went so far as to find that Doe did not make *any statements that he was in fear*, despite evidence to the contrary that she included in her own report. SOF¶213; Ex. 60, p.8. The inference of bias is obvious.  See, e.g., Collick v. William Paterson University, 2016 WL 6824374, *11 (D. N.J. 2016) ("[A]n allegation that the process was one-sided, irregular and unsupported by evidence may give rise to an inference of bias.")

In addition to LC's favorable treatment of Roe, there is sufficient evidence that QU treated Roe and Roe2 more favorably than Doe throughout the entire disciplinary process.  For selective enforcement to apply, the parties must be similarly situated.  Contrary to QU's argument, Def. Brief at 7, the females are similarly situated to Doe in three ways (in which they are in the same posture regarding charges of T9 violations, specifically IPV[5]): (1) Roe and Roe2[6] as complainants in INV1 are similarly situated to Doe as a complainant in INV1; (2) Roe as a complainant in INV1 is similarly situated to Doe as a complainant in INV2; and (3) Roe as a respondent in INV2 is similarly situated to Doe as a respondent in INV1. Further, because QU not only was obligated to,

---

[5] Plaintiff refers to Intimate Partner Violence as IPV.
[6] Roe is the female student Doe dated from January 2015 through June 2016; Roe2 is the female student Doe dated from May 2014 through January 2015. SOF ¶¶10, 12.

but also specifically promised its students it would treat complainants and respondents equitably in the T9 disciplinary process, Roe and Roe2 as complainants were similarly situated to Doe as a respondent in INV1.   Doe v Brown, 327 F Supp.3d 397, 412 (D.R.I. 2018) ("A comparator must be 'similarly situated in material respects,'") (citations omitted); Doe v. Univ. of Chicago, 2017 WL 4163960, at *4 (N.D. Ill. 2017) (gender discrimination established where male is treated adversely in one Title IX disciplinary process because he is male, and a female student was treated better because she was female.); Doe v. Amherst College, 238 F.Supp.3d 195, 223 (D. Mass. 2017) (school took proactive steps to encourage female but not male to file formal complaint); Doe v. Rollins College, 2019 WL 208283 at *5 (M.D. Fla. 2019) (male student was intoxicated when female complainant engaged in sexual activity with him and experienced retaliation during the investigation, but school did not encourage him to file a complaint or investigate his claims).

As complainants in INV1, QU treated Roe and Roe2 more favorably than Doe in numerous ways.  For example, Roe provided information about possible T9 violations by Doe to public safety and to a QU RA, who realized what Roe said may be a Title IX matter. Ex.3, p.211, 10-21. They immediately reported this to SK, who in turn immediately instructed VC and AH to investigate Roe's claims, which they promptly did as required by T9 and QU's policy. SOF ¶¶13, 25; Exs.14, pp.3, 5; 65, p.4; 79, p.4.  Likewise, when interviewed as a witness for Roe, Roe2 provided information which the investigators perceived as possible T9 violations by Doe. SOF ¶16. VC and AH followed QU's T9 policy and reported Roe2's allegations to SK.  Id. SK then instructed VC and AH to investigate Roe2's allegations in INV1, which they did, after opening an administrative complaint, as required by T9 and QU's Title IX policy. Id.  When, however, Doe reported stalking and harassment by Roe and Roe2, he received completely different treatment by the investigators.

9

During the course of his interviews with VC and AH, Doe identified the conduct of Roe and Roe2 both to show that they were unafraid of him (to defend against the charge of IPV), and also because they were taking actions against him that were causing <u>him</u> to have safety concerns.  SOF ¶¶23, 25. This information clearly raised possible T9 and violations of the QU Student Handbook ("Code") by Roe2 and Roe. SOF ¶¶96, 179. VC and AH, however, did not report this conduct to anyone, open a complaint, or investigate -- all in violation of T9, QU's T9 Policy and QU's training. SOF ¶¶25, 232; Exs.14, pp.3, 5; 65, p.4; 79, p.4. In fact, they never conducted an interview of Roe or Roe2 after Doe's interview to question them about his defense and their violations of QU policies, even in the later Hearing.  SOF ¶¶25, 182.

Despite multiple opportunities to comply with their policies and T9, the investigators did not report or investigate Doe's claims even when he repeated them in two additional interviews. SOF ¶ 25.  Moreover, QU did not investigate his claims or open an administrative complaint against Roe like they did for Roe2 despite his request that they do so in his Response.  SOF ¶¶37, Ex. 22 p.20. QU again failed to investigate these complaints when Doe later asked the same of the T9 Coordinator, TJ, who undeniably understood what Doe was requesting. SOF ¶¶40, 47. Yet she abandoned her responsibilities and duties as T9 Coordinator when she refused to conduct an independent investigation and make an independent determination of whether Doe's allegations were possible violations of T9, instead relying on VC, AH and SK because she trusted them "to have done what she presumed they would have done." SOF ¶47.  TJ not only refused to investigate Doe's defense or open an administrative complaint against Roe (as QU had done for Roe2), she instead forced Doe to file a formal complaint against Roe, despite his desire not to do so and despite the fact that it was not typical for QU to receive formal complaints.  SOF ¶¶48, 50, 198.

10

Forcing Doe to file a formal complaint and to undergo a separate investigation under these circumstances -- especially to have his defenses investigated -- defies logic. QU is required to report and investigate *any possible T-IX violations* whether someone files a complaint or not, even if the person prefers not to cooperate or participate.  SOF ¶230.  VC explained this to Roe2 when she did not want to file a complaint against Doe, emailing her "the University is required by the government to determine if any reports we received may be violations of the Title IX policy are accurate. Though we will follow up on what was reported, you are not required to participate or respond to questions if you do not wish to." Ex. 18, see also Ex. 3, p. 220, 8-14 (it was not typical for QU to get formal complaints).[7]

QU's actions are even more difficult to understand in light of the very low threshold for reporting and opening an initial investigation into information that may constitute possible violations of T9.  A later formal investigation is required "if what they said happened, could have violated [Title IX.]" Ex., 3 p. 181, 16-25, and opening an initial investigation requires less. SOF ¶277.  Any reasonable person (much less one trained in T9) who read or heard Doe's allegations, even without access to the evidence he provided, would see potential violations of T9, possible IPV, stalking and sexual harassment, as well as violations of other QU policies by Roe and Roe2.[8] SOF ¶¶96, 179.  When Doe ultimately filed a formal complaint to avoid waiving his defenses, TJ found reasonable cause to open a formal investigation on the very same information upon which

---

[7] Further, investigating Doe's allegations would have been efficient as the case involved the same parties, witnesses and facts and the investigators were already up to speed.  It would have been supportive to both Roe and Doe as complainants to avoid subjecting them to additional proceedings and interfering with their education.  Moreover, Doe said he did not want to file a formal complaint because he did not want to escalate the situation anymore, face possible retaliation charges or more harassment by Roe.  SOF ¶198.
[8] Indeed, the investigators in INV2 read the allegations as constituting IPV, stalking and sexual harassment. SOF ¶96.

VC, AH and SK had refused to open an initial investigation. SOF ¶199. This is a higher standard than that for an initial investigation showing that QU applied a *higher* standard to investigate Doe's similar if not more egregious complaints against females than vice versa.

QU's defense that VC and AH did nothing because they could not corroborate the allegations also makes no sense as that is not the standard for reporting or for opening an initial investigation; rather, corroborating the evidence is *the purpose and end result* of an investigation. In any event, Doe's allegations were corroborated by the evidence he provided, as well as by Roe and Roe2's statements.  SOF ¶25.

QU's actions here alone are sufficient to create an inference of gender discrimination in favor of females.  Rossley v. Drake Univ., 2018 WL 5307625, *22 (S.D. Iowa 2018) (summary judgment denied given factual questions as to whether "Defendants' decision to initiate disciplinary proceedings against Plaintiff but not Jane Doe—even though they were both accused of sexual misconduct—was motivated by gender"); Doe v. Amherst College, 238 F.Supp.3d 195, 223 (D. Mass. 2017)  (gender bias shown where college took proactive steps to encourage female but not male to file complaint); Doe v. Syracuse University, 2018 WL 4440530, at *10 (N.D.N.Y. 2018) (where university elevated allegations of claimant's complaint, but did not afford respondent the same consideration, court held actions supported selective enforcement claim).

Further, QU used an incorrect definition of IPV in Doe's Hearing, which required fewer elements to be proved, and relied on conduct well outside the time during which Doe and Roe2 were involved in an intimate relationship to find Doe responsible for IPV. SOF ¶¶66, 174, 187. On the other hand, QU used the correct definition of IPV in INV2 to find Roe not responsible for charges based on the same evidence. SOF ¶¶177, 200.  QU investigated the same set of facts and

time frame regarding Roe and Doe's relationship in INV1 as INV2. SOF ¶200. Investigators in INV2 concluded the behavior was mutual and did not have the necessary one-sided power dynamic for IPV, finding Roe not responsible. SOF ¶214. Yet investigators in INV1, using the same evidence, found Doe responsible for IPV. SOF ¶¶67, 200. In addition, INV1 included 18 witnesses and took more than 4 months before it concluded, with Doe being found responsible; INV2 concluded 9 days after investigators interviewed Doe with no witnesses for Roe and 5 for Doe, with Roe being found not responsible. SOF ¶¶19, 204, 207, 212.  The numerous ways in which QU treated Roe and Roe 2 more favorably than Doe in both disciplinary proceedings evinces a pattern of preferential treatment of similarly-situated females sufficient to create an inference that gender was at least in part a motivating factor for QU's actions.  Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994).  See Exhibit 129 for additional examples of preferential treatment of Roe and Roe2.

That these actions were undertaken against the backdrop of OCR 2011 guidance and enforcement of T9 causing schools to feel pressure to favor females in T9 cases provides even more reason to deny summary judgment on this ground. QU claims that Doe has adduced no evidence of any Quinnipiac official being pressured by the supposed nationwide trend favoring female students because of OCR's enforcement of the 2011 DCL, Def. Brief at 6, but this is untrue. OCR's 2011 Dear Colleague Letter ("DCL") began a sea change in OCR's enforcement of T9, focusing on female victims and underreporting of sexual assault. SOF ¶145. Media attention to the DCL, responding Connecticut ("CT") state law and subsequent federal government guidance reinforcing the government's commitment to requiring colleges to aggressively pursue sexual assault focusing on female victims showcased the pressure colleges were feeling to comply with

13

OCR.  Id. There was a significant uptick in the number of colleges OCR investigated for not following T9 procedures, and in which OCR always found in favor of female complainants until Fall 2016. Id.; Ex. 79.

QU, through SK, TJ and others, was aware of OCR oversight generally, the potential for investigation and loss of federal funding, and potential lawsuits.  SOF ¶146. SK stayed abreast of the evolving law and media and trained the T9 team on these topics. SOF ¶¶144, 224, 225. SK recalled a training after the Doe case had ended, in which he discussed with colleagues the new "countercurrent" in T9, with more focus on due process for respondents, and which "has shifted the institutional response in a general." Ex. 3, p.152, 17; 153, 5-7. He also recalled an OCR investigation in the Fall of 2016 being the first time OCR had ever found in favor of a respondent. Exs. 3, p.154, 10-15; 79.  TJ testified that the government's stricter enforcement of T9 on college campuses in part was "looking to engage males—rather than only educating females to be not raped, educating males, everybody, involving the males more vocally on affirmative consent and men can stop rape. And changing the societal norms of those environments." Ex. 2, p.86, 18-23; see also Ex. 2, pp.90, 25; 91, 3-12 (QU's "message to break underreporting . . . to make our process and procedures more clear" was due to its investment in "changing away from rape culture.").  See Collick v. William Paterson University, 2016 WL 6824374, at * 12 (D.N.J. 2016) (court took judicial notice of 2011 DCL and noted that it was a commonsense inference that the attention to the issue of campus sexual assault may have caused university to believe it was in the spotlight).

Moreover, QU received targeted scrutiny by OCR in 2012 for claims of discrimination in its student processes and, at the same time, was found by the Second Circuit to have discriminated against women in violation of T9 and was under court-ordered monitoring for its compliance with

14

T9, which continued through at least June 2016. SOF ¶147; Defendants Answer (Dckt.# 75 ) ("Def. Answ.") ¶25; see also Beidiger v. Quinnipiac University, 691 F.3d 85 (2d Cir. 2012).  SK and the T9 team were acutely aware of the consent decree requiring monitoring of QU for compliance with T9 not only due to national press but because under that monitoring, QU's T9 disciplinary processes were reviewed. Exs. 3, pp.29, 17-25; 2, pp.48, 23-25; 49, 1-10.

