**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

|  |  |
|---|---|
| JOHN DOE | : |
|  | : |
| Plaintiff, | : Civil Action No.: 3:17-CV-00364-JBA |
|  | : |
|  | : |
| V. | : |
|  | : |
| QUINNIPIAC UNIVERSITY, TERRI | : |
| JOHNSON, SEANN KALAGHER, | : |
| AND VINCENT CONTRUCCI | : |
|  | : |
| Defendants | : January 22, 2019 |
|  | : |

---

## LOCAL RULES 56(a)(2) STATEMENT

1. The plaintiff, John Doe was a male student at Quinnipiac University from the fall of 2014 until his graduation in May of 2017.  (Complaint ¶ 2).

   **RESPONSE**   Admit.

2. The defendant, Quinnipiac University is a private university of higher education located in Hamden, Connecticut.  Quinnipiac University is the beneficiary of financial funds with the meaning of Title IX.  (Complaint ¶ 3).

   **RESPONSE**:  Admit.

3. The defendant, Terri Johnson was employed by Quinnipiac University as its Associate Dean of Student Affairs and Deputy Title IX Coordinator for Students.  (Complaint ¶ 4).

   **RESPONSE**:   Deny.  Johnson was employed by QU as Associate VP of Operations and University T-9 Coordinator.  (Ex. 14, p. 7, 2).

4. The defendant, Kalagher was employed by Quinnipiac University as its Associate Dean of Student Affairs and Deputy Title IX Coordinator for Students.  (Complaint ¶ 5).

   **RESPONSE**:  Admit Kalagher was responsible for the Title IX process regarding students, directly supervised Buda and is the institutional 30(b)(6) designee. Ex. 3 (SK), pp. 1; 55, 4-9; 79, 1-19; Ex. 2 (TJ), p. 141, 5-17.

5. The defendant, Vincent Contrucci was employed by Quinnipiac University as its Director, Office of Community Service.  (Complaint ¶ 6).

   **RESPONSE**:   Admit.

6. The 2015-2016 QU Title IX policy is applicable.  (See <u>Exhibit A</u>).

   **RESPONSE**:   Admit.  (hereinafter "T9 Policy," Pl. Ex. 14.).

7. The 2015-2016 QU Student Handbook is applicable.  (See <u>Exhibit B</u>).

   **RESPONSE**:   Admit that it is Exhibit C (hereinafter "Code," Pl. Ex. 61).

8. The QU Guidelines and Procedures for Students with Disabilities ("ADA") is applicable.  (See <u>Exhibit C</u>).

   **RESPONSE**: Admit that it is exhibit B, (hereinafter referred to as "ADA Policy", Pl Ex. 50).

9. The plaintiff, John Doe was a student at Quinnipiac University from the spring of 2014 until he graduated in May 2017.  (<u>Exhibit D</u>, Pl's Depo Tran. p. 38: 2-3; p. 43: 15-16).

   **RESPONSE**:   Admit.

10. The plaintiff was involved in a relationship with Jane Roe 2 from approximately May 2014 through January 2015.  (Complaint ¶ 43).

    **RESPONSE**:   Admit.  Ex. 1 (VC), p. 194, 3-22.

11. Jane Roe 2 graduated in May 2015 and has resided in Boston.  (Complaint ¶ 45).

    **RESPONSE**:   Admit.

12. The plaintiff was involved in a relationship with Jane Roe from approximately January 2015 through June 2016.  (Complaint ¶ 43).

    **RESPONSE**:   Admit.

13. On approximately June 28, 2016, Jane Roe made a Title IX complaint with QU alleging that the plaintiff verbally and physically abused her.  She also indicated that the plaintiff had also verbally abused his previous girlfriend, Jane Roe 2.  (See Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11, p. 1; Complaint ¶ 47).

    **RESPONSE**:   Admit one hour after Doe broke up with Roe, Roe provided information to QU Public Safety (hereinafter "PS") and a QU RA who recognized included possible violations of T9 and reported it to Kalagher.  Kalagher met with Roe and determined there was

reasonable cause to investigate and immediately began a formal investigation.  Ex. 1 (VC), pp. 91, 4-25; 92, 1-25; 93, 12-25; 95, 6-25; 96, 1-6, 19-23; 101, 7-25; 102, 1-20; Ex. 4 (AH), pp. 19-25; 244, 1-25; 246, 1-25; Ex. 86, p. 3; Ex. 15; Ex. 86, DCxii, D; Ex. 130, ¶14; Ex. 83.[1]

14. The Quinnipiac University investigators, Vincent Contrucci and Audrey Heins (hereinafter "investigators") interviewed Jane Roe on July 12, 2016, July 28, 2016, October 14, 2016 and October 19, 2016.

**RESPONSE**:  Admit investigator met with Roe on those dates but deny characterization. July 12 and July 28 were interviews as part of the investigation. October 14th and 19th were findings meeting after the investigation was closed. Ex. 86, pp. 72-73; Ex. 1 (VC), pp. 456, 1-11; 463, 13-25; 464, 1-25; 465, 1-4; Ex. 16.

15.  The investigators interviewed Jane Roe 2 on July 18, 2016, October 14, 2016, and October 19, 2016. (See Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11, p. 1).

**RESPONSE**:  Admit investigator met with Roe2 on those dates but deny characterization. July 12th and July 18th were interviews as part of the investigation.  October 14th and 19th were findings meeting after the investigation was closed.  Ex. 86, pp. 72-73; Ex. 1 (VC), pp. 456, 1-11; 478, 1-25; 479, 1-16; Ex. 17.

16. Jane Roe 2 did not file a formal complaint, rather QU investigators moved forward with a complaint on her behalf after they interviewed her.  (Complaint ¶ 52).

**RESPONSE**:  Admit in her interview as a witness, Roe2 provided information that included possible violations of T9 against Doe to the investigators, who reported it to SK immediately and instructed them to investigate which they did after opening an administrative complaint for Roe2. Ex. 86; Ex. 18; Ex. 2 (TJ), pp. 126, 14-25; 127, 1-20; Ex. 5 (CM), pp. 192, 21-25; 193, 1-9; Ex. 9 (SF), pp. 250, 1-11; Ex. 6 (MB), pp. 262, 12, 2-5; 263, 1-21; Ex. 4 (AH), pp. 203, 3-25; 308, 13-25; 309, 1-25; 310, 1-25; 311, 1-25; 312, 1-13; 313, 8-22; 314, 1-24; Ex. 1 (VC), pp. 196, 13-25; 198, 1-25; 199, 1-22; 206, 15-23; 218, 1-25; 219, 1-16; Ex. 3 (SK), pp. 219, 3-25; 258 6-25. Ex. 86, p. Jiii.

17. On August 22, 2016, the investigators notified John Doe via email that they were investigating a Title IX complaint and requested to meet with him to review the process, ask him questions and answer his questions.  He was also informed that he could bring another person with him to the meeting that was not involved in the investigation.  Also attached to the meeting request was a no contact order, which requested that he not contact Jane Roe, Jane Roe 2 and another student, A.S. (See Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11, T-IX Doc C).

---

[1] Plaintiff refers to the Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11, p. 1; Complaint ¶ 47 a as "RR" and it is Ex. 86.

**RESPONSE**: Admit. The No Contact Orders ("NCO's") were mutual. Ex. 19; Ex. 20; Ex. 3 (SK), pp. 266, 24-25; 267, 1-2.

18. The investigators interviewed John Doe on August 23, 2016 with an attorney present as his adviser.  They also interviewed him on August 26, 2016, August 31, 2016, September 28, 2016 and October 25, 2016, and November 1, 2016.  (See Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11, p. 1).

   **RESPONSE**: Admit investigator met with Doe on those dates but deny characterization. August 26th, August 31st and September 28th were interviews as part of the investigation. October 25th and November 1st were findings meeting after the investigation was closed.  (Ex. 86, pp. 73-74; Ex. 1 (VC), p. 456, 1-11; Ex. 21).

19. Between July 12, 2016 and October 5, 2016, the investigators interviewed eighteen individuals. It is typical for the investigators to interview a Complainant, witnesses and then the Respondent. (See Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11, p. 1; See also Exhibit E, .Depo Tran., Vol. II, p. 359: 24-25; p. 360.

   **RESPONSE**:  Admit first sentence.  Investigators interviewed Roe and Roe2 and all but one of their witnesses (13) before interviewing Doe.  Deny it is a typical order of interviewing. Investigators in INV2 interviewed the Complainant, then Respondent, and then the witness. Ex. 86, pp. 1-2, 7-50; Ex. 7 (KK), p. 196, 9-23; Ex. 12 (LC), p. 188, 9, 21-23; Ex. 5 (CM), pp. 132, 12-25; 133, 1-14. Ex. 60.

20.  The investigators listened to John Doe's father, even though he was an adviser and did not have a speaking role.  If his father had provided information that the investigators believed was relevant, then it would have been included in the report.  (Exhibit E,.Depo Tran., Vol. II, p. 415: 1-6).

   **RESPONSE**:   Admit first sentence. Deny the second sentence; Doe's father provided relevant information at Doe's interviews.  Investigator did not interview him or include that information in the RR.  Investigators are required to put relevant information in the RR. Ex. 3 (SK), pp. 261, 1-20; 268, 11-25; 270, 1-70; Ex. 4 (AH), pp. 133, 6-16; 366, 12-25; Ex. 1 (VC), pp. 414, 23-25; 415, 1-22; 419, 17-22; Ex. 132, ¶5; Ex. 130, ¶¶22-23; Ex. 22, p. 21.

21. John Doe's mother provided information to the investigators about the nature of John Doe and Jane Roe's relationship and it was included within the report because the investigators found it relevant.  (Exhibit E, Depo Tran., Vol. II, p. 416: 24-25; p. 417: 9-12).

   **RESPONSE**:  Admit, the information from Doe's mother was in an email from her and included in an appendix.  Doe's mother was not interviewed in this investigation (hereinafter "INV1") even though she had additional relevant information. Ex. 23; Ex. 1 (VC), pp. 416, 14-25; 417, 1-25; 418, 1-16; Ex. 3 (SK), p. 268, 11-25; Ex. 4 (AH), pp. 353, 8-25; 354; 355; 356, 1-25; Ex. 131, ¶¶4-5.

22. The investigators interviewed Jane Roe's mother because she told them that she had pictures of her daughter's neck after John Doe allegedly grabbed her daughter by the neck. (Exhibit E, VC Depo Tran., Vol. II, p. 308: 13-15 and 19-23).

   **RESPONSE**: Admit that the investigators interviewed Roe's mother. Deny remainder. Roe's mother was interviewed because Roe "had indicated that [her] mother had been contacted by [Doe] on a number of occasions during your relationship." Ex. 24; Ex. 86, Dvii.

23. John Doe informed investigators that Jane Roe's friends had been contacting him indirectly through his friends and harassing him about the ongoing investigation. He believed that it was a breach of confidentiality surrounding the investigation and the no contact order issued to Jane Roe on August 19, 2016. (Complaint ¶ 55).

   **RESPONSE**: Admit. Doe told investigators in August 2016. Investigators told Doe and his father there was nothing they could do about it and did not contact one of Roe's friends after Doe provided her name as they said they would. Ex. 25; Ex. 86, p. 70; Ex. 1 (VC), pp. 421, 8-25; 422, 1-25; 423, 1-25; Ex. 130, ¶¶19-20.

24. The Investigators can ask students to be respectful of others privacy and respectful of the process and they ask students not to speak about the investigation openly, but students are not barred from speaking about investigations. (Exhibit E, VC Depo Tran., Vol. I, p. 231, 8-11; p. 232: 11-17; p. 534: 16-19; See also Exhibit F).

   **RESPONSE**: Admit first part but deny "students are barred from speaking about investigations." Students are prohibited from engaging in harassment, retaliation or a violation of a no contact order ("NCO"). Ex. 14, p. 5; Ex. 27.

25. The investigators investigated John Doe's complaints against Jane Roe and Jane Roe 2. They questioned John Doe, Jane Roe and Jane Roe2. The investigators could not corroborate John Doe's allegations. John Doe never provided individuals that the investigators could speak with or that corroborated the allegations. The investigators made the determination that there was nothing that needed to be investigated, reinvestigated or new charges brought. (Exhibit E, VC Depo Tran., Vol. II, p. 531: 7-25; p. 534: 1-15; Exhibit F, SK Depo. Tran., p. 301: 20-25; p. 304: 8-21).

   **RESPONSE**: Deny first sentence. Admit second sentence. As part of his defense to the charge of Intimate Partner Violence ("IPV"), Doe provided information in his three interviews in INV1 to show that Roe and Roe2 were not afraid of or intimidated or controlled by Doe. That information included possible T9 violations by Roe and Roe2. The investigators did not report the possible T9 violation, open an administrative complaint against Roe or Roe2, or interview Roe or Roe2 after Doe was interviewed to investigate these claims. Doe's allegations were corroborated by Roe and Roe2's statements and by the evidence provided by Doe. Doe provided his parents and other witnesses that were interviewed and Roe and Roe2 were available to be interviewed. It is the investigator's responsibility to identify witnesses and discover facts and gather evidence. Ex. 86, pp. 52-78; 6; Ex. 40; Ex. 22, p. 6-19; Ex. 6

(MB), p. 264, 8-24; Ex. 4 (AH), p. 418, 6-25; Ex. 5 (CM), pp. 264, 23-25; 265, 1-25; Ex. 2 (SK), pp. 208, 23-25; 209, 1-25; Ex. 86, pp.1-2; Ex. 1 (VC), pp. 352, 9-25; 353, 1-25; 354, 1-2; Ex. 4 (AH), pp. 414, 1-25; Ex. 2 (TJ), pp. 231, 23-25; 232, 1-10; Ex. 86, Ciii, Civ; Ex. 86, pp. 50-66; Ex. 1 (VC), pp. 125, 10-25; 126, 1-17; Ex. 2 (TJ), p. 146, 15-19. See *supra*, ¶¶ 20, 21.

26. At end of October 2016, the investigators gave John Doe a copy of their final investigation report and their recommendations. The report was over 250 pages long with attachments. (See Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11; Complaint ¶ 58).

   **RESPONSE**: Admit that investigator gave Doe a report.  The final report is Def. Ex. 1 (hereinafter Response, Pl Ex. 22) that was provided in January.  See *infra* ¶39.

27. The Investigators applied the preponderance of the evidence standard and found that John Doe may have violated the Title IX policy and student code of conduct and may be responsible for five charges, including Intimate Partner Violence, Assault, Breach of Peace, Disturbing the Peace and Property Damage and recommended that he be suspended for one year, if he accepted their findings.  (Complaint ¶ 58; Exhibit E, Ex. 1, Tran., Vol. II, p. 453: 4-7).

   **RESPONSE**: Admit except to "applied the preponderance of the evidence standard". Investigators used the standard in QU's T9 policy, "sufficient information to conclude that these may have been violations of the Title IX Policy and Student Code."  Ex. 60, p. 4; Ex. 14, p 16.  Investigators recommended "at least" one year suspension. Ex. 130, ¶24; Ex. 132, ¶8.  There was not a preponderance of evidence to find Doe responsible. Ex. 22, Ex. 86.

28. John Doe was given the standard three days to make a decision and inform the investigators whether or not he was accepting responsibility.  (Exhibit F, Depo Tran., p. 276: 3-5; p. 278: 19-21; Complaint ¶ 59).

   **RESPONSE**: Admit.

29. On November 1, 2016, John Doe met with the investigators and his attorney was present as his adviser.  During this meeting, John Doe informed the investigators that he has disabilities. (Complaint ¶ 61; See Title IX Investigation Report, Exhibit No. 1 and made part of Amended Complaint, filed at 3: 17cv364, Docket No. 11, p. 1).

   **RESPONSE**: Admit.

30. John Doe testified that Jane Roe was treated more favorably than him during the investigation because one side of the investigation was done before he had a chance to speak and Jane Roe had more time to prepare everything.  (Exhibit D, Pl's Depo Tran., p. 215: 21-25; p. 216: 1-8).

   **RESPONSE**: Admit Doe testified to that in substance.  Doe also testified it was because Roe had more time to gather evidence, the investigation was one-sided to begin with before he had

a chance to defend himself.  Def Ex. D, Pl Depo pp. 215, 21-25; 216, 1-8.

31. John Doe testified that he was given multiple opportunities to speak with the investigators and when he asked for additional time to review the investigation report and submit his response and the extra time was provided to him.  (Exhibit D, Pl's Depo Tran., p. 215: 21-25; p. 217: 4-12).

