UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE, *Plaintiff,* *v.* QUINNIPIAC UNIVERSITY, TERRI JOHNSON, SEANN KALAGHER, AND VINCENT CONTRUCCI, *Defendants.* | Civil No. 3:17-cv-364 (JBA) July 10, 2019 |

## RULING ON MOTION FOR SUMMARY JUDGMENT

In this action brought under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.* ("Title IX"), and state common law, Plaintiff John Doe alleges that Defendants Quinnipiac University, Terri Johnson, Seann Kalagher, and Vincent Contrucci treated him unfairly as a male respondent in a disciplinary proceeding and as a complainant in a related proceeding, in contravention of both Title IX and QU's own internal policies and procedures. Defendants move for summary judgment on all claims asserted by Plaintiff. For the reasons set forth below, the Motion is granted in part and denied in part.

## I.     Background and Summary Judgment Record

The Plaintiff, John Doe, was a male undergraduate student at Quinnipiac University from Fall 2014 until his graduation in May 2017. (Parties' L.R. Stmts. ¶ 1.) Defendant Quinnipiac University ("QU"), a private university located in Hamden, Connecticut, is a beneficiary of federal funds within the meaning of Title IX. (*Id.* ¶ 2.) Defendant Terri Johnson was QU's Associate VP

for Operations and University Title IX Coordinator. (Pl.'s Ex. 14 at 2.) Defendant Seann Kalagher was employed by QU as the Deputy Title IX Coordinator. (Pl.'s Ex. 3 at 74.) Defendant Vincent Contrucci was QU's Director, Office of Community Service. (Parties' L.R. Stmts. ¶ 5.) The 2015-2016 QU Title IX policy is applicable to Doe's claims. (Parties' L.R. Stmts. ¶ 6.)

Plaintiff was involved in a relationship with "Jane Roe 2" from May 2014 through January 2015. (Parties' L.R. Stmts. ¶ 10.) She graduated in May 2015 and has since resided in Boston. (Parties' L.R. Stmts. ¶ 11.) Plaintiff was in a relationship with "Jane Roe" from January 2015 through June 2016. (Parties' L.R. Stmts. ¶ 12.) According to the Title IX Investigation Report, ([Doc. # 11]), on June 28, 2016 Jane Roe reported to the University that she had a verbal argument with her boyfriend (Plaintiff) and that Plaintiff ended their relationship. (*Id.* at 3.) "She reported that she was accidentally struck while [Plaintiff] was attempting to grab her purse to throw her out of his apartment." (*Id.*) Roe "related that their relationship had been 'rocky' with [Plaintiff] swinging between periods of affection and care to highly aggressive behavior and verbal abuse." (*Id.*) She "reported that [he] had been physically violent with her in December." (*Id.*) She "also indicated that [his] previous girlfriend, [Jane Roe 2], had also suffered verbal abuse from [him] and that [Roe 2] had attempted to warn [Roe]." (*Id.*)

The Quinnipiac University investigators Audrey Heins and Defendant Vincent Contrucci ("investigators") interviewed Jane Roe on July 12, 2016 and July 28, 2016 and met with her for findings meetings on October 14, 2016 and October 19, 2016. (Parties' L.R. Stmts. ¶ 14.) They interviewed Jane Roe 2 on July 18, 2016 and met with her for findings meetings on October 14, 2016 and October 19, 2016. (Parties' L.R. Stmts. ¶ 15.) Jane Roe 2 never filed a formal complaint but after QU investigators interviewed her, QU opened an administrative complaint on her behalf against Plaintiff. (Parties' L.R. Stmts. ¶ 16.)

On August 22, 2016, the investigators notified John Doe via email that they were investigating a Title IX complaint and requested to meet with him to review the process, ask him questions and answer his questions. (*Id.* ¶ 17.) He was also informed that he could bring another person with him to the meeting who was not involved in the investigation. (*Id.*) Also attached to the meeting request was a "no contact" order, which directed him not to contact Jane Roe, Jane Roe 2 and another student, A.S. (*Id.*) Roe, Roe 2, and A.S. were similarly given "no contact" orders directing them not to contact Plaintiff. (*Id.*)

The investigators met with Plaintiff on August 23, August 26, August 31, September 28, October 25, and November 1. (Title IX Investigation Report at 1.) The first four meetings were interviews; the last two were findings meetings. (*Id.* at 73-74.) Between July 12, 2016 and October 5, 2016, the investigators interviewed twenty-one individuals—Roe, Roe 2, Plaintiff, and eighteen witnesses. (Parties' L.R. Stmts. ¶ 19; Title IX Investigation Report [Doc. # 11] at 1-2.) The investigators listened to Plaintiff's father, who was present at some of Plaintiff's interviews, but did not include his statements in the final report. (*Id.* ¶ 20.) John Doe's mother provided information to the investigators about the nature of John Doe and Jane Roe's relationship, and it was included in the report. (*Id.* ¶ 21.) The investigators interviewed Jane Roe's mother, (*id.* ¶ 22), and she told them that she had pictures of her daughter's neck after Plaintiff allegedly grabbed her daughter by the neck, (Ex. E to Mot. Summ. J. (Contrucci Dep.) [Doc. # 81-7] at 308:10-23).

John Doe informed investigators that Jane Roe's friends had been contacting him indirectly through his friends and harassing him about the ongoing investigation. (Parties' L.R. Stmts. ¶ 23.) He believed that it was a breach of confidentiality surrounding the investigation and the no contact order issued to Jane Roe on August 19, 2016. (*Id.*)

Doe contends that as "part of his defense to the charge of Intimate Partner Violence ("IPV"), Doe provided information in his three interviews . . . to show that Roe and Roe 2 were not afraid of or intimidated or controlled by Doe" and that "[t]hat information included possible T9 violations by" both women. (Pl.'s L.R. Stmt. ¶ 25.) Contrucci testified that QU did not open an investigation or an administrative complaint against Roe and Roe 2 because "[w]e looked into it, but we could not find any instance where we were able to corroborate whether or not that had actually happened." (Contrucci Dep. at 534:23-535:3.) At the end of October 2016, the investigators gave Doe a copy of their investigation report and recommendations, and QU later gave Plaintiff a final report in January 2017. (Parties' L.R. Stmts. ¶ 26.)

The investigators "found that John Doe may have violated the Title IX policy and student code of conduct and may be responsible for five charges, including Intimate Partner Violence, Assault, Breach of Peace, Disturbing the Peace and Property Damage and recommended that he be suspended for one year, if he accepted their findings." (Parties' L.R. Stmts. ¶ 27.) John Doe was given the standard three days to make a decision and inform the investigators whether or not he was accepting responsibility. (*Id.* ¶ 28.) On November 1, 2016, John Doe met with the investigators with his attorney present as his adviser. (*Id.* ¶ 29.) During this meeting, John Doe informed the investigators that he has disabilities, including ADHD, that affected his ability to process information. (*Id.*)

At his deposition, John Doe testified in substance that Jane Roe was treated more favorably than he during the investigation because Roe's witnesses were interviewed before he was and because Roe had more time to prepare everything. (*Id.* ¶ 30.) The investigators interviewed twelve of the witnesses before interviewing Plaintiff. He conceded that he was given multiple opportunities to speak with the investigators and when he asked for additional time to review the

investigation report and submit his response, extra time was provided to him. (*Id.* ¶ 31.) On November 1, 2016, John Doe and his adviser contacted Matthew Cooper in the Office of Student Accessibility seeking these accommodations, who approved an extension for John Doe to November 11, 2016 to decide if he was accepting responsibility. (*Id.* ¶ 32.) On November 9, 2016, John Doe requested another extension until November 12, 2016, which was denied. (*Id.* ¶ 33.) On November 11, 2016, John Doe accepted responsibility for Property Damage, i.e. breaking a glass door. (*Id.* ¶ 34.) He did not accept responsibility for the other four charges. (*Id.*)

On November 16, 2016, Matthew Cooper recommended that the Title IX Grievance Committee Hearing ("Hearing") be scheduled no earlier than February 1, 2017. (*Id.* ¶ 35.) On January 13, 2017, Mr. Kalagher scheduled the Hearing date for January 23, 2017. (*Id.* ¶ 36.) On January 20, 2017, John Doe submitted a 20-page response to the investigation report. (*Id.* ¶ 37.) On January 24, 2017, Mr. Kalagher re-scheduled the hearing for February 7, 2017 and informed John Doe that the investigator, Mr. Contrucci reviewed his Response and that the investigation report would not be amended, although on January 27, 2017, Mr. Kalagher provided John Doe with a revised investigation report. (*Id.* ¶¶ 38-39.) At this time, the other investigator, Ms. Heins, was no longer employed at QU. (*Id.* ¶ 38.)

On February 1, 2017, Plaintiff's counsel wrote Terri Johnson, contending that the manner in which the school had handled the investigation was "extremely problematic and unfair" and in violation of various laws, asserting that "Mr. Kalagher has a history of treating [Doe] unfairly and should not be involved in this investigation[,]" and seeking an investigation of the investigation itself. (Pl.'s Ex. 56 at 1, 11.) According to Plaintiff, "Kalagher handled a case of a QU student who assaulted [Doe]" and that "[d]ue to Mr. Kalagher's lenient discipline" in not removing the student from campus, the student assaulted Doe for a second time. (*Id.*) Doe asserted that his "parents

interacted with Mr. Kalagher and believe he was not supportive of [Doe] and was unprofessional in their interactions with them." (*Id.*)

Doe also claimed conflict with Megan Buda, a committee member who reported to Kalagher. Kalagher found no basis for conflict with her or himself. (Parties' L.R. Stmts. ¶¶ 42-43.)

On February 6, 2017, QU continued the Hearing until February 24, 2017. (*Id.* ¶ 41.)