In 2012, SK created QU's T9 policy to comply with the DCL. SOF 148 QU, TJ, SK and CM implemented educational programming to comply with the DCL to increase reporting, focusing its programs on female victims of sexual assault.  SOF ¶148. This evidence creates a reasonable inference that, due to OCR's DCL and its enforcement, the pressure to comply with the DCL and CT's laws designed to protect female victims of sexual misconduct and harassment, and the targeted OCR oversight of QU at the time for discriminating against females under T9, QU felt pressured to and was motivated to favor female students over male students in its T9 disciplinary proceedings.  QU was focused on insulating itself from accusations that it had failed to protect female students from sexual harassment and misconduct and on the avoidance of OCR investigations, the loss of federal funding and potential litigation.  See, e.g, Doe v. Columbia Univ., 831 F.3d 46, 56–57 (2d Cir. 2016) (plaintiff's complaint pointing to student group criticism and university statements was sufficient to raise a plausible inference of bias); Doe v. Miami Univ., 882 F.3d 579, 594 (6th Cir. 2018)  (complaint sufficient where university faced "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment—loss of all federal funds—if it failed to comply"); see also Doe v. Baum, 903 F.3d 575, 586 (6th Cir. 2018) (gender bias found where public pressure created backdrop combined with

other evidence).[9]

QU's gender bias created by pressure to conform to the DCL is supported by statistics. Reporting increased over the years at QU with many more women bringing complaints against men than men against women. SOF ¶149; Ex N. T9 investigations rose from 1 in 2012 to 14 in 2013 (9 were females filing complaints against males and only 1 was a male against a female). Id. Since 2011, QU chose to investigate 38 T9 complaints brought by females against males and only 4 T9 complaints brought by males against females. Id. QU found 19 men responsible when accused by a woman, and only one woman responsible when accused by a man. Id.

QU also imposed harsher sanctions on males accused by females than on females accused by males: six male respondents, but no female respondents, were expelled or dismissed; three male respondents, but no female respondents, were suspended; and eight male respondents, but only one female respondent, were given deferred suspension. Id. These disparities provide concrete evidence of gender bias. See Drisin v. Florida International University Board of Trustees, 2017 WL 3505299 at * 13 (S.D. Fla. 2017) (statistics showed a pattern of failure to adhere to school's guidelines and regulations resulting in gender skewed sexual misconduct charges); Bleiler v. Coll. of Holy Cross, 2013 WL 4714340, at *6 (D. Mass. 2013) ("Title IX. . . permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination.").[10]

---

[9] Courts routinely find sufficient inference of bias under facts similar to those here. See, e.g., Doe v. Amherst Coll., 238 F.Supp.3d 195, 223 (D. Mass. 2017); Doe v. Lynn Univ., Inc., 235 F.Supp.3d 1336, 1340–42 (S.D. Fla. 2017); Neal v. Colorado State University-Pueblo, 2017 WL 633045 (D. Colo. 2017); Doe v. The Trustees of the University of Pennsylvania, 270 F.Supp.3d 799, 823 (E.D. Pa. 2017); Doe v. Rollins College, 2019 WL 208283 at *4 (M.D. Fla. 2019).

[9] Additional support for QU's differential treatment of males than females in their student conduct processes is shown by QU's handling of the SR case. SOF ¶137. Doe was assaulted on two different occasions and sustained injuries. Id. SR was given a lesser sanction for assaulting him twice and causing serious injuries

Consistent with this pattern, QU treated Roe's complaint much more seriously than Doe's similar complaint by immediately investigating Roe's complaint against Doe; finding sufficient evidence to hold a hearing; and finding Doe responsible for all violations. SOF ¶¶13, 66. QU delayed responding to, and resisted initiating an investigation of Doe's complaint against Roe based on similar if not more egregious conduct but found there was insufficient evidence to go to a hearing.  SOF ¶¶93, 106. QU found Roe not responsible for any violations, which Roe never denied. SOF ¶59, 174. Similarly, QU took Roe2's complaint more seriously and brought an administrative complaint against Doe after Roe2 described conduct in her interview about Doe that could have been possible violations of T9, but did not bring an administrative complaint against Roe2 or Roe after Doe identified conduct in his interviews regarding Roe and Roe2 that could have been possible violations of T9, or even after he brought forward additional more compelling allegations and evidence against Roe and Roe2 in his Response.  SOF ¶¶16, 25, 40, 47.

Additionally, QU's actions in the disciplinary proceedings reflect a chauvinistic attitude. Neal, 2017 WL 633045 at *9–10 ("The predominant question is whether the college's actions were motivated by gender bias or if the disciplinary procedures establish a pattern of decision-making that applies a chauvinistic view of the sexes.").  LC's acceptance of Roe's claims of fear but not Doe's reflects stereotypical gender roles. SOF ¶210. In the Hearing, moreover, the Board appeared visibly moved by Roe's expression of emotion, despite that it was not all related to Doe. SOF ¶¶64,

---

than the sanction Doe would have received of at least 1-year suspension if Doe accepted responsibility for allegedly putting his arm across Roe's neck in self-defense, SOF ¶138, showing that QU treats males less severely for hitting males that they treat males hitting females due to gender stereotyping.

184. VC was tearing up and appeared to be visibly shaken right after he heard Roe's emotional outburst when he retrieved Doe to escort him back to the hearing room and looked at Doe with disdain and contempt. SOF ¶184, Ex.130, ¶¶62, 63. When the investigators lost their notes in INV1, although they could not recall the substance of Roe's words, they specifically noted that she was emotional and very upset, something they thought was significant enough by itself to put in the RR – as if that was evidence of credibility. SOF ¶164.  QU took the words of Roe, Roe2 and a female witness (AS) at face value that they were afraid of Doe, yet did not believe Doe when he said he was afraid of and felt unsafe around Roe and took six months to follow up on his claims of Roe's harassment and violations of the NCO that he made in his first interview, relying on stereotypical notions of gender. SOF ¶¶23, 85, 163, 210.  This evidence creates a material issue of fact as to whether QU was motivated by gender bias.  See Schaumleffel v. Muskingum University, 2018 WL 1173043 at * 16 (S.D. Ohio 2018) ("Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning."); Saravanan v. Drexel University, 2017 WL 5659821 at *5 (E.D.Pa. 2017) (culture of gender bias against males claiming sexual assault by females); Rolph v. Hobart & William Smith Colleges, 271 F.Supp.3d 386, 401 (W.D.N.Y. 2017) (manner in which investigation handled consistent with a "view of men as predators and women as guardians of virtue").

QU's failure to act in accordance with its T9 procedures designed to protect accused students, as set forth in Section 3, Breach of Contract, also is sufficient to support an inference of gender discrimination.  See, e.g, Collick, 2016 WL 6824374, at * 11  (inference of bias created where female's allegations against male were accepted as true without investigation; males were not given opportunity to respond or explain themselves; males did not receive proper notice; males

were not permitted cross examination; males were not given a list of witnesses against them; and males were not provided a thorough and impartial investigation).

Further, QU's T9 policy language favors females. QU, TJ, SK and members of the T9 team agree that using the words "complainant" and "respondent" is the balanced and neutral way to refer to the parties in a T9 matter because using "accused" is more negatively weighted against the respondent. SOF ¶257. Similarly, using the word "victim" is weighted in favor of the complainant. Id. SK trained the QU T9 team to use the neutral terms of complainant and respondent, and that language matters.[11] SOF ¶262; see Doe v. The Trustees of the University of Pennsylvania, 270 F.Supp.3d 799, 823 (E.D. Pa. 2017) (problematic that sexual violence policy referred to complainants as "victims/survivors"); Schaumleffel v. Muskingum University, 2018 WL 1173043, at * 16 (S.D. Ohio 2018) ("Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning."); Doe v. Brown University, 166 F.Supp.3d 177, 189 (D. R.I. 2016) (professor held a debate to discuss rape issues and one female debater remarked that males are "bad" and females are "victims;" professor commented that these remarks were consonant with culture on campus).

SK and TJ were responsible for editing and revising the T9 policy annually. SOF ¶231. Yet, QU's T9 policy used "complainant" and "accused" more than 50 times (showing QU's biased presumption against respondents in favor of women), as well as referring to complainants as 'victims.'[12] SOF ¶263. This language has never been changed. In fact, there have been no

---

[10] QU's T9 expert testified that using complainant and respondent is neutral. Ex. 137, pp. 208, 11-25; 209, 1-25; 210, 1-23. Using "accused" is weighted negatively against the respondent; "victim" is weighted in favor of the complainant. Id.

[11] Nationally and at QU, most respondents are men and most complainants are women. SOF ¶270.

substantive changes to the policy since its creation in 2012. SOF ¶231. TJ conceded she should have changed the policy. Ex. 2, pp.160, 19-25; 161, 1-2. Even if QU's training has evolved, the T9 policy is a vestige of QU's efforts to comply with the DCL and treat females more favorably.

Additionally, members of the QU T9 team involved in Doe's case were biased by personal experience with sexual violence against females, victim advocacy roles, and affiliations with sororities and pro-feminist orientations that infected the process with bias against males, adding to the motivation to support women and find men responsible for sexual misconduct. SOF ¶269. <u>See Doe v. Case Western Reserve University</u>, 2017 WL 3840418 at *7 (N.D. Ohio 2017) (T9 coordinator who was involved directly in proceedings made statements in her doctoral dissertation that men were the sexual aggressors); <u>Doe v. Washington and Lee University</u>, 2015 WL 4647996 at * 10 (W.D. Va. 2015) (T9 officer's bias based on article written for female-focused website); <u>Doe v. The Trustees of the University of Pennsylvania</u>, 270 F.Supp.3d 799, 823 (E.D. Pa. 2017) (university personnel publicly advocated for other colleges and universities to combat sexual violence on campuses and strengthen protection of victims by engaging in 'victim-centered' responses). Each of these factors by itself is sufficient, but in totality this evidence should defeat summary judgment for Counts 1 and 2.

### 2. <u>Count Three - Deliberate Indifference</u>

Count 3 asserts that QU was deliberately indifferent to harassment directed against Doe. In the typical deliberate indifference case, "a plaintiff seeks to hold an institution liable for sexual harassment and . . . [is required to] demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct." <u>Sahm v. Miami University</u>, 2015 WL 93631, at *4 (S.D. Ohio 2015). In addition to

not responding at all, "[d]eliberate indifference may be found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a lengthy and unjustified delay. [D]eliberate indifference will often be a fact-based question, for which bright line rules are ill-suited." Doe ex rel. Doe v. Derby Bd. of Educ., 451 F. Supp. 2d 438, 447 (D. Conn. 2006); Doe v. Amherst College, 238 F.Supp.3d 195, 224 (D. Mass. 2017) (where school failed to take even minimal steps to determine whether male student should be viewed as a victim allegations provided sufficient basis for deliberate indifference claim).

Contrary to QU's argument, Def. Brief at 11, the record shows that QU officials with the authority to take corrective action had actual notice that Doe was being discriminated in numerous ways:

(a) Doe told VC and AH in his three interviews in INV1 that Roe and Roe2 had harassed and stalked him, and that Roe, through her friends, was harassing him while INV1 was ongoing, SOF ¶¶23, 25, 88, 93;

(b) On January 28, 2017, SK was informed Roe was breaching confidentiality and the NCO as retaliation or further sexual harassment, SOF ¶215;

(c) SK, VC and TJ reviewed Doe's Response that described the complainants' harassment and stalking of him, that Roe was harassing him while the investigation was ongoing, that the investigators had done nothing about either, and requested that QU open administrative complaints against Roe and Roe2 and that his claims be investigated, SOF ¶¶37, 38, 47;

(d) TJ reviewed his February 1, 2017 letter and February 17, 2017 email in which Doe raised the same issues, adding that the investigators had delayed investigating these claims of sexual misconduct and harassment, which in itself created a hostile environment and, as such, was sexual harassment, SOF ¶¶40, 48;

(e) TJ, MD and VC read Doe's appeal in which he raised 1) his previous allegations of sexual harassment by Roe and Roe2 and that investigators had done nothing (2) that investigators were discriminating against him based on gender because of their handling of the past and ongoing harassment by Roe in INV1 and (3) that TJ had been informed about all of the above

21

and did nothing, SOF ¶¶76, 79, 197; and

(f) Doe informed TJ on May 26, 2017 that INV2 was unfair in favor of Roe due to gender bias, SOF ¶213.