**RESPONSE**:  Admit Doe testified to that in substance.

32. On November 1, 2016, John Doe and his adviser contacted Matthew Cooper in the Office of Student Accessibility seeking an accommodation.  Mr. Cooper approved an extension for John Doe to decide if he was accepting responsibility, until November 11, 2016.  (Complaint ¶ 62).

**RESPONSE**:  Admit.

33. On November 9, 2016, John Doe requested another extension until November 12, 2016, which was denied.  (Complaint ¶ 62).

**RESPONSE**:  Admit.  Doe requested an extension from Friday at 4:00 p.m. until Monday due to academics in addition to the holiday and the length of the RR. Ex. 28.

34.  On November 11, 2016, John Doe accepted responsibility for Property Damage, i.e. breaking a glass door.  He did not accept responsibility for the other four charges.  (Complaint ¶ 63).

**RESPONSE**:  Admit.

35. On November 16, 2016, Matthew Cooper recommended that the Title IX Grievance Committee Hearing ("Hearing") be scheduled no earlier than February 1, 2017.  (Exhibit G, MC Depo Tran., p. 40: 15-18).

**RESPONSE**:  Admit the first sentence. Cooper recommended Doe be given until the week of January 16th to respond to the RR, and to avoid the first day of classes, January 23rd due to Doe's disabilities. Cooper recommended scheduling the Hearing after Doe had sufficient time to submit a Response so investigators could have time to consider his Response. Exs. 29, 30;  Ex. 130, ¶28; Ex. 3 (SK), pp. 281, 19-25; 283, 11-14, 21-25.

36. On January 13, 2017, Mr. Kalagher re-scheduled the Hearing date for January 23, 2017.  Mr. Kalagher had a conversation with Mr. Cooper about whether he felt it would be acceptable to schedule the Hearing before February 1, 2017 and he did not have any objections.  Mr. Cooper picked that date because it was the 1st of the month.  (Complaint ¶ 66; Exhibit F. Depo Tran., p. 282: 3-9 and 15-17).

**RESPONSE**:  Admit first and third sentence.  Deny second sentence.  The Hearing was scheduled on the very day Cooper recommended QU avoid and before Doe submitted his Response.  Doe was never told of the date change by Cooper and Cooper would have discussed the date change with him.  Cooper makes the decision on accommodations after discussing

them with the student and QU always complied. Ex. 4 (AH), pp. 114, 15-25; 115, 1-25; Ex. 1 (VC), pp. 507, 9-15; 509, 23-25; 510, 1-25; 511, 1-20; Ex. 2 (TJ), pp. 191, 16-25; 193, 1-25; Ex. 3 (SK), pp. 93, 17-22; 94, 7-25; 95. 1-11; Ex. 11 (MC), pp. 36, 19-25; 37, 1-2, 18-25; 38, 1, 8-20; 40, 4-25; 41, 1-3, 21-25; 42, 12-25; 43, 1, 16-18.

37. On January 20, 2017, John Doe submitted a 20-page response ("Response").  (Complaint ¶ 68, see Exhibit 2 attached and made part of the Amended Complaint, see 3: 17cv364, Docket No. 12.)

**RESPONSE**:  Admit.  Doe submitted his Response that included 20 pages of text plus exhibits that totaled 240 pages, in which Doe provided additional information and evidence of possible T9 violations by Roe and Roe 2, which also were a defense to the charges against him.  Doe's Response included that his parents had relevant information and had not been interviewed and asked investigators to consider his Response and investigate his claims of the possible violations by Roe and Roe2 in his Response and also expressed concerns of gender bias in INV2.  Ex 22; Exs. 27, 31, 32; Ex. 7 (KK), pp. 223, 8-18; 233, 11-14.

38. On January 24, 2017, Mr. Kalagher informed John Doe that the investigator, Mr. Contrucci reviewed his Response and that the investigation report would not be amended.  The other investigator, Ms. Heins was no longer employed at QU.  Mr. Kalagher re-scheduled the Hearing for February 7, 2017.  (Complaint ¶ 69; Exhibit F, SK Depo Tran., p. 232: 12-22).

**RESPONSE**:  Admit. SK and VC reviewed the Response. SK did not conduct an independent analysis.  Neither SK nor VC investigated Doe's claims of the possible T9 violations of Roe and Roe2 or the claims of ongoing harassment by Roe. SK did not speak to TJ about Doe's claims of harassment but relied on VC to decide next steps.  Exs. 32, 33, 43 and 94; Ex. 1 (VC), pp. 544, 4-25; 545, 1-25; 546, 1-25; 547, 1-25; 548, 1-25; 549, 1-25; 550, 1-25; 551, 1-24; Ex. 3 (SK), pp. 232, 1-25; 234; 6-25; 235, 1-25; 236 1-14; 306, 1-25.

39.  On January 27, 2017, Mr. Kalagher provided John Doe with a revised investigation report ("Revised Report").  (Complaint ¶ 70). VC,466, 6-13;

**RESPONSE**:  Admit the final report was provided and it contained additional information regarding subsequent interviews and communications between the investigators and Roe and Roe 2 dating back to November and December 2016, including Roe and Roe2's response to the RR that Doe had never seen. Doe was never given a chance to respond to this additional information. Ex. 34. Ex. 131, ¶35. Ex. 130, ¶35.

40.  On February 1, 2017, the plaintiff informed Terri Johnson, Title IX Coordinator that he believed the investigation was unfair and in violation of Title IX and the QU Student Handbook.  He requested an investigation into the manner in which the investigation was handled to determine whether or not charges should be brought against him for IPV or Assault. John Doe further requested that an investigation be conducted before scheduling the Hearing, the investigators and Mr. Kalagher be removed from further involvement due to bias, an objective investigator conduct an independent investigation, and administrative charges be brought against Jane Roe for the same charges against him and also a violation of Jane Roe's

no contact order.  Also, he requested that administrative charges be brought against Jane Roe and Jane Roe 2 for sexual harassment, harassment and stalking.  (Complaint ¶ 76, 77.)

**RESPONSE**:  Admit Doe submitted a letter to Johnson on February 1 and the letter speaks for itself. Doe also requested an investigation into his allegations of Roe's and Roe's harassment, sexual harassment, IPV and Stalking. Exhibit 56.

41.  On February 6, 2017, QU continued the Hearing until February 24, 2017.  (Complaint ¶ 78).

**RESPONSE**:  Admit.

42.  Mr. Kalagher reviewed John Doe's claims and found that there was no rational conflict with Ms. Buda.  Ms. Buda sent John Doe an assessment email that every student in the conduct process received and she answered the telephone when his parents called once or twice.  Ms. Buda was not a student conduct officer in either of John Doe's prior student conduct cases. (Exhibit F, Depo Tran., p. 324: 21-25; p. 325: 1-8; Exhibit H, MB Depo Tran. p. 174: 10-22).

**RESPONSE**:  Admit. MB was involved as the NCO officer in a case in which Doe was a respondent and was also involved in handling calls with Doe, his lawyer and his parents in the SK assault case.  On February 27th, when Doe discovered she was on the Board, he requested she be recused due to a conflict based on her involvement in his two prior conduct issues and because SK was her direct supervisor.  Doe was assaulted twice by a QU student SR and SK was the hearing officer in those student conduct cases.  Doe and his parents and their lawyer had calls with SK and MB about their lenient handling of SR and treated them unprofessionally and did not take their son's safety or fears seriously.  In his Response, Doe asked that SK be removed due to a conflict, which TJ denied.  Ex. 111; Ex. 112; Ex. 114, See ¶4 *infra*. Ex. 6 (MB), pp.169, 17-25; 170, 1-25; 174, 11-25; Ex. 42.

43.  Mr. Kalagher found he did not have any conflicts with John Doe.  Mr. Kalagher had no involvement with the finding of responsibility or what sanction was imposed by the Hearing Committee.  (Exhibit F, Depo. Tran., p. 345: 22-24; p. 239: 21-23).

**RESPONSE**:   Admit that Kalagher had no direct involvement in the finding or sanction. On February 1, 2017, Doe asked TJ to excuse SK from further involvement in his case, due to his past behavior and his bias, which TJ repeatedly denied, even after Doe gave her information showing his involvement in the former case. Ex. 130, ¶¶6-12; Ex. 132, ¶¶3, 4; Ex. 3 (SK), pp. 250, 7, 14-25; 251, 1-21; Ex 36, p. 2; Ex. 22, p. 20-21; Ex.42; Ex. 56, p. 11.

44. Ms. Johnson assessed John Doe's complaints set forth in the February 1, 2017 letter, the Title IX policy and process, consulted with Mr. Kalagher and QU legal counsel and decided not to open an independent investigation.  (Exhibit I, SK Depo Tran., p. 197: 17-23).

**RESPONSE**:  Admit except to "assessed" and "consulted" but agree that she spoke with Kalagher.

45. The Hearing was rescheduled by QU until March 3, 2017 due to a scheduling conflict.

(Complaint ¶ 79).

**RESPONSE**: Admit.

46. On February 24, 2017, Mr. Kalagher provided John Doe with the information for the Hearing. John Doe renewed his request that Mr. Kalagher and Ms. Buda, Director of Student Conduct and the Hearing Committee Chair be recused from the Hearing based on alleged conflicts. He also requested that the documents regarding his disabilities be given to the Hearing members, but not the parties. Also, he requested that his claims that Jane Roe violated the no contact order and confidentiality be brought to the Hearing members attention, as he believed they showed her credibility and motive. (Complaint ¶ 83).

**RESPONSE**: Admit, except to "showed her credibility." Doe wrote that they undermined his credibility. Ex. 35; Ex. 130, ¶¶42, 43.

47. On February 27, 2017, Ms. Johnson responded that she reviewed the underlying investigation and found that it was not biased or unfair and that "the university will not be opening an investigation into the matter in which this Title IX investigation has been handled nor will there be another investigation performed as you requested." She also responded that the "Deputy Title IX Coordinator appropriately addressed the various issue raised in regard to both your client and the Complainants." (Complaint ¶ 84, See Exhibit 4 attached and made part of the Amended Complaint, see 3: 17cv364).

**RESPONSE**: Admit the letter speaks for itself, which contained no explanation for TJ's decisions. TJ did not conduct a review or independent investigation or instruct anyone to into Doe's defense, possible T9 claims against Roe or Roe2 or the way the employees handled INV1, did not speak with the investigators about INV1 but relied "on the investigators and Seann Kalagher to have done what [she] presumed they would have done." TJ understood Doe's allegations were a defense to the charges and denied his request to an investigation into his allegations in INV1 so they could be decided in the same hearing as Roe's and Roe 2's. Ex. 2 (TJ), pp. 208, 17-25; 209, 210, 1-25; 230, 1-25, 232, 1-20; 241, 1-16; 242, 11-25; 243, 1-25; 244, 1-25; 245, 1-17; Ex. 1 (VC), pp. 554, 1-22; 555, 1-25; Ex. 4 (AH), pp. 427, 22-25; 428, 1-24; Ex. 3 (SK), pp. 299, 2-25; 317, 2-13; Ex. 36; Ex. 37.

48. On February 27, 2017, John Doe requested that his response and exhibits be considered a formal complaint against Jane Roe and Jane Roe 2. (Complaint ¶ 85).

**RESPONSE**: Admit. Doe filed formal complaint only after SK and TJ told him the only way they would investigate his defense and Roe's alleged T9 violations would be if he filed a formal complaint. Ex. 2 (TJ), pp. 245, 18-25; 246, 1-21; Ex. 36, p. 2; Ex. 38.

49. On February 27, 2017, Ms. Johnson denied John Doe's request for recusal based on conflicts because Ms. Buda was not involved in the prior student disciplinary conduct investigation or prior decision-making process, Mr. Kalagher had not been unfair or biased and also was not involved in the decision making or sanctions at the Hearing. (Complaint ¶ 86).

**RESPONSE**: Admit Johnson stated those reasons. It is not typical to have formal complaints at QU.  Ex. 39. 3 (SK), p. 220, 11-16

50. On February 28, 2017, Ms. Johnson informed John Doe that she accepted his formal complaint and that the Hearing would still be going forward on March 3, 2017.  (Complaint ¶ 87).

**RESPONSE**:  Admit. Doe filed the formal complaint because it was the only way to get "his side before the hearing panel so that he can have a fair hearing and requested that his complaint be heard by the same Board in the same Hearing since they arise out of the same set of facts and transactions," which Johnson denied. Ex. 40; Ex. 2 (TJ), pp. 244, 3-25; 245, 1-25.

51. On March 1, 2017, John Doe met with Mr. Cooper and obtained his recommendation for accommodations.  (Complaint ¶ 88).

**RESPONSE:**   Admit.

52. On March 2, 2017, John Doe filed an action and motion for a TRO and preliminary injunction. Admit. The Hearing was stayed pending a hearing and ruling on the motion for preliminary injunction.  (Complaint ¶ 89).

**RESPONSE**:  Admit.

53. On March 31, 2017, this Court denied John Doe's motion for preliminary injunction. (Complaint ¶ 90).

**RESPONSE**:  Admit.

54. On April 5, 2017, Mr. Kalagher informed John Doe that the Hearing was scheduled for April 21, 2017.  (Complaint ¶ 91).

**RESPONSE**:  Admit.

55. On April 8, 2017 and April 19, 2017, John Doe renewed his request that Mr. Kalagher and Ms. Buda be recused from the Hearing.  (Complaint ¶¶ 94, 97).

**RESPONSE**:  Admit.  Doe provided information of Kalagher and Buda's prior involvement. In same email, Doe requested there be a person trained in understanding mental health issues and learning differences/disabilities on the Board to assist the Board in understanding both Doe's conduct under investigation and how his disabilities could affect his credibility in interviews; whether Doe's psychiatrist could testify as a witness to assist the Board in understanding Doe's disabilities and mental health issues and that QU only provide the confidential information to the Board and not the complainants. Doe also emailed Kalagher and Johnson inquiring about the status of his formal complaint against Roe because he heard nothing since February 27.  Def. Answer ¶97; Exs. 42; 87.

56. On April 18, 2017 and April 20, 2017, Ms. Johnson denied John Doe's renewed request.

(Complaint ¶¶ 96, 97, 98).

**RESPONSE:** Admit. TJ denied Doe's renewal request again reasoning that Buda was not involved in the prior investigation or decision-making in that case and Kalagher had not been unfair or biased against Doe and was not involved in the decision-making in the Hearing. TJ based her decision on SK's representation that he had spoken with MB who confirmed she was not involved in prior incidents. MB denied that anyone had spoken with her about this. Exs. 115, 117; Ex. 42; Ex. 6 (MB), p.179, 1-25; Ex. 3 (SK), pp. 324, 12-25; 325, 1-25; Ex. 2 (TJ), pp. 236, 1-25; 237, 1-24; 238, 1-25; 267, 8-25; 268, 1-25; 269, 1-25; 276, 19-25; 277; 1-18;

57. On April 19, 2017, Mr. Kalagher informed John Doe that the following accommodations would be provided at the Hearing: (a) To aid in his processing the information, all questions pertaining to a specific event and date should be kept together, without going back and forth between dates and events; (b) To avoid "shutting down," allow John Doe time (several minutes) to process questions and regroup," with assistance if necessary, in order to recall the context of the question at hand; (c) Because of his difficulty sustaining attention and focus and the ease with which he tires out cognitively, John Doe should be given frequent breaks in the questioning (every 15-20 minutes), during which time he may "clear his head" and confer with his adviser. (Complaint ¶ 98).

**RESPONSE**: Admit. SK denied Doe's accommodation requests that an expert advise the panel and how his disabilities affected his credibility and the conduct at issue, that his own expert testify as a witness at the hearing for the same purposes and that they consider any option other than a hearing. Ex. 44.

58. John Doe requested that Mr. Kalagher share his documented disabilities with the Committee knowing it would be shared with the Complainants. (Complaint ¶ 100).

**RESPONSE**: Admit, Doe requested this was after QU denied repeated requests to keep the information from the complainants due to their harassment and sharing of personal information and DOE had no choice but to share this information with Roe and Roe2 if he wanted the Board to see the information. See *infra* ¶¶ 264, 265. Ex. 45; Ex. 130, ¶46.

59. Prior to the Hearing, the Committee was provided the investigation report and John Doe's Response for review. (Exhibit F , SK Depo Tran., p. 288: 8-12).