On February 24, 2017, Mr. Kalagher provided John Doe with information for the Hearing. (*Id.* ¶ 46.) Doe renewed his request that Mr. Kalagher and Ms. Buda, Director of Student Conduct and the Hearing Committee Chair, be recused from the Hearing based on alleged conflicts, which Johnson denied. (*Id.* ¶¶ 46, 49.) He further requested that the documents regarding his disabilities be given to the Hearing members, but not the complainants. (*Id.*) Also, he requested that his claims that Jane Roe violated the no contact order and confidentiality be brought to the Hearing members' attention, as evidence of her lack of credibility and motive. (*Id.*)

On February 27, 2017, Ms. Johnson responded that she reviewed the underlying investigation and found that it was not biased or unfair and that "the university will not be opening an investigation into the ma[nn]er in which this Title IX investigation has been handled nor will there be another investigation performed as you requested." (*Id.* ¶ 47.) She also responded that the "Deputy Title IX Coordinator appropriately addressed the various issue[s] raised in regard to both your client and the Complainants." (*Id.*) The hearing was then rescheduled to March 3, 2017. (*Id.* ¶ 45.)

That same day, John Doe requested that his response and exhibits be considered a formal complaint against Jane Roe and Jane Roe 2, which was accepted the next day. (*Id.* ¶¶ 48, 50.) On March 1, 2017, Doe met with Mr. Cooper and obtained his recommendation for accommodations. (*Id.* ¶ 51.) On March 2, 2017, the day before the Hearing was to proceed, Doe filed the federal

Complaint commencing this case, ([Doc. # 1]), along with a motion for TRO and motion for preliminary injunction, ([Doc. ## 2, 3]). The Hearing was stayed pending oral argument on March 8, 2017 and ruling on the preliminary injunction motion. (*Id.*)

Plaintiff's motion for preliminary injunction was denied on March 31, 2017. ([Doc. # 26].) On April 5, 2017, Mr. Kalagher informed John Doe that the Hearing was rescheduled for April 21, 2017. (*Id.* ¶ 54.) On April 8, 2017 and April 19, 2017, John Doe again renewed his requests that Mr. Kalagher and Ms. Buda be recused from the Hearing. (*Id.* ¶ 55.) On April 18, 2017 and April 20, 2017, Ms. Johnson again denied these requests. (*Id.* ¶ 56.) On April 19, 2017, Mr. Kalagher informed Doe of the accommodations that would be provided to him at the Hearing: (a) to aid in his processing the information, all questions pertaining to a specific event and date would be kept together; (b) he would be allowed time (several minutes) to process questions and regroup, with assistance if necessary, in order to recall the context of the question at hand; (c) because of his difficulty sustaining attention and focus and the ease with which he tires cognitively, he would be given frequent breaks in the questioning (every 15-20 minutes), during which time he could "clear his head" and confer with his adviser. (*Id.* ¶ 57.)

Prior to the Hearing, the Committee was provided the investigation report and John Doe's Response. (*Id.* ¶ 59.) The Hearing was held for seven hours on Friday, April 21, 2017, with Doe in attendance with his attorney. (*Id.* ¶ 60.) The Title IX Grievance Committee composition was of mixed gender, as it consisted of Ms. Megan Buda, Ms. Courtney McKenna, and Mr. Stefano Fasulo. (*Id.* ¶ 61.) John Doe pled not responsible on all charges. (*Id.* ¶ 62.) Investigator Contrucci orally summarized the investigation report and response, reading from a document that he prepared, which was provided to the Committee members and Doe. (*Id.* ¶ 63.) No witnesses were called by the Committee. (*Id.* ¶ 65.) After recess, the Committee read the definitions for each of the charged

conduct violations and found John Doe responsible for each charge against each complainant. (*Id.* ¶ 67.) John Doe and Jane Roe each read their impact statements. (*Id.* ¶ 68.)

The Hearing Committee then announced the sanctions: that the no contact order would remain in effect; that Doe would be given a deferred suspension through graduation during which time any violation of policy would result in immediate suspension; that he was suspended from University-owned property without prior permission, except to attend classes; that he was prohibited from attending University sponsored events, including senior week, which restriction could be reviewed by the Title IX Coordinator after the 2017-2018 academic year; and that he would be required to adhere to the recommendations of the Title IX Coordinator regarding commencement, including his participation in the School of Business Graduation. (*Id.* ¶ 70.) On Monday, April 24, 2017, Mr. Kalagher emailed the decision letter to him. (*Id.* ¶ 71.)

On April 27, 2017, Ms. Johnson informed Doe that he could not walk at the graduate ceremony for the School of Business but could walk at the earlier graduation for the College of Arts and Sciences. (*Id.* ¶ 109.) Doe was also prohibited from attending any social events following the graduation. The restrictions were designed to prevent proximity between Doe and Jane Roe, as Roe was also graduating from the School of Business. (*Id.* ¶ 110.) Doe's request for reconsideration was denied by Ms. Johnson on May 1, 2017. (*Id.* ¶ 111.)

John Doe requested permission to be on campus during the last weeks of classes and through graduation and sought permission to accept a QU professor's offer of a summer internship. (*Id.* ¶¶ 112-113.) Ms. Johnson approved this request on May 11, 2017 for the internship program dates of July 10 through July 21, 2017. (*Id.*, Ex. 105 to Opp'n.)[1] Doe twice requested

---

[1] Plaintiff claims that his request was not limited to these dates but in support of this assertion refers the Court to an email from his attorney to Seann Kalagher, requesting permission

approval to participate in the internship on additional dates in June or July, which Ms. Johnson denied, as Jane Roe would be using the library and school of business building, where the internship was located. (*Id.* ¶¶ 114-115.)

On May 9, 2017, John Doe filed his appeal of the Title IX committee's decision and requested Ms. Johnson's recusal. (*Id.* ¶ 74.) He appealed on two grounds: (1) additional and/or new relevant information not available at the time of the Hearing; and (2) an error in the process of the abridgment of rights, as outlined in the Title IX policy, which materially impacted the outcome of the Hearing. (*Id.* ¶ 75.) Doe criticized Contrucci for omitting from the investigation report a copy of the cease and desist letter Doe's lawyer sent to Jane Roe on July 11, 2016, which states that Doe "reports you have been engaging in harassing and threatening conduct, uninvited and unwelcome visits, and repeated cell phone messages" and that "[i]f all contact between you and [Doe] does not cease immediately, we will be applying for a restraining order in the Superior Court." (Ex. 133 (Cease and Desist Letter) to Opp'n and Ex. 93 (Appeal) to *id.*) On May 15, 2017, Contrucci acknowledged that he had incorrectly told the committee that Doe failed to corroborate having sent a cease and desist letter. (Appeal at 5; Parties L.R. Stmts. ¶ 76.) Doe had emailed the letter to Contrucci on August 23, 2016. (*Id.*) While the letter was not included in his final investigation report, it was included as an exhibit to Doe's Response and thus provided to the Committee prior to the Hearing. (*Id.*)

On May 26, 2017, Ms. Johnson assigned Monique Drucker, Vice President and Dean of Students and former Title IX Coordinator, as the appeal officer, along with an appeal panel. (*Id.*

---

to accept the internship, with an attached brochure that lists those program dates. (*Id.*) Accordingly, the basis for Plaintiff's claim is unclear.

¶¶ 77, 79.) On June 23, 2017, Ms. Johnson sent Ms. Drucker's Appeal Decision Letter to Plaintiff, affirming the Hearing Committee's April 24, 2017 decision, with limited remand to the Hearing Committee for reconsideration based on the procedural misstep that the investigation took more than 60 days. (*Id.* ¶¶ 80, 82.) On July 15, 2017, the Hearing Committee determined that "although the investigation took more than 60 days, it would not have materially impacted the outcome, findings and sanctions." (*Id.* ¶ 83.)

*Plaintiff's Complaints Against Jane Roe and Jane Roe 2 for Violation of No Contact Orders*

On February 17, 2017, John Doe notified Mr. Kalagher and Ms. Johnson that he was harassed by two friends of Jane Roe. (*Id.* ¶ 87.) On February 22, 2017, QU Public Safety Officer Karoline Keith interviewed Doe regarding his claims that the no contact order was violated and on March 3, 2017, submitted her report to student affairs, finding no violation. (*Id.* ¶¶ 88, 89.)

Thereafter, on March 21, 2017, Ms. Johnson advised Doe by email that his complaints had been reviewed by Cindy Long Porter, who found that the information did not support charges being brought against Jane Roe. (*Id.* ¶ 90.) On March 27, 2017, Doe reviewed Keith's report in the presence of Ms. Johnson and Ms. Keith. (*Id.* ¶ 91.) The Hearing Committee was given a copy of the report before the Hearing. (*Id.* ¶ 92.)

On April 7, 2017, Doe reported to Ms. Johnson and Ms. Keith that he believed Jane Roe again violated the no contact order when she walked by him at a restaurant and said "I fucking hate you." (*Id.* ¶ 93.) On April 8, 2017, Ms. Johnson advised Doe that Ms. Keith would follow up on his earlier, Fall 2016 complaint, *supra* p. 3, about violation of the NCO and breach of confidentiality harassment/retaliation by Jane Roe by means of a friend whose name Doe did not know. (*Id.* ¶ 85.) Doe never received any substantive response regarding the results of this investigation. (*Id.*)

Ms. Keith interviewed Doe on April 12, 2017 about his April 7, 2017 complaints. (*Id.* ¶ 94; Ex. 55 at Bates 372.) On June 1, 2017, Ms. Johnson informed Doe that Mark DeVilbiss, Director of Residential Life, found that the information did not support charges against Jane Roe. (*Id.* ¶ 95.)

*Plaintiff's Formal Complaint Against Roe and Roe 2*

With respect to Doe's February 27, 2017 *formal* complaint, QU informed Doe that he could not bring a complaint against Jane Roe 2 because she was no longer a student. (*Id.* ¶ 97.) During the month of March 2017, QU's investigation of Doe's complaint against Roe awaited this Court's preliminary injunction ruling on March 31, 2017. (*Id.* ¶ 100.) On April 8, 2017 and April 18, 2017, Doe inquired as to the status of his complaint against Jane Roe and was advised by Mr. Kalagher that Jane Roe was notified of his complaint and that QU needed to schedule a meeting to speak with Doe further. (*Id.* ¶¶ 98-99.)