Actual notice of discriminatory practices could not be clearer. This is more than sufficient to defeat summary judgment on this element. See KB v. Daleville City Bd. of Educ., 536 Fed. App'x 959 (11th Cir. 2013) ("[T]he actual notice must be sufficient to alert that official to the possibility of the plaintiff's sexual harassment."); Doe v. Amherst, 238 F.Supp.3d at 224 (where school failed to take even minimal steps to determine whether male student should be viewed as a victim sufficient basis for deliberate indifference claim).

QU next argues that it did not ignore Doe's complaint of sexual harassment or assault, it simply did not find in his favor. Def. Brief at 11. The record includes substantial evidence that QU's actions clearly were unreasonable, and that many times QU ignored Doe's complaints of discrimination and handled his claims in violation of its own policies and T9.

Concerning Doe's allegations that Roe and Roe2 engaged in conduct that violated T9, the investigators did not report them, investigate them or open administrative complaints as required by T9 and QU's own policies, training and practice, and as it did for Roe and Roe2 under the same circumstances. SOF ¶¶13, 16, 25. In addition, when these very claims were brought to the attention of SK and TJ, they told Doe they would not investigate his claims unless he filed a formal complaint, notwithstanding the fact that Doe had told them he preferred not to because he did not want to escalate the matter and experience further harassment and retaliation from Roe. SOF ¶¶47, 48, 50, 198.

VC chose not to pursue Doe's claims because he "could not corroborate them," SOF ¶25,

but when TJ reviewed Doe's same allegations, she determined there was reasonable cause to open an investigation and did just that.  SOF ¶199.  Drucker failed to do anything in connection with the appeal except communicate *ex parte* with QU employees to ask if they were discriminating and then believe them when they said they were not; she did not speak with Doe or anyone else about his claims. SOF ¶197.  INV2 was a sham conducted in 9 days and closed even before investigators had interviewed one of Doe's witnesses, and when Doe brought the errors and differential treatment of his and Roe's complaints to TJ's attention, she did not look into his claims but simply advised him there was no recourse.   SOF ¶¶ 201, 205, 207, 208, 210-13. QU delayed investigating the breaches of confidentiality and violations of NCO's until spring semester after Doe had filed a TRO, and then conducted sham investigations of some of them, two by KK who also conducted INV2, and gave varying, inconsistent explanations of what had happened in others. SOF ¶¶ 23, 40, 87-90, 93-95. When Doe brought his claims of hostile environment based on discrimination by the investigators to TJ in his Response, letters and emails, she did not investigate, as required by QU's T9 policy; instead, TJ relied on SK and VC to have acted professionally, as did Drucker in the appeal.  SOF ¶¶47, 197. Doe brought his concerns to QU at least 10 times. SOF ¶¶ 23, 25, 37, 40, 48, 85, 87, 93. TJ knew that Doe was extremely distressed and anxious due to the overtly biased treatment, yet never spoke to Doe about his concerns. SOF ¶222.  QU first addressed Doe's concerns of bias raised in his Response almost three months after his Response when VC defended himself against Doe's complaints at the Hearing, with no advance notice to Doe, falsely accusing Doe of being untruthful in front of the Board, and undermining Doe's credibility. SOF ¶¶63, 195. Doe was not permitted to address this or correct it, in violation of QU's T9 Policy. Id.

23

QU argues that the alleged harassment did not deny Doe access to educational resources or opportunities. Def. Brief at 11-12.  Due to the discriminatory manner in which QU conducted INV1, including its failure to address Doe's allegations of past and ongoing harassment by Roe and Roe2, Roe was empowered to continue to harass Doe.  Roe continued her harassment in September and through the spring.  See *supra* at page 22-23.

After Doe received the RR at the end of October, he became increasingly anxious about attending QU social events or going on campus because Roe could easily have approached him in retaliation or for the purpose of fabricating more charges against him. Def. Answ. ¶165; Ex. 130, ¶74. Doe was deeply concerned because he believed QU would automatically continue to credit Roe and more charges would be levied. Ex. 130, ¶74; see Jennings v. University of North Carolina, 482 F.3d 686, 699 (4th Cir. 2007) (deprivation of access to educational opportunities or benefits includes when "the harassment (1) results in the physical exclusion of the victim from an educational program or activity; (2) so undermines and detracts from the victim['s] educational experience as to effectively deny [him] equal access to an institution's resources and opportunities; or (3) has a concrete, negative effect on [his] ability to participate in an educational program or activity.").

Faced with a possible one-year suspension, the loss of tuition and credits for the fall semester and graduation a year later, the prospect of having to prove his innocence and respond to the voluminous RR while studying for finals, Doe's anxiety escalated. Ex. 130, ¶¶29, 30. This caused Doe to get a "D," the lowest grade he ever received at QU, in a course in his competitive major. SOF ¶117.  The time and labor Doe spent over winter break poring over the lengthy RR, gathering evidence to prove he was not responsible, and putting together his Response, which

would not have been necessary had QU properly and fairly conducted its investigation, heightened Doe's anxiety and depression. Ex. 130, ¶¶30, 31.

QU scheduled a hearing before seeing Doe's Response on the first day of classes, against advice from Cooper, QU's disability officer. Ex. 130, ¶32; SOF ¶¶35, 36. SK and TJ did not consider Doe's Response and refused to re-investigate or answer any of Doe's concerns, further increasing his anxiety. SOF ¶¶38, 47. This caused him to seek treatment from his psychiatrist to address the unfair investigation and ongoing harassment by Roe which was preventing him from being able to defend himself, and QU's handling of the matter. SOF ¶ 220, 221.  Roe's continued breaches of confidentiality and harassment through her friends approaching him in public places and discussing the IPV investigation during the Spring ruined Doe's reputation and caused him to avoid QU and other places where he thought she or her friends might be. SOF ¶¶126, 273.

The extreme stress and anxiety from the continued unreasonable, discriminatory and biased conduct of QU affected Doe's educational activities at QU as well as his life beyond graduation. SOF ¶276. Each day Doe wrestled with uncertainty as he faced the prospect of being suspended or expelled at the upcoming hearing. Ex. 130, ¶40. It interfered with his studies, when he was hoping to have his best grades as he neared the end of school and was seeking employment. Ex. 130, ¶76. His contact with friends, classmates and professors dropped off precipitously as the Hearing approached, impacting the very connections he should have been able to rely on as an alumnus for life. Ex. 130, ¶77. He was completely prohibited from attending the Business School graduation, without QU considering a plan that would keep Doe and Roe separated, in contravention of the educational and safety purposes of QU's sanctions.  SOF ¶¶109, 110, 189. Doe was not permitted to attend Senior week, which is the culminating event at QU, and his family

was not permitted to attend any social events tied to graduation. SOF ¶¶110, 190. There was no effort to adjust these sanctions in a way that would ensure Roe's safety and permit Doe to attend activities, despite many requests from Doe and his family.  SOF ¶110.  Doe and his parents were devastated that they could not participate in Doe's graduation, particularly in light of the challenges Doe had overcome in terms of his disabilities and childhood. SOF ¶190.  Doe was not permitted on QU property, denying him access to campus resources without permission, which required extra steps to seek to be on campus. SOF ¶¶70, 112. Doe requested permission to accept a summer internship with a QU professor who was a possible employment contact. Defining the internship as an educational activity, TJ permitted Doe to attend two weeks of it. SOF ¶¶114, 115. When he requested to participate in the entire internship of ten weeks, and then for two weeks but at a different time at his professor's request, TJ denied Doe's request and repeatedly refused to explain why. SOF ¶115. In light of the struggle he had with TJ and her unreasonable denial with no explanation, Doe had no reason to believe she would grant permission to attend any events or access campus resources. SOF ¶191.

There is substantial evidence that the harassment by Roe and Roe2 and QU's discriminatory handling of the harassment caused a negative and concrete effect on Doe's educational activities. There is ample evidence to deny QU's summary judgment on Doe's deliberate indifference claim. Leader v. Harvard University Board of Overseers, 2017 WL 1064160 at * 4 (D. Mass. 2017) (plaintiff properly alleged that school had not acted reasonably to prevent harassment when it continued: she informed school on multiple occasions that it was ongoing, and that she was dropping shifts from her job and missing meals to avoid it); Wells v. Hense, 235 F.Supp.3d 1, 9 (D. D.C. 2017) (where defendants' response to the reported incidents

was to promise an investigation and appropriate consequences, but then failed to conduct a proper investigation, punish the perpetrators, ensure that the victims were protected from future assaults, and prevent the subsequent harassment by other students, all of which caused the victims to stop attending school for the remainder of the year, school's conduct could be found unreasonable); Doe v. Forest Hills School District,  2015 WL 9906260 at *10 (W.D. Mich. 2015) (question of fact as to whether school's response was unreasonable where school merely "talked to" harasser and told plaintiff to avoid him, put the onus on the plaintiff to report the harasser, and knew it's measures had been ineffective); Doe v. University of North Texas,  2017 WL 2402577 at *4 (E.D. Tex. 2017) (harassment was severe and pervasive because it interfered with educational opportunities such as going to school, the gym, the library, and social interactions and question of fact existed as to whether school's response was reasonable given delay in investigation, failure to prevent further encounters, failure to keep plaintiff informed of measures it took and remedial actions were inadequate to prevent it). For the foregoing reasons Counts 1, 2 and 3 should survive summary judgment.

## C.   The State Law Claims Survive Summary Judgment

### 1. Count Four – Breach of Contract

In Johnson v. Schmitz, 119 F.Supp.2d 90 (D. Conn. 2000), this Court described the contractual underpinning of the student / university relationship:

> [T]he basic legal relation between a student and a private university or college is contractual in nature.... [T]here seems to be no dissent from [the] proposition that the catalogues, bulletins, circulars, and regulations of the institution determine the contractual relationship between the student and the educational institution.... [A] court that is asked to enforce an asserted contract between a student and his university must examine the oral and written expressions of the parties in light of

27

the policies and customs of the particular institution.... Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises, consistent with the limitations expressed in <u>Gupta v. New Britain General Hospital</u>, 239 Conn. 574, 687 A.2d 111 (1996), appears sound.

<u>Id</u>. at 93 (citations and internal quotation marks omitted).   Under <u>Gupta v. New Britain General Hospital</u>, 239 Conn. 574, 592-93 (1996), "courts will entertain a cause of action for institutional breach of a contract for institutional services . . . if the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program."

    This Court has recognized that, to support a claim under <u>Gupta</u>, a "specific contractual promise … must have been precise and based on specific contractual terms or provisions." <u>Kloth-Zanard v. Amridge University</u>, 2012 WL 2397161 at * 4 (D. Conn. 2012). This Court also has held that provisions in student handbooks constitute "specific contractual promises" supporting breach of contract claims. <u>See</u> <u>Mario v. Yale University School of Medicine</u>, 2006 WL 908155 at * 5 (D. Conn. 2006); <u>Johnson v. Schmitz</u>, 119 F.Supp. 2d 90, 92-97 (D. Conn. 2000); <u>see</u> <u>also</u>  <u>Ross v. Creighton University</u>, 957 F.2d 410, 416 (7th Cir. 1992) ("catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the [education] contract" [internal quotation marks omitted]);  <u>Okafor v. Yale University</u>, 2004 WL 1615941 at * 6 (Conn. Super. June 25, 2004) (disciplinary proceeding rights conferred on plaintiff by "Yale's Undergraduate Regulations" contractually binding on Yale).

    Courts specifically have recognized breach of contract claims arising in the context of school disciplinary proceedings.  Policies articulated in student handbooks give rise to contractual

28

obligations and a failure to adhere to those policies creates a cause of action.  See Doe v. Belmont University, 334 F.Supp.3d 877, 891-92 (M.D. Tenn. 2018) (school's failure to follow procedures outlined in sexual misconduct guide sufficient to state a breach of contract claim); McCarty v. Yale University, 2017 WL 4508771 at * 4 (Conn. Super. Aug. 29, 2017) (expulsion was not grounded in academic, but in disciplinary reasons, judicial deference was not required and the matter fell squarely within the court's competency); Faraclas v. Botwich, 2005 WL 527961 at * 6 (Conn. Super. Jan. 25, 2005) (court denied the school's motion for summary judgment, finding that there was an issue of fact relative to whether a contract existed, what its terms were and whether it was breached);  Goodman v. The President and Trustees of Bowdoin College, 135 F.Supp.2d 40 (D. Maine 2001) (student handbook language stating that college acknowledged its responsibility to conduct judicial procedures which reflect fundamental fairness sufficient to state claim for breach of contract).