**RESPONSE**: Admit. QU did not include Doe's Response in RR but did include Roe and Roe2's responses admittedly "imbuing their responses with the cloak of credibility." Answer ¶70. Roe and Roe2 responded to the RR and neither denied Doe's claims of possible T9 violations against them. Ex. 86, Jx; Dxiv; Ex. 1 (VC), p. 551, 1-15.

60. The Hearing was held for approximately seven hours on Friday, April 21, 2017. John Doe was in attendance with his attorney as his adviser. (Complaint ¶ 101; Exhibit F,.Depo Tran., p. 321: 14-17; Exhibit H, Depo Tran., p. 213: 14-25; p. 214: 1-3).

**RESPONSE**: Admit.

61. The Title IX Grievance Committee was mixed gender, as it included Ms. Megan Buda, Ms. Courtney McKenna and Mr. Stefano Fasulo.  (Exhibit H, MB.Depo Tran., p. 214: 2-5).

    **RESPONSE**:   Admit.  Investigators in INV1 were gender mixed but not in INV2, against QU's practice.  Ex. 6 (MB) p. 157, 6-21.

62. John Doe plead not responsible to the charges for Jane Roe and Jane Roe 2.  (Complaint ¶ 102).

    **RESPONSE**:   Admit.

63. Investigator Contrucci orally summarized the investigation report and response by reading from a document that he prepared, which was provided to the Hearing members and John Doe.  (Complaint ¶ 105).

    **RESPONSE**:   Admit.  Contrucci defended his actions and marshalled the evidence in favor of the findings against Doe and in favor of Roe and Roe2.  Contrucci summarized Roe and Roe 2 and their witnesses' interviews, reflected in 10.5 single-spaced pages, and summarized Doe's and his witnesses' interviews in under 4 pages. Contrucci summarized Doe's lengthy Response in one line. Contrucci addressed Doe's concerns raised in his Response which was new information.  Contrucci told the Board that he omitted the Cease and Desist letter because Doe did not give it to him, which was false.  QU did not give the summary to Doe until later that day and Doe was never given the opportunity to address or rebut it.  Exs. 47; 49; Ex. 130, ¶¶53-56;  Ex. 9 (SF), pp.127, 2-25; 128, 1-8; 214, 1-14; 215, 15-22; Ex. 5 (CM), pp. 147, 9-25; 148, 1-4; pp. 176, 6-25; 177, 1-8; 223, 6-19; Ex. 6 (MB), pp. 230, 5-13, 17-25; Ex. 1 (VC), p. 571, 6-13; Ex. 9 (SF), pp. 220, 21-25; 222, 1-17; 147, 14-17 ; Ex. 1 (VC), pp. 559, 14-22; 567, 1-23; 568, 1-25; 569, 1-25; 570, 1-22; Ex. 4 (AH), pp. 149, 9-25; 151, 10-16; Ex. 7 (KK), pp. 138, 22-25; 139, 1-13; Ex. 6 (MB), p. 166, 2-11.

64. During the Hearing, Jane Roe had a female student with her as her adviser. Jane Roe stated that she was upset because the Hearing had been postponed so many times. (Complaint ¶ 108; Exhibit F, SK Depo Tran., p. 310: 18-20).

    **RESPONSE**:   Deny first sentence.  Admit second sentence. A male TC was Roe's advisor at the Hearing.  Roe was crying and emotional. Ex. 130, ¶¶59, 60; Def.'s Answer, ¶108.

65.  No witnesses were called by the Hearing members.  One witness, T.C. was on standby, if the Hearing Committee wanted to interview him.  (Complaint ¶ 109; Exhibit F, SK Depo Tran., p. 310: 15-22).

    **RESPONSE**:   Admit first sentence. Deny second sentence.  Kalagher did not provide notice to Doe of any witnesses as required by T9 policy. Ex. 14, p. 17.  TC was Roe's advisor at the Hearings.  Ex. 130, ¶59.

66. The Hearing Committee took a break to decide responsibility. The Hearing Committee used

the preponderance of the evidence standard.  The Hearing Committee used the definition of IPV in the Title IX policy when finding John Doe responsible.  (Complaint ¶ 110; Exhibit H, MB Depo Tran., p. 184: 9-10).

**RESPONSE**:    Admit the first sentence. Deny the second sentence. The Board did not use the definition of IPV in the T9 policy and did not apply the preponderance standard.  It used the wrong definition of IPV with less elements to prove and used evidence after January 2015 outside of timeframe when Roe2 and Doe were in an intimate relationship which is beyond T9 policy IPV definition.  The weight of the evidence does not meet preponderance, including that Roe and Roe2 did not deny Doe's allegations of the T9 violations or the defenses he raised in his interview or Response.  The Board relied on the "investigation report along with the appendices" but did not consider Doe's Response. Ex. 22; Ex. 14, p. 11; Ex. 51, pp. 1-2; Ex. 5 (CM), pp. 243, 1-25; 244, 1; 246, 1-12; Ex. 9 (SF), pp. 238, 21-25; 239, 7-23; 240, 18-25; 241, 1-9; 17-25; 243, 1-6; Ex. 6 (MB), pp. 249, 5-19; 253, 9-21.

67. After the Hearing Committee reconvened, it read the definitions for each of the charged conduct violations and found John Doe responsible for each charge against each complainant. (Complaint ¶ 111.).

**RESPONSE**:  Admit.

68. John Doe and Jane Roe each read their impact statements.  (Complaint ¶ 112)

**RESPONSE**:  Admit.

69. Mr. Kalagher read John Doe's prior charge of assault to the Committee and provided the range of sanctions available for the findings of responsibility for the charges with which John Doe had been found responsible.  (Complaint ¶ 114).

**RESPONSE**:  Admit except to the characterization of the charge of "assault."

70.  After a break to determine the sanctions, the Hearing Committee announced that the no contact order would remain in effect; that John Doe would be given a deferred suspension through graduation for which any violation of policy committed during that time would result in immediate suspension; that John Doe was suspended from University owned property without prior permission, except that he could attend classes; that John Doe was prohibited from attending University sponsored events, including senior week, which restriction may be reviewed by the Title IX Coordinator after the 2017-2018 academic year; and that John Doe must adhere to the recommendations of the Title IX Coordinator regarding commencement, including his participation in the School of Business Graduation.  (Complaint ¶ 115).

**RESPONSE**:  Admit.

71.  On Monday, April 24, 2017, Mr. Kalagher emailed the decision letter to John Doe. (Complaint ¶ 115).

**RESPONSE**:   Admit except ¶116.

72. John Doe testified that the Hearing was biased against him and inadequate because "it didn't seem very important on what I had to say.  It was kind of more based off what was written in the investigation report."  (Exhibit D, Pl's Depo Tran., p. 226: 2-6).

**RESPONSE**:   Admit he testified to that quote, except "investigation" is "incident."

73. John Doe testified that if the hearing panel reviewed and considered his Response and the investigator's report that would encompass everything that he wanted them to consider. (Exhibit D, Pl's Depo Tran., p. 226: 19-24).

**RESPONSE**:   Admit Doe testified to that.

74. On May 9, 2017, John Doe filed his appeal and requested that Ms. Johnson be recused from reviewing it.  (Complaint ¶¶ 118, 119).

**RESPONSE**:   Admit.

75. John Doe appealed on two grounds: (1) additional and/or new relevant information not available at the time of the Hearing; and (2) an error in the process of the abridgment of rights, as outlined in the Title IX policy, which materially impacted the outcome of the Hearing. (Complaint ¶ 120).

**RESPONSE**:    Admit.

76.  On May 15, 2017, Mr. Contrucci filed a response to the appeal stating that he was incorrect when he told the Hearing Committee that John Doe had not sent him the Cease and Desist letter.  It was not included within his final investigation report, but it was included within John Doe's Response and provided to the Committee prior to the Hearing.  (Complaint ¶¶ 123, 124).

**RESPONSE**:    Admit.

77. On May 26, 2017, Ms. Johnson assigned Monique Drucker, Vice President and Dean of Students and former Title IX Coordinator, as the appeal officer to review the appeal. (Complaint ¶ 126).

**RESPONSE**: Admit.

78. Jane Roe and Jane Roe 2 did not file a response to the appeal.  (Complaint ¶ 125).

**RESPONSE**:   Admit.

79. The appeal was reviewed by Ms. Drucker and also by an appeal panel.  (Exhibit J, MD Depo Tran., p. 144: 5-9).

**RESPONSE**:  Admit.

80. On June 23, 2017, Ms. Johnson sent Ms. Drucker's Appeal Decision Letter to John Doe, affirming the Hearing Committee's April 24, 2017 decision.  (Complaint ¶ 127).

   **RESPONSE**:  Admit.

81. The appeal panel found no ground for appeal based on new evidence, as there was no effect on John Doe because he had included the Cease and Desist Letter in his Response, which had been provided to the Committee prior to the Hearing.  (Complaint ¶ 127).

   **RESPONSE:**  Admit QU sent the letter. Deny that the new evidence had no impact because Drucker did not consider damage to Doe's credibility in front of the board when accused of lying with no opportunity to respond or rebut it. The letter and it speaks for itself. Ex. 52.

82. The appeal panel found one sufficient ground for appeal based on error in the process, which was that the investigation took more than 60 days.  The appeal panel remanded the matter back to the Hearing Committee for reconsideration.  (Complaint ¶ 127).

   **RESPONSE**:  Admit.

83. On June 15, 2017, the Hearing Committee determined that "although the investigation took more than 60 days, it would not have materially impacted the outcome, findings and sanctions." (Complaint ¶ 127).

   **RESPONSE**:  Admit.

84.  John Doe testified that the appeal was biased and unfair because "they kind of already had their minds made up already" because of the investigation and subsequent report.  (Exhibit D, Pl's Depo Tran., p. 228: 2-6; p. 229: 5-9).

   **RESPONSE:**  Admit testified to quoted language, and deny remaining portion of sentence. The transcript speaks for itself. Def Ex. D, Doe Depo, pp. 228, 2-6; 229, 5-9.

85. On April 8, 2017, Ms. Johnson advised John Doe that Ms. Keith would follow-up on John Doe's complaint about a possible violation of the NCO and breach of confidentiality harassment/retaliation by Jane Roe through a friend that John Doe had disclosed to investigators before October 22, 2016 to ascertain the identity of that friend to address John Doe's concerns.  John Doe never heard back about that investigation.  (Complaint ¶ 159).

   **RESPONSE**:  Admit. Doe never heard anything substantive about that investigation.  In her February 28th letter, Johnson told Doe that Keith would follow up on Doe's complaint in September 2016 about the possible violation of the NCO and breach of confidentiality harassment/retaliation by Roe. April 21, 2017, Contrucci told the Board at the Hearing that the investigators had addressed Doe's claims of harassment and ongoing harassment and

breaches of confidentiality with Roe in the fall but "this, unfortunately, was not included in the notes from our conversation." Ex. 49 p. 11; Ex. 2 (TJ), pp. 227, 21-25; 228, 20-25; 229, 7-23; 261, 19-25.  Ex. 37.

86. Alleged violations of no contact orders are investigated by public safety, like many general student conduct matters.  (Exhibit F, SK Depo Tran., p. 246: 8-13).

   **RESPONSE**:  Admit.

87. If a staff member makes the decision that a student will not be charged with violation of a no contact order, then it is not standard practice to inform the student.  (Exhibit F, Depo Tran., p. 248: 15-24).

   **RESPONSE**:  Admit. It is not "necessarily a normal practice" to inform a student of "every public safety report that ends up not becoming a student conduct matter." Ex. 3 (SK) p. 248, 20-23. QU is required to inform a complainant regarding developments in his T9 case.  Ex. 14, p. 15. There is nothing in QU publications (Exhibit 14 or 61) reflecting the practice.

87. On February 17, 2017, John Doe notified Mr. Kalagher and Ms. Johnson that he was harassed by two different friends of Jane Roe.  (Complaint ¶ 80).

   **RESPONSE**:  Admit Doe notified QU of two separate incidents.  Kalagher assured Doe that QU's Public Safety Department would investigate the incident he reported and that he would contact Roe "to reiterate the expectations of the no contact order, share Doe's concerns and let her know that the university will be following up on the matter."  Doe requested that Kalagher let him know when the above steps have been taken as it would provide some comfort to Doe and allow him to go about his daily activities without fear of being harassed."  Doe was never informed that Roe had been contacted, unlike in the fall when the investigators informed Roe, Roe2 and AS when they contacted Doe upon their request. Ex. 90.

88. On February 22, 2017, QU Public Safety Officer Karoline Keith interviewed John Doe regarding his claims that the no contact order was violated.  (Complaint ¶¶ 81, 162).

   **RESPONSE**:  Admit.  Keith interviewed Doe regarding the two claims in ¶87.  Keith also advised that Kalagher would handle the issues regarding breaches of confidentiality of the investigation and any previous incidents of claims of violation of the NCO.  Doe never heard from SK about the confidentiality issues or previous violations of NCOs.  Ex. 90.

89. On March 3, 2017, Ms. Keith finished her investigation and submitted her report to student affairs, which found that the no contact order was not violated.  (Complaint ¶ 160).

   **RESPONSE**:  Admit.  Doe had provided Keith with an audio recording of Roe's friend pursuing Doe to talk about Roe and what Doe did to her in which the friend admits Roe told him about the situation.  When the investigator interviewed Roe's friend, he denied saying that Roe had said anything to him. Roe denied it as well.  Despite the fact that there was an audio recording in direct contradiction of what that friend and Roe had told Keith, Keith did

not question them about the audio tape and closed the case.  Ex. 130, ¶43; Exs. 53; 97.

90. On March 21, 2017, Ms. Johnson emailed John Doe and advised that the complaints were reviewed by Cindy Long Porter who found that the information did not support charges being brought against Jane Doe.  (Complaint ¶ 161).

   **RESPONSE**:  Admit.  Doe's complaints met the threshold for bringing a charge which is if there is "a possibility that this person would be responsible." Ex. 3 (SK), pp. 246, 1-25; 247, 1-15.

91. On March 27, 2017, John Doe reviewed the report in the presence of Ms. Johnson and Ms. Keith.  (Complaint ¶ 162).

   **RESPONSE**:  Admit.

92. The Hearing Committee was given a copy of the public safety report and informed that there was no violation by Jane Roe.  (Complaint ¶ 164).

   **RESPONSE**:  Admit.

93. On April 7, 2017, John Doe reported to Ms. Johnson and Ms. Keith that he believed Jane Roe violated the no contact order when she allegedly walked by him at a restaurant and said "I fucking hate you."  (Complaint ¶ 166).

   **RESPONSE**:  Admit.  Doe also reported additional continuing harassment by Roe.  Ex. 54.

94. On April 12, 2017, Ms. Keith met with John Doe to interview him about his complaint. (Complaint ¶ 167).

   **RESPONSE**:  Admit. In her interview with Keith, Roe admitted she was at the restaurant with friends but denied seeing Doe or saying anything to him. Roe said when she left, she was talking on the phone to friends and was intoxicated but was aware and that she did not believe that she said she "fucking hates him" when she was on the phone but could not recall her conversation. Roe checked her phone to prove the times of her call but said that her phone log only went back to April 8 and did not show Keith the phone.  Keith interviewed Doe's friends who corroborated his whereabouts.  Keith failed to interview any of Roe's friends or check any social media or phone logs to corroborate Roe's story.  Keith closed the case. Ex. 55. Def.'s Answer ¶169.

95. On June 1, 2017, Ms. Johnson informed John Doe that Ms. Keith concluded her investigation on May 4, 2017.  The case was also reviewed by Mark DeVilbiss, Director of Residential Life, who found that the information did not support the charges being brought against Jane Roe. (Complaint ¶ 168).

   **RESPONSE**:  Admit.  Doe's response met the threshold for bringing a charge. Ex. 3 (SK), pp. 246, 1-25; 247, 1-15.

18

96. On February 27, 2017, John Doe made a formal complaint against Jane Roe and Jane Roe 2. (Complaint ¶ 128).

   **RESPONSE**:  Admit QU accepted his Response and exhibits as a formal complaint, which investigators believed involved allegations of IPV, stalking and sexual harassment against Roe.  Ex. 7 (KK), pp. 213, 9-25; 214, 1-17; Ex. 2 (TJ) pp. 163, 5-20; 239, 16-25; 240, 1-25; 183, 12-25; 185, 7-13; 246, 5-21; 188, 14-16; 189, 1-3; 190, 1-4; Ex. 37.