On April 20, 2017, QU investigators Karoline Keith and Lila Carney requested to interview Doe regarding his complaint against Roe, informing him that his response and attachments to the investigation report (on the complaints against Doe) would be the focus of the meeting. (*Id.* ¶¶ 101-102.) Doe identified witnesses, including his parents. (*Id.* ¶ 103.) On May 12, 2017, Ms. Keith interviewed Doe's mother and father by telephone. (*Id.* ¶ 104.) Doe's mother requested that Doe's aunt be interviewed and also that she and her husband be able to review Keith's notes of their interviews, both of which requests Keith declined. (*Id.* ¶ 105.)

On May 19, 2017, the investigators met with Doe to review their findings that by a preponderance of the evidence, Jane Roe was not responsible for sexual harassment, intimate partner violence, or stalking in violation of the University Title IX Policy or Student Code of Conduct Policy. (*Id.* ¶ 106.)

In the operative Second Amended Complaint ("SAC"), Plaintiff seeks damages and injunctive relief for alleged violations of Title IX and state common law. Plaintiff asserts that his rights have been violated in twelve separate counts:

- Count One—Title IX Claim for Erroneous Outcome of Disciplinary Hearing (against Defendant QU)

- Count Two—Title IX Claim for Selective Enforcement (against Defendant QU)

- Count Three—Title IX Claim for Deliberate Indifference (against Defendant QU)

- Count Four—Breach of Contract (against Defendant QU)

- Count Five—Breach of the Covenant of Good Faith and Fair Dealing (against Defendant QU)

- Count Six—Tortious Interference with Contract (against Defendant Johnson)

- Count Seven—Tortious Interference with Contract (against Defendant Kalagher)

- Count Eight—Tortious Interference with Contract (against Defendant Contrucci)

- Count Nine—Negligent Infliction of Emotional Distress (against all Defendants)

- Count Ten—Intentional Infliction of Emotional Distress (against all Defendants)

- Count Eleven—Negligence (against all Defendants)

- Count Twelve—Reckless and Wanton Misconduct (against all Defendants)

## II.   Discussion

### A.  Legal Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R.

Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

### B. Spoliation

Plaintiff claims that Defendant Kalagher shredded all the notes taken during the hearing in the first investigation and that Karoline Keith destroyed her notes pertaining to the second investigation. (Pl.'s Resp. to Defs.' Mot. Summ. J. [Doc. # 95] at 3.) Plaintiff argues that this spoliation of evidence precludes entry of summary judgment because the "hearing and [the second investigation] are at the core of all Doe's claims against the Defendants" and posits that an attorney like Kalagher and a former state trooper like Keith, both of whom knew about the pending lawsuit and litigation hold, should have known not to destroy evidence. (*Id.*) Defendants respond, perplexingly, that "[t]he undisputed evidence shows that this [is] not an intentional spoliation case[,]" and that Plaintiff has failed to make out the elements of a state tort claim for intentional spoliation of evidence, (Defs.' Reply [Doc. # 143] at 1), missing the point that Plaintiff does not assert a stand-alone spoliation cause of action and maintains instead that the spoliation "supports an adverse inference against Defendants sufficient to create a material issue of fact on all Defendants' identified grounds for summary judgment." (Pl.'s Resp. at 3-4.)

More pertinently, Defendants assert that Plaintiff's evidence does not establish that the notes at issue ever necessarily existed. (Defs.' Reply [Doc. # 143] at 1-2, n. 3.) Kalagher's deposition testimony states that as a matter of general practice, "[a]t the conclusion of the hearing, once the chairperson completes the letter, all of their materials, if they had them, paper materials would be given to me and we would -- I would shred them." (Ex. 3 to Pl.'s Opp'n at 199.) Kalagher also testified that he did this because he "didn't want extra copies of the case materials hanging around." (*Id.*) Kalagher did not testify whether notes were in fact taken in Plaintiff's hearing, just that when they exist, he shreds them. However, Megan Buda testified that she was "sure someone" had taken notes at the hearing. (Buda Dep., Ex. 6 to Pl.'s Opp'n at 233.)

Keith's testimony reflects a certainty which is even more problematic for Defendants. She testified that in the course of an investigation she creates handwritten notes, but that she no longer had those notes in this case because although she created them, she destroyed them, as she typically does. (Ex. 7 to Pl.'s Opp'n at 183.)

"A party seeking an adverse inference based on spoliation must establish '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.' " *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372, 376 (D. Conn. 2007) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

Kalagher and Keith were indisputably under a duty to preserve and "'[o]nce the duty to preserve attaches, any destruction of documents is, at a minimum, negligent.'" *Id.* (citation omitted). And with respect to state of mind, "a culpable state of mind is established by ordinary negligence." *Id.* (citing *Residential Funding Corp.*, 306 F.3d at 108).

Defendants conclusorily assert that because Plaintiff "has been litigating this case for almost a year without" these notes, "[a]t no time during the course of discovery has he been hindered from pursuing his claims." (Reply Supp. Mot. Summ. J. at 2.) But Defendants offer no explanation as to why the apparent destruction of hearing and investigation notes by officials who knew of the litigation hold was not, at a minimum, negligent.

"To establish the third prong of a spoliation of evidence claim, that the destroyed evidence is 'relevant' to a party's claims, that party 'must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. at 380 (quoting *Residential Funding Corp.*, 306 F.3d at 107). "However, because 'holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, . . . the level of proof that will suffice to support an inference in favor of the innocent party on a particular issue must be less than the amount that would suffice to survive summary judgment on that issue.'" *Id.* at 380–81 (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)).

The destroyed evidence relates directly to Plaintiff's claims that he was subjected to an unfair investigatory process in both his capacities as a respondent and complainant. With respect to the hearing notes shredded by Kalagher, there is no evidence in the record or argument by Defendants that the substance of those notes was preserved through incorporation into any other document or record. When the hearing took place, Plaintiff had already filed this action, and Plaintiff and QU had already litigated Plaintiff's motion to preliminarily enjoin QU from proceeding with the hearing. Defendants simply offer no justification for the destruction of evidence. Moreover, the documentary record in this case is notably devoid of written materials

15

showing the committee's reasoning process in reaching the findings that it did. From an investigation report and Doe's response, each of which total hundreds of pages in length including exhibits, the committee produced a findings letter of merely two pages. The committee members' contemporaneous notes during the hearing may well have shed light on the committee's deliberative process, credibility assessments of witnesses, and weighing of the evidence, all of which might have allowed Plaintiff to more effectively take deposition and trial testimony from committee members Courtney McKenna, Megan Buda, and Stefano Fasulo on the topic of the committee's decision-making process. Similarly, while Keith testified that she only destroyed the handwritten interview notes after having "typed the interview[,]" (Keith Dep. at 183), comparing Keith's contemporaneous handwritten notes with her official reports would have allowed a factfinder to determine whether Keith faithfully and neutrally transcribed her handwritten notes or whether she exercised discretion or selectiveness in turning the raw source material into official reports. Under these circumstances, a reasonable factfinder is entitled to determine whether the Title IX committee's hearing notes and Keith's handwritten notes likely contained evidence supporting Plaintiff's claim under Title IX that gender was a motivating factor in the decision to discipline him.

### C. Title IX Claims

Plaintiff brings three claims under Title IX—erroneous outcome, selective enforcement, and deliberate indifference. Although the elements of these claims differ, they all require Plaintiff to establish that QU discriminated against him on the basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .").

a.   Erroneous Outcome and Selective Enforcement Claims (Counts One and Two)

The Second Circuit has held that "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). "Plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories." *Id.* "In the first category," in what is called an erroneous outcome claim, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Id.* "In the second category, the plaintiff alleges selective enforcement[,]" which "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*

"Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* "If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." Moreover, "[a] plaintiff must . . . also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.*

In the Second Circuit, Title IX cases are analyzed under the *McDonnell Douglas* burden-shifting framework. *Doe v. Columbia Univ.*, 831 F.3d 46, 55–56 (2d Cir. 2016). In *Doe v. Columbia*, an appeal of the district court's grant of a motion to dismiss, the Second Circuit identified specific allegations pled by the plaintiff that supported an inference of sex discrimination, including that "[b]oth the investigator and the panel declined to seek out potential witnesses Plaintiff had identified as sources of information favorable to him" and "[t]he investigator and the panel failed to act in accordance with University procedures designed to protect accused students." *Id.* at 56-57. Additionally, the Second Circuit found relevant that plaintiff's allegations that "during the

period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students[,]" and "that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue." *Id.* at 57. Finally, the Second Circuit concluded that "[a]gainst this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault." *Id.*

Defendants argue that Plaintiff's erroneous outcome claim fails because his "claims are based on sheer speculation" rather than competent evidence, contending that Plaintiff provides neither direct nor indirect "evidence of gender bias on the part of the investigators, Hearing Committee, appeal officer, appeal panel, or any QU official for that matter." (Mem. Supp. Defs.' Mot. Summ. J. [Doc. # 81-1] at 4 (citation omitted).) Defendants rely on Plaintiff's unsurprising concession that no QU officials told him that they were going to find him responsible (in his capacity as respondent) because he was male or that Jane Roe was found not responsible (in the case in which he was a complainant) because of his gender. (*Id.*) Defendants further maintain that Plaintiff has no indirect evidence of systemic gender bias, as QU's policies concerning sexual assault are gender neutral, among other facts. (*Id.*)

Plaintiff responds that "statistics derived from data provided by the Defendants show men were treated less favorably than women for T9 violations at QU, and that QU treated females more favorably due to pressure from [the Department of Education Office of Civil Rights] and from the State of Connecticut to err on the side of females in T9 cases." (Resp. at 6.) Plaintiff further

maintains that the records "include[s] statements and actions of a key decision-maker ([investigator Lila] Carney) showing that gender bias motivated her actions"[2] as well as "overwhelming evidence that the defendants treated Doe differently than Roe throughout the entire process." (*Id.*)