The defendants rely heavily on Gupta, a case in which a surgical resident was discharged from the defendant hospital's residency program for lack of proficiency and skill in connection with his training to be a physician.  Unlike this case, Gupta did not involve a college's failure to follow its policies and procedures in connection with disciplinary proceedings. Contrary to the defendants' argument, this case falls squarely within Gupta's exception.  Doe agrees that Gupta provides the proper basis for his breach of contract claim, but defendants seriously misinterpret the holding of that decision.

First, defendants attempt to miscast Doe's breach of contract claim as a claim for "educational malpractice." Def. Brief at 15. This position not only is at odds with Gupta, which expressly recognizes breach of contract claims, it is at odds with defendants' position elsewhere

in their brief: "[i]n cases such as this one, in which a student alleges that he was wrongfully disciplined for violating a university's code of conduct, are evaluated as claims for breach of contract." Def. Brief at 44.

Second, defendants cite <u>Gupta</u> for the proposition that claims alleging contractual breaches by educational institutions are viable only if supported by the defendant's "arbitrary, capricious or bad faith conduct." Def. Brief at 17-18. This standard, however, applies not to breach of contract claims, but to claims based on improper "academic decision-making" based on the "determination whether to dismiss a student for academic reasons." <u>Gupta</u>, 239 Conn. at 594-97; <u>See</u> <u>McCarty v. Yale University</u>, 2017 WL 4508771 at ** 3-4 (Conn. Super. Aug. 29, 2017) (rejecting argument that plaintiff claiming breach of contract following discipline must establish that decision "was made arbitrarily or in bad faith.").[13]

QU and Doe clearly were parties to a contract, whether express or implied, which involves no legal difference. <u>Boland v. Catalano</u>, 202 Conn. 333, 337 (1987) ("A true implied [in fact] contract can only exist [however] where there is no express one. It is one which is inferred from the conduct of the parties though not expressed in words."); <u>Demoulas v. Quinnipiac University</u>, 2015 WL 1427951 at* 4 (Conn. Super. Mar. 5, 2015) (trier of fact could find an implied contract between the plaintiff and QU and that the Student Handbook and the Student Code of Conduct were a part of that contract).

---

[13]   Defendants also rely on <u>Vogel v. Maimonides Academy of Western Conn., Inc.</u>, 58 Conn. App. 624 (2000), which is readily distinguishable from this case as there were no claims in <u>Vogel</u> that the school implemented disciplinary action or that it failed to follow its policies or procedures. Similarly, <u>Hope Academy v. Friel</u>, 37 Conn. L. Rptr. 535 (2004), was essentially a collections action brought by a school against the parents of a child who counter-claimed, asserting that the school failed to provide educational opportunities for their daughter.  The issues in that case had nothing to do with disciplinary procedures at all.

Pursuant to the contract, QU offered to provide a college education with all of its attendant benefits, including the right to defined policies and procedures for the adjudication of disciplinary matters as articulated in its publications.  Exs. 14, 50, 61.  In exchange,  Doe paid it a hefty tuition fee.  Ex. 130, ¶¶4, 5. Within those publications, QU made specific promises to its students outlining the duties to which it bound itself in exchange for their decision to attend the school.  *See infra* pp. 32-46.

QU next argues that if Doe's claims fall under the <u>Gupta</u> exception, there are no clear and definite promises, and if promises exist, there was no "material breach."  Doe had an expectation of receiving a college education pursuant to the contract.  He also had a reasonable expectation that Quinnipiac would follow the procedures and policies stated in its Student Handbook ("Code"), ADA Policy and T9 Policy. SOF ¶229; Ex. 3, p.159, 13-33 (explaining the purpose of having T9 policy is "so people know what the expectations are if they have to go through one of these processes," so that they understand what conduct is prohibited and their rights and responsibilities); Ex. 3, p.160, l-6 (QU expects students to abide by its policies.); <u>Demoulas</u>, *supra*.

Defendants also advance the idea that their breach somehow is actionable only if it constitutes a "material breach" rather than an "immaterial breach." Def. Brief at 19 (discussing "material" and "immaterial" breaches, and noting that the latter "may occasion liability for damages"); <u>Id.</u> at 22-25, 27-32, 34-37 (stating, with respect to specific promises made and violated by defendants, plaintiff's alleged inability to establish a "material breach"). They offer no legal support for this novel concept.[14]  Contrary to the position taken throughout Defendants' brief, Doe

---

[14]   QU also asserts that because its flawed investigation and hearing culminated in findings of responsibility, *Doe* materially breached the subject contract, and this vitiates any "material breach" of the

may survive summary judgment if a reasonable jury could conclude that the Defendants breached their obligations under the QU Documents, whether material or immaterial. Alaimo v. Beacon Industries, Inc., 89 Conn. App. 363, 365 (2005) ("Whether there has been a material breach of a contract is a question of fact.").

Notwithstanding their repeated reference to Doe's purported violation of Code provisions, the defendants argue that the Code cannot be the basis for a breach of contract claim due to a disclaimer. Def. Brief at 20-21. QU already has been on the losing end of this argument regarding its Code, and the T9 policy contains no such disclaimer. Ex. 14; see Demoulas, 2015 WL 1427951 at * 4; see also Atria v. Vanderbilt University, 142 Fed. Appx. 246 (6th Cir.  2005) (student handbook stating that policies did not constitute a contract may be enforced as implied contract).

The record includes numerous examples of specific promises contained within QU's policies and which QU breached.  QU promised its students in its disciplinary proceedings *at least* the following:

**a. QU promised that it "complies with Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex in educational programs or activities that receive federal financial assistance."  Ex. 14, p. 1.**

This promise was breached in numerous ways, illustrated in Section B, *supra*.  QU utterly failed to "provide an environment free from gender-based discrimination and harassment" and is clearly not compliant with T9.  QU discriminated against Doe on the basis of sex throughout its investigation of the claims directed against him and those he brought against Roe and Roe2. In

---

contract by QU.  Def. Brief at 20.  It was the very inadequacies of the process, including the processes of the investigation and the hearing, that culminated in the erroneous finding of responsibility.  Therefore, the Defendants cannot use these inadequacies as both sword and shield – namely as a sword to punish Doe and as a shield to insulate themselves from liability.

addition, T9 imposes specific requirements on colleges' handling of disciplinary proceedings, which QU promised in its policy as set forth below.  It also requires colleges to follow their own T9 policies. SOF ¶¶229, 232, 279; Ex. 65, p.8.  Each time QU failed to follow its T9 policy it also failed to comply with T9.

**b.  QU promised that it would provide proper notice to respondents.**

The QU T9 policy pertaining to formal investigations explicitly states that it will "give the accused individual *proper notice of the investigation*."  Ex.14, p. 21.  The Code states:

> A student who has been charged with a violation of the Student Code of Conduct is granted *fundamental fairness* in the form of the following rights as part of this process:
>
> • Notice—The right to be *informed, in writing*, of the specific alleged violation(s) of the Student Code of Conduct in which the student is suspected of involvement.
>
> • Procedures—The right to be informed orally and/or in writing of the conduct procedures.

Ex. 61, p. 61.

Prior to being interviewed about the charges lodged by Roe and Roe2, Doe was given no notice of whether he was being charged with something, what those charges were, who the claimants were or what sections of the QU policies were at issue.  SOF ¶150.  He was simply summoned to meet with investigators who had been "assigned to investigate a complaint" and told that they wanted to ask him questions about a "situation." Ex. 81.  This is a clear breach of this contractual promise.[15]  See also, Exs. 66, p. 13; 71, p.4; SOF ¶280.

---

[14] Demoulas v. Quinnipiac University, 2015 WL 1427951, *5 (Conn. Super. Mar. 5, 2015); Doe v. Belmont University, 334 F. Supp.3d 877, 891 (M.D. Tenn. 2018); Fellheimer v. Middlebury College, 869 F.Supp. 238, 246 (D. Vt. 1994); Doe v. Western New England University, 228 F.Supp.3d 154, 174-175 (D. Mass. 2017).

33

**c.  QU's Code guaranteed that students charged with violations were granted "fundamental fairness," see section b., above; see also Ex. 14, p. 6 ("assures a fair process for . . . accused").**

An assurance of fundamental fairness in disciplinary proceedings has been held to constitute an enforceable contractual promise, see Demoulas v. Quinnipiac University, 2015 WL 1427951 at * 6 (Conn. Super. Mar. 5, 2015); Goodman v. President and Trustees of Bowdoin College, 135 F.Supp. 2d 40, 57 (D. Maine 2001) (student handbook language stating that college acknowledged its responsibility to conduct judicial procedures which reflect fundamental fairness sufficient to state claim for breach of contract), and includes notice, the chance to present witnesses and exculpatory evidence and the opportunity to be heard and meaningfully participate in an unbiased hearing.  None of these were provided to Doe in another breach of the contract by QU.  See Demoulas, 2015 WL 1427951 at *5.

**d.  QU promised that responsible employees will "promptly report any incidents of sex discrimination or sexual misconduct they may witness or become aware of." Ex. 14, p. 5; see also Exs. 65, p. 4; 66, pp. 14, 15; 79, p. 4.**

The QU T9 policy required the investigators to report Doe's allegations of sexual harassment and stalking by Roe and Roe2 to the T9 coordinator or deputy coordinator. Ex. 14, p. 5.  When alerted in his interview in INV1 that Doe had been (and continued to be) the victim of harassment and stalking by Roe and Roe2, the investigators failed to report this to the T9 coordinator and took no steps to prevent its recurrence. SOF ¶¶23, 25. When Doe reiterated his concerns, the investigators again failed to report it.  SOF ¶¶25, 37, 38, 40.  Doe's claims were

ignored and no guidance was provided to him about any next steps to be taken to avail himself of

this clear promise that the school would investigate his complaints responsibly.  SOF ¶¶38, 44, 47.

**e.  QU promised it would "investigate all incidents about which the university knows or has reason to know to protect the health and safety of the university community and the university will investigate issues raised anonymously or by third parties."  Ex. 14, p. 3 (see id., p. 21, QU promised to "conduct an immediate initial investigation to determine if there is cause to proceed with further investigation."); see Exs. 79, p. 4; 65, p.4; 66, p. 14-15.**

When Doe reported the prior stalking and harassment to the investigators on at least five

occasions, in his three interviews, his Response and his February letter to TJ, they did not

investigate. SOF ¶¶25, 38, 40, 44, 47.  The defendants also breached this promise by failing to

investigate Doe's claims in INV1 and waiting two months to follow up on his formal complaint in

INV2.  SOF ¶202. Defendants also failed to report or investigate Doe's allegations of ongoing

harassment by Roe starting in September 2016, and left Doe exposed to the repeated misconduct

through April 2017.  SOF ¶¶23, 85, 88. These were both contractual violations. Novio v. New

York Academy of Art, 317 F.Supp.3d 803, 813 (S.D.N.Y. 2018) (promise to respond promptly to

complaints of sexual harassment and to take immediate action to eliminate sexual harassment

articulated in student handbook and on school's website held adequate to support breach of

contract claim).

**f. QU promised that claimants and respondents had "the right to have the Title IX grievance process fully explained, and to receive written notice of all Student Conduct Code charges at least 48 hours before a committee hearing."  QU T9 Policy, p. 13.**

The Code requires that a student accused of a violation be "informed orally and/or in

writing of the conduct procedures."  Ex. 61, p. 68. The investigators explained nothing to Doe

about the conduct procedures when he made his reports to them about ongoing stalking and

harassment by Roe and Roe2 in INV1 or INV2. Ex. 130, ¶19.

**g. QU promised that an accused student "has the right to . . . address concerns of bias and/or conflict of interest in regard to committee members." Ex. 14, p. 14.**

Doe was denied this right when he notified SK and TJ that MB had previously been involved in two student matters involving him.  SOF ¶46. Although he brought this to the attention of SK and TJ, it was repeatedly disregarded notwithstanding the obvious conflict that he had identified. SOF ¶¶ 42, 46, 49, 56; Ex. 130, ¶¶6-12.  This was another violation of QU's contract.  See Doe v. Rider University, 2018 WL 466225 at *13-14 (D. N.J. 2018) (breach of contract claim properly based on alleged failure to provide impartial investigators and hearing panel).