97. QU informed John Doe that he could not bring a complaint against Jane Roe 2 because she was no longer a student. (Complaint ¶ 130).

   **RESPONSE**:  Admit.

98. On April 8, 2017 and April 18, 2017, John Doe inquired as to the status of his complaint against Jane Roe. (Complaint ¶¶ 131, 132).

   **RESPONSE**:  Admit.  Doe inquired because he had heard nothing since he submitted the formal complaint on February 27.  Ex. 58.

99. On April 19, 2017, Mr. Kalagher responded that Jane Roe was notified of his complaint and that QU needed to schedule a meeting to speak with him further. (Complaint ¶ 133).

   **RESPONSE**:  Admit.  QU spoke with Roe before anyone spoke with Doe about his formal complaint and Inv2. Ex. 59; Ex. 2 (TJ), pp. 270, 19-25; 272, 1-13.  Ex. 130, ¶52.

100. The investigation was delayed because QU was waiting for a decision and guidance from the federal court on QU's practices during investigation no. 1.  (Exhibit I, Depo Tran, p. 247: 9-19).

   **RESPONSE:**  Admit that TJ testified to that.  QU determined Inv2 was a separate and independent investigation from INV1. Ex. 2TJ, pp. 282, 14-17; Ex. 12LC, pp. 120, 5-8.

101. On April 20, 2017, QU investigators, Karoline Keith and Lila Carney requested to interview John Doe.  (Complaint ¶ 135).

   **RESPONSE**:  Admit.  Keith and Carney contacted Doe on the day before his Hearing in INV2. Ex. 130, ¶51.

102. The investigators informed John Doe that his Response and attachments would be at the center of the meeting.  (Complaint ¶ 137).

   **RESPONSE**:  Admit.

103. Due to scheduling conflicts, on May 3, 2017, John Doe was interviewed by the investigators. The investigators were aware of his disabilities.  John Doe suggested witnesses, including his parents.  (Complaint ¶ 139).

     **RESPONSE**:  Admit.

104. On May 12, 2017, Ms. Keith interviewed John Doe's mother and John Doe's father over the telephone.  (Complaint ¶ 141).

     **RESPONSE**:  Admit. Keith also interviewed Doe's mother on May 11, 2017.  Doe's mother and father would have preferred to be interviewed in person but that option was never offered. Ex. 60, p. 18;  Ex. 131, ¶8; Ex. 132, ¶9.

105. On May 12, 2017, John Doe's mother requested that John Doe's aunt be interviewed and also that she and her husband be able to review her notes of their interviews.  Investigator Keith informed her that it was not her practice to review notes with witnesses.  (Complaint ¶ 142).

     **RESPONSE**:  Admit.  Doe's mother asked Keith for the second time to interview Doe's aunt because she had important information about the events under investigation.  Keith advised she did not interview Doe's aunt because Doe did not request her to.  Keith told Doe's mother that she would check with Johnson about the request to review he notes and did not get back to Doe's mother or permit Doe's parents to review the notes. Ex. 131, ¶10; Ex. 98; Def.'s Answer ¶142**.**

106. On May 19, 2017, the investigators met with John Doe to review their findings.  The investigators used the preponderance of the evidence standard.  The investigators concluded that they did not find Jane Roe responsible for sexual harassment, intimate partner violence, or stalking in violation of the University Title IX Policy or Student Code of Conduct Policy. (Complaint ¶ 144; <u>Exhibit K</u>, KK Depo Tran., p. 189: 14-19 and 21-24).

     **RESPONSE:**  Admit that investigators used the preponderance standard but did not apply it correctly. See infra ¶172.

107. John Doe testified that no QU officials or representatives made comments or statements that they were biased against him during investigation no. 2 because he was male.  (<u>Exhibit D</u>, Pl's Depo Tran., p. 231: 3-5).

     **RESPONSE**:  Admit that Doe testified to that in substance.

108. QU maintains John Doe's disciplinary record for seven years.  (Complaint ¶ 151).

     **RESPONSE:**  Admit QU is required by policy to keep disciplinary for seven years, and all of records of dismissals or expulsions for life. Ex. 61 p. 69; Ex. 3 (SK), pp. 64, 13-25; 65, 1.

109. On April 27, 2017, Ms. Johnson informed John Doe that he would not be able to walk at the graduate ceremony for the School of Business, but could walk at the earlier graduation for the School of College Arts and Sciences.  (Complaint ¶ 152).

   **RESPONSE**:   Admit.

110.  John Doe also could not attend any social events following the graduation. The restrictions were designed to prohibit proximity between John Doe and Jane Roe, as Jane Roe was also graduating from the School of Business.  (Complaint ¶¶ 152, 153).

   **RESPONSE**:  Admit.  Doe and his family were not permitted to attend any social events related to graduation.  Johnson said restrictions were to prohibit proximity between Doe and Roe.  QU made no effort to permit Doe and his family to attend events or portions of events in a manner that would avoid Roe, despite repeated requests from Doe and his family.  The Board did not permit Doe to attend senior week even when it did not know whether Roe would attend. Ex. 2 (TJ), pp. 296, 14-16; 297, 24-25; 298, 1-23; 299, 1-4; 302, 13-22; Ex. 6 (MB), pp. 258, 3-25; 259, 1-23; Ex. 130, ¶69. Ex. 104.

111. After requesting reconsideration, on May 1, 2017, Ms. Johnson informed John Doe that her decision stands.  (Complaint ¶ 154).

   **RESPONSE**:  Admit.  Johnson refused to explain to Doe her reasons. Ex. 130, ¶68; Ex.104.

112. John Doe requested permission to be on campus over the last weeks of classes and through graduation.  (Complaint ¶ 156).

   **RESPONSE**:  Admit.

113. On May 1, 2017, John Doe emailed Ms. Johnson and Mr. Kalagher requesting approval to accept a QU's professors offer of a summer internship from July 10, 2017 through July 21, 2017.  (Complaint ¶ 158).

   **RESPONSE**:   Admit except deny Doe's request was limited to the dates of July 10, 2017 through July 21, 2017.  The brochure Doe sent was to provide a description of the internship. Ex. 105.

114. Ms. Johnson approved this request on May 11, 2017.  John Doe responded by requesting approval to attend the internship on additional dates in June or July, which Ms. Johnson denied.  (Complaint ¶ 158).

   **RESPONSE**:  Admit. Ex. 2 (TJ), pp. 303, 12-25; 304, 3-17; 305, 1-3.

115. John Doe twice renewed his request, which Ms. Johnson denied.  Jane Roe would be using the library and school of business building, which is where the internship was located.

**RESPONSE**: Admit, except deny that it was an undergraduate internship. Johnson defined the internship as educational. Johnson never explained why she refused to permit Doe to participate in educational programming and ultimately denied Doe the opportunity to participate in less days but on different dates due to his Professor's request. Roe did not confirm she would be working at the S. Business School or provide dates or times she may use it or the library. Ex. 63; Ex. 2 (TJ), pp. 296, 14-16; 302, 13-25; 303, 15-25; 304; 1-25; 305, 1-3, 311, 1-25; 312, 11-25. Def.'s Answer ¶¶157, 158.

116. John Doe testified that prior to attending Quinnipiac University, he attended Connecticut College. He withdrew because he thought he would be suspended after the fourth time that he was written-up. (Exhibit D, Pl's Depo Tran., p. 21: 1-3 and 14-16).

**RESPONSE**: Admit that Doe testified in substance to that.

117. John Doe testified that he was not an honors student. During the fall semester, he received a grade of D in a class. He had received the grade of C and C+ during previous semesters at QU. (Complaint ¶ 65; Exhibit D, Pl's Depo Tran., p. 110: 7-10; See also Exhibit D, Pl's Depo Tran., QU Transcript, attached as Exhibit D).

**RESPONSE**: Admit, Doe testified he did not believe he was an honor student. A "D" is the lowest grade Doe received at QU. Def. Ex. D, Pl Depo. Ex. 130, ¶76.

118. John Doe testified that there is nothing on his transcript that says anything about a disciplinary proceeding, finding or sanction against him. If an employer asked for his transcript, then the employer would not see anything regarding any disciplinary proceedings. (Exhibit D, Pl's Depo Tran., p. 128: 12-23).

**RESPONSE**: Admit he testified to that.

119. John Doe testified that he is not employed. He wants to work for a big bank in wealth management. He has avoided applying to big banks because he thinks they perform background checks that potentially would reveal that there were disciplinary proceedings against him at Quinnipiac University and he also does not have the credentials. (Exhibit D, Pl's Depo Tran., p. 48: 1-3; p. 50: 1-7 and 18-23).

**RESPONSE**: Admit Doe testified to that in substance.

120. John Doe testified that he attended ten interviews. He did not inform the interviewers that he was involved in any disciplinary hearing at Quinnipiac University and he does not recall if the question was asked. (Exhibit D, Pl's Depo Tran., p. 57: 1-5).

**RESPONSE**: Admit Doe testified to that.

121. John Doe testified that he has received two job offers. He did not accept the job offers because they were financial representative positions and he might not make a salary of $50,000, which

he believed was fair market value for his economics degree.  (Exhibit D, Pl's Depo Tran., p. 61: 1-23; p. 64: 12-18; p. 67: 17-19).

**RESPONSE**:  Admit that Doe testified to that in substance.

122. John Doe testified that he has not applied to any graduate schools.  (Exhibit D, Pl's Depo Tran., p. 77: 20-21).

**RESPONSE**:  Admit Doe testified to that in substance.

123. John Doe testified that Professor Norman Gray told him that he could not hire him for a full-time position at his company because of the way his company was set-up.  It was not a wealth management position.  (Exhibit D, Pl's Depo Tran., p. 81: 3-25; p. 82: 1-5).

**RESPONSE**:  Admit Doe testified to that in substance.

124. John Doe testified that he experienced stress and anxiety as a result of the conduct alleged in his complaint and was prescribed Xanax by a psychiatrist.  (Exhibit D, Pl's Depo Tran., p. 88: 21 -25; 89: 1-2 and 8-10).

**RESPONSE**:  Admit Doe testified to that in substance.

125. John Doe testified that he was prescribed Xanax by his psychiatrist for anxiety in 2013, prior to the incidents alleged in his Complaint.  (Exhibit D, Pl's Depo Tran., p. 90: 19-25; p. 91: 1-6).

**RESPONSE**:  Admit. Doe testified to that in substance.

126.  John Doe testified that his reputation was damaged because everything became public knowledge and he believes individuals stopped talking to him because of it.  He also believes Professor Norman Gray may consider him a less worthy job candidate, but has never had that conversation with him.  (Exhibit D, Pl's Depo Tran., p. 82: 17-25; p. 83: 1-4).

**RESPONSE:**  Admit.  Doe believed that Gray did not hire him because he knew about Doe's disciplinary issue.  Pl. Depo. 83, 1-22; Ex. 113;  Ex. 130, ¶70.

127. John Doe never asked for permission to be on campus to use the library to study, find job resources or meet with teachers.  (Terri Johnson Affidavit, ¶ 7, attached as Exhibit L).

**RESPONSE**:  Admit Doe did request to be on campus to study and for academic reasons. Ex. 2 (TJ), p. 305, 17-23.

128. John Doe testified that he was not expelled.  He was not suspended from attending classes.  He received a deferred suspension.  He was able to finish his education and graduate without delay.  (Exhibit D, Pl's Depo Tran., p. 85: 14-23; p. 86: 5-10).

**RESPONSE**:  Admit Doe testified to the above.

**Individual Defendants**

129. John Doe testified that no Quinnipiac officials or representatives made any comments or statements that they were going to find him responsible because he was male.  (Exhibit D, P's Depo Tran., p. 222: 14-23).

**RESPONSE**:  Admit Doe testified to the above.

130.  John Doe testified that Seann Kalagher, Terri Johnson and Vincent Contrucci never made any comments or statements that they were going to find him responsible because he was male.  (Exhibit D, Pl's Depo Tran., p. 222: 24-25; p. 223:1-4).

**RESPONSE**:  Admit Doe testified to the above.

131. John Doe testified that Vincent Contrucci harassed him by not listening to what he had to say and stating that did not receive certain information that he did.  Anything John Doe felt was missing was provided in his Response.  (Exhibit D, Pl's Depo Tran., p. 234: 9-25).

**RESPONSE**:  Admit Doe testified to the first two sentences.  Deny the characterization of third sentence.  Doe's transcript speaks for itself.

132. John Doe testified that Terri Johnson harassed him by not allowing him to participate in the activities with his professor and enforcing the findings against him by the Title IX Hearing Committee, even though that is her job as Title IX Coordinator.  (Exhibit D, Pl's Depo Tran., p. 235: 4-19).

**RESPONSE**:  Admit Doe testified to the above.

133. John Doe testified that Seann Kalagher harassed him because he had predetermined opinions about him based off previous encounters with him, even though Seann Kalagher was not the hearing officer in the student conduct case when he assaulted another student and was sanctioned.  (Exhibit D, Pl's Depo Tran., p. 232: 13-25; p. 233: 1-18; Exhibit H, MB Depo Tran., p. 174: 10-12).

**RESPONSE**:  Deny characterization of Doe's testimony.  Doe's testimony speaks for itself.

134. John Doe testified that Vincent Contrucci, Terri Johnson, and Seann Kalagher intended to intentionally inflict emotional distress upon him because he was "treated poorly" and "wasn't listened to" by the defendants, despite the fact that Vincent Contrucci met with the plaintiff and Attorney Katz, the plaintiff and his father, the plaintiff and Attorney Duffy, and he also had phone calls with the plaintiff and his advisers.  (Exhibit D, Pl's Depo Tran., p. 237: 12-25 and 19-24; p. 238: 3-9 and 10-25).

**RESPONSE**:  Admit Doe testified in substance to the above.

135. John Doe testified that the defendants were reckless in their conduct by how they went about their investigation. (Exhibit D, Pl's Depo Tran., p. 240: 20-25; p. 241: 1-2).

   **RESPONSE**: Admit Doe testified to the above.

136. John Doe testified that Terri Johnson, Seann Kalagher, and Vincent Contrucci intentionally interfered with his contractual relationship with QU by not allowing him to access things on campus that he would have enjoyed to. (Exhibit D, Pl's Depo Tran., p. 237: 2-11).

   **RESPONSE**: Admit Doe testified to the above.

137. In 2015, John Doe was punched in the face by another student named S.R. After John Doe slept with S.R.'s girlfriend, S.R. headbutted his chin. S.R. was found responsible during the student conduct disciplinary procedure by Mr. Kalagher, not Ms. Buda. (Exhibit D, Pl's Depo Tran., p. 119: 14-20; p. 120: 20-24; Exhibit F, SK Depo Tran., p. 250: 5-7).

   **RESPONSE**: Admit.

138. As sanctions, S.R. was suspended from the residence halls for a semester, received deferred suspension from the University and a counseling referral. Quinnipiac did not enforce the suspension from the resident halls and SR did not live there, affidavit. John Doe does not believe that S.R. was treated differently than S.R. in regards to his disciplinary proceedings. (Exhibit D, Pl's Depo Tran., p. 125: 21-25; Exhibit M, SR's Conduct File, p. 33).

   **RESPONSE**: Admit first sentence. Deny second sentence. QU issued an NCO but did not enforce it, resulting in SR assaulting Doe a second time. Doe believes that SR was given a lesser sanction for assaulting him twice and causing serious injuries than the sanction Doe would have received of at least 1-year suspension if Doe accepted responsibility for allegedly putting his arm across Roe's neck in self-defense. Ex. 130, ¶¶6-10, 26, 71; Ex. 86, p. 69; See infra ¶¶ 42, 43, 44; Ex. 116.

139. In 2015, John Doe was involved in a shuttle bus incident. In September 2015, John Doe and three of his friends were beating another student named C.M. People started screaming to the driver not to move the shuttle bus for fear of running over C.M. (Exhibit D, Pl's Depo Tran., p. 130:18-20; p. 137: 11-19).

   **RESPONSE**: Admit first sentence, deny characterization of second and third sentences but admit those were the allegations made, CM was male and MB was the NCO Officer. Ex. 62.

140. John Doe was found responsible for student conduct code violations by Cindy Long Porter and received deferred suspension from the university and suspension of shuttle privileges as a sanction. (Exhibit D, Pl's Depo Tran., p. 143:13-23; p. 144: 1-4; Exhibit F, Depo Tran., p. 250: 4-25; Exhibit H, Depo Tran., p. 174: 10-12).