Doe argues that Carney discriminatorily failed to credit his statement that Roe made him feel unsafe simply because he had returned voluntarily to Roe's apartment, while crediting Roe's claims that *she* felt unsafe despite the fact that she "repeatedly went back to Doe's apartment, refused to leave his car and his home, and followed him to his parents' house in Stamford[.]" (Opp'n at 7-8.) This evidences some support for Plaintiff's effort to establish "articulable doubt on the accuracy of the outcome of the disciplinary proceeding[,]" because QU investigated both Plaintiff's and Roe's responsibility on the charges of intimate partner violence in order to determine whether either exhibited "a pattern of behavior . . . used to establish power and control over another person through fear and intimidation." In order to determine whether a person was establishing power and control over another through fear and intimidation, evidence showing a

---

[2] Carney was asked why she did not believe Doe's statement that he felt "unsafe" just because he returned voluntarily to Roe's apartment. (Ex. 12 to Pl.'s Opp'n at 161-62.) Carney agreed that she did not credit this statement because Doe's actions suggested to her that he had not in fact felt unsafe. (*Id.*) Carney was further asked whether her analysis would have been the same had the complainant's (Doe) and respondent's (Roe) genders had been reversed—i.e. if a female complainant had made the same statement and engaged in the same actions as did Doe. Carney responded that she thought she would have reached the same conclusion, but that she "just [couldn't] imagine everything would have played out exactly the same if he were the woman and she were the man" because it was "hard for [her] to wrap [her] head around that scenario." (*Id.* at 163-64.) While Plaintiff characterizes Carney as having testified that she may have treated the case differently and that the outcome might have been different if the genders were reversed, Carney also testified that she thought she would have reached the same conclusion but that she could not be absolutely certain because she had not been presented with that factual scenario.

complainant's degree of fear or lack of fear of the respondent is undoubtedly relevant. Plaintiff argues that bias is further apparent in Carney having found that Doe did not make any statements that he was in fear, despite contrary evidence that she included in her report. (*Id.* at 8.)

Plaintiff's selective enforcement claim "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."[3] *Yusuf*, 35 F.3d at 715. To establish selective enforcement, Plaintiff must show that he was similarly situated to Roe or Roe 2. He argues that:

(1) both Roes are similarly situated to him as complainants in the first investigation,

(2) Roe as a complainant in the first investigation is similarly situated to him as a complainant in the second investigation, and

(3) Roe as a respondent in the second investigation is similarly situated to him as a respondent in the first investigation.

(Opp'n at 8.) Further, because QU was obligated to and also "specifically promised its students it would treat complainants and respondents equitably in the T9 disciplinary process, Roe and Roe2 as complainants were similarly situated to Doe as a respondent in [the first investigation]." (*Id.* at 8-9.)

Defendants dispute that Roe or Roe 2 are proper comparators, arguing that the reason that the investigators did not pursue Doe's allegations against them was because "the investigators could not corroborate" his allegations, and because Roe 2 was no longer a student and thus not subject to disciplinary action. (Mem. Supp. Mot. Summ. J. at 7-8.) Defendants dispute that Roe

---

[3] Because of the overlapping evidence in these claims for erroneous outcome and selective enforcement, the Court analyzes the summary judgment record on these claims together in this section, identifying where the analysis applies only to one claim or the other.

was similarly situated to Doe, essentially because, in Defendants' view, Roe's complaint was correctly sustained by Defendants on the merits, and Doe's complaint was correctly denied on the merits. (*See id.* at 8 ("Jane Roe was not similarly situated to the plaintiff when the investigators decided not to charge her after the plaintiff made a formal complaint against her. Jane Roe was investigated and found not responsible for sexual harassment, intimate partner violence and stalking.").)

The bases for Plaintiff's claim that "[a]s complainants in [the first investigation], QU treated Roe and Roe2 more favorably than Doe in numerous ways[,]" include:

- Reporting and investigating Roe and Roe 2's allegations about Doe as Title IX matters, while ignoring Doe's reporting of stalking and harassment by both women. (*Id.* at 9-10.)

- Forcing Doe to file a formal complaint against Roe in order to have his allegations investigated, against Doe's express wishes, and not requiring Roe 2 to file any complaint at all in order to begin investigating her allegations. (*Id.* at 10-11.)[4]

- Using an incorrect definition of Intimate Partner Violence in Doe's hearing, which required fewer elements to be proved, while using the correct definition in the

---

[4] QU's Title IX policy provides that "Title IX requires the University to investigate all incidents about which the University knows or has reason to know to protect the health and safety of the University community" and "the University will undertake an investigation where appropriate even in cases where the alleged victim and/or complainant choose not to cooperate or participate." (Ex. 14 to Opp'n at 3.) The Title IX policy provides for both a formal "complaint and grievance procedure[]" as well as allowing for students to make "[i]nformal [c]omplaints." (*Id.* at 6.)

second investigation to find Roe not responsible for charges "based on the same evidence" in the same time frame. (*Id.* at 12.)[5]

Plaintiff also contends that gender discrimination can be inferred from the national backdrop of a heightened Title IX enforcement paradigm at the federal level, as well as the context of QU having been found to have discriminated against female students in violation of Title IX and remaining under court monitoring in that case through June 2016. (*Id.* at 13-15 (citing, *inter alia*, *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 90–91 (2d Cir. 2012) (affirming entry of permanent injunction against QU after the University was found in a bench trial to have violated Title IX by failing to afford equal participation opportunities in varsity sports to female students)).)

Taken together, Plaintiff argues that this evidence creates a reasonable inference that "QU felt pressured to and was motivated to favor female students over male students in its T9 disciplinary proceedings" because it was "focused on insulating itself from accusations that it had failed to protect female students from sexual harassment and misconduct" to avoid the potential for litigation and loss of federal funding. (*Id.* at 15.)

Plaintiff points to statistical evidence showing that "[r]eporting increased over the years at QU with many more women bringing complaints against men than men against women[,]" that QU investigated 38 Title IX complaints brought by females against males and only 4 complaints brought by males against females, and that QU found "19 men responsible when accused by a woman, and only one woman responsible when accused by a man[.]" However, Plaintiff proffers

---

[5] "QU investigated the same set of facts and time frame regarding Roe and Doe's relationship in" the two investigations, and concluded in the second investigation that "the behavior was mutual and did not have the necessary one-sided power dynamic for [intimate partner violence], finding Roe not responsible" while investigators in the first investigation found Doe responsible for intimate partner violence, based on the same evidence. (*Id.* at 12-13.)

no explanation why a higher complaint rate by women should support an inference of QU's gender bias. Plaintiff further provides no data to assess differential investigation *rates* between genders nor data reflecting how many accused men and women were found *not* responsible. While Plaintiff's statement of additional material facts (¶ 149), and the Court's analysis of the data in Defendant's Ex. N suggest that between 2012 and 2017, 50% of men were found responsible when accused by a woman and one third of women were found responsible when accused by a man, the very small sample of investigations of women accused by men (3), standing alone, without further explanation or additional data, does not in and of itself seem to support an inference of QU's gender bias in Title IX investigations.

Plaintiff also faults QU for imposing harsher sanctions on males accused by females than the reverse but similarly provides no comparative analyses to rule out disparities in the underlying conduct being sanctioned.

Moving beyond statistical evidence, Plaintiff argues that "QU's actions in the disciplinary proceedings reflect a chauvinistic attitude" insofar as Carney's "acceptance of Roe's claims of fear but not Doe's reflects stereotypical gender roles." (Opp'n at 17.) Plaintiff also argues that QU's failure to act in accordance with its own procedures (as detailed with respect to the breach of contract claim, *infra* at pages 32-42) similarly supports an inference of gender discrimination.[6]

At least four parts of the record minimally suffice to establish that there are undisputed facts and genuine disputes of material fact that preclude a grant of summary judgment on

---

[6] Plaintiff additionally asserts that QU's Title IX policy language "favors females" because the policy used the word "victim" instead of "complainant," thus tilting the process against the accused ("respondents"), because it presupposes liability. However, this language is gender-neutral on its face, since of course both male and female students may be complainants or respondents, and thus does not support any inference of gender bias.

Plaintiff's Title IX claims for erroneous outcome and selective enforcement. Given the voluminous summary judgment record, the remaining alleged factual disputes need not be additionally analyzed.[7]

First, the record reflects a genuine dispute of material fact as to whether QU applied materially disparate standards to the respective claims of intimate partner violence made by Plaintiff and Jane Roe.

In the Title IX Grievance Committee Hearing Outcome summary, John Doe was found to be responsible for intimate partner violence ("IPV") against Jane Roe under the following standard for IPV:

> University policy defines Intimate Partner Violence as a pattern of behavior that is typically determined based on the repeated use of words and/or actions and inactions in order to demean, intimidate, and/or control another person. This behavior can be verbal, emotional and/or physical.

(Ex. 51 to Pl.'s Opp'n.) However, QU's Title IX Policy defines IPV using a standard that is arguably more difficult to satisfy, as it contains additional elements:

> Relationship violence is a pattern of behavior in an intimate relationship that is used to establish power and control over another person through fear and intimidation. A pattern of behavior is typically determined based on the repeated use of words and/or actions and inactions in order to demean, intimidate, and/or control another person. This behavior can be verbal, emotional and/or physical. Examples include, but are not limited to: striking another person (slapping, punching, etc.), property damage, reckless behavior, name calling and insults, public humiliation, harassment directed toward friends and acquaintances, and verbal and/or physical threats.

---

[7] For example, the Court need not and does not reach Plaintiff's arguments claiming that QU failed to properly investigate his claims that Roe violated the non-contact order by encouraging her friends to harass him.

(Ex. 14 to *id.* at 11.) Notably, unlike the IPV standard under which the Committee based its outcome adverse to Plaintiff,[8] the Title IX policy defines IPV as a pattern of behavior occurring "in an intimate relationship" and "that is used to establish power and control over another person through fear and intimidation." (*Id.*) Defendants contended at oral argument that the outcome letter merely failed to correctly state the full, correct standard, which was in fact applied, but a factfinder must make that determination.

Second, Defendants do not dispute the fact that when Plaintiff claimed that he had been subject to harassment by Jane Roe as a result of her refusal to accept his termination of their relationship, he was required to file a formal complaint against Roe in order to have his affirmative claims against Roe and his defense claims investigated, while similar formal filing requirements were not imposed on Roe 2 in order to have her claims against Doe investigated.