**h.  QU promised Doe would have the right to "review all documents and reports produced by the investigation . . . at least 24 hours prior to the hearing," and "to challenge information and documents prior to the hearing." Ex. 14, p. 14.**

Doe was afforded neither of these rights.  On the day of the hearing, VC submitted an 11-page document that Doe had never seen before and which contained new information about the investigation.  SOF ¶¶63, 195. Doe had not reviewed it, analyzed it or had any chance to object to its contents in advance of the hearing, as required by the T9 Policy.  Ex. 130, ¶53.  These were both contractual violations.  See Doe v. Brandeis University, 177 F.Supp.3d 561, 606 (D. Mass. 2016) (failure to provide timely access to examiner's report sufficient to state breach of contract).

When Doe was provided the RR on January 27, 2017, it contained additional information from communications with Roe and Roe2 that he had never seen and to which he had never been given a chance to respond. SOF ¶39; Ex. 130, ¶35.  Again, QU breached its contract by depriving Doe of his right to challenge this information before the Hearing.

**i. QU breached its contract when it failed to allow Doe to challenge information and documents prior to the hearing.**

See, section h., above.

36

**j.   QU promised students accused of misconduct have "[t]he right to be present and participate in the committee hearing." Ex. 14, p. 14.**

Doe's 'participation' was limited to submission of a handful of questions and the reading of an impact statement after a finding of responsibility had been made.  SOF ¶65, 68, 181, 182. Doe could not make an opening statement, introduce evidence or call or cross-examine witnesses or parties, resulting in a breach of QU's contract.  SOF ¶¶181.

**k. QU promised the Board would decide the matter by a preponderance of the evidence based on credible, relevant and convincing evidence.  Exs. 61, p. 64; 14, p. 16; 65, p. 11.**

Given the bias that infected the entire investigation and the Board's reliance on the report spawned from that bias, QU relied on neither credible nor convincing evidence.  The QU investigators did not take into account information made available to them that undermined the credibility of Roe and Roe2, notwithstanding Doe's attempts to put it before them.  SOF ¶¶37, 38, 155-58, 160, 170.  Since the Board simply relied upon VC's report in making its conclusions, there could not have been any credible and convincing evidence for it to consider.  SOF ¶¶66, 187.  Their use of the incorrect definition of IPV, which contained fewer elements, coupled with the fact that they relied on evidence beyond the time frame of the relationship to conclude Doe was responsible, further detracts from any analysis about preponderance. SOF ¶¶174, 176, 187. Moreover, given that SK shredded any and all notes created by Board members, there is no way to know what evidence they used and/or relied upon or what standard, if any, they used to reach their conclusions. SOF ¶259; see, Section A, *supra*.  Doe should be granted an inference that whatever was contained in those records was damaging to QU's defense.  See Doe v. Norwalk Community College, 248 F.R.D. 372, 375-82 (D. Conn. 2007).

37

**l. QU promised that its investigators and the Board would employ the definitions in the T9 Policy.**

The definition of IPV the Board used in finding Doe responsible was not derived from QU's T9 Policy, imposing a lesser burden on QU than was required by the T9 Policy. The Board applied the following standard:

> University policy defines Intimate Partner Violence as a pattern of behavior that is typically determined based on the repeated use of words and/or actions and inactions in order to demean, intimidate, and/or control another person. This behavior can be verbal, emotional and/or physical.  Ex. 51.

The definition of IPV from QU's T9 Policy states:

> **Relationship violence** is a pattern of behavior in an intimate relationship that is used to establish power and control over another person through fear and intimidation. A pattern of behavior is typically determined based on the repeated use of words and/or actions and inactions in order to demean, intimidate, and/or control another person. This behavior can be verbal, emotional and/or physical. Examples include, but are not limited to: striking another person (slapping, punching, etc.), property damage, reckless behavior, name calling and insults, public humiliation, harassment directed toward friends and acquaintances, and verbal and/or physical threats.  Ex. 14, p. 11.

The Board's definition excluded several elements of the definition published in QU's materials and resulted in a much lower threshold for finding Doe responsible. SOF ¶¶66, 174. The Board also used an incorrect interpretation of  "intimate relationship" by relying on evidence outside of an intimate relationship, as did the investigators.  SOF ¶¶172, 176. Notably, QU used the definition from the actual T9 Policy when investigating Doe's claims against Roe and Roe2. SOF ¶177. The failure to use the definition from the T9 Policy is another breach of contract by QU.  see Doe v. Western New England University, 228 F.Supp.3d 154, 170 (D. Mass. 2017) (breach of contract where plaintiff found responsible for conduct that was not defined as prohibited in operative policy).

**m. QU promised to respond to complaints promptly, thoroughly and equitably and to conduct an unbiased investigation. Ex. 14, p. 16.  See also, Exs. 65, pp. 9-10, 12, 18; 66, p. 25.**

Upon receiving a report, the university will respond promptly, equitably and thoroughly. When conducting a formal investigation, QU promised to: commence a thorough and impartial investigation by developing a strategic investigation plan, including a witness list, information list, intended investigation timeframe, and order of interviews for all witnesses and the accused individual.  QU T9 Policy, p. 16.

For all of the reasons stated above, the conduct of QU throughout this ordeal was not prompt, thorough, equitable or impartial.[16]  In INV2, no new evidence was sought, obtained or considered by the investigators; rather, they simply reviewed VC's report from INV1 and reached *pro forma* conclusions that correlated with it.  SOF ¶208; see also ¶¶204, 205, 207, 210, 212.  INV1 fell well short of this standard for numerous reasons, including that the investigators did not evaluate anyone for credibility; did not include a rationale in its report; did not question Roe about the alternative motive for filing a complaint; did not follow-up on ambiguous evidence with the parties or witnesses or to establish reliability; did not include all relevant information in the report; and did not interview relevant witnesses for Doe. SOF ¶¶151, 153, 155, 157-60, 166, 247.

**n.  QU promised to allow respondents to present a defense. Ex. 14, pp. 6, 14.**

This promise is implicit in the rights of the accused and the "fair" process for the accused. Ex. 14, pp. 6, 14. QU deprived Doe of a defense relative to the charges brought against him in numerous ways: in failing to interview witnesses provided by Doe; not considering any of the information he provided that showed Roe and Roe2 lacked credibility; not considering his response to the RR prior to the hearing; not interviewing him or any additional witnesses after receiving his

---

[16] See Ex. 129

response; prohibiting him from speaking at the hearing except to answer a few questions; and not asking questions of the parties or witnesses.  SOF ¶¶ 25, 47, 153, 155, 159, 193.

**o.  QU promised to maintain communication with the parties on the status of the investigation and overall process; if the procedures lasted longer than 60 days, "to communicate the reasons and expected timeline to all parties."  Ex. 14, p. 20.**

QU took four months to investigate Doe's claims once he made a formal complaint.  SOF ¶¶25, 48. No one at QU communicated with Doe about the more than two-month delay in investigating his formal complaint, as TJ conceded, in breach of its promise. SOF ¶201.

**p.  QU promised to "take steps to prevent the recurrence of misconduct and correct its effects."  Ex. 14, p. 1.**

When Doe reported stalking and harassment by Roe and Roe2 to the investigators, they failed to report it to the T9 coordinator and made no suggestions to Doe about what he should do to stop and prevent it.  SOF ¶ 25; Ex. 130, ¶19. They delayed looking into Doe's claims of continuing harassment by Roe beginning in September, and when they finally did, they conducted woefully inadequate 'investigations,' failing to meet the minimal standard for charging a violation of the NCO, empowering Roe to continue to harass Doe further violating the QU contract.  SOF ¶¶90, 95.

**q.  QU promised to guide complainants "with regard to how much detail is needed in an initial report."  Ex. 14, p. 5.**

Despite this assurance, Doe received no guidance from anyone when he reported the harassment and stalking by Roe and Roe2, and no one spoke with him, about him or guided him when he was forced to file a "formal" complaint.   SOF ¶¶50, 222.

**r.  QU promised it would keep all records, files and proceedings appropriately private and would share materials and information prepared or acquired under Title IX procedures only as necessary with investigators, witnesses and other relevant parties.**

The QU T9 Policy, ADA Policy and Code all contain specific assurances relative to the privacy.

> "Only people who have a need to know about the issue will be informed, and materials and information prepared or acquired under Title IX procedures will be shared only as necessary with investigators, witnesses and other relevant parties" . . . and that both complainants and respondents have: "The right to privacy, and the assurance that information regarding the complaint will be shared only with those necessary." Ex. 14, pp.5, 13-14.

> QU has the responsibility to "assure appropriate confidentiality of all information pertaining to a student's disability." Ex. 50, p. 7.

> The Code provides that a student accused of a violation has the right to "Privacy—The right to have all records, files and proceedings kept appropriately private," and that "[o]nly people who have a need to know about the incident will be informed, and information will be shared only as necessary with investigators, witnesses and the accused person(s)." Ex. 61, pp. 68, 80.

As part of his defense, Doe sought to advise the Board of his disabilities because of the effect they might have on their assessment of his credibility and because they provided an alternative explanation for his underlying conduct. He asked QU to provide information to the Board without sharing it with the complainants. SOF ¶46, 55, 264; Ex. 130, ¶45; Def. Answ. ¶67. When he made his request, SK denied it, stating that any information he provided - even of such a sensitive and private nature - would have to be disclosed to Roe and Roe2. SOF ¶¶ 264, 265. Doe was forced to waive his right to confidentiality or not have the information considered at all, a dilemma which should not have been placed on him. SOF ¶265; Ex. 130, ¶46. No one spoke with the QU Disability Office to ascertain whether this was a reasonable accommodation, or with Roe to ascertain whether she might agree to confidentiality. SOF ¶265. This was another contractual violation.

**s. Complaints "alleging discrimination on the basis of sex in any University program or activity" will be handled by TJ, for which QU follows a specific procedure. Ex. 14, pp. 7-8.**

Doe brought his concerns about the investigators' gender-biased investigation directly to TJ in February and asked her to investigate it. SOF ¶40. TJ did not follow appropriate procedures in the T9 Policy, which required her to investigate Doe's complaint. Instead, she dismissed them with no further process when it is clear that Doe's allegations, taken as true, would have constituted a violation of the T9 policy. SOF ¶¶47, 178.

**t. QU promised to comply with the ADA, to provide reasonable accommodations and to modify its programs to permit students to use the T9 procedures. Ex. 14, p. 9; 61, p. 71; Ex. 50, p. 5.**

Doe put QU on notice that he required accommodations to participate meaningfully in the disciplinary process. SOF ¶¶ 29, 32, 221; Def. Answ. ¶¶60, 61. QU failed to consider any alternatives to a hearing as requested by Doe and his therapist and failed to allow someone trained in disabilities to advise the Board about his disability and how it affected his underlying conduct and credibility in the interviews and at the hearing. SOF ¶¶55, 57, 180; Ex. 130, ¶44. They did not permit his therapist to testify as a witness on his behalf at the hearing and failed to review INV1 in the context of how his disability played a part once informed of it in October 2016. SOF ¶57; Ex. 130, ¶44. Rather than accommodating Doe, QU made it more difficult when (1) it failed to assist Doe with understanding the process of making complaints against Roe and Roe2 when their policies required that they do so; (2) it deliberately scheduled the hearing in INV1 for the one day identified by Cooper as posing the greatest problem for him; (3) no one even spoke with Doe about his concerns knowing that he was extremely stressed and anxious about the Hearing; and (4) it failed to furnish him with the 11-page document relied upon by VC prior to the date of the

42

hearing to give him adequate time to review it, understand it and defend against it in light of his disability.  SOF ¶¶35, 36, 63, 195, 219, 222; Ex. 130, ¶19, 53. These are all violations of QU's contractual promise to comply with the ADA.

**u.  QU promised that the parties could "appeal the finding and sanction of the committee, in accordance with the appeal guidelines" in QU's T9 Policy. Ex. 14, p. 14.**

The appeal of the finding of responsibility did not conform with the policies articulated in QU's T9 Policy.