**RESPONSE**:  Admit.

141. In 2012, QU was under investigation by the Office of Civil Rights ("OCR") based on a complaint made by a student named J.P. that he was discriminated against during the student conduct process based on his ethnicity, not gender. The OCR found that QU engaged in no bias, they looked through past cases, found no pattern of bias, and that Mr. Kalagher did not make racially insensitive statements.  (Exhibit F, SK.Depo Tran., p. 26: 20-25; p. 27: 1-25; p. 28: 1-13).

**RESPONSE**: Admit first sentence.  Admit Kalagher testified to second sentence.  Plaintiff requested documents in discovery related to this investigation and nothing was produced. Ex. 89, p. 8 #11; See infra, ¶147.

142. Since 2012, in cases in which a determination was made, 22 out of 43 male students charged with sexual assault or sexual misconduct were found not to be responsible.  (See QU Title IX Spreadsheet, attached as Exhibit N).

**RESPONSE**:  Admit 43 male students were charged with T9 violations between 2012 up to and including 2017 based on one spreadsheet created by QU. Def. Ex. N.  Deny 22 male students were found not responsible. Nineteen males were found not responsible. Ex. N.

143. Since 2012, in cases in which a determination was made, 2 out of 4 female students charged with sexual assault or sexual misconduct were found not be to be responsible.  (See QU Title IX Spreadsheet, attached as Exhibit N).

**RESPONSE**:  Admit based on Ex. N.

144. Since 2012, Mr. Kalagher conducted and arranged trainings for all Title IX investigators and hearing board members throughout the year.  (Exhibit F, SK Depo Tran., p. 80: 14-20).

**RESPONSE**:  Admit trainings were arranged and available to all Title IX investigators and Board members. See infra ¶¶225, 226.

<u>Plaintiff's Additional Material Facts</u>

145.    The DCL, which began a sea change in federal government enforcement of T9, required colleges to aggressively pursue sexual assault focusing on female victims.  The DCL was followed by Connecticut state law and federal law and guidance reinforcing the DCL.  Beginning in 2011, colleges were increasingly criticized for failing to protect females from sexual assault with the threat of OCR investigation, loss of federal funds and lawsuits, which captured much media attention through July 2017.   Exs. 65 - 79; Ex. 119.

26

146.     Defendants and members of QU's T9 team were aware of the evolution in T9 enforcement due to the DCL, and subsequent federal and state laws and guidance, and the pressure to comply with the DCL or lose federal funds due to the media, conversations in professional educational organizations and through training provided by SK. Ex. 3 (SK), p. 3, 6-14; Ex. 13 (MT), pp. 17, 14-20; 35, 4-13; 47, 16-19; Ex. 10 (MaD), pp. 44, 6-25; 45, 1-4; Ex. 9 (SF), pp. 92, 7-25; 93, 1-25; 96, 9-14; 260, 23-25; 261, 1-2, 7-10; Ex. 8 (MoD), pp. 67, 1-25; 78, 14-18; 79, 1-25; Ex. 5 (CM), pp. 78, 5-25; 76, 1-25; Ex. 6 (MB), pp. 17, 1-25; 18, 11-14; 18, 1; 67, 19-25; 68, 1-5; 75, 20-25; 79, 15-25; 80, 21-25; 81, 1-14; , 139, 2-22; 140, 11-18; 141, 7-12; 142, 1-3; 18-25; 143, 15-22; Ex. 7 (KK), pp. 38, 1-6; 59, 4-22; 60, 1-2, 6-10; 300, 6-11, 14-19; Ex. 1 (VC), pp. 236, 18-25; 238, 5-17; 576, 21-25; 577, 11-16, 21-25; Ex. 2 (TJ), pp. 23, 22-25; 26, 1-25; 28, 8-10; 45, 3-24; 48, 19-25; 81, 12-25; 82, 1-25; 83- 1-25; 84, 1-25;  85, 1-25; 86, 1-23; 91; 5-25; 99, 1-25; 100, 20-25; 101, 1-25; 102, 1-25; Ex. 4 (AH), pp. 421, 24-25; 422, 1-2, 8-14; Ex. 3 (SK), pp. 52, 6-11; 80, 1-25; 99, 14-25; 100, 8-25; 102, 1-25; 103, 1-25; 104, 1-25; 106; 1-25; 112, 1-5; 114, 1-25; 115, 1-25; 151, 17, 23-25; 152, 1-25; 153, 1-22, 22-25; 154, 1-17.

147.     In 2012, (1) QU was investigated by OCR for discrimination in its student conduct process for a complaint involving a male assaulting his girlfriend; (2) OCR received a complaint for gender discrimination under T9 against QU; and (3) the Second Circuit upheld the district court ruling that QU had discriminated against women in violation of Title 9, which resulted in a consent decree under which QU was monitored for its compliance with Title 9 and required to submit yearly reports until at least June 2016. Ex. 124; Ex. 8 (Mo)D, pp. 19, 15-25; Ex. 5 (CM), p.77, 5-22; Ex. 13 (MT), pp. 6, 16-25; 16, 15-21; 30, 19-25; 31, 1-2; 43, 16-19; 47, 16-19; Ex. 10 (MaD), p. 18, 14-25; Ex. 9 (SF), p. 261, 7-11; Ex. 12 (LC), pp. 208, 14-25; 209, 1-7; Ex. 3 (SK), pp. 26,

20-25; 27, 1-25; 29, 2-25; 30, 1-3. Ex. 6 (MB), p. 8, 11-14; Ex. 2 (TJ), p. 23, 22-25; Ex. 4 (AH), p. 422, 1-14.

148.    SK and MD created QU's T9 policy in 2012 and QU began to implement educational programming focused on female victims of sexual assault to increase reporting to comply with the DCL.   Exs. 73, p. 17; 74, p. 17; Ex. 3 (SK), pp. 51, 1-25; 52, 1-2; 54, 1-20; 118, 15-24; 49, 23-25; 50, 11-16; 58; 25; 54, 1-7; 54, 14-20; 62, 4-11; 74, 8-18. Ex. 2 (TJ), pp. 63, 13-22; 70, 6-25; 71, 10-22; 75, 12-13; 133, 11-15; 139, 21-25; Ex. 9 (SF), 74, 10-20; 75, 3-4; 107, 3-22;  Ex. 8 (MoD), 41, 1-25; 56, 21-25; 57, 1-18; 58, 9-15; 68, 1-17; 73, 1-16; 78, 1-25; 93, 4-12; 95, 3-7; Ex. 5 (CM), pp. 38, 17-25; 39, 12-20; 40, 3-24; 41, 1-25; 63, 1-25; 64, 1-25; 65, 2-5, 13-16, 21-25; 94, 6-8, 19-22; 111, 22-25; 112, 1-25; 113, 1-15; Ex. 6 (MB), pp. 65, 2, 9, 22-24; 66, 1-10;  76, 1-23; 77, 1-9; Ex. 7 (KK), pp. 62, 13-22; 80, 21-25; 81, 1-15; Ex. 3 (SK), pp. 50, 9-22; 10-25; Ex. 2 (TJ), pp. 64, 21-25; 65, 1-25; 73, 1-25; 84, 1-25; 87, 2-24; 88, 17-25; 89, 1-25; 90, 5-25; 91, 1-20; 104, 1-25; 105, 4-23; 111, 1-12; 114, 6-12; Ex. 13 (MT), pp. 54, 9-25; 55, 1-13; Ex. 12 (LC), pp.- 45, 2-16; 65, 1-20; 71, 1-25;72, 1-12; 73, 15-23; 74, 15-25; Ex. 4 (AH), pp. 70-74, 1-25; 86, 10-15.

149.    As a result of QU's implementation of it, the DCL and QU's investigations of sexual misconduct rose from 1 in 2012 to 11 in 2013 and 14 in 2014. Between 2012 and through 2017, QU investigated 36 T9 complaints brought by women against men and 3 brought by men against women;  found 18 men responsible when accused by a woman, and only one woman responsible when accused by a man;  expelled or dismissed six male respondents and no female respondents, suspended three male and no female respondents; and imposed deferred suspension on fifteen male respondents and only one female respondent.  Ex. N.

150.     QU did not provide sufficient notice for Doe to prepare for his interview, they did not inform him he was a respondent or who the complainants were but informed him they were investigating a complaint that has been brought forward to the university in violation of T9 policy. Ex. 2TK, pp. 164, 18-25; 165, 1-3, 5-15; Ex. 3SK, pp.188, 1-23; Ex. 1VC, Vol. pp. 1- 108, 12-20; Ex. 1VC, Vol 2, pp. 377, 1-2, 4-5, 16-21; 378, 4-25; 379, 1-10; 384, 24-25; 385, 1-9; 386, 8-12, 21-25; 387, 11-14; 388, 4-19; 393, 9-25; Ex. 4AH, pp.260, 23-25; 263, 13, 18-25;  264, 1; 331, 8-25; 332, 1-17; 334, 2-8; 335, 6-14; 342, 1-19; Ex. 5CM, pp. 172, 3-10; 18-21.  Ex. 81.

151.     QU did not give Doe or the Board the audio recordings that Roe provided in INV. They only provided the transcript preventing Doe from fully defending himself and the Board from hearing relevant evidence. Ex. 4AH, pp. 316, 11-25; Ex. 5CM, pp. 197, 2-15; Ex. 1VC, pp.- 249, 6-25; 250, 1-25; 251, 1-25; 252, 1-25; 253, 1-25.  Ex. 130, ¶24; Ex. 86, Appendix Dviii.

152.     QU chose to interview most of witnesses and the parties on the phone when QU's best practice is to speak in person. Ex. 2 (TJ), p. 154, 2-20; Ex. 1 (VC), pp. 181, 6, 8, 14-25; Ex. 86; pp. 52; 57, 58; Ex. 130, ¶18.

153.     QU did not re interview Roe, Roe2 or their witnesses after Doe's interview to question them about the new relevant information he had provided in his defense. Ex. 7 (KK), pp. 196, 8-9; 16-18; 21-22; 199, 2-13; Ex. 6 (MB), pp. 110, 7-25; 111, 1-7; Ex. 5 (CM), pp. 132, 12-25; 133, 1-15; 134, 1-17; 213, 18-25; Ex. 9 (SF), pp. 134, 22-25; 135, 1-25; 136, 1; Ex. 4 (AH), pp. 262, 20-25; 263, 1-12. Ex. 86.

154.     After investigators interviewed Roe, Roe2 and 12 of their witnesses, they had decided Doe was responsible.  Investigators did not believe Doe since his initial interview when he denied the allegation, which denial they characterized as flippant. Ex. 5 (CM), pp. 131, 6-13;

20-25; Ex. 12 (LC), pp. 88, 2-7; Ex. 4 (AH), pp. 274, 1-16; 345, 14-25; 346, 3-9; 347, 7-15.  Ex.
130, ¶¶18, 20-21.

155.    There is evidence that Roe brought her complaint because she was hurt and angry
and wanted revenge that Doe broke up with her and she did not want him to file a restraining order
so she could not walk at graduation, but Investigators never questioned Roe about the alternate
theory of motive.  Ex. 22 generally, and specifically pp. 3-5, 15-16.  See infra ¶¶156, 151; Ex. 130,
¶¶13-16, 19.

156.    Roe's expressed fears of Doe concerned Doe bringing legal recourse and getting a
restraining order against her.  Ex. 22, pp. 15-16; Ex. 86, pp. 8, 17, 34, 35; Ex. 4 (AH), pp. 275, 12-
23; 276, 1-25; 278, 1-25; 279, 1-25; 280, 5-20; 431, 12-23; 432, 2-12; 433, 2-13.

157.    Doe sent Roe a cease and desist letter before he was aware of her complaint, which
he gave to VC on August 23, 2016 in support of Roe's motive to file this complaint maliciously.
VC did not include the Cease and Desist letter in the RR or question Roe about. Ex. 1 (VC), pp.
255, 13-25; 404, 2-19; Ex. 86; Ex. 133; Ex 130, ¶¶15, 55.

158.    The Investigators did not question anyone about any evidence that was provided,
follow up on the evidence to ensure it was reliable or gather relevant information, which is
inconsistent with QU's training and T9 (forensic). Ex. 130, ¶55; Ex. 1 (VC), pp. 131, 8-25; 143,
15-25; 144, 1-25; 145, 1-25; 146, 1-25; 147, 6, 12-25; 148, 1-7; 190, 18-25; 191, 1-10, 15-25; 192,
1-25; 215, 4-24; 216, 1-17; 258, 1-25; 259, 1-25; 260, 1-25; 261, 1-25; 262, 1-8; 278, 1-25; 315,
1-25; 316, 1-25; 317, 1-25; 445, 1-25; 446, 1-6; Ex. 2 (TJ), pp.146, 7-25.  Ex. 66, p. 25.

159.    Investigators did not interview Doe's mother or father when they knew each had
relevant information, and did not follow up sufficiently on his other witnesses See also, *supra*,
¶¶20, 21, 22; Ex. 1 (VC), pp.175, 3-10; 414, 23-25; 415, 1-22; 416, 13-25; 417, 1-25; 418, 1-22;

419, 6-22; 434, 1-25; 436, 1-25; 437, 1-25; 438, 1-7; Ex. 3 (SK), pp. 268, 11-25; Ex. 4 (AH), pp.

353, 13-25; 354, 1-25; 355, 1-25; 356, 1-23; 366, 1-25; 367, 1-25.

      **160.**     Roe and Roe2 told investigators they spoke to each other and their witnesses before

Roe2 and the witnesses spoke with the investigators but AH and VC did not ascertain the dates

when they spoke to the witnesses to rule out bias.  The investigator allowed the females to contact

their witnesses before investigator contacted them against QU's best practice.  Investigators never

questioned Roe or Roe 2 about their relationships with each other and witnesses, such as friends,

sorority sisters, family to explore bias.   Ex. 4 (AH), pp. 302, 24-25; 303, 12-25; 304, 1-25; 305,

3-21; 306, 12-25; Ex. 1 (VC), pp. 139, 1-25; 140, 1-25; 141, 3-25; 142, 1-10; 187, 1-14; 193, 12-

24; 202, 20-25; 203, 1-25; 204, 1-25; 205, 1-25; 206, 1-13; 217, 7-25; 223, 5-25; 224, 9-25; 225,

1-4; 242, 11-23; 243, 10-21; 247, 12-25; 248, 1-10; 254; 2-25; 255, 1-12; 257, 1-8; 272, 6-14; 273,

12-25; 274, 1-17; 276, 1-25; 277, 6-25; 278, 1-8; 332, 1-25; 333, 1-25; 334, 7-25; 335, 1-19; 443,

9-25; 444, 1-25; Ex. 86; Ex. 22, pp. 4,5; See Def's Answer, ¶49.

      161.     The RR is replete with examples that show the investigators were friendlier to Roe

and Roe2 and their witnesses than to Doe, using first name basis and responding quicker and with

more detail than they did to Doe.  See Ex. 86, D, J, A and C; Ex. 1 (VC), pp.  244, 1-12; Ex. 86,

73.

      162.     In INV1, the investigators permitted one of Roe and Roe2s witnesses, AS, to review

and make changes to her interview notes in the RR before it was finalized. Ex. 1VC, pp. 457, 1-2,

13-25; 458, 1-25; 460, 13-17, 22-25;  Ex. 86, App. A, Aiii; Ex 82.

      163.     INV1 the investigators bent over backwards and were solicitous toward the

complainants in addressing their alleged fear of Doe's reaction to the complaint. See RR. For

example, investigators agreed to notify the complainants and witnesses when Doe was notified of

the charges, informed them of the NCO and other avenues they had if they felt threatened and asked if they were afraid of Doe but never asked Doe if he was afraid of them or followed up on his allegations of harassment by Roe. Ex. 86, pp. 17, 24, 25, Aiv, Dix; Ex. 56, p. 11; Ex. 1 (VC), 369, pp. 20-25; 370, 1-8, 12-25; 371, 17-25; 372, 1-25; 373, 1-23; 441, 3-15; 442, 1-6.

164.    When the investigators lost their notes in INV1, they could not recall the substance of Roe's words but recalled that she was emotional and very upset, something they thought was significant by itself to put in the RR as evidence that she was credible. Ex. 1 (VC), pp. 369, 2; 481, 6-25; 482, 1-9; Ex. 4 (AH), pp. 380, 1-25; 381, 1-20. Ex. 86, p. 73.