Third, Plaintiff argues that Carney discriminatorily failed to credit his statement that Roe made him feel unsafe simply because he had returned voluntarily to Roe's apartment, while crediting Roe's claims that *she* felt unsafe despite the fact that Roe "repeatedly went back to Doe's apartment, refused to leave his car and his home, and followed him to his parents' house in Stamford[.]" (Opp'n at 7-8.)[9] Defendants provide no explanation as to why a reasonable factfinder could not draw an inference of gender bias on the basis of this apparently disparate treatment.

---

[8] Oddly, the Committee used the correct standard for assessing Jane Roe 2's IPV charge against Plaintiff. Whether this cuts in favor of or against Defendants' argument that the correct standard was in fact also applied to Jane Roe's charge against Plaintiff is a question for a factfinder to determine.

[9] Additionally, the Title IX investigation report on John Doe's complaint concludes that his claim of stalking by Roe could not be substantiated in part because after he broke up with her on one occasion, he drove to her apartment the next day and left a gift card for her brother. (Ex. 60 to Pl.'s Opp'n at 25.) Lila Carney testified that she did not believe Plaintiff's claim that Roe's actions

Fourth, Kalagher's and Keith's destruction of the hearing committee and handwritten interview notes will subject QU's witnesses (including Kalagher and Keith, as well as the Committee Hearing members) to additional credibility assessments by the factfinder on whether the proceedings concluding in the decision to discipline Plaintiff were tainted by gender bias.

Plaintiff's proffered record evidence demonstrates that there is a triable issue of fact on whether he was subject to an unfair process when compared to the treatment of the female students under the *McDonnell Douglas* burden-shifting framework, which suffices to meet his minimal burden of establishing his prima facie case that gender was a motivating factor in the decision to discipline him, for both his claims of erroneous outcome and selective enforcement.

Having established his prima facie case for the purpose of summary judgment, the burden shifts to Defendants to offer some legitimate, non-discriminatory reason for the apparently disparate treatment. At oral argument, Defendants conclusorily stated their position that the reason Plaintiff was treated differently than Jane Roe was simply that his complaints and defense lacked merit, while her complaints and defense had merit. While this reason may offer some explanatory power with respect to the ultimate outcome of both Title IX investigations, it fails to address the apparent procedural disparities claimed and substantiated by Plaintiff as part of his erroneous outcome and selective enforcement claims.[10] Accordingly, summary judgment will be denied as to Plaintiff's Title IX claims for erroneous outcome and selective prosecution.

---

made him feel unsafe because he admitted that after Roe physically assaulted him, he subsequently "chose to come back to her apartment." (Ex. 12 to Pl.'s Opp'n at 161, 175-176.)

[10] QU also argues that Plaintiff's selective enforcement claim fails because he lacks "evidence of a comparator of the opposite sex who was treated more favorably by QU when facing similar disciplinary charges" and that Jane Roe cannot be similarly situated to Plaintiff because he was "found responsible" while she was not. (Mem. Supp. Mot. Summ. J. at 7.) But a selective

b.   Deliberate Indifference Claim (Count Three)

Plaintiff claims in Count Three that QU was deliberately indifferent to harassment directed against him. (Opp'n at 20.) "Title IX is violated when a federal funding recipient's response to known harassment amounts to 'deliberate indifference to discrimination.'" *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 447 (D. Conn. 2006) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003)). "'Deliberate indifference may be found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a lengthy and unjustified delay.'" *Id.* (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). "'[T]he deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it.'" *Id.* (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999)).

Plaintiff identifies six specific instances of "QU officials with the authority to take corrective action ha[ving] actual notice that Doe was being discriminated [against] in numerous ways."

---

enforcement claim may "assert[] that, regardless of the student's guilt or innocence, the severity of the penalty and/*or the decision to initiate the proceeding* was affected by the student's gender." *Yusuf*, 35 F.3d at 715 (emphasis added). Thus, even if Defendants can prove that Plaintiff was correctly found responsible—which would by definition defeat his erroneous outcome claim—decisions to initiate proceedings based on gender bias are actionable.

Because a selective enforcement claim focuses on gender bias towards *respondents*, Plaintiff's effort to cast both Roes as similarly situated to him in his and their respective roles as *complainants* is unavailing. However, Plaintiff argues that Roe as a respondent in the second investigation is similarly situated to him as a respondent in the first investigation, such that a reasonable factfinder could determine that "the decision to initiate the proceeding was affected by the student's gender" given (1) QU investigating Roe 2's claims against Doe without requiring Roe 2 to file a formal complaint, while not investigating Doe's claims against Roe until Doe filed a formal complaint; (2) the apparent application of different IPV standards to Plaintiff and Roe in their respective capacities as respondents; and (3) the disparate treatment of Plaintiff's and Roe's respective claims of fear.

(Opp'n at 20-21.) QU responds that it did not ignore Doe's complaint but instead simply did not find in his favor.

Plaintiff seeks in part to hold QU liable for deliberate indifference for failing to check what he characterizes as QU's own gender discriminatory actions towards him, in what he claims was a fundamentally unfair disciplinary process towards him as respondent. Plaintiff explains this theory of liability most clearly in his Motion for Leave to file Supplemental Evidence in Response to Defendants' Motion for Summary Judgment: "Because Jane Roe's filing of false charges was due to her inability to accept the termination of a relationship, any denial of educational benefits and opportunities flowing from the disciplinary proceedings were also due to her sexual harassment." ([Doc # 147] at 2 n.1.) This theory of liability seeks to bootstrap Plaintiff's erroneous outcome and selective enforcement claims into his deliberate indifference claim as well, by casting every claimed act by QU against Plaintiff in his capacity as a respondent as a failure to treat Plaintiff properly as a complainant.

But Plaintiff identifies no authority for his proposition that a school can be held liable under a Title IX deliberate indifference theory for flaws in the school's own disciplinary process towards a student as a *respondent*, as opposed to a school's failure to take corrective action with respect to harassment suffered by a student as a *complainant*. Moreover, the Sixth Circuit has expressly rejected this theory of liability for a Title IX deliberate indifference claim. *See Doe v. Baum*, 903 F.3d 575, 588 (6th Cir. 2018) ("The deliberate-indifference theory was designed for plaintiffs alleging *sexual harassment*" and "to plead a Title IX deliberate-indifference claim, 'the misconduct alleged must be sexual harassment,' not just a biased disciplinary process." (emphasis in original) (citations omitted)).

Even if Plaintiff is right that "Jane Roe's filing of false charges was due to her inability to accept the termination of a relationship," QU had an affirmative obligation to investigate Roe's allegations against him, and any errors or unfairness in the process with him as a respondent are thus properly considered instead as evidence of his erroneous outcome and selective enforcement claims. Here, the Court is focused on whether the record contains sufficient evidence to preclude a grant of summary judgment on Plaintiff's claim that QU was deliberately indifferent to gender-based or sexual harassment of Doe *by other students*—namely both Roes, and their friends.

The majority of the harassment that Plaintiff claims he was subjected to by Roe occurred over the course of their relationship, long before he put QU on notice of any claims of harassment by Roe on August 23, 2016.[11] And the vast majority of harassment by Roe that Plaintiff claims he was subjected to *after* August 23, 2016 consists of Roe's substantive participation in the Title IX investigation of Plaintiff, which cannot support a deliberate indifference claim for the reasons described above. Plaintiff summarizes the remaining claimed harassment by both Roes and their friends that QU allegedly failed to stop once QU was on notice of Plaintiff's claims:

> Roe's ongoing sexual harassment (including stalking) during both INV1 and INV2 continued the same pattern of her sexual harassment that existed during their relationship and after Doe had made clear he was ending the relationship, which pattern included conduct after Doe filed the formal complaint. Ex. 130, ¶¶ 20, 40, 42; SOF ¶¶ 93, 94; Ex. 54; Response pp. 21, 24. As explained at oral argument, the

---

[11] For the purposes of this claim, the "clock" for relevant claimed harassment starts on August 23, 2016, when Plaintiff first put QU on notice of his allegations that Roe and Roe 2 had harassed and stalked him. Accordingly, the Court cannot consider whether "Jane Roe's and Jane Roe 2's sexual harassment throughout the spring of 2015 and continuing through June 2016 was sufficiently serious as to" deny him educational opportunities or benefits, the subject of a supplemental declaration that Plaintiff seeks leave to file. (See Mot. for Leave to File Supp. Evidence in Resp. to Defs.' Mot. for Summ. J.) Plaintiff's Motion for leave to file this declaration is therefore denied.

record contains evidence that Roe's continuing sexual harassment during INV1 and INV2 denied Doe educational opportunities, Response at 24; Ex. 130, ¶¶31, 40, and QU's deliberate inference to his complaints of that sexual harassment. Response at 23, 24; Ex. 130, ¶¶43, 73, 77.

(Mot. for Leave to File Supp. Evidence in Resp. to Defs.' Mot. for Summ. J. at 2.)

In addition to generalized and vague statements such as "Roe and her friends were harassing me and saying things in public about the investigation and that I was being charged" and "[w]hile I was working on my Response, Roe's friends continued to harass me[,]" (Ex. 130 (Pl.'s Aff.) ¶¶ 20, 31), the record reflects the following claimed specific instances of "Roe's continuing sexual harassment" during the two investigations:

- On September 2, 2016, Plaintiff emailed Contrucci and Heins, stating "I have some concerns about what is going on. I thought this was a closed investigation, but a random person approached me last night and said he knew about it. Someone is not keeping this confidential." (Ex. 25.)

- On September 28, 2016, Plaintiff told investigators that that "there is a student . . . who has been going around at parties and talking to [Plaintiff's] friends asking 'how long have you known [Plaintiff]? Do you know [Roe]? Do you know what [Plaintiff] did?'" (Ex. 86 at 70.)