> If the appeal letter(s) does not bring forward sufficient grounds for appeal, the appeal will be denied and the matter will be closed. If the appeal officer determines the appeal should be considered, he or she may decide to
>
> - affirm the decision of the committee. In this case, the initial decision is final.
> - remand the matter back to the committee to make a decision in light of the appeal officer or panel's findings.
> - initiate a new Title IX Grievance Committee hearing.

Ex. 14, p. 20.

Rather than follow these procedures and decide whether there were any issues on the papers, MD conducted her own *ex parte* 'mini investigation' and spoke only to the QU employees who were involved.  SOF ¶197. Because she believed them, she took no further steps and affirmed the Board's decision for all issues but one. Id. This procedure is not found in any QU policy or procedure (nor is the designating of an appeal panel), and it constitutes another breach of contract. See Atria v. Vanderbilt University, 142 Fed. Appx. 246, 255-56 (6th Cir. 2005); Neal v. University of North Carolina, 2018 WL 2027730 at * 7 (E.D.N.C. 2018) (breach of contract claim permitted to go forward as to failure to follow promised procedures in appeal process).

**v.  QU promised it would "meet with the complainant to inquire about and finalize the complaint" after reviewing the complaint.  Ex. 14, p. 21.**

See section Q *supra*.

**w. QU promised to select a second trained investigator to assist with the formal investigation.  Ex. 14, p. 21.**

When AH was no longer involved in Doe's investigation, QU did not appoint a replacement, in violation of this provision. SOF ¶38.

**x.  QU promised to train employees involved in the T9 process annually on T9 issues, investigations and hearing practices and appeals**. **Ex. 14, p. 16.**

The Title IX Grievance Committee shall be composed of university staff members who are underline annually on Title IX issues, investigations and hearing practices. In each hearing, the committee shall consist of three members, with one designated as the chair, who is charged with conducting the hearing. . .During the formal investigation, the deputy coordinator, or a underline lead investigator identified by the deputy coordinator, will: • identify and select a second underline investigator to assist with the formal investigation. Ex.14, pp. 15, 16.

Based on their conduct throughout the investigation, it is apparent that VC and AH lacked appropriate training. SOF ¶¶ 224, 226. They failed to follow many of the T9 policies articulated in the QU publications, which demonstrates their lack of training. See sections *supra* a,-e, l, and m-q.  Additionally, they did not consider credibility assessments in writing their RR, include any rationale in the report, or investigate Doe's claims of sexual harassment by Roe and Roe2 as required by the policies.   SOF ¶¶ 160, 166. AH and VC testified they never received training on credibility which QU requires. SOF ¶227. The Board also was not trained, and included no sanction rationale, used the wrong definition of IPV in the Outcome Letter (which at least one member relied on), relied on evidence outside the time period of the relationship (in violation of the QU definition), and found Doe responsible by a preponderance, despite the fact that the weight of evidence was in favor of Doe.  SOF ¶¶ 66, 174, 175, 188. The failure to train the investigators

was another contractual violation by QU.  See Novio v. New York Academy of Art, 317 F. Supp.3d

803, 813 (S.D.N.Y. 2018) ("Defendant's assertion 'to designate a Title IX coordinator who is

trained and experienced to address complaints of sex discrimination' is a clear and plain statement

of a specific [promised] service….").

**y.  QU promised that witnesses to incidents or those otherwise involved in the matter before the committee would not serve as advisers.  Ex. 14, p. 17.**

QU allowed TC to serve not only as a witness, but also as an adviser to Roe during the hearing

and investigation process. SOF ¶ 192. Further, QU allowed him to be Roe's advisor during INV2,

when he clearly was tainted by his participation in INV1. Ex. 60, p. 29. This was a violation of

policy and of the contract.

**z.  QU promised that "retaliation against any person in the university community for alleging a violation of Title IX or for cooperating in any investigation, proceeding or hearing relating to an alleged violation of Title IX is strictly prohibited and may result in disciplinary action, including additional interim or permanent measures. Any concerns regarding retaliation should be addressed immediately with the university Title IX coordinator or deputy coordinator." Ex. 14, p. 5.**

The fact that QU took no action to address Roe and Roe2's retaliation against Doe during

these proceedings was another breach of contract by QU.  See, supra sections d and e.

**aa.  QU failed to afford Doe his right to an investigation and appropriate resolution of all credible complaints of sexual misconduct, gender-based discrimination and/or harassment. Ex. 14, p. 1.**

See sections a, d, e, f, m, n, p, q, v and z above.

**bb. QU promised that an accused student had "the right to identify witnesses and other parties, and to request the deputy coordinator contact those individuals as part of the investigation." Ex. 14, p. 14.  See also, Ex. 65, pp. 6, 8-12; SOF ¶232.**

Although the investigators interviewed all of the witnesses identified by Roe and Roe2,

they failed to interview witnesses identified by Doe or to include information obtained from them

in their report.   SOF ¶¶20, 21, 194.  Doe's parents, who were not interviewed, had relevant information.   <u>Id</u>. QU breached its contract with Doe by failing to obtain and consider this information and to include it in the investigators' report.

**cc.  QU failed to treat the Doe in the same manner and provide the same benefits as it did the female complainants because he was male. See also, Ex. 65, pp. 6-12; SOF ¶232.**

See, Sections 1 and 2, *supra*.

These are some, but by no means all of the ways in which QU breached its contract with Doe.  The taint of bias infected the entire investigation in terms of the witnesses interviewed, the weight given to their statements, and the conclusions drawn.  That same taint permeated the hearing, which relied in large measure on the information produced by the investigation.  There is sufficient evidence of definite promises that the defendants breached and which present questions of material fact that should be decided by a jury.  Under Connecticut law, in cases involving contract claims under <u>Gupta</u>, "[i]nterpretation of the written terms of a contract and the degree of compliance by the parties are questions of fact to be determined by the trier of fact."  <u>Burns v. Quinnipiac University</u>, 120 Conn. App. 311, 320 (2010); <u>see</u> <u>Craine v. Trinity College,</u> 259 Conn. 625, 655–56 (2002). Summary judgment, therefore, should be denied on Count Four.

**2.     <u>Count Five – Breach of the Covenant of Good Faith and Fair Dealing</u>**

The legal principles for a claim for breach of the covenant of good faith and fair dealing are well established:

> [I]t is axiomatic that the ... duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship.... In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.... The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or

46

interpretation of a contract term.... To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.

Renaissance Management Co. v. Connecticut Housing Finance Authority, 281 Conn. 227, 240 (2007).

Good faith means honesty in fact and behaving in such a way as to allow both parties to obtain the benefits for which they contracted. The covenant of good faith and fair dealing thus requires faithfulness to an agreed common purpose and consistency with the justified expectation of the parties in the performance of their agreement. Citibank v. Twerdahl, 1996 WL 157336, at *2 (Conn. Super. Mar. 18, 1986); see also Magnan v. Anaconda Indus. Inc., 193 Conn. 558, 566 (1984).

An action for breach of the covenant of good faith and fair dealing requires proof of three essential elements: (1) that the plaintiff and the defendants were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; (2) that the defendants engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and (3) that when committing the acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendants were acting in bad faith. Fairfield Fin. Mort. Group. Inc. v. Salazar, 2002 WL 1009809, at *3 (Conn. Super. Apr. 23, 2002). A party's neglect or refusal to fulfill a contractual obligation constitutes bad faith if prompted by some interested motive. Feinberg v. Berglewicz, 32 Conn. App. 857, 862 (1993). "Bad faith," for purposes of the implied covenant of good faith and fair dealing, may be overt or may consist of inaction, and may include evasion of the spirit of the bargain." Landry v. Spitz, 102 Conn. App. 34, 42 (2007).

Defendants argue that Doe cannot prove that they were acting in bad faith.  Def. Brief at 37. To the contrary, it is abundantly clear that the actions taken by the defendants were motivated by animus directed against Doe and that they acted in bad faith.  Among the examples of this, are the following:

- MB expressly stated that the penalty imposed on Doe was punitive as opposed to educational, which is not a purpose of QU's sanctions. SOF ¶189.

- TJ expressly acknowledged that Doe's internship was part of his educational experience, yet deprived him of the opportunity to complete that internship by limiting him to two weeks' presence on campus. SOF ¶115.

- The complaint against Doe was investigated in a manner entirely different from how the complaint he brought against Roe was investigated. See pages 9-11, *supra*.

- When VC spoke at the hearing on April 2, 2017 he read from and provided an 11-page narrative that Doe had never seen before, notwithstanding the fact that he was entitled to view it 24 hours in advance of the hearing in violation of QU's policies and defended himself rather than simply summarize the RR. SOF ¶¶63, 195.

- The unequal weight afforded to Doe's defense in the document compared with the information provided by Roe and Roe2.  SOF ¶¶ 25, 38, 59, 187.

- The repeated allusions to Doe's lack of veracity during the hearing itself, including when VC stated that he never provided him with the cease and desist letter. SOF ¶63.

- Letters from Doe's therapist that reflected the dangers to his mental health in proceeding with a hearing that was skewed against him were not considered by the Board. SOF ¶221.

- No accommodations were offered to temper the ill effects of the hearing on his psychological state when the Board was fully aware of the toll it was taking on him. SOF ¶¶47, 55, 57, 180.

- INV2 was nothing more than a token, cursory investigation into the allegations brought by Doe against Roe and Roe2 notwithstanding the fact that he reported his level of fear and stress related to Roe's conduct, which was completely ignored. SOF ¶¶207, 210-13.

- The "investigation" of Doe's complaint relied on canned information from VC which already reflected his biases and impressions, and the Board's unsupported finding of responsibility to discredit Doe, and deprived Doe of a full and fair investigation into his allegations directed to Roe and Roe2. SOF ¶208.

48

- The complete disregard of the fact that the claims against Doe were brought in response to his break up with Roe and no evaluation of her credibility was undertaken. SOF ¶¶ 155, 160, 170.

- The fact that the hearing date was deliberately set for the one date identified by Cooper as problematic for Doe because it was the first day of class. SOF ¶¶36.

- Even after Doe alerted the investigators, TJ, SK and MD numerous times in interviews, in his Response and in letters regarding the errors in the process, to his concerns as a victim of sexual misconduct and the discrimination against him by the investigators because he was male and they did nothing. SOF ¶25, 37, 38, 44, 47.

- Even after TJ, VC, SK and MD were made directly aware that he was experiencing severe emotional distress due to the unfairness of the entire process, and that the hearing could cause irreparable psychological harm based on his disabilities, they did nothing. SOF ¶¶103, 180, 219, 221, 222.

These facts alone raise questions of material fact relative to the issue of whether the defendants' conduct was in bad faith.  See Papelino v. Albany College of Pharmacy of Union University, 633 F.3d 81, 93-94 (2d Cir. 2011) (genuine issues exist for trial relative to whether school breached implied duty of good faith by failing to investigate complaint of sexual harassment, mishandling of Honor Code proceedings and denying students a diploma); Demoulas v. Quinnipiac University, 2015 WL 1427951 at *7 (Conn. Super. Mar. 5, 2015); Jacobs v. Ethel Walker School, Inc., 2003 WL 22390051 at *6 (Conn. Super. Sept. 30, 2003).

### 3.    Counts Six, Seven and Eight – Tortious Interference with Contractual Relations

To prevail on his claim for tortious interference with contract, Doe must satisfy the following elements:

> (1) the existence of a contractual or beneficial relationship,
> (2) the defendants' knowledge of that relationship,
> (3) the defendants' intent to interfere with the relationship,
> (4) the interference was tortious, and
> (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct.

49

Landmark Investment Group, LLC v. CALCO Construction & Development Co., 318 Conn. 847, 864 (2015).

Doe had a contract with QU for the opportunity to graduate from QU with a degree and to participate in an educational internship.   SOF ¶¶1, 115.  His contract with QU provided that if he were charged with misconduct he would receive a fair and impartial investigation and hearing, and if found not culpable, his record would remain clean.  SOF ¶¶229, 246.  He also had a contract for and the right to equal treatment and fair handling of any claims he made.   SOF ¶¶229, 236, 248.

The individual defendants interfered with Doe's contract by conducting a biased and cursory investigation of Roe and Roe2's allegations; by not taking his statements seriously; by deciding responsibility up front; and by placing the burden of disproving it on him.  The individual defendants knew their actions were causing Doe emotional distress, but continued their actions. Their actions thus were reckless. See Section 7, *infra*.