165.    The investigators lost their notes of the last two findings meetings with Roe and Roe2 and permitted Roe and Roe2 to recreate what they said during those interviews.  Investigators did not permit Doe to recreate his meeting with them after they lost notes of his interviews. Ex. 1 (VC), pp. 508, 10-25. 60, Dxiv; Jxii.

166.    Investigators did not include a rationale in the RR as required by QU training and federal law which also required investigators to include all relevant information and interview witnesses whether or not requested by a party. Ex. 4 (AH), pp.133, 6-17; 253, 1-17; 315, 6-17; Ex. 3 (SK), pp. 261, 1-17; 271, 1-10; Ex. 12 (LC), pp. 87, 8-15; Ex. 1 (VC), Vol. 1, pp. 107, 6-25; 133, 3-14; 178, 1-10; 214, 6-25; 244, 1-25; 245, 1-17; 247, 7-11; Ex. 1 (VC), Vol. 2, pp. 312, 15-24; , 313, 8-25; 314, 1-15; 341, 19-25; 343, 1-25; 344, 1-8; 515, 1-9; Ex. 64, p. 5; Ex. 88.

167.    Investigators interviewed Roe's mother even though she did not request it. Ex. 86, Dvii; Ex. 1VC, pp.– 244, 1-25; 245, 1-17; 247, 7-11.

168.    October 25th, after the investigation was closed, was the first time Doe had seen the report, and the evidence against him or knew who had been interviewed. When Doe and his father asked what evidence QU relied on to make these findings, Contrucci emphatically held a single

photo that Roe had submitted that purportedly showed red marks on her neck as evidence that Doe had choked Roe and waved it at them in an accusatory and disdainful manner. Ex. 1 (VC), pp.– 124, 3-17; 485, 11-24; 490, 6-25; Ex. 4 (AH), pp. 383, 3-25; 385, 2-25; 386; 1-25. Ex. 130, ¶24, 25; Ex. 132 ¶8.

**169.**    When Doe read the RR, he became very anxious and stressed when he learned that QU did not follow T9 and its own policies and procedures, had treated the women much more favorably than him, and had given him only 3 days to process the information and respond to it. The timing problematic due to Doe's academic schedule and his documented disabilities and he knew he needed more time to effectively respond to the RR.  Ex. 130, ¶¶ 24, 26, 27; Ex. 131, ¶6; Ex. 132, ¶10.

170.    Doe presented evidence that Roe's allegations of choking were false and neither the Board nor investigator in INV1 or INV2 ever questioned Roe about the evidence. QU never asked questions of Roe or her witnesses about the internal inconsistencies between their five different reports, of the choking incident and the only witness that Roe told investigators would corroborate her choking story did not. Ex. 1VC, Vol. 1, pp. 149, 1-20; 150, 3-25; 151, 1-25; 152, 1-25; 153, 1-25; 272, 19-25; 273, 1-12; Ex. 1VC, Vol. 2, pp. 308, 6-25; 309, 1-25; 310, 1-25; 311, 1-7; 345, 4-25; 346, 1-25; 347, 1-25; 405, 8-25; 406, 1-25; 407, 1-25; 408, 1-25; 409, 1-15; Ex. 4AH, pp. 350, 12-25; 351, 1-25; 352, 7-18.  Ex. 22, pp. 6-10; Ex. 86, DCvi, viii, xi, xii, 12, 36, 37, 22, 54, 58, 59, DC; Ex. 85.

171.    QU errs on the side of the Respondent when the only evidence is the complainant and respondent's word based on QU's training. Ex. 4AH, pp. 140, 6-25; 141, 1-18; Ex. 1VC, pp. 524, 12-17; 525, 23-25; 526, 1-25; 527, 1-5, 8-12.

172.    Investigators in INV1 did not use the preponderance of evidence standard.  They found "sufficient information to conclude that there may have been violations of the Title IX Policy and student code of conduct" and "believe that the following may have been breached" by Doe. Ex. 86, p. 4.  QU's T9 Policy provides investigators will charge a student if it is "supported by the investigation findings." Exhibit 14, p. 16.  The evidence by itself did not support that it was more likely than not that Doe was responsible for IPV, which was bolstered by the fact that Roe and Roe2 did not deny his allegations of their stalking, IPV and sexual harassment against them and that the investigative findings were based on evidence after January 2015 when Doe and Roe2 were no longer in an intimate relationship, which was outside of the time frame to fit the definition of IPV for Roe2. Ex. 1 (VC), pp. 517, 1-25; 518, 1-7; 520, 20-25; 521, 1-24; 522, 1-25; Ex. 4 (AH), pp. 155, 18-21; 156, 1-25; 157, 1-21; 397, 17-25; 400, 1-25; 401, 1-25; 406, 20-23; 407, 3-20; Ex. 9 (SF), pp. 130, 7-18.  Ex. 86, p. 4; Ex. 14, p. 11; Ex. 22; Ex. 86, pp. 53-63, 68-70. See supra ¶10; See *infra*, ¶186.

173.    KK and LC, in INV2 purported to use the preponderance of evidence standard but did not apply it correctly based on the weight of the evidence they reviewed and their reliance on the biased from INV1 and the Board's finding of responsibility for Doe in Inv1 as well as basing their findings on inaccurate facts. Ex. 7 (KK), pp.189, 3-15; (see  infra ¶213, and supra ¶66).

174.    The Board did not apply the preponderance of evidence based on the evidence they reviewed.  The Board used the wrong definition of IPV with less elements to prove, used evidence outside the time frame for IPV for Roe2, and relied solely on the RR and appendices and not Doe's Response. The weight of the evidence showed Roe and Roe2 were not afraid of Doe, which was bolstered by the fact that neither Roe or Roe2 ever denied Doe's allegations regarding their conduct

34

in the responses to the INV1 in October, or to Doe's Response or at the hearing.  Doe Ex. 23, pp. 6-19; Ex. 86, pp. 53-63, 68-70; Ex. 51.  See *supra*, ¶66.

175.    Kalagher trains QU's T9 team to apply the definitions in its T9 policy.  Yet Buda testified that one instance is sufficient for a pattern in IPV and the Board used and relied on the wrong definition with less elements to prove of IPV in finding Doe responsible. Ex. 2 (TJ), pp.160, 12-25; 291, 18-20; 293, 1-25; 294, 11-25; 296, 1-4; Ex. 3 (SK), pp.171, 6-25; 172, 1-22; 173, 1-19, 17-19; 349, 1-14; Ex. 1 (VC), pp. 245, 19-25; 246, 1-25; 295, 1-25; 296, 1-25; 297, 1-25; 298, 1-25; 299, 1-25; 300, 1-25; 301, 4-21; Ex. 4 (AH), pp. 169, 1-4; 170, 21-25; 171, 1-25; 172, 1-25; 173, 4-25; 174, 18-25; 175, 1, 6-25; 176, 5-6; Ex. 6 (MB), pp.125, 6-25; Ex. 5 (CM), pp. 247, 2-24; Ex. 12 (LC), pp. 94, 9-25; 98, 14-19; Ex. 7 (KK), pp.129, 1-13;  Ex 14, pp. 9-11; Ex. 51; Ex. 88, p. 4; Ex. 6 (MB), pp. 284, 1-15; 285, 1-25; 286, 1-25; 287, 1-3; 288, 1-25; 289, 10-20; 290, 1-20.

176.    The investigators used evidence outside of the time Roe2 and Doe were in an intimate relationship, to find Doe responsible for IPV.  Ex. 86, p. 4; Ex. 1 (VC), pp. 527, 24-25; 528, 1-18.  (see supra ¶66).

177.    Investigators in INV2 used the correct definition of IPV to find Roe not responsible for IPV.  Ex. 60, pp. 25-27; Ex. 12 (LC), pp. 193, 4-23; Ex. 7 (KK), pp. 257, 13-18; 249, 11-25; 250; 1-25; 251, 1-25; 252, 1-25; 253; 1-25; 254, 1-25.

178.    Johnson did not follow the T9 policy when she failed to speak with Doe or investigate his allegations of gender bias by the investigator in INV. 1 set forth in Doe's 2/1/17 letter to Johnson, and failed to report this to Mark Thompson or his designee. For complaints of gender discrimination in a QU program, QU will dismiss a complaint only if the allegations, even if true, would not constitute a violation of T9 policy.  Ex. 56, p. 1, 2, 14-15; Ex. 13MT 71, 7-23;

Ex. 2TJ, pp. 156, 1-22; 157, 1-12; 158, 6-13, 19-25; 159, 1-25; 194, 12-24; 195, 3-25; 197, 1-14;

198, 4-9; 199, 3-25; 200, 2-14; 201, 1-7, 19-25; 202, 6-22; 203, 11-25; 205, 3-8, 18-25; 217, 22-

25; 218, 1-21; Ex. 3SK, 70, 2-5; Ex. 14, pp. 7-8.

179.    Doe's allegations and evidence in Inv1, including his Response, constituted

possible violations of T9 by Roe and Roe 2 and met the threshold for QU to both conduct an initial

investigation and to open a formal investigation.  Ex. 14, pp. 15, 16; Ex. 86, pp. 6, 53-63, 68-70,

Ciii, Civ. Ex. 22, 6-19; Ex. 3 (SK), pp. 181, 8-11, 13-15, 18-23; See *infra*, ¶199.

180.    In his February 1st letter to Johnson and on April 6, 2017, Doe through counsel

inquired whether QU was amenable to discussing a way to resolve the disciplinary process without

a Hearing to avoid serious emotional distress to him. On April 11, 2017, QU informed Doe that it

was not amenable to resolving the disciplinary process without a hearing and that the Hearing

would proceed as scheduled. Having heard no response and becoming increasingly distressed and

anxious as he tried to prepare, on April 18, 2017, Doe emailed again stating he had received no

answers. Ex. 130, ¶¶37, 38; Ex. 56; Ex. 58; Ex. 134.

181.    At the hearing, Doe was not permitted to rebut any information or ask questions of

anyone.  He was only permitted to participate by answering questions posed by the Board.  Ex. 14,

pp. 16, 17; Ex. 35; Ex. 138; Ex. 1 (VC), Vol. 2, p. 560, 1-25; Ex. 6 (MB), pp.164, 11-25; Ex. 5

(CM), pp. 179, 13-25; 180, 1-25; Ex. 8 (MoD), pp. 154, 6-25; Ex. 12 (LC), pp. 102, 15-25; 103,

1-6; Ex. 9 (SF), pp. 143, 9-25; 144, 1-25; 145, 12-25; Ex. 138.

182.    The Board asked Doe and Roe less than 5 questions, and asked no questions of

Roe2, the investigator or any witnesses, relying primarily on the RR for its decision.  The Board

did not ask Roe or Doe about Doe's Response or Doe's allegations of sexual misconduct and

harassment by Roe other than asking Roe if she read Doe's texts, which she said she had not. Ex.

7 (KK), pp.146, 5-25; 147, 1-21; Ex. 9 (SF), pp.180, 5-23; 183, 2-18; 184, 1-25; 188, 1-6;1, 3-25;

212, 1-25; Ex. 4 (AH), pp.155, 1-12; Ex. 6 (MB), pp. 165, 7-23; 168, 10-13; 184, 1-25; 209, 23-

25; 210, 1-21; 225, 1-19; 226, 3-25; 227, 1-15; 228, 1-25; 229, 6-25; 234, 4-23; 235, 1-5, 9-15;

17-25; 236, 1-6, 17-25; Ex. 5 (CM), pp. 186, 21-25; 208, 9-13; 234, 1-5; 237, 3-15; Ex. 12 (LC),

pp.105, 2-11; Ex. 130, ¶¶57, 58.

183.     At the hearing, Roe and Roe2 did not deny the allegations Doe made in Response

or his three interviews.  At the hearing, Roe2 did not deny the allegations Doe made in Response

or his three interviews. Roe2 did not attend. Ex. 130 ¶¶58, 72; Ex. 86, Dxiv, Jx.

184.     Over the video conference, the Board appeared to be visibly moved by Roe's

emotion. When Contrucci retrieved Doe to escort him to the Hearing room, Contrucci was tearing

up and appeared to be visibly shaken by Roe's emotional interview and peered at Doe with disdain.

Ex. 130, Ex. 130, ¶¶ 62, 63.

185.     Roe was crying and upset at the Hearing. Ex. 3 (SK), pp. 343, 1-4; Ex. 130 ¶60.

186.     MB, Chair of the Board, believed it could be Doe's responsibility to prove he is not

responsible. Ex. 6 (MB), pp. 227, 20-25; 228, 1-12.

187.     The Board's rationale did not include the necessary elements for IPV.  The Board

concluded that Roe and Roe2 were credible "as corroborated by numerous witness statements,"

most of which contained no personal knowledge of the specific incidents under investigation and

relied on the "thoroughness of the investigative report along with the appendices" but not Doe's

Response in finding Doe responsible.  Ex. 51, pp, 1-2.

188.     The Board did not include a rationale for its sanctions, in violation of QU's training.

Ex. 51, p. 2; Ex. 64, p. 1; Ex. 88, pp. 1-8. Ex. 6 (MB), pp. 256, 6-25.

189.   The purpose of a sanction in T9 cases is not punitive, yet MB imposed a punitive sanction. Ex. 2TJ, pp. 298, 1-25; 299, 1-3; Ex. 3SK, pp. 201, 9-23; 202, 1-12, 16-17; Ex. 6MB, pp. 258, 3-25; 259, 1-25; Ex. 8MoD, pp. 50, 10-25; 51, 1-4; 52, 1-10.

190.   Doe was not permitted to attend Senior week, which is the culminating event at QU, and his family was not permitted to attend any social events tied to graduation which was a source of shame and humiliation for him and increased his anxiety.  No one at QU offered to consider any options to allow Doe or his family to attend even portions with safety for Roe in mind, despite numerous requests which was devastating to them all as they had all overcome challenges with Doe's disabilities. Ex. 130, ¶69; Ex. 132, ¶10; Ex. 131, ¶¶15, 16.

191.   In light of the struggle he had with Johnson and her unreasonable denial of his internship with no explanation, Doe had no reason to believe she would grant permission to attend any events or access campus resources.  See *infra*, ¶115.  Ex. 130, p. 73.

192.   TC was a witness for Roe who was interviewed in INV1 and was her advisor in a subsequent interview and at her Hearing.  The emails to Roe and Roe2 and Doe all contained notification they could bring an advisor to the interview but only Doe's contained the language 'who is not involved in the investigation.'  Ex. 1 (VC) Vol. 1, pp. 113, 2-5; 114, 6-15; 116, 11-25; 172, 14, 17-19; Ex. 8 (MoD) pp. 147, 21-25; 148, 10-18; Ex. 12 (LC), p. 102, 7-16; Ex. 2 (TJ), pp. 173, 14; 174, 1-7; 224, 8-20; 225, 1-21; Ex. 6 (MB) pp. 161, 8-25; 214, 1-18; 215 1-18; Ex. 7 (KK), p. 133, 1-15; Ex. 4 (AH), pp. 188, 12-25; 190, 1-25; 335, 1-25; 337, 2-17; 378, 4-25; Ex. 1 (VC), Vol. 2, pp. 376, 9, 18-24; 467, 10-20; 481, 6-9; Ex. 9 (SF), p. 141, 15-25; Ex. 86, pp. 18, 72, 73; Ex. 92; Ex. 130, ¶59.

193.    QU did not alert Doe to the fact that TC had been involved in numerous T9 investigations as a witness so Doe could address related credibility issues or conflicts with investigators or in his Response.  Ex. 86.

194.    Doe's father was his advisor in two interviews, provided relevant information to the investigators who declined to interview him as witness or include his information in the RR. Ex. 3 (SK), pp. 270, 1-8.  See *infra*, ¶20.  Ex. 132, ¶5.

195.    Doe was shocked when he heard Contrucci's angry and defensive summary during which he addressed the concerns Doe raised in his Response about bias for the first time and told the Board that Doe had been untruthful when Doe wrote he had provided the cease and desist letter to Contrucci in August.  Doe was devastated when he could not respond to the summary at the Hearing and defend himself in such a serious matter where he believed he was facing at least a 1 year suspension. Ex. 6 (MB), pp. 231, 1-14; Ex. 5 (CM), pp. 231, 3-8; Ex. 9 (SF), pp. 220, 21-25; 222, 1-16. Ex. 130, ¶54, 56; See *supra* ¶63.