- On February 17, 2017, Plaintiff notified Kalagher and Johnson that he had been harassed by different friends of Roe on two separate incidents. (Parties' L.R. Stmts. ¶ 87.) First, on December 3, 2016, "a little after midnight in a restaurant/bar, after [Roe] walked past [Plaintiff] and left, [Plaintiff] was approached by one of [Roe's] friends"—who was herself friends with the person involved in the September 28 incident—who "swore at him and told him he knew what she was talking about."

(Ex. 90 at 3.) Second, on February 16, 2017, Plaintiff had been out at Brother Jimmy's in New Haven on a night when Roe and her friends also came into the restaurant. "Towards the end of the night when [Plaintiff] was waiting for an Uber, a friend of [Roe's] . . . approached [Plaintiff] and told [Plaintiff] that he had heard from [Roe] about their break up in the last few weeks and wanted to ask [Plaintiff] questions about [Plaintiff's] side of the story and was persistent." (*Id.*)

- On April 2, 2017, John Doe reported to Ms. Keith that when he was at lunch at Eli's and came out of the bathroom, he heard a woman say, "that's [Jane Roe's] ex-boyfriend." (Ex. 54 to Opp'n at 2.) Plaintiff reported that he went to his table and when he looked back, Roe had joined the group of women at the table. Plaintiff reported that he "felt very uncomfortable and thought it odd that [Roe] was showing up after he was at the restaurant." (*Id.*)

- On April 7, 2017, John Doe reported to Ms. Johnson and Ms. Keith that he believed Jane Roe violated the no contact order when she allegedly walked by him at a restaurant and said "I fucking hate you." (Parties' L.R. Stmts. ¶ 93.)

While Plaintiff's brief characterizes the harassment he says he faced as sexual or gender-based in nature, this characterization is conclusory. At oral argument, Plaintiff's counsel clarified that his theory was that Jane Roe's harassment of him was sexual in nature because it resulted from her refusal to accept his termination of their relationship. But even drawing all reasonable inferences in favor of Plaintiff, the overwhelming majority of these incidents involve conduct engaged in by Roe's friends, not Roe herself, and even if Roe was the source of disparaging information about Plaintiff, Plaintiff provides no authority for the proposition that a Title IX complainant engages in sexual harassment where she informs her friends of the nature and details

of her complaint against a former partner. Nor does Plaintiff point to any direct or circumstantial evidence suggesting that Roe orchestrated a campaign of harassment by proxy, instead simply speculating that it must have been so.

Plaintiff faults QU for failing to investigate his claims that Roe was harassing and stalking him after August 2016, but the record reflects that at various points in time QU did in fact investigate these claims, even if the investigation was not as robust as Plaintiff believes would have been appropriate. Deliberate indifference can only be found "when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a lengthy and unjustified delay." *Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d at 447 (internal quotation marks and citation omitted). Here, the record reflects that QU knew that Plaintiff had alleged harassment and investigated those claims without finding substantiation.

While Plaintiff points to many things the investigators should or could have done but failed to do, a reasonable factfinder could not determine that QU's response was "clearly unreasonable in light of the known circumstances[.]" Accordingly, the Court grants summary judgment to Defendants on this claim.

**D. State Law Claims**

In addition to Plaintiff's federal causes of action, he also brings nine claims under Connecticut common law.

   a.   Breach of Contract (Count Four)

Plaintiff's breach of contract claim forms the heart of his allegations under state law. Defendants argue that "these claims amount to nothing more than an educational malpractice challenge of the university's decision to find the plaintiff responsible under its Title IX policy after

conducting a Title IX investigation, Title IX Grievance Committee Hearing, and appeal process." (Mem. Supp. Mot. Summ. J. at 12.) Defendants claim that because this is—as they characterize it— an educational malpractice claim, it is barred by *Gupta v. New Britain General Hospital*, 239 Conn. 574 (1996).

*Gupta* does indeed make clear that educational malpractice claims are not cognizable under Connecticut common law but did so in the context of a *tort*-based liability theory. *Gupta* also recognized that "contract claims challenging the overall quality of educational programs have generally been rejected" as well. *Id.* at 592-93. But here, Plaintiff's breach of contract claims neither sound in tort, nor challenge any aspect of the quality of QU's educational program. Moreover, *Gupta* expressly held that courts may entertain a cause of action for breach of contract against a school where "the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program."[12] *Id. See also Johnson v. Schmitz*, 119 F. Supp. 2d 90, 96–97 (D. Conn. 2000) (denying motion to dismiss breach of contract claim by student that "Yale failed to deliver on its express and implied contractual duties to . . . address charges of academic misconduct in accordance with its own procedures.").

---

[12] Indeed, while one Connecticut Superior Court decision characterized a claim against a school for unfair disciplinary processes as an educational malpractice claim, nonetheless, several of that plaintiff's claims survived under *Gupta*'s exception permitting claims based on *specific* contractual promises. *See Jacobs v. Ethel Walker Sch. Inc.*, No. CV020515279S, 2003 WL 22390051, at *5-6 (Conn. Super. Ct. Sept. 30, 2003) (summary judgment on a breach of contract claim was denied on the basis that "[a]lthough this court concludes that the complaint in this matter raises an issue of educational malpractice, . . . the plaintiffs have alleged that the defendants have violated specific contractual obligations to conduct the disciplinary process in accordance with the procedures set forth in the Walker Handbook.").

Defendants also argue that because "[a] party who has materially breached a contract cannot prevail on a claim of breach by the other party" Plaintiff is barred from bringing a breach of contract claim, because, having been found responsible for violating QU's Title IX policy, he himself materially breached "any alleged contract he claims existed between him and QU." (Mem. Supp. Mot. Summ. J. at 20.) Defendants offer no authority for the proposition that the adverse outcome of the process whose fairness Plaintiff challenges precludes him from claiming breach of the process set forth in QU's own specific policies.

"[T]he basic legal relation between a student and a private university or college is contractual in nature" and "there seems to be no dissent from [the] proposition that the catalogues, bulletins, circulars, and regulations of the institution determine the contractual relationship between the student and the educational institution." *Burns v. Quinnipiac Univ.*, 120 Conn. App. 311, 320–21 (2010) (quoting *Johnson*, 119 F. Supp. 2d at 93) (alterations in original) (internal quotation marks omitted).

Plaintiff opposes summary judgment on the breach of contract claim because "[i]nterpretation of the written terms of a contract and the degree of compliance by the parties are questions of fact to be determined by the trier of fact." *Burns*, 120 Conn. App. at 320 (citation omitted). Plaintiff identifies 29 alleged breaches of contract (*see* Opp'n at 32-46). The Court focuses on those claimed breaches going to QU's alleged denial of the process reasonably relied on by Plaintiff, based on QU's own policies and procedures, that demonstrate why summary judgment cannot be granted.

- **(1):** QU promised that it "complies with Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex in educational programs or activities that receive federal financial assistance."

    o  Plaintiff seeks to hold QU liable for breaching its promise in its Title IX policy and by incorporation, Student Handbook, to comply with Title IX. Defendants provide no authority for the proposition that a plaintiff cannot bring a Connecticut breach of contract claim under these circumstances, and courts applying Connecticut law permit students to bring breach of contract claims based on a school's violations of its own specific policies and procedures, as discussed *supra*. In fact, binding authority makes clear that plaintiffs are barred from bringing state breach of contract claims to enforce federal laws which they are *not* entitled to privately enforce, with no parallel prohibition on contract claims for violations of privately enforceable federal statutes, which Plaintiff pursues here. *See Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003) ("Since in this case . . . no private right of action exists under the relevant statute, the plaintiffs['] efforts to bring their claims as state common-law claims are clearly an impermissible 'end run' around the [Davis-Bacon Act]."); *Bushell v. UnitedHealth Grp. Inc.*, No. 17-CV-2021 (JPO), 2018 WL 1578167, at *3 (S.D.N.Y. Mar. 27, 2018) (noting that the Supreme Court has "unanimously rejected the attempt to use state contract law to assert a claim for which there was no federal private right of action." (citing *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011).)).

- (12): QU promised that its investigators and the Board would employ the definitions in the Title IX Policy.

- o Plaintiff argues that "[t]he definition of IPV [intimate partner violence] the Board used in finding Doe responsible was not derived from QU's T9 Policy, imposing a lesser burden on QU than was required by the T9 Policy."

- **(13):** QU promised to respond to complaints promptly, thoroughly and equitably and to conduct an unbiased investigation.

  - o Plaintiff asserts that in the first investigation, investigators "failed to evaluate anyone for credibility; did not include a rationale in its report; did not question Roe about the alternative motive for filing a complaint; did not follow-up on ambiguous evidence with the parties or witnesses or to establish reliability; did not include all relevant information in the report; and did not interview relevant witnesses for Doe" and that in the second investigation, "no new evidence was sought, obtained or considered by the investigators; rather, they simply reviewed VC's report from INV1 and reached pro forma conclusions that correlated with it."

- **(2):** "QU promised that it would provide proper notice to respondents."

  - o Plaintiff complains that he was summoned to meet with investigators who did not tell him what specifically he was accused of in violation of "[t]he right to be informed, in writing, of the specific alleged violation(s) of the Student Code of Conduct in which the student is suspected of involvement."

- **(4):** QU promised that responsible employees will promptly report any incidents of sex discrimination or sexual misconduct that they witness or become aware of.

  - o Plaintiff asserts that the "QU T9 policy required the investigators to report Doe's allegations of sexual harassment and stalking by Roe and Roe2 to the

T9 coordinator or deputy coordinator" and that Plaintiff alerted
investigators in the first investigation to this conduct by the two women but
"the investigators failed to report" it and "took no steps to prevent its
recurrence."

- o  (5): Relatedly, Plaintiff asserts that QU breached its promise to "investigate
     all incidents about which the university knows or has reason to know to
     protect the health and safety of the university community and the university
     will investigate issues raised anonymously or by third parties."

- **(6):** QU promised that complainants and respondents had "the right to have the
  Title IX grievance process fully explained, and to receive written notice of all
  Student Conduct Code charges at least 48 hours before a committee hearing."

  - o  Plaintiff's affidavit maintains that the investigators explained "nothing" to
       him "about the conduct procedures" when he made his reports to them
       "about ongoing stalking and harassment" in both investigations. (Ex. 130, ¶
       19.) Defendants direct the Court to no record evidence undercutting or
       rebutting Plaintiff's statement in his affidavit.