QU again makes the argument that these claims are foreclosed under Gupta.  For the reasons set forth above, this does not apply.  See Section 1, supra.

The defendants also challenge these claims on the ground that there is no evidence that the actions of TJ, SK and VC in interfering with Doe's contract were tortious.   The Connecticut Supreme Court explained this element in detail:

> This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation … or that the defendant acted maliciously. … [the interference must be] wrongful by some measure beyond the fact of the interference itself …. The plaintiff … must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification. … whether a defendant's interference is tortious is a question of fact for the jury."

Landmark Investment Group, 318 Conn. at 868-69.

A motion for summary judgment is not the appropriate mechanism for determining whether the defendants' interference was tortious because it rests on intent.  That being said, the proof of tortious interference is plentiful.  The defendants did not follow QU's rules, were biased against Doe, and wrongfully found Doe responsible for IPV. There was no justification for their actions.

The defendants also argue that because they were employees of QU, they are agents of the school and therefore in some sense immune from personal liability for their intentional misconduct.   The cases cited in support of this claim have no applicability to the facts of this case. Both Longley v. Suffield Academy, 2004 WL 728554 (Conn. Super. Mar. 27, 2004), and Murray v. Bridgeport Hospital, 40 Conn. Supp. 56 (1984), involve claims made by employees against each other. The courts in both cases followed the "general rule barring tortious interference claims between two employees of the same corporation." See  Longley, at 3. Nothing in either case suggests an immunity such that the individual defendants in this case cannot be held liable for their tortious actions in interfering with the contractual relationship between QU and Doe.   Selby does not address this issue at all.

### 4.    Count Nine – Negligent Infliction of Emotional Distress

To establish a claim for negligent infliction of emotional distress, a plaintiff must show that (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiffs distress. Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (2003).

The defendants argue that Gupta bars Doe's claim for negligent infliction of emotional distress.  They assert that this claim is part and parcel of the tort of educational malpractice, which

Gupta rejected. Gupta *did not* involve a claim for personal injury arising out of the hospital/educator's actions and is completely distinguishable from this case.

QU owed Doe an independent duty of care. McClure v. Fairfield University, 2003 WL 21524786 at *7-8 (Conn. Super. June 19, 2003) (Gallagher, J.). It is well established under Connecticut law that once a school has undertaken to supervise its students, it has a duty to protect them. Id. In McClure, the court held that a university's adoption of policies for violations of certain behaviors as set forth in its handbook "constituted an assumed duty which became an indispensable part of the bundle of services which colleges afford . . . their students." Id. at *6 (internal quotations and citations omitted). Schools are subject to liability for harm "resulting from [their] failure to exercise reasonable care to perform [their] undertaking, if (a) [their] failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.' Id. (internal quotations and citations omitted).

QU adopted policies and procedures to prevent sexual harassment and gender discrimination, as well as discrimination based on disabilities, and to provide fair and unbiased proceedings for complaints based on those policies and procedures. Due to QU's negligent performance of its duties under the T9 Policy and Code, Doe was subjected to additional sexual harassment and gender discrimination and suffered greatly because he relied on QU's promises. It was foreseeable that the continued harassment and discrimination, as well as the unfair and biased manner in which QU handled the proceedings, would take an extreme emotional toll on Doe, particularly in light of his known disabilities. See, e.g., Wager v. Moore, 2015 WL 7421582, *4-5 (Conn. Super. 2017) (defendant's motion for summary judgment denied on the grounds that the college assumed direct responsibility for safety of students and therefore, had a

duty to protect); <u>Leary v. Wesleyan University</u>, 2009 WL 865679, *10 (Conn. Super. 2009) (reasoning where a duty is imposed upon a college or university stemming from the gratuitous undertaking of services, foreseeability is often found where the college or university has either adopted policies or protocols addressing the specific harm that has occurred or has undertaken in some way to prevent the specific harm from occurring); <u>Vega v. Sacred Heart University, Inc.</u>, 836 F.Supp.2d 58, 62 (D. Conn. 2011) (in upholding claim for negligent infliction of emotional distress, citing cases that hold that a "university may *assume* a duty to protect its students by way of its affirmative conduct.")

In <u>Doe v. Yale University</u>, 252 Conn. 641 (2000), the Connecticut Supreme Court distinguished the plaintiff's claim from an educational malpractice claim as rejected in <u>Gupta</u>, and recognized a negligence claim arising in the educational context:

> We conclude … that the distinction lies in the duty that is alleged to have been breached. If the duty alleged to have been breached is the duty to educate effectively, the claim is not cognizable. … If the duty alleged to have been breached is the common-law duty not to cause physical injury by negligent conduct, such a claim is, of course cognizable. That common-law duty does not disappear when the negligent conduct occurs in an educational setting.

<u>Id.</u>, at 659; <u>see also</u> <u>Riley v. The Travelers Home and Marine Insurance Co.</u>, 173 Conn. App. 422, 439 (2017) (finding insurance company could be held liable for negligent infliction of emotional distress based on the investigation that it conducted). Questions of material fact remain as to defendants' liability on Count Nine which should be resolved by the trier of fact.

### 5. **Count Ten – Intentional Infliction of Emotional Distress**

To establish a claim for intentional infliction of emotional distress, a plaintiff must establish that (1) that the actor intended to inflict emotional distress or that he knew or should have

known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme

and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4)

that the emotional distress sustained by the plaintiff was severe. Carrol v. Allstate Ins. Co., 262

Conn. 433, 442–43 (2003).

Defendants claim that Doe cannot prove outrageous conduct or show they intended to

inflict emotional distress as a matter of law.  However, …

> "[t]he cases analyzing claims of intentional infliction of emotional distress make clear that,
> there are few, if any, bright lines to assist a trial court in carrying out its gatekeeping
> function.  On the contrary, the analysis of such claims is always highly fact-specific."
> Thibault v. Barkhamsted Fire Dist., 2013 WL 6038259 at *8 (Conn. Super. 2013).

T9 discrimination claims are analogous to employment discrimination claims. See Doe v.

Columbia, 831 F.3d 46, 55 (2d Cir. 2016). In Pottie v. Atlantic Packaging Group, LLC, 2012 WL

6087282 at *8 (D. Conn.  2012), Judge Garfinkel recognized "the strong public policy prohibiting

employment discrimination on the basis of race, sex and national origin" and found the plaintiff

had alleged adequate facts to support her claim for intentional infliction of emotional distress.  Id.,

at *3; see also Satterwhite v. Cleveland Metropolitan School District, 2017 WL 6326882, *5 (N.D.

Ohio 2017) (gender discrimination in the police department held adequate to support intentional

infliction of emotional distress claim because society "cannot yet be said to be so depraved as to

prevent a person of reasonable sensibilities from exclaiming 'Outrageous!' " at plaintiff's

description of defendant's conduct); Kidd v. Itron, Inc., 2017 WL 4230513, *2 (E.D. Ky. 2017);

Faulkner v. Dillon, 92 F.Supp.3d 493, 502 (W.D. Va.  2015). Gender discrimination in and of itself

is so odious that it can be said to constitute irreparable harm.  See Able v. United States, 847 F.

Supp. 1038 (E.D. N.Y. 1994), remanded, Able v. U.S., 44 F.3d 128 (2d. Cir. 1995); Mitchell v.

Cuomo, 748 F.2d 804 (2d Cir. 1984); Covino v. Patrissi, 967 F.2d 73 (2d Cir. 1992).

Doe was falsely charged with intimate partner violence by his ex-girlfriend an hour after he ended their relationship.  SOF ¶13.  She threatened, "I'll make sure you can never go near me again."   Ex. 86, Dviii. The investigation into her claims proceeded at length before he was even notified it was pending, and his first notice that he had been charged came *after* he was summoned for an interview and subjected to interrogation without knowing the purpose.  SOF ¶¶19, 150; Ex. 130, ¶17.  Blindsided by the false allegations, he set about the challenge of trying to defend against them, but was placed at a severe and obvious disadvantage because the investigators refused to give him the opportunity to defend himself or consider the defense he raised.  SOF ¶¶25, 37, 38. In the course of the investigation, Doe identified Roe's conduct and a conspiracy with another ex-girlfriend (Roe's sorority sister) to obtain revenge against him, but the investigators completely ignored this information.  SOF ¶¶155, 157, 160; Ex. 130, ¶¶ 13-15; 19; 21-23. Doe also claimed Roe and Roe2 had harassed and stalked him (showing they were not afraid, intimidated or controlled by him) to rebut the charges of IPV.   Ex. 130, ¶ 19, 35. Again, the investigators completely ignored this information, did not ask questions and did not investigate these statements. SOF ¶¶25, 37, 38, 153. Even when TJ was given a detailed account of the problems and Doe asked her to review it, aware of the extreme anxiety this was causing Doe, she did nothing in response. SOF ¶¶40, 44, 47, 222; Ex. 130, ¶36.

Doe was deprived of the meaningful opportunity to be heard by someone in a position to evaluate his information with an open mind.  The investigation amounted to nothing but a sham,[17]

---

[17] INV2 was also a sham. SOF ¶¶ 200-215, see pages 21-23 *supra*.

and the matter proceeded to a hearing in which Doe's ability to present a defense was severely limited.  See pages 21-23 *supra*.  No real accommodations were made for him in terms of his disability or his anxiety.  SOF ¶223, see also section t *supra*.

To the contrary, VC exploited his learning differences by withholding material from him in violation of the university's procedures.   See section t *supra*.  The Hearing was scheduled for a date that was maximally disruptive to his emotional state on the one day specifically identified as the most problematic for him.  Id.   The Board did not call any witnesses, Roe2 did not attend the hearing and the committee relied almost exclusively on the biased RR. SOF ¶¶65, 66, 182, 183, 187. Doe could not respond to anything, question Roe, VC or anyone else.  SOF ¶¶63, 187, Ex. 130, ¶¶56, 61.

Doe was found responsible for the charges that were made against him despite the absence of any meaningful investigation of the charges he brought against the complainants which served as his core defense, and with the use of the wrong definition of IPV, which lowered the threshold for finding Doe responsible.  SOF ¶¶66, 174.

The penalty was calculated to cause unnecessary anxiety as well.  Doe was prohibited from attending graduation with his friends in the school of business and was forced to attend the ceremony with a different group with whom he had no connection.  SOF ¶109; Ex. 130, ¶68. His parents could not attend any of the graduation events.  SOF ¶¶110, 190. Doe's ability to participate in an internship that would have provided him with career opportunities was severely limited in an effort to "punish" him for an offense he did not commit.  SOF ¶¶113-115, 189; Ex. 130, ¶70. All of this was driven by gender bias on the part of the investigators, the hearing board and the school.

The evidence shows that defendants knew or had reason to know emotional distress was

likely.  Murray v. Bridgeport Hospital, 40 Conn. Supp. 56, 62 (1984) (intentional infliction of emotional distress requires that the actor either intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct.). TJ, VC and SK knew Doe was experiencing extreme emotional distress from the report of his treating psychiatrist which stated that the events could lead to a spiral he had never before experienced. SOF ¶¶219, 221, 222.   Despite this, QU refused to speak with Doe about these concerns or his claims of harassment and discrimination, address his concerns of sexual harassment and discrimination or consider any other options even though he repeatedly brought these to their attention. SOF ¶222. They forced him to attend a one-sided hearing and unreasonably delayed INV2 to ensure it occurred after the hearing regarding INV1 had been concluded.  SOF ¶¶ 201, 202; Ex. 130, ¶¶49-52; 65. VC abused his authority and abdicated his responsibility to ensure a fair process by defending *his actions* before the Board without advance notice to Doe as required by QU's policies and procedures, and falsely accused Doe of lying.  SOF ¶¶63, 195. VC then failed to permit Doe to defend himself against this accusation, with SK and the Board looking on. Id. TJ, VC, SK, the Board and MD, who later refused to grant an appeal on these very same issues, all abused their positions of authority as administrators with the power to conduct fair disciplinary proceedings in compliance with QU's procedures. SOF ¶¶196, 197. See Longo v. Waterbury Hospital Health Center, 2005 WL 407785 at * 3 (Conn. Super. Jan. 14, 2005) ("[T]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other which gives him actual or apparent authority over the other, or power to affect his interests … in particular police officers, *school authorities*, landlords and collecting creditors have been held liable for extreme abuse of their position").