196.    Under QU's T9 policy an appeal will be granted if the appeal letter itself brings forward sufficient grounds, at which point the appeal officer has four options.  Ex. 14, pp. 19, 20; Ex. 2 (TJ), pp. 180, 1-25; 181, 1-22; Ex. 8 (MoD), pp. 143, 1-18;  Ex. 3 (SK), pp. 202, 13-25.

197.    Doe's appeal letter itself brought forth sufficient grounds on the 2 grounds that he raised but Drucker went behind the papers and conducted an ex parte investigation and determined that the appeal letter raised insufficient grounds on all bases but one because she "believed Vincent and Meghan and Sean and Terri." Ex. 8MoD, pp. 242, 18-20.  Drucker designated on appeal panel to decide which option to pursue regarding the issue of the investigation lasting more than 60 days, which is not an option in the Title IX policy.  Ex. 14, p. 15; Ex. 93; Ex. 94; Ex. 95; Ex. 8 (MoD) 175, 11-25; 176, 1-20; 177, 1-25; 189, 12-25; 190, 17-25; 191, 17-25; 192, 23-25; 193, 1-9, 22-

25; 194, 1-13; 195, 7-25; 196, 1-25; 197, 1-25; 198, 1-25; 199, 1-25; 200, 1-25; 201, 1-21; 202, 1-7, 14-25; 203, 1-7, 24-25; 204, 1-3,17-25; 205, 1-25; 207, 1-20; 208, 8-15; 18-25; 209, 1-24; 210, 6-25; 211, 1-25; 212, 7-25; 213, 9-25; 214, 7-25; 215, 7-10; 216; 2-25; 217, 1-23; 218, 1-25; 219, 1-25; 220, 13-18; 221, 6-25; 222, 1-10; 14-25; 224, 5-23; 225, 1-12; 226, 9-25; 227, 1-25; 228, 6-25; 229, 1-14; 231, 1-25; 232, 1-22; 233, 1-25; 234, 1-25; 235, 1-25; 236, 1-25; 237, 12-25; 238, 4-23; 239, 7-25; 240, 6-10; 241, 10-17, 25; 242, 1-21; 243, 8-14, 21-25; 244, 1-25; 245, 1-25; 246, 1-7; 247, 5-25; 248, 14-25; 249, 1-25; 250, 1-25; Ex. 1 (VC), pp. 255, 13-25; 402, 1-25; 403, 1-25; 404, 1-12, 13-19; 573, 3-12; 17-25.

198.    Doe told QU that he preferred not to file a formal complaint because he did not want to escalate the matter or face harassment or retaliation by Roe but did so to have his defense investigated. Ex. 2 (TJ), pp. 239, 16-25; 240, 1-22; 246, 8-22.  Ex. 96; Ex. 130, ¶41.

199.    Johnson determined there was reasonable cause to open a formal investigation based on Doe's complaints and that Doe's Response met that threshold which is "if what they said happened could have violated the policy." Ex. 3 (SK), p. 181, 8-23; Ex. 9 (SF), pp. 133, 17-25; 134, 1-8; Ex. 12 (LC), pp. 133, 18-25; 134, 1-8; Ex. 7 (KK), pp. 127, 21-25; 128, 1-13; 131, 2-17.

200.    Doe's formal complaint was based on the same facts and events as INV1.   Ex. 40; Ex. 60, pp. 22-23; Ex. 12 (LC), pp. 152, 6-10; Ex. 86.

201.    Doe filed the formal complaint on February 27, 2017. QU took almost two months to begin an investigation after Doe's formal complaint, when investigators contacted him on April 20, 2017 for an interview. Ex. 140; Ex. 60, pp. 1, 2.

202.    INV2 took longer than 60 days and QU did not communicate with Doe about the reasons for its delay in investigating his formal complaint, in violation of the T9 policy.  Ex. 60, p. 17. Ex. 14, p. 15; Ex. 2 (TJ), pp. 248, 8-23; Ex. 12 (LC), pp. 122, 1-21.

203.     QU contacted Roe before April 18th before contacting Doe about his complaint on April 20th.  See ¶101, *infra*.  Ex. 59; Ex. 2 (TJ), pp. 271, 22-25; 272, 1-25.

204.     QU interviewed Roe right after Doe and then conducted 5 witness interviews for Doe, including his mother and father, and none for Roe.  Ex. 60, pp. 2, 11, 15-22; Ex. 7KK, pp. 261, 20-25; 262, 1.

205.     QU did not interview a witness that was identified as having relevant information earlier.  See *infra* ¶105.

206.     QU did not permit Doe's parents to review their notes when they requested to as QU did for Roe's in INV1.  Ex. 1 (VC), Vol. 1 pp. 188, 10-25; 189, 15-23; 228, 10-23. See ¶105, *supra*.

207.     The investigators completed their investigation of Doe's complaint that spanned the same time frame and facts that Roe's did on May 12, just 9 days after interviewing Doe and before they interviewed one of Doe's witnesses.  Ex. 60, pp. 2, 17.  Ex. 12 (LC), pp. 170, 8-25; 174, 2-25; Ex. 141.

208.     INV2 was an independent and separate investigation from INV but investigators did not conduct independent investigation and interview all relevant witnesses but instead relied on the RR and the Board's findings of responsibility against Doe to conclude that Roe was not responsible for any violation of a QU code. Ex. 60, pp. 22-23. Ex. 12LC, pp. 120, 5-8; 148, 1-23;149, 3-25; 150, 1-25; 151, 1-25; 152, 6-25;  153, 1-25; 154, 3-25; 190, 11-25; 191, 1-2; Ex. 7KK, pp. 242, 14-25; 243, 1-23; 262, 1-25; 263, 1-25; Ex. 3SK, pp. 307, 10-25; Ex. 2TJ, pp. 282, 14-25; 285, 4-25; 286, 1-25; 287, 9-18; 288, 8-25; 289, 1-11; 300, 1-25; 301, 2-6, 22-25; 316, 10-25; 317, 1-9; 318, 5-18;

209.    Roe was not upset or emotional at her interviews in Inv2, but merely "inconvenienced." Ex. 7 (KK), pp. 266, 21-25.

210.    Keith and Carney disregarded Doe's claims of fear, despite the fact that their report contained his statements that he was unsafe and afraid, as did other documents they relied on. Carney disregarded Doe's claims of fear because he went back to Roe's apartment yet believed Roe's claims of fear even though she repeatedly went back to Doe's place and Carney may have treated INV2 differently if Doe was a female. Ex. 60, pp. 8, 25; Ex. 99; Ex. 12 (LC), 161, 11-14; Ex. 7 (KK), pp. 280, 1-25; 281, 1-10; Ex. 12 (LC), pp. 161, 11-25; 162, 163, 164, 1-25; 165, 1-11; 175, 20-25; 176, 1-9, 17-25; 177, 1-14; Ex. 22, pp. 8.

211.    The investigators relied on inaccurate timeline to find Roe not responsible in Inv2 relying on Roe's word in her interview, despite that RR and evidence that conflicted with Roe's statement. Ex. 60, p. 25; Ex. 99; Ex. 86, pp. 60-61; Dviii; Ex. 12 (LC), pp. 146, 17-25; 147, 1-25; Ex. 7 (KK), pp. 236, 21-25; 264, 1, 13, 21, 25; 265, 1-25;

212.    Investigators in INV2 relied on what Doe wrote in his Response rather than analyzing the facts to find Roe not responsible for IPV.  Ex. 60, pp. 10, 24.

213.    On May 26th, Doe raised concerns about the inaccurate timeline and facts in INV2 report. Johnson did not look into Doe's concerns or talk with investigators, but replied almost two weeks later, that the investigators did nothing wrong and that Doe had no recourse if he did not agree per QU's policy.  Ex. 99; Ex. 12 (LC), pp. 204, 18-22; Ex. 2TJ, pp. 325, 1-25; 326, 1-25; Ex. 7 (KK), pp. 275, 3-14; 276, 4-25; Def's Answer ¶¶149, 150.

214.    QU used the same evidence in both Inv1 and Inv2, LC and KK concluding in INV2 that  Roe and Doe both equally and willfully engaged in certain conduct,  the content of texts was unclear and subjective,  they would both purposefully re-engage  with each other after breaking up

at different points, that the past practice and conduct in timing of the communications resulted in groomed and accepted behavior,  and that there was no pattern of behavior to establish the requisite power and control in the relationship.  Ex. 60, pp. 5, 22, 23 and 24; Ex. 12LC, pp. 156, 11-25; 157, 8-19; 158, 1-15; 159, 4-25.

215.    On January 28, 2017, Kalagher was informed that Roe was continuing to harass Doe.  Kalagher responded that the only way QU could act would be if Doe filed a claim of retaliation or harassment. Ex. 27; Ex. 1 (VC), pp. 367, 3-25; Ex. 7 (KK), pp. 54, 7-19; 55, 15-25; 56, 2-11, 19-25; 57, 1-15; Ex. 5 (CM), pp. 200, 3-21; 203, 13-25; Ex. 9 (SF), pp. 201, 2-22.

216.    In Doe's Response, he raised QU's failure to act on Roe's harassment. Ex. 22, pp. 1, 21; Ex. 1 (VC), pp. 2, 421, 9-10, 12; 16-23; 422, 1-18, 20; 423, 1-20; 432, 16-25; Ex. 2 (TJ), pp. 228, 1-25; 229, 7-23; 261, 10-25; Ex. (AH), pp. 357, 14-25; 358, 2-25; 359, 1-3, 10-18; Ex. 5 (CM), pp. 191, 10-25.

217.    Continuing violations of NCO's or harassment during an investigation to IPV could be evidence of the underlying pattern of IPV. Ex. 1 (VC), pp. 367, 3-25; Ex. 7 (KK), pp.54, 7-19; 55, 15-25; 56, 2-11, 19-25; 57, 1-5; Ex. 5 (CM)200, 3-21; 203, 13-25; Ex. 9 (SF), pp. 201, 2-22.

218.    Doe requested that Roe's harassing and retaliatory behavior be provided to the Board since it showed she was not afraid of him. Kalagher provided only one report of Roe's continuing harassment to the Board for its consideration.  Ex. 102. Ex. 130, ¶¶20, 42, 72.

219.    QU was aware of Doe's disabilities since he was a student at QU and specifically since October 2016 and that he was extremely stressed and anxious due to QU's handling of his case and the continued harassment by Roe. Ex. 5CM, pp. 45, 20-25; 46, 1-25; Ex. 1VC, pp. 70, 18-25; Ex. 2TJ, pp. 190, 17-20; 191, 220, 6-23; 1-25; 259, 4-21; 260, 1-9; 264, 24-25; 265, 1-3; 275, 5-6, 9-11; 276, 6-13; Ex. 3SK, 229, 24-25; 230, 1-25; 313, 13, 21-25.  Ex. 4 (AH); Ex. 103.

220.     Doe spoke with his therapist about his anxiety over the unfair investigation and time pressure to respond to the lengthy document and to get assistance in receiving extension due to length and complexity of the RR in combination with his disabilities. Affidavit.  Ex. 130, ¶30.

221.     February 6, Doe also provided to QU a letter from his psychiatrist documenting Doe's disabilities, medication and treatment history, and stating that "the current investigation has been detrimental to [Doe's] health and well-being, causing extreme stress and anxiety, in large part because he feels it has been very biased and he is not being given a fair hearing…a hearing under these circumstances could set off a downward spiral of anxiety and depression of a magnitude he has never had to deal with." Ex. 103.

222.     In February, Johnson knew Doe was extremely stressed and was having trouble academically after he had raised concerns of being treated unfairly and being the victim of sexual misconduct yet she never spoke with him or addressed his concerns. Ex. 2 (TJ), pp. 40, 3-17; 220, 16-23; 221, 1-25; 222, 1-25. Ex. 130, ¶¶36, 37.

223.     QU did not take Doe's disabilities into account with respect to his underlying conduct or his credibility in interviews, even though it may have been material. Ex. 9 (SF), pp. 109, 17-25; 110, 1-2, 16-19; 111, 23-25; 112, 1-25; 113, 1-25; 114, 9-25; 197, 16-25; Ex. 12 (LC), pp. 72, 17-25; Ex. 8 (MoD), pp. 138, 1-23; Ex. 139, pp.1-18, 22-25; 140, 1-6; Ex. 5 (CM), pp.120, 1-23; Ex. 6 (MB), pp. 196, 8-22; Ex. 7 (KK), pp. 102, 16-25; 103, 1-7; Ex. 1 (VC) 502, 6-10, 16, 20-22; 503, 12-25; 504, 1-21.  See *supra*, ¶55.

224.     Federal and state laws, OCR and QU's T9 policy require the T9 team (investigators and Board members), to be trained annually on TIX and on numerous topics, including how to apply the standard preponderance, how to apply definitions of sexual

misconduct, respondents' rights, how to conduct an investigation, how to write a report, how to assess credibility, and how to conduct an appeal, which training is the responsibility of and implemented by Kalagher. Ex. 2 (TJ), pp.55, 3-14; 115, 6-25; 116, 1-25; 117, 1-25; Ex. 9 (SF), pp.118, 10-25; 119, 1-25; 120, 21; 16-22; Ex. 3 (SK), pp. 80, 14-24; 107, 8-14; 113, 10-25; 114, 3-21; 115, 1-24; 118, 9-25; 127, 2-5; 161, 12-25; 162, 5-25; 163, 1-13; Ex. 5 (CM), pp. 127, 1-25; 137, 14; 138, 1-24; 139, 1-16; Ex. 8, pp. 100, 19-25; 101, 1-25; 128, 13-25; 129, 1-25; 130, 1-6; 131, 12-25.

225.    SK created training materials that he used to train the T9 team, which included templates and power point presentations.  Ex. 64; Ex. 88; 142; Ex. 2 (TJ), pp.121, 24-25; 122, 1-4; 123, 4-22; 124, 1-15; 125, 3-8, 17-25; 126, 1-7; 150, 14-21; Ex. 3, pp. 156, 1-25; 132, 1-18; 133, 1-25; Ex. 1(VC), pp.113, 2-22; Ex. 7 (KK), pp.114, 16-25; 116, 18-25; Ex. 6 (MB), pp.111, 11-21; 112, 4-24; 113, 5-25; 114, 17-25; 115, 1-25; Ex. 8 (MoD), pp. 131, 2-11; 160, 18-25; 162, 2-22.

226.    QU did not require attendance at the T9 trainings, keep records of which employees attended or evaluate T9 employees on their work. Ex. 2 (TJ), pp. 119, 5-15; 120, 1-5; Ex. 8 (MoD), pp. 102, 1-4, 23-25; 103, 1-15; 104, 24; 105;1-22; Ex. 6 (MB), pp. 87, 8-25; 91, 21-24; Ex. 3 (SK), pp. 122, 22-25; 123, 1-18; 124, 5-15; 125, 1-25; 134, 2-17; Ex. 1 (VC), pp. 76, 1-5, 8-14; 77, 1-17; 580, 2-15; Ex. 9 (SF), pp. 105, 5-25; Ex. 12 (LC), pp. 54, 1-25; 55, 21-24; Ex. 4 (AH), pp. 98, 12-24; Ex. 7 (KK), pp. 70, 5-9; 72, 19-22; 73, 2-4.

227.    VC and AH did not receive training on how to make credibility determination. Ex. 1 (VC), p. 524, 8-11; Ex. 4 (AH), pp. 143, 1-6.

228.    MB testified that QU does not have to prove each element of IPV and that one instance is sufficient to establish a pattern under IPV. Ex. 6 (MB), pp. 284, 1-15; 285, 1-25; 286,

1-25; 287, 1-3; 288, 1-25; 289, 10-20; 290, 1-20.

229.    The T9 team is required to follow QU's T9 policy and procedures because that is

fair and because it provides reasonable notice to both students and QU of what each can expect

from each other. Ex. 5 (CM), pp. 121, 4-7; 25; 122, 1-11; 125, 6-25; 126, 15-24; Ex.

9 (SF), pp.115, 4-23; 117, 15-25; Ex. 12 (LC), pp. 75, 22-25; Ex. 1 (VC), pp. 81, 12-22; 226, 12-

16; Ex. 8 (MoD), pp. 122, 1-17; 126, 1-18; 127, 22-25; 128, 1-25; Ex. 3 (SK), pp.158, 3-14; Ex.