- **(8):** QU promised Doe would have the right to "review all documents and reports
  produced by the investigation . . . at least 24 hours prior to the hearing," and "to
  challenge information and documents prior to the hearing."

  - o  Doe claims this promise was violated when, on the day of the hearing,
       committee member Contrucci "submitted an 11-page document that Doe
       had never seen before and which contained new information about the
       investigation" and on January 27, 2017, he received the committee's Title IX

Investigation Report which contained "additional information from communications with Roe and Roe2 that he had never seen and to which he had never been given a chance to respond."

- o (9): Relatedly, Doe asserts that QU breached its contract when it failed to allow Doe to challenge information and documents prior to the hearing.

- o QU's briefing does not dispute that it failed comply with the 24-hour notice period or the requirement to allow Doe to challenge information and documents prior to the hearing.

- (11): QU promised that the Board would decide the matter by a preponderance of the evidence based on credible, relevant and convincing evidence. Doe claims that this promise was breached because:

  - o "Given the bias that infected the entire investigation and the Board's reliance on the report spawned from that bias, QU relied on neither credible nor convincing evidence."

  - o "The QU investigators did not take into account information made available to them that undermined the credibility of Roe and Roe2, notwithstanding Doe's attempts to put it before them."

  - o "Since the Board simply relied upon VC's report in making its conclusions, there could not have been any credible and convincing evidence for it to consider."

  - o "Their use of the incorrect definition of IPV, which contained fewer elements, coupled with the fact that they relied on evidence beyond the time

frame of the relationship to conclude Doe was responsible, further detracts from any analysis about preponderance." *See supra*, pp. 24-25.

- o "Moreover, given that SK shredded any and all notes created by Board members, there is no way to know what evidence they used and/or relied upon or what standard, if any, they used to reach their conclusions."

- (15): QU promised to maintain communication with the parties on the status of the investigation and overall process, and if the procedures lasted longer than 60 days, "to communicate the reasons and expected timeline to all parties." QU took four months to investigate Doe's claims once he made a formal complaint and did not initially communicate with him "about the more than two-month delay in investigating his formal complaint."

- (17): QU promised to guide complainants "with regard to how much detail is needed in an initial report."

  - o Doe contends that this promise was breached because he "received no guidance from anyone when he reported the harassment and stalking by Roe and Roe2, and no one spoke with him, about him or guided him when he was forced to file a 'formal' complaint."

- (22): QU promised it would "meet with the complainant to inquire about and finalize the complaint" after reviewing the complaint. Plaintiff asserts breach on the basis of QU providing him no guidance on how to report harassment and stalking by Roe and Roe 2. *See* (17), *supra*.

- (23): QU promised to select a second trained investigator to assist with the formal investigation.

- Plaintiff claims breach because when one investigator "was no longer involved in Doe's investigation, QU did not appoint a replacement, in violation of this provision." The provision of QU's Title IX policy at issue states that "[d]uring" a formal investigation, "the deputy coordinator, or a trained lead investigator identified by the deputy coordinator, will: identify and select a second trained investigator to assist with the formal investigation." (Ex. 14 at 21.)

- <u>(27)</u>: QU failed to afford Doe his right to an investigation and appropriate resolution of all credible complaints of sexual misconduct, gender-based discrimination and/or harassment.

  - Plaintiff contends that this promise was breached by virtue of QU having breached its other process-related promises to him.

- <u>(28)</u>: QU promised that an accused student had "the right to identify witnesses and other parties, and to request the deputy coordinator contact those individuals as part of the investigation."

  - Plaintiff claims breach when the investigators interviewed all of the witnesses identified by Roe and Roe 2, while failing to interview Doe's parents as he requested.

- <u>(29)</u>: QU failed to treat Doe in the same manner and provide the same benefits as it did the female complainants because he was male.

  - Plaintiff contends that QU's violation of his rights to equal treatment under Title IX constitutes breach of contract.

As discussed *supra*, Defendants' argument that Plaintiff's breach of contract claims "amount to nothing more than an educational malpractice" claim, barred under *Gupta*, is unavailing. Defendants also argue that the QU Student Handbook, which incorporates the University's Title IX policy, expressly states that it is provided on a purely informational basis to students, "does not constitute a contract, either express or implied, and is subject to change at the University's discretion." (Mem. Supp. Mot. Summ. J. at 20-21.) But while one Superior Court decision in 2004 found such disclaimer language in a student handbook significant, *see Kent Literary Club of Wesleyan Univ. v. Whaley*, No. CV040104195S, 2004 WL 2361686, at *4 (Conn. Super. Ct. Sept. 16, 2004) ("The foregoing language creates a legal impediment to the plaintiffs' ability to prevail on their claim of breach of contract[.]"), a more recent Superior Court decision held that such language alone in QU's handbook did not preclude a student's breach of contract claim against QU:

> This court disagrees with the defendants as to the validity of the plaintiff's breach of contract claim against QU. The existence of an implied contract is a question of fact. *Christensen v. Bic Corp.*, 18 Conn. App. 451, 457–58, 558 A.2d 273 (1989). Employee Handbooks can form an implied contract. *Id.* Here, it cannot be gainsaid that there was some sort of contractual agreement between QU and the plaintiff for QU to provide an education to the plaintiff and for the plaintiff to pay some amount of tuition to QU for that education. *See Bass v. Miss Porter's School*, *supra*, 738 F. Supp. 2d at 320. Therefore, the contours of that contract were informed to some degree by the Student Handbook and the Student Code of Conduct. Indeed, QU's reliance upon the Student Handbook and the Student Code of Conduct as justification for its suspension of the plaintiff is ample evidence of that. Accordingly, QU cannot now deny the plaintiff's claims based upon the same sections of the Student Handbook. This court concludes a trier of fact could find that there was an implied contract between the plaintiff and QU and that the Student Handbook and the Student Code of Conduct were a part of that contract.

*Demoulas v. Quinnipiac Univ.*, No. CV155006283S, 2015 WL 1427951, at *4 (Conn. Super. Ct. Mar. 5, 2015). Here, whether QU's policies created an enforceable contract with Plaintiff must be

determined by a factfinder. While Defendants offer, in response to Plaintiff's 29 claimed breaches of contract, a host of factual arguments explaining why Defendants did not breach any of these promises, (*see* Mem. Supp. Mot. Summ. J. at 18-36), the Court concludes for substantially the reasons articulated in the Court's denial of summary judgment on Plaintiff's Title IX claims for erroneous outcome and selective enforcement, that summary judgment must be denied as to Plaintiff's breach of contract claims for violations of QU's Title IX policy and specific promises of procedural fairness and regularity.

> b.   Breach of the Covenant of Good Faith and Fair Dealing (Count Five)

> [I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship . . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement . . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term . . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.

*Renaissance Management Co. v. Connecticut Housing Finance Authority*, 281 Conn. 227, 240 (2007). Because the Court has already concluded that Plaintiff has established that there are genuine disputes of material fact precluding summary judgment on the questions of (1) whether Plaintiff and Defendants were parties to a contract and (2) whether Defendants injured Plaintiff's rights under that contract, the remaining issue in Count Five is just whether a reasonable factfinder could determine that Defendants' refusal to honor the contract was done in bad faith. Defendants argue that at worst, they were negligent with respect to honoring Plaintiff's contractual rights. (Reply at 6.) But Defendants' arguments that they did not act in bad faith are entirely conclusory,

merely asserting that "the plaintiff has not alleged facts nor can the plaintiff prove that the decision resulted from arbitrary, capricious or bad faith conduct by QU." In the absence of a non-conclusory explanation by Defendants as to *why* a reasonable factfinder could not determine that the alleged contractual breaches resulted from bad faith conduct by QU, summary judgment is denied as to this claim.[13]

        c.   Tortious Interference with Contract (Counts Six, Seven, and Eight)

Plaintiff also asserts that the Individual Defendants (Terri Johnson, Seann Kalagher, and Vincent Contrucci) tortiously interfered with his contract with QU for the opportunity to graduate from QU with a degree, for fair investigation of any claims made against him, and for fair handling of any claims made by him. Plaintiff argues that the Individual Defendants "interfered with Doe's contract by conducting a biased and cursory investigation of Roe and Roe2's allegations; by not taking his statements seriously; and by placing the burden of disproving it on him."

Central to the viability of these counts is Defendants' assertion that because "the defendants were employees and agents of QU in their employment positions and because all of the conduct alleged by the plaintiff occurred within the employment relationship, then they are deemed agents of the employer and the tort thus does not apply." (Mem. Supp. Mot. Summ. J. at 39.)

"[I]t is well-settled that the tort of interference with contractual relations only lies when a third party adversely affects the contractual relations of two *other* parties." *Metcoff v. Lebovics*, 123 Conn. App. 512, 520–21 (2010) (internal quotation marks and citations omitted). "[T]here can be

---

[13] Defendants also argue that *Gupta* precludes this claim. Because Plaintiff's claim for breach of the covenant of good faith and fair dealing is tied to specific contractual promises that Plaintiff claims Defendants breached, *Gupta* does not bar this claim for the reasons described *supra*.

no intentional interference with contractual relations by someone who is directly or indirectly a party to the contract" and "the general rule is that the agent may not be charged with having interfered with a contract of the agent's principal." *Id.* "[A]n agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract . . . ." *Id.* "In other words, an exception to the general rule applies if the agent did not act legitimately within his scope of duty but used the corporate power improperly for personal gain." *Id.*

Plaintiff directs the Court to no record evidence from which Plaintiff could prove that the individual Defendants, using their official positions, tortiously interfered with Plaintiff's contract with QU for the purpose of their own personal gain, and the Court's review of the record finds no such evidence. Accordingly, summary judgment is granted on these three counts.

d. Negligent Infliction of Emotional Distress (Count Nine) and Negligence (Count Eleven)

Defendants rely on *Gupta* barring Plaintiff's tort-based claims against QU. *Gupta* concerned tort and contract claims based on educational quality and academic-based dismissal from a residency program, rather than school disciplinary procedures, but in its core holding barred negligence-based claims of "educational malpractice." *See Gupta*, 239 Conn. at 590–91 (claims that "raise[] questions concerning the reasonableness of conduct by educational institutions in providing particular educational services to students[,]" which "must be answered by reference to principles of duty, standards of care, and reasonable conduct associated with the law of torts" are "not cognizable." (internal quotation marks and citations omitted)).