Addressing defendants' third argument that there is no evidence that Doe suffered serious mental distress, the record shows that Doe received treatment to address the effects of the biased handling of the proceedings.   SOF ¶¶124, 221.   He was forced to take prescription anxiety medication to cope and experienced anxiety and depression so significant that not only affected his ability to participate in the subject proceedings, it also impacted his grades.   SOF ¶¶221, 272; Ex. 130, ¶¶29, 30.   In fact, the way QU treated him has greatly exacerbated Doe's emotional trauma and distress, anxiety, and depressive mood.   Dr. Liebowitz testified that Doe will continue to experience the negative effects of the investigations, hearing, appeal and the imposition of the sanctions conducted by QU and its agents. SOF ¶276.   Questions of material fact exist relative to this claim that are sufficient to defeat summary judgment.

### 6.   **Count Eleven – Negligence**

Count Eleven of the Doe's complaint asserts a claim for negligence against the defendants arising out of the manner in which they conducted investigations and proceedings involving Doe. For the reasons fully articulated above, <u>Gupta</u> is inapplicable to this claim for negligent investigation.  <u>McClure v. Fairfield University</u> and <u>Doe v. Yale University</u> both hold that schools can be liable to their students for negligent conduct.[18]

---

[18] Courts have acknowledged the viability of negligence claims against schools in numerous contexts. <u>See, e.g.</u>, <u>Hernandez v. Baylor Univ.</u>, 274 F. Supp. 3d 602, 621 (W.D. Tex. 2017) (finding plaintiff alleging sexual assault by Baylor football players plausibly alleged a claim for negligence in addition to Title IX violation under theory of deliberate indifference); <u>Doe v. Univ. of St. Thomas</u>, 240 F. Supp. 3d 984, 995 (D. Minn. 2017) (holding male student who was suspended did not state plausible claim of gender bias against university to support Title IX claims but did state plausible negligence claim); <u>Doe v. Salisbury Univ.</u>, 123 F. Supp. 3d 748, 763 (D. Md. 2015) (male student plaintiffs disciplined for sexual misconduct stated plausible claims of negligence against university and its officials in their professional capacities and erroneous outcome discrimination in violation of Title IX); <u>Doe v. Case W. Reserve Univ.</u>, 2017 WL 3840418 *12(N.D. Ohio 2017) (in sexual misconduct case, male students' Title IX erroneous outcome claim and negligence claims against some defendants survived dismissal).

Defendants further argue that they owed Doe no duty of care, and that negligence claims thus do not apply in cases involving student discipline, citing cases from other jurisdictions that are inapposite. In Xiaolu v. Vassar College, 97 F. Supp.3d 448 (S.D.N.Y. 2015) and Weitz v. State of New York, 182 Misc.2d 320 (N.Y. 1999), the courts found that the State of New York did not recognize causes of action for negligent prosecution or investigation and applied that concept to schools.   Although a review of Connecticut law does not yield authority specific to a claim for negligent investigation in a school disciplinary proceeding, Connecticut has recognized a cause of action for negligent investigation arising in certain employment settings. See, e.g., Crosby v. HSBC North American Holdings, Inc., 2008 WL 2930188 (Conn. Super. June 30, 2008) (allegation of negligent investigation of termination was legally sound); Rood v. Canteen Corp., 1996 WL 548174 (Conn. Super. Sept. 19, 1996) (failure to follow procedures in employee handbook may give rise to a claim for negligent investigation in connection with an employee's termination).[19]

Bass v. Miss Porter's School, 738 F. Supp.2d 307 (D. Conn. 2010), also is distinguishable. In Bass, the minor plaintiff was expelled from her private high school for violating the no alcohol policy after school administrators were informed that she had done so.  This information came to

---

[18] The other cases cited by the Defendants are also distinguishable. Okafor v. Yale University, 2004 WL 1615941 (Conn. Super. June 25, 2004), did not involve a claim for negligent investigation, although the court dismissed a claim for negligent misrepresentation.  In Craine v. Trinity College, 259 Conn. 625, 661-664 (2002), the court distinguished Gupta, indicating that it involved a dismissal for poor performance, and held there was adequate support for jury's finding in favor of the plaintiff on a negligent misrepresentation claim against the university.  Salus v. State of Nevada, 2011 WL 4828821 (D. Nev. 2011) and Doe v. Emerson College, 153 F. Supp.3d 506, 514 (D. Mass. 2015) arose in jurisdictions in which, unlike Connecticut, schools do not have a legal duty of care to their students. The bottom line is that negligence claims routinely are recognized in this context.

the administrators after the student was already removed from campus for cheating on a test.  This Court found there was no cause of action for negligent infliction of emotional distress under Gupta based on the academic decision that had been made, since negligence was inconsistent with the language of Gupta that limited claims for the improper exercise of educational judgment to instances involving arbitrary and capricious decisions.

A recent line of authority involving Title VII claims is relevant to the fact pattern now before the court.[20] In Vasquez v. Empress Ambulance Service, Inc., 835 F.3d 267 (2d. Cir. 2016), the Court of Appeals vacated and remanded a District Court decision granting a motion to dismiss a claim against an employer for conducting a negligent investigation.  In Vasquez, the plaintiff was sent a text containing a sexually graphic photograph by a coworker who had repeatedly made romantic overtures towards her which she had rebuffed.  She immediately reported the inappropriate text to her employer.  The coworker, who was present at the time she made the report and knew his job was in jeopardy, fabricated a series of texts on his phone to make it appear that the plaintiff had engaged in sexually inappropriate behavior towards him.  The coworker then reported her and showed the investigators the fabricated evidence, which they credited and used as justification to immediately discharge the plaintiff from her job. Id. at 269.

The plaintiff brought suit alleging that the false report was motivated by revenge and that

---

[19] QU argues that even if a duty exists, "an officer of a corporation does not incur personal liability for its torts merely because of his official position.  Where, however, an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby." Def. Brief at 47, quoting, Joseph General Contracting, Inc. v. Couto, 317 Conn. 565 (2015).  This language supports the plaintiff's position, since it is alleged and will be proven that the individual defendants did in fact participate in the commission of torts.  The plaintiff is not arguing that the individual defendants are liable for acts of QU; the plaintiff is arguing that they are liable for their own negligent actions in this count.

the investigation, by failing to take into account all of the evidence, including evidence in support of her claims, and in finding that her coworker's complaint was credible with inadequate bases, was negligent. The Vasquez court found:

> [W]hen an employer in effect adopts an employee's unlawful animus by acting negligently with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision, … the employee's motivation [can] be imputed to the employer and used to support a claim under Title VII.  Id. at 275.

The investigators negligently embraced Roe's allegations and interviewed 13 witnesses before they even met with Doe.  SOF ¶19. The Roe complaint was motivated by revenge since Doe had just ended their relationship, yet the investigators paid no credence to this motive in wholeheartedly crediting her story and failing to question her about it.  SOF ¶¶25, 37, 38, 153, 157, 160; Ex. 130, ¶¶13-15; 19; 21-23. To the extent Roe sought to bolster her story by persuading Roe2 to support her, as they were sorority sisters, Roe 2 also had motives not only to help Roe, but also to exact revenge on Doe since she too had dated him, and he had ended their relationship. SOF ¶¶13, 160; Ex. 130, ¶¶13, 15. When Doe attempted to bring his claims against Roe and Roe2 for stalking and harassment, the investigators ignored those claims and did nothing to examine any evidence to determine their validity.  SOF ¶¶25, 38. When Doe brought a formal complaint, a sham investigation was conducted based on the report from the INV1 which failed to address his allegations in any substantive way.  SOF ¶¶ 200-215, see pages 21-23 supra.  The investigators of Doe's complaint reached a conclusion which they supported with inaccurate facts, mischaracterizations of the evidence and gender-biased presumptions favoring Roe, including believing Roe's expression of fear, but not Doe's, based on the same conduct by each. SOF ¶¶ 200-215, see pages 21-23 supra. Like the Vasquez investigation, QU simply credited one side's

claims from the inception, and the only evidence-gathering that occurred was simply to justify that conclusion as opposed to seeking the actual truth.

Also instructive is <u>Crenshaw v. Bozeman Deaconess Hospital</u>, 213 Mont. 488, 693 P.2d 487 (1984). In <u>Crenshaw</u>, a respiratory therapist was terminated allegedly for inadequate performance. She complained to the hospital administrator, who indicated that he would investigate the matter, but that investigation culminated in a finding that she was properly fired. She brought suit alleging that the investigation conducted by the hospital was negligent and inadequate and the court allowed the claim. In <u>Crenshaw</u>, as in our case, the hospital failed to interview all of the appropriate witnesses, including witnesses who would have supported the plaintiff's contentions. <u>Id.</u>, 693 P.2d at 500.

The cases cited by the individual defendants also do not support the proposition that they cannot be found responsible for their own negligence. <u>Joseph General Contracting, Inc. v. Couto</u>, 317 Conn. 565 (2015) was a CUTPA case and is completely inapposite. <u>Scribner v. Obrien, Inc.</u>, 169 Conn. 389 (1975), involved a claim for vicarious liability of officers and agents for corporate torts, which <u>Ventres v. Goodspeed Airport, LLC</u>, 275 Conn. 105 (2005), contradicts.

Material questions of fact regarding the negligence of QU, TJ, SK and VC exist and summary judgment as to Count Eleven should be denied.

### 7. <u>Count Twelve – Reckless and Wanton Misconduct</u>

For the reasons previously stated, it is clear that QU owed Doe a duty of care notwithstanding Defendants' argument to the contrary. Additionally, there is no language in <u>Gupta</u> that prohibits a claim for reckless and wanton conduct arising out of a school's biased investigation of a disciplinary allegation. Contrary to Defendants' third argument, there is

sufficient evidence that Defendants' conduct was deliberate, reckless or wanton.

> A count based on reckless and wanton misconduct must, like an action in negligence, allege some duty running from the defendant to the plaintiff.  In order to establish that the conduct of a defendant, who was under such a duty, was deliberate, wanton and reckless, the plaintiff must prove … the existence of a state of consciousness with reference to the consequences of one's acts … such conduct is more than negligence, more than gross negligence … In order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. … it is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. … In sum, such conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. Vitale v. Kowal, 101 Conn. App. 691, 698-99 (2007) citing, Elliott v. Waterbury, 245 Conn. 385 (1998).

As discussed in detail above, the Defendants' treatment of Doe demonstrates "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."   Indeed, in Harris v. Bradley Memorial Hospital and Health Center, Inc., 296 Conn. 315 (2010), the Connecticut Supreme Court affirmed a jury verdict awarding punitive damages based on reckless and wanton conduct exhibited in the course of a biased investigation.  Id. at 348.  The record in this case fully supports a similar result.   At the very least, the determination of whether Defendants' actions amounted to reckless and wanton misconduct should be left to the jury.  See  Williams v. Housing Authority, 327 Conn. 338, 360–61 (2017) ("[R]ecklessness ordinarily presents a question of fact for the jury  . . . [T]he general rule [is] that when a defendant's conduct represents more than mere 'momentary thoughtlessness or inadvertence,' whether it rises to the level of 'reckless or wanton misconduct on any given state of facts [ordinarily] is a question of fact for the jury'"); Craig v. Driscoll, 64 Conn. App. 699, 721 (2001), aff'd, 262 Conn. 312 (2003) (claim of reckless disregard of another person's rights is usually question of fact unless no reasonable person can differ as to conclusion);

63

Stolnick v. Lech, 2018 WL 1785685 at *3 (Conn. Super. Feb. 22, 2018) ("A claim of recklessness usually presents a question of fact, unsuitable for summary judgment, unless no reasonable mind can differ as to the conclusion.").

     For the foregoing reasons, Defendants' motion for summary judgment should be denied.

PLAINTIFF
JOHN DOE

By:    /s/ Felice M. Duffy
       Felice M. Duffy (ct21379)
       Duffy Law, LLC
       129 Church Street, Suite 310
       New Haven, CT 06510
       Phone:  (203) 946-2000
       Fax:  (203) 907-1383
       felice@duffylawct.com

       Douglas J. Varga (ct18885)
       Lucas & Varga LLC
       2425 Post Road, Suite 200
       Southport, CT 06890
       Phone:  (203) 227-8400
       Fax:  (203) 227-8402
       dvarga@lucasvargalaw.com
       His Attorneys

**CERTIFICATION**

     I hereby certify that on January 22, 2019 a copy of the foregoing motion was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

By:    /s/ *Felice M. Duffy*
       Felice M. Duffy