2, pp. 143, 5- 23; 144, 16-23; Ex. 13, pp. 49, 22-25; 50, 1-25; 53, 9-16; Ex. 12 (LC), pp. 77, 17-

25; 78, 1-7.

230.    The QU T9 policy and T9 require responsible employees to promptly report any

information that could be a possible violation of T9 that they know or have reason to know

whether a complainant's wants it to or decline to cooperate or participate, or files a formal

complaint and QU is required to promptly conduct an initial investigation.  Ex. 2 (TJ), pp.126, 8-

25; Ex. 5 (CM), pp.141, 2-24; 142, 10-25; 143, 1-6; Ex. 9 (SF), pp. 120, 22-25; 121, 8-25; 122,

1-8; Ex. 10 (MaD), pp. 51, 22-25; 52, 1-25; Ex. 6 (MB), pp.138, 1-14; Ex. 12 (LC), pp. 94, 23-

25; 95, 3-25; 96, 6-24; 97, 1-25; Ex. 4 (AH), p. 184, 10-25; Ex. 3 (SK), pp. 163, 23-25; 164, 1-

25; 165, 1-25; 256, 23-25; 257, 1-25; Ex. 8 (MoD), pp.158, 8-25; 159, 1-24; 160, 1-18; 205, 9-

25; 206, 1-25; 207, 1-24.  Ex. 14; T9 Ex. 14, p. 5; Ex. 65, p. 4; Ex. 66, pp. 14, 5; Ex. 79, p. 4.

231.    SK and TJ and MD were responsible for editing and revising the T-IX policy,

annually and there have been no substantive changes over the years. Ex. 2 (TJ), pp. 70, 7-16;

139, 3-23; Ex. 3(SK), pp. 58, 1-20; 61, 7-25; 62, 1-20; Ex. 8 (MoD), pp. 47, 11-18; 57, 16-18.

Ex. 116.

232.    SK required and trained QU's T-IX team to comply with OCR guidance. Ex. 3

(SK), pp. 111, 13-24.

233.     SK required and trained T9 team to put a rationale for a Board's sanction in its outcome letter. Ex. 2 (TJ), pp. 150, 14-15, 19-22; 151, 18-20, 23-25; 152, 1-22; 178, 2, 7, 9-23; 179, 7; Ex. 3(SK), pp. 133, 8-25; 136, 10-13; 137, 8-13, 16, 22-25; Ex. 7 (KK), pp.188, 4-5, 7, 10-16, 22-25; 189, 2-4; Ex. 6 (MB), pp. 114, 18-25; 115, 1-22; 123, 21-25; 124, 8-24; 125, 1-25; 126, 3-6; 14-16; Ex. 5 (CM), pp. 164, 5-9, 24-25; 165, 1-7; Ex. 12 (LC), pp. 131, 11-18, 20-24; 132, 1-18; 188, 17-24. Ex. 88; Ex. 64, p. 4;

234.     QU's T-9 policy promises its students that it will comply with Title IX.  Ex. 14, p. 1.

235.     QU's T-9 policy promises its students that it will provide proper notice to Respondents. Ex. 3 (SK), pp. 188, 7-15.  Ex. 14, p. 21.

236.     QU's T-9 policy promises its students that it will provide a fair process for respondents. Ex. 3 (SK), pp. 168, 9-11.  Ex. 14, T9, p. 6.

237.     QU's T-9 policy promises its students that it will be supportive of victims. Ex. 14, pp. 5.

238.     QU's T-9 policy promises its students that it will treat parties with respect throughout the process. Ex. 14, pp. 13, 14.

239.     QU's T-9 policy promises its students that it will address concerns of bias and/or conflict of interest of Committee members.   Ex. 14, p. 13.

240.     QU's T-9 policy promises its students that it will provide all documents and names of all witnesses who may be called at least 24 hours before the Hearing not TC. Ex. 14, pp. 13, 14.

241.     QU's T-9 policy promises its students that it will give the parties the right to challenge information and documents prior to the hearing.  Ex. 14, pp. 13, 14.

242.     QU's T-9 policy promises its students that parties may participate in the Hearing. Ex. 14, pp. 14, 16.

243.     QU's T-9 policy promises its students to require the Board to decide the matter by a preponderance of the evidence based on credible and convincing evidence.  Ex. 14, p. 9.

244.     QU's T-9 policy promises its students that it will require that investigators and the Board will use the definitions in the T9 policy.  Ex. 14, pp. 9-11.

245.     QU's T-9 policy promises its students that it will fully explain its Title IX grievance process to the parties.  Ex. 14, p. 6.

246.     QU's T-9 policy promises its students that it will require its employees to respond to complaints promptly, thoroughly and equitably and conduct unbiased, thorough and equitable proceedings.  Ex. 14, pp. 4, 8, 16, 18.

247.     QU's T-9 policy promises its students that investigators will develop a strategic investigation plan, including a witness list, information list, intended investigation timeframe, and order of interviews for all witnesses and respondent, which VC did not do. Ex. 3 (SK), pp. 185, 5-11; 17-25; Ex. 1 (VC), pp. 108, 5-13; Ex. 4, pp. 260, 15-20; Ex. 14, p. 16.

248.     QU's T-9 policy promises its students that it will give the respondents a right to present a defense.  Ex. 14, p. 6, 14.

249.     QU's T-9 policy promises its students that it will not permit witnesses to incidents or those otherwise involved in the matter before the committee to serve as advisers. Ex. 14, p. 17.

250.     QU's T-9 policy promises its students that it will maintain communication with the parties on the status of the investigation and overall process and if the procedures last longer than 60 days QU will communicate the reasons and expected timeline to all parties.  Ex. 14, p. 20.

251.    QU's T-9 policy promises its students that it will take steps to prevent the recurrence of the misconduct and correct its effects.  Ex. 14, p. 5.

252.    QU's T-9 policy promises its students that it will keep all records, files and proceedings appropriately private and will share material and information prepared or acquired under Title IX procedures only as necessary with investigators, witnesses and other relevant parties. Ex. 12LC, pp. 92, 17-25; Ex. 6MB, pp.118, 11-12; Ex. 4AH, pp. 160, 18-25; 161, 1-25; Ex. 14, pp. 5, 13-14.

253.    QU's T-9 policy promises its students that it will comply with ADA and will provide reasonable accommodations and modify its programs to permit students to use the T9 procedures.  Ex. 14, p. 9; Ex. 61, p. 71; Ex. 50, p. 5.

254.    QU's T-9 policy promises its students that it will give the parties the right to appeal the finding and sanction of the committee, in accordance with the appeal guidelines in T9 policy.  Ex. 14, p. 14.

255.    QU's T-9 policy promises its students that it will require the Board to assign appropriate sanctions in accordance with T9 policy (and the ("Code") Handbook."   Ex. 14, p. 16.

256.    Complainants are usually females and respondents are usually males in T9 cases. Def. Ex. N; Ex. 7 (KK), pp. 30, 18-19, 22, 24-25; Ex. 2 (TJ), pp. 91, 18-20.

257.    Using the word complainant and respondent is the balanced and neutral way to refer to the parties in a Title IX matter because using accused for a respondent when using complainant is not balanced and is a more negatively weighted term against the respondent. Using the word victim is more positively weighted for the complaining party and complainant is more neutral.  Ex. 2, (TJ) pp. 87, 9-25; 88, 1-15; 91, 18-23; Ex. 3 (SK), pp. 210, 1-25; Ex. 7

49

(KK), pp. 32, 2-18; Ex. 6 (MB), pp.128, 1-25; 129, 3-11; Ex. 5 (CM), pp.136, 14-25; Ex. 8 (MoD), pp.166, 21-25; 167, 1-17; Ex. 12 (LC), pp. 67, 18-25; 68, 3-25; Ex. 9 (SF), pp. 97, 3-19; Ex. 2 (TJ), 160, 19-25; 161, 1-12.

258.    When faced with a possible one-year suspension, which would have made him lose the tuition and credits for the fall semester and graduate a year later and the prospect of having to prove his innocence and respond to the voluminous RR, while studying for finals, Doe's anxiety escalated causing Doe to get a "D" heightened Doe's anxiety and depression. Ex. 1VC, Vol. 2, pp. 488, 1-20; 489, 9-16.  Ex. 130, ¶29.

259.    SK was an attorney, a leader in T-IX associations and had years of experience in student conduct and T9 cases and knew what a litigation hold was and that Doe's TRO hearing was taking place and shredded Doe's Hearing notes and papers, which is against T9 and QU's practice. Ex. 1VC, pp.11, 1-17; 16, 7-19; Ex. 2 (TJ), pp.18, 6-25; 19, 1-9; 20, 11-25; 21, 1-6; Ex. 3 (SK), pp.199, 1-13, 18-20; Ex. 8 (MoD), pp. 70, 9-22; 71, 1-18; Ex. 9 (SF), pp. 17, 15-22; 186, 11-25; 187, 1-3, 11-21; 193, 22-23; 194, 2-9; 207, 22-25; 213, 16-19; 236, 17-18; Ex. 6 (MB), 146, 19-20; 216, 4-22; 233, 11-13; 240, 25; 241, 1-2; Ex. 5 (CM) pp. 178, 4-25; 206, 9-13; 232, 20-25; 233, 1; Ex. 65, p. 10-12.

260.    KK was a state trooper with extensive trial experience, knew she was required to retain all documents since the TRO hearing and destroyed her notes of the interviews in Inv2, which is against QU's practice.  Contrucci and Carney preserved their notes for INV1 and INV2. Ex. 106, Ex. 107; Ex. 7 (KK), pp. 9, 20-25; 183, 8-14; 260, 10-19; Ex. 8 (MoD), pp.70, 9-22; 71, 1-18; Ex. 9 (SF), pp. 17, 15-22; 186, 11-25; 187,1-3, 11-21; 193, 22-23; 194, 2-9; 207, 22-25; 213, 16-19; 236, 17-18; Ex. 6 (MB), 146, 19-20; 216, 4-22; 233, 11-13; 240, 25; 241, 1-2; Ex. 5 (CM), pp. 178, 4-25; 206, 9-13; 232, 20-25; 233, 1; Ex. 12 (LC), pp. 137, 4-23; 179, 3-5, 23-25;

180, 1-10; 181, 11-12.

261.     QU Title 9 policy promises it will meet the complainant to inquire about and finalize complaint after reviewing the complaint.  Ex. 14, p. 21.

262.     Kalagher trained the QU Title IX team to use neutral terms of complainant and respondent and that language matters.  Ex. 88, pp. 9-15.

263.     QU's T9 policy used complainant and accused more than 51 times and used the word victim.  Ex. 14, pp. ii, b, 5, 13, 14, 16, 17, 18, 19, 21.

264.     In Doe's Response, he requested information about his disabilities and psychiatric background not be shared with complainants because "it is very personal and I would like it treated with the utmost confidentiality."  Ex. 22, p. 1.  Kalagher replied that if he wanted the Board to have access to his confidential information, it would need to be provided to the complaints. Ex. 118, p. 15. Ex 11 (MC), 12, 14-25; 13, 1-9; 25, 23-25; 26, 1-25; 54, 2-11; Ex. 8 (MoD), pp. 134, 4-17; Ex. 1 (VC) 229, 5-23; 230, 16-24; Ex. 3 (SK), pp.71, 5-19.

265.     On February 24, 2017, Doe again requested that the documents regarding his disabilities be given to the Board, but not the parties and Kalagher informed him if he wanted the materials shared with the Board he would have to share them with Roe and Roe2.  Johnson and Kalagher never discussed Doe's request with Cooper to check with ADA policy and confidentiality. Ex. 11 (MC), pp. 45, 9-20; Ex. 2 (TJ), pp. 278, 1-25; Ex. 130, ¶45.

266.     QU assigned a male and female investigator per its practice in Inv1 but assigned two females in INV2. Ex. 2 (TJ), pp.164, 1-11. Ex. 86; 60.

267.     QU Investigators will review a Response to a report to see if it materially changed the report or findings. Ex. 1 (VC), Vol. 2, pp. 493, 1-25; 494, 1-11.

268.     The RR contained relevant information that Doe never had an opportunity to

comment on since it was received after his Response. Ex. 1 (VC), Vol. 2, pp. 475, 18-25; 476, 1-20; Ex. 130, ¶35.

269.    Members of the T9 have personal experience with sexual violence against females, victim advocacy roles, affiliations with sororities and pro-feminist orientations that skewed them in favor of Roe and Roe2.  Ex. 2 (TJ), 38, 12- 25; 39, 11-17; Ex. 4 (AH), pp. 87, 3-25; 88, 1-6, 18-25; 420, 6-21; Ex. 7 (KK), pp. 296, 20-25; 297, 1-7, 18-25; 298, 1-8; Ex. 5 (CM), pp. 22, 21-25; 23, 1-15; 25, 14-25; 26, 1-5, 16-21; 34, 21-25; 37, 1-16, 19-25; 91, 3-18; 93, 4-25; 272, 12-23; Ex. 8 (MoD), pp. 98, 5-25;99, 1-25; 267, 22-25; 268, 2-6; 16-20; Ex. 12 (LC), pp.17, 11-17; Ex. 9 (SF), pp. 59, 16-20; 71, 1, 3-6; 62, 18-21; 73, 3-14; 74, 2-20; 75, 1-7; 103, 6, 17-25; 104, 1-8; 257, 5-20, 24; 259, 3-8.

270.    Complainants are usually females and respondents are usually males in T9 cases. Ex. 7 (KK), pp. 30, 18-19, 24-25; See *supra*, ¶256.

271.    After Doe received the RR at the end of October, Doe became increasingly anxious to go out to QU social events or to go on campus because Roe could easily have approached him either in retaliation or for the purpose of fabricating more charges against him, which caused Doe great concern because he felt QU would automatically continue to believe Roe and more charges would be levied. Ex. 130, ¶¶40, 74.

272.    QU scheduled a hearing before seeing Doe's Response and on the first day of classes, against advice from Cooper, did not even consider Doe's Response, refused to re-investigate or answer any of Doe's concerns, which increases Doe's anxiety and depression, causing him to see his psychiatrist to address the unfair investigation of past and ongoing harassment by Roe.  Ex. 130, ¶¶30, 32, 33, 36, 37, 38.

273.    Roe's continued breaches of confidentiality and harassment through her friends in

the spring, approaching him in public places and discussing the IPV investigation, ruined Doe's reputation and caused Doe to avoid QU and other places where he thought she or her friends may be and avoided campus so he would not have to see anyone and explain himself. Ex. 130, ¶¶40, 75; See Ex. 136.

274.    The extreme stress and anxiety from the continued manner in which QU handled the investigation is likely to affect Doe's life beyond his graduation. See Leibowitz deposition. It interfered with his studies, where he was hoping to have the best grades as he neared the end of school and was seeking employment, and his contact with friends, classmates and professors dropped off precipitously as the Hearing approached, leaving Doe anxious, depressed and fearful for his future.  Ex. 130, ¶¶40, 76 and 77.

275.     Kalagher created training materials on which he trained the T9 team on. Ex. 3 (SK), pp. Depo. 141, 24- 25, 142-151, 155, 20-25, 156 1-10, 133, 8-22; 132, 1-18.  Ex. 119, 143, 11-21; 144, 1-18.

276.    Dr. Jerome Liebowitz testified that the unfairness of QU's investigations and it's refusal to give Doe a fair hearing exacerbated Doe's depression and stress, leaving him with ongoing difficulties trusting people.  He testified that the trauma from QU's conduct caused a severe anxiety reaction in Dan and that his experiences from the investigation and hearing process will affect him in the future.  Ex. 136 (JL), pp. 71, 21-25; 72, 1-14; 78, 3-25; 79, 2-5; 86, 16-25; 87, 2-3; 133, 1-10; 134, 23-25; 135, 1-7.

277.    The threshold for conducting an initial investigation into a possible violation T9 violation is what the student said could be a possible violation of T9, which is lower than that for opening a formal investigation. Ex. 7 (KK), pp. 127, 21-25; 128, 1-13; see *supra* ¶199.

278.    The investigators in INV2 put a rationale in their report. Ex. 60, pp. 23-25.

279.     T-IX requires colleges to follow their policies.  Ex. 65, p. 8.

280.     OCR published additional guidelines to reinforce the rights of the respondent,

which TJ wrote "does not fundamentally change Quinnipiac's obligations policies or procedures.

See Ex. 126; Ex. 71.