While *Gupta* thus precludes negligence-based educational malpractice claims, it contemplated less difficulty in permitting a specific subset of contract[14] and tort[15] claims against educational institutions in contrast to tort claims relating to the provision of educational services and based on ordinary negligence.

As explained *supra*, Plaintiff's contract claims are permissible under *Gupta* because he seeks to enforce specific contractual promises. But in the tort context, *Gupta*'s holding that "an educational institution does not have license to act arbitrarily, capriciously, or in bad faith" makes clear that claims based on ordinary negligence and relating to the provision of educational services may not be brought.

*Gupta* itself could be read as distinguishable from this case insofar as it concerned educational quality and academic-based dismissal from a program, rather than school discipline procedures, but courts applying Connecticut law since *Gupta* have applied it to bar negligence-based suits against schools over discretionary decisions of student discipline. *See Bass ex rel. Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 327 (D. Conn. 2010) (*Gupta* "necessarily exclude[s] negligence theories of liability" that fall short of arbitrary, capricious, or bad faith actions in cases against educational institutions.") "*Gupta* does not foreclose only claimed breaches of duties to

---

[14] *See Gupta*, 239 Conn. at 592–93 (noting that there are "at least two situations wherein courts will entertain a cause of action for institutional breach of a contract for educational services": one based on "a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field[,]" and one where "the educational institution failed to fulfil a specific contractual promise distinct from any overall obligation to offer a reasonable program.").

[15] *See id.* at 595 ("The plaintiff properly observes that, in exercising its professional judgment, an educational institution does not have license to act *arbitrarily, capriciously, or in bad faith.*" (emphasis added)).

educate" but "holds, more broadly, that a school's 'academic decision deserves deference from the courts.'" *Id.* (quoting *Craine v. Trinity College*, 259 Conn. 625, 663–64 (2002)). As this Court concluded in *Bass*:

> Under *Gupta*, "[t]he plaintiff bears a heavy burden in proving that [her] dismissal resulted from arbitrary, capricious, or bad faith conduct on the part of the [school]. To prevail, [s]he must show that the [school's] decision had no 'discernable rational basis.' " *Gupta*, 239 Conn. at 596, 687 A.2d 111. Because the Handbook provides that dismissal is warranted upon violation of any Major Rule, and because Plaintiff violated a Major Rule when she consumed alcohol, Porter's's determination to dismiss Plaintiff does not lack a "discernable rational basis."

738 F. Supp. 2d at 327. In effect, in *Bass*, this Court concluded that a negligence action challenging the outcome of a school disciplinary proceeding is governed by *Gupta*'s general prohibition on negligence-based claims related to academic decisions. Nor is *Bass* the only decision to reach this conclusion. *See Jacobs v. Ethel Walker Sch. Inc.*, No. CV020515279S, 2003 WL 22390051, at *5-6 (Conn. Super. Ct. Sept. 30, 2003) (characterizing claim against a school for unfair disciplinary processes as an educational malpractice claim and applying *Gupta* to deny summary judgment only with respect to plaintiff's claims based on specific contractual promises). While the Court finds no binding authority establishing definitively whether negligence claims such as those presented in this care are barred under *Gupta*, it concludes that *Gupta* bars claims challenging a school's disciplinary processes and outcomes, based on mere negligence, as opposed to arbitrary, capricious, or bad faith conduct.[16] Accordingly, the Court grants summary judgment on Counts Nine (NIED) and Eleven (Negligence).

---

[16] While courts applying Connecticut law have permitted certain claims against educational institutions to proceed post-*Gupta* based on ordinary negligence, those cases of which the Court is aware did not relate to discretionary decisions of student discipline but rather involved breaches of the schools' duties to protect students from physical harm. *See McClure v. Fairfield Univ.*, No.

e.   Intentional Infliction of Emotional Distress (Count Ten)

Plaintiff also asserts an IIED claim against all Defendants. In order to establish a claim for

intentional infliction of emotional distress, the plaintiff must demonstrate: (1) the actor intended

to inflict emotional distress, or that he knew or should have known that the emotional distress was

a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the

defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by

the plaintiff was severe. *See Kelly v. Yale University*, No. 3:01-cv-1591, 2003 WL 1563424 (D. Conn.

March 26, 2003); *see also Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. September

29, 2000). "Liability for intentional infliction of emotional distress requires conduct that is so

extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as

atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated

to cause, and does cause, mental distress of a very serious kind." *Id.* at 194.

While Defendants argue that this tort claim is foreclosed under *Gupta*, *Gupta* expressly

permits claims based on arbitrary, capricious, or bad faith actions, which would include conduct

motivated by intent to cause emotional distress, as opposed to mere negligence.

---

CV000159028, 2003 WL 21524786, at *8 (Conn. Super. Ct. June 19, 2003) (denying summary
judgment in claim for injuries suffered in a pedestrian-automobile accident, where plaintiff alleged
"that university was negligent in that it failed to enforce rules regarding alcohol consumption and
to provide adequate transportation to students between the campus and Fairfield Beach" and
holding that university assumed "a duty to protect students who traveled to and from parties at the
beach area" because it offered a shuttle service for student transportation between these locations);
*Doe v. Yale Univ.*, 252 Conn. 641, 660 (2000) (because "the duty alleged to have been breached in
the present case is . . . the duty not to cause physical harm by negligent conduct[,]" rather than
"some general duty to educate [a plaintiff] effectively, as was the claim alleged in *Gupta*[,]"
"plaintiff did not assert an educational malpractice claim, but instead stated a viable negligence
claim.").

However, even drawing all reasonable inferences in favor of the non-moving party, the record here would not permit a reasonable factfinder to determine that the claimed conduct was so extreme and outrageous as to satisfy the second element of this claim. While there are genuine disputes of material fact with respect to the questions of (1) whether Defendants treated Plaintiff unfairly against the both the baseline of the school procedures and as compared with the treatment of Jane Roe, (2) whether any bias was attributable to gender discrimination, and (3) whether any breaches of contractual promises were done in bad faith, even if Plaintiff proves that he was treated unfairly and that his contractual and Title IX rights were violated, that does not afford a reasonable factfinder any basis for determining that Defendants' actions meet the high bar of being "beyond all possible bounds of decency, . . . atrocious, . . . utterly intolerable in a civilized society," or "of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind." *See Suraci by & Through Suraci v. Hamden Bd. of Educ.*, No. 3:17-CV-152 (JBA), 2019 WL 161501, at *2 (D. Conn. Jan. 10, 2019) (noting that school official "had a factual and reasonable basis for her actions" even though they exposed plaintiff to trauma, and that "[t]his conduct falls well short of what reasonable minds could differ on as to whether it was extreme and outrageous."). Accordingly, summary judgment is granted with respect to this claim.

      f.   Reckless and Wanton Misconduct (Count Twelve)

Finally, Plaintiff argues that Defendants acted recklessly and wantonly towards Plaintiff, and that no language in *Gupta* precludes this cause of action. As discussed above, the Court has concluded that *Gupta* precludes negligence-based causes of action brought challenging a school's investigation and imposition of discipline, but nothing in *Gupta* bars tort actions based upon claims that involve more than mere negligence. *See Gupta*, 239 Conn. at 595 ("The plaintiff properly observes that, in exercising its professional judgment, an educational institution does not

have license to act arbitrarily, capriciously, or in bad faith."). Moreover, as Plaintiff correctly notes, the Connecticut Supreme Court affirmed a jury verdict awarding punitive damages based on reckless and wanton conduct exhibited in the course of an allegedly biased investigation in the context of a hospital's decision to terminate a physician's privileges. *See Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 296 Conn. 315, 348, 994 A.2d 153, 172 (2010) ("The plaintiff had the right to expect that any summary suspension of his privileges would adhere to the requirement of . . . the defendant's bylaws" and in part because "the defendant never made the required determination[,]" "the evidence presented by the plaintiff is sufficient to support an inference that the defendant's investigation was contaminated by bias" which "is more than sufficient to support a finding that the defendant acted in reckless indifference of the plaintiff's rights."). Defendants contend that *Harris* is inapposite because it involved a claimed biased disciplinary proceeding in the employment rather than educational context, but proffer no authority or reasoning explaining why this factual distinction should matter here. Defendants further fault Plaintiff for failing to provide "a single court decision where a cause of action sounding in reckless and wanton misconduct survived summary judgment in a student disciplinary case involving Title IX" but themselves offer no authority suggesting that such a claim cannot be brought. Finally, Defendants nonsensically assert the following:

> In the present case, the plaintiff has not alleged nor can he prove that the defendants conduct was deliberate, wanton or reckless. To the contrary, the plaintiff testified that the defendants were reckless in their conduct by how they went about their investigation. (Exhibit D, Pl's Depo Tran., p. 240: 20-25; p. 241: 1-2).

(Mem. Supp. Mot. Summ. J. at 49.) While the Court agrees that only a plaintiff's testimony how defendants acted might not suffice to establish defendants' recklessness, it does not preclude the jury from making that assessment. Summary judgment is denied as to this claim.

### III.    Conclusion

For the reasons set forth above, the Court grants Defendant's Motion for Summary Judgment in part and denies the Motion in part. The Motion is granted with respect to Count Three (Deliberate Indifference under Title IX), Counts Six, Seven, and Eight (all for Tortious Interference), Count Nine (NIED), Count Ten (IIED), and Count Eleven (Negligence). The Motion is denied with respect to Counts One and Two (Erroneous Outcome and Selective Enforcement Title IX Claims), Count Four (Breach of Contract), Count Five (Breach of the Covenant of Good Faith and Fair Dealing), and Count Twelve (Reckless and Wanton Misconduct).

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of July 2